

**FILED**

JUL - 7 2005

Phil Lombardi, Clerk
U.S. DISTRICT COURT

**IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

GEORGE S. COHLMIA, JR. , M.D., and )
CARDIOVASCULAR SURGICAL SPECIALISTS )
CORP., an Oklahoma corporation, )
　 )
　　　　Plaintiffs, )
　 )
vs. )
　 )
ARDENT HEALTH SERVICES, LLC, )
a Delaware limited liability company; AHS )
OKLAHOMA HEALTH SYSTEM, LLP, an )
Oklahoma limited liability partnership; )
AHS HILLCREST MEDICAL CENTER, LLC, )
a Delaware limited liability company; )
HILLCREST HEALTHCARE SYSTEM. an )
Oklahoma Corporation d/b/a Hillcrest )
Healthcare System; HILLCREST MEDICAL )
CENTER, an Oklahoma corporation; )
OKLAHOMA HEART INSTITUTE, INC., d/b/a )
Oklahoma Heart Institute, an Oklahoma )
corporation; OKLAHOMA HEART, INC., an )
Oklahoma corporation; ST. JOHN MEDICAL )
CENTER, an Oklahoma corporation; CVT )
SURGERY, INC., an Oklahoma corporation; )
FRED GARFINKEL, M.D.; STEVEN )
LANDGARTEN, M.D.; STEVE DOBBS; )
RONALD C. ELKINS, M.D.; MARC S. )
MILSTEN, M.D.; THOMAS D. )
ROBERTS, M.D.; JAMES A. JOHNSON, M.D.; )
WAYNE N. LEIMBACH, JR., M.D.; ELLEN )
H. CHEN, M.D.; PAUL W. KEMPE, M.D.; )
WILLIAM C. BURNETT, M.D.; AND )
HOWARD W. ALLRED, M.D., )
　 )
　　　　Defendants. )

**05CV0384 JHP-PJC**

Case No.

SEALED ᴿᴿ
unsealed 8/9/06

**COMPLAINT**



Plaintiffs, George S. Cohlmia, Jr. and Cardiovascular Surgical Specialists, (referred to collectively as "Dr. Cohlmia") for their claims against Defendants allege and state as follows:

## I.

## PARTIES

1.      Plaintiff, George S. Cohlmia, Jr., M.D. is a resident of the City of Tulsa, County of Tulsa, State of Oklahoma and is a licensed physician in the State of Oklahoma specializing in cardiovascular, thoracic, vascular, and endovascular surgery.      Dr. Cohlmia provides cardiovascular and endovascular surgical care to patients in the City of Tulsa, State of Oklahoma and the United States of America and engages in both intrastate and interstate commerce.

2.      Plaintiff, Cardiovascular Surgical Specialists, is an Oklahoma Corporation which provides cardiovascular, thoracic, vascular, and endovascular surgical care to patients in the City of Tulsa, the State of Oklahoma, and the United States of America and engages in both intrastate and interstate commerce. Plaintiff, Dr. George S. Cohlmia, Jr. is the sole owner and shareholder of Cardiovascular Surgical Specialists, Inc (Plaintiffs will be referred to jointly as "Dr. Cohlmia").

3.      Defendant, Ardent Health Services, LLC is a Delaware corporation with its principal offices in Tennessee purposely availing itself of this Oklahoma forum by acquiring and operating healthcare facilities in the State of Oklahoma, along with those facilities' incumbent assets, liabilities and claims in the State of Oklahoma.

4.      Defendant AHS Oklahoma Health System, LLP is a Delaware corporation domesticated and doing business in the State of Oklahoma.

2

5.     Defendant AHS Hillcrest Medical Center, LLC, is a Delaware corporation domesticated in the State of Oklahoma with principal offices in the State of Oklahoma and doing business as Hillcrest Medical Center.

6.     Defendant Hillcrest Healthcare System is an Oklahoma corporation with principal offices in Tulsa, County, Oklahoma.

7.     Defendant, Hillcrest Medical Center is an Oklahoma corporation with principal offices in Tulsa County, Oklahoma.

8.     Defendants Ardent, AHS Oklahoma, AHS Hillcrest, Hillcrest Healthcare System, and Hillcrest Medical Center (collectively referred to herein as "Hillcrest Medical Center" or "HMC") were, at all times relevant to this action, engaged in the business of providing healthcare, negotiating healthcare agreements, managing physician privileges, and similar activities, in and around the Tulsa, Oklahoma based Hillcrest Medical Center.

9.     Defendant Oklahoma Heart Institute, Inc. is an Oklahoma corporation with its principal offices in Tulsa County, Oklahoma.

10.     Defendant Oklahoma Heart, Inc. is an Oklahoma corporation with its principal offices in Tulsa County, Oklahoma.

11.     Defendants Oklahoma Heart Institute, Inc. and Oklahoma Heart, Inc. (collectively referred to herein as "OHI") employed cardiologists primarily doing business and practicing medicine in the City of Tulsa. OHI represents the most significant source of cardiologist referrals to cardiovascular surgeons in the City of Tulsa as well as the most significant source of cardiological medical support for pre and post operative care of cardiovascular surgery patients.

12.     Defendant, St. John Medical Center, Inc. ("SJMC") is an Oklahoma Corporation with its principal place of business in Tulsa, Oklahoma.

3

13.     Defendant, CVT Surgery, Inc. ("CVT") is an Oklahoma corporation with its principal place of business in Tulsa County, Oklahoma.

14.     Defendant, Steven Landgarten, M.D. is a doctor of internal medicine and is an employee of Hillcrest Medical Center. At all times relevant to this action, Dr. Landgarten was the Medical Director of HMC and served on the HMC Medical Executive Committee and Credentials Committee. At all times relevant to this action, Dr. Landgarten acted on behalf of himself and HMC.

15.     Defendant, Steve Dobbs, is and at all times relevant to this action was Chief Executive Officer of Hillcrest Medical Center and acted on behalf of HMC.

16.     Defendant, Fred Garfinkel, M.D. is a doctor of internal medicine and served as a member of the HMC Medical Executive Committee and Credentials Committee of HMC and also as the Chairman of the Board of Trustees of HMC. At all times relevant to this action, Dr. Garfinkel acted on behalf of HMC.

17.     Defendant, Thomas D. Roberts, M.D. is a radiologist and was at all times relevant to this action Chief of Radiology at Hillcrest Medical Center. Prior to 2004, Dr. Roberts served as HMC Medical Staff President, and at all times relevant to this action was a member of the HMC Credentialing Committee and Medical Executive Committee. Dr. Roberts is a direct economic competitor of Dr. Cohlmia in the field of endovascular specialty procedures in the Relevant Service Market and acted on behalf of himself and HMC.

18.     Defendant, Marc S. Milsten, M.D. is a urologist and was from 2002 to 2003 the President of the Medical Staff, and in 2004 the Chairman of the Credentials Committee at HMC and has been at all times relevant to this action a member of the HMC Medical Executive Committee. Prior to serving as President of the Medical Executive Committee, Dr. Milsten was

4

President of the Medical Staff at HMC. At all times relevant to this action, Dr. Milsten acted on behalf of HMC.

19.     Defendant, James A. Johnson, M.D., is a general surgeon and at all times relevant to this action served as the Medical Director of the Operating Room Surgical Services of HMC, and was a member of the HMC Credentials Committee and Medical Executive Committee. At all times relevant to this action, Dr. Johnson acted on behalf of HMC.

20.     Defendant, Ronald C. Elkins, M.D., is a cardiovascular and thoracic surgeon and at all times relevant to this action Dr. Elkins acted on behalf of HMC.

21.     Defendant, Wayne N. Leimbach, M.D. is a cardiologist and member of Defendant OHI, as well as a member of the HMC Cardiology Quality Assurance Committee, Peer Review Committee, and Credentials Committee. At all times relevant to this action Dr. Leimbach acted on behalf of OHI and HMC.

22.     Defendant, Ellen H. Cher, M.D. is a cardiologist and former member of Defendant OHI. At all times relevant to this action Dr. Chen acted on behalf of OHI and HMC.

23.     Defendant, Paul W. Kempe, M.D., is a cardiovascular surgeon and member of Defendant CVT. Dr. Kempe also serves on the HMC Medical Executive Committee, Credentials Committee, and is the HMC Chief of the Section of Cardiothoracic Surgery. Dr. Kempe is a direct economic competitor of Dr. Cohlmia in the field of cardiovascular and thoracic surgery. At all times relevant to this action, Dr. Kempe acted on behalf of himself, CVT, SJMC, and HMC.

24.     Defendant, William C. Burnett, M.D., is a doctor of internal medicine specializing in cardiovascular disease and intervention and is a member of the St. John Heart Institute and was President Elect of the Medical Staff at SJMC. At all times relevant to this action, Dr.

5

Burnett was an economic competitor of Dr. Cohlmia and acted on behalf of himself, SJMC, and HMC.

25. Defendant, Howard William Allred, M.D., is a doctor of general surgery specializing in rectal and colon surgery and was Vice President of Medical Affairs at SJMC. At all times relevant to this action, Dr. Allred acted on behalf of SJMC and HMC.

## II.

## JURISDICTION AND VENUE

26. Jurisdiction is proper in this Court based on Federal Question Jurisdiction, 28 U.S.C. §§ 1331 and 1337 because Plaintiff's claims arise, in part, pursuant to the laws of the United States of America as enacted by Act of Congress regulating commerce and protecting trade.

27. This action is instituted, in part, under Section 4 of the Clayton Act, 15 U.S.C. §§ 15, 16, and 26, to recover damages for, and to obtain injunctive relief from, injury caused by Defendants to competition and commerce in the Relevant Services Market and to the business, property, and livelihood of Dr. Cohlmia, sustained by reason of violations by Defendants, as alleged below, of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. This action is further brought under the laws and Constitution of the United States for the violation of civil rights protected by 42 U.S.C. § 1981.

28. This Court also has pendent jurisdiction to hear claims brought under the laws of the State of Oklahoma as asserted by Dr. Cohlmia below. Jurisdiction is also proper in this Court pursuant to Oklahoma Antitrust Reform Act, Okla. Stat. Tit. 79, § 202, *et. seq.*, and 76 O.S. § 27.

6

29.     Venue is proper in this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c) because Dr. Cohlmia resides in this District and because each Defendant transacts business and/or is registered or licensed to transact business in this District and the unlawful actions and conduct of Defendants were carried out within this District.

## III.

## BACKGROUND OF DR. COHLMIA AND
## CARDIOVASCULAR SURGICAL CONSULTANTS, INC.

30.     Plaintiff, George S. Cohlmia, Jr., M.D. ( "Dr. Cohlmia") is a duly licensed physician in the State of Oklahoma and has practiced cardiovascular, thoracic, vascular and endovascular surgery in Tulsa, Oklahoma since 1984.  Dr. Cohlmia is board certified by the American Board of Surgery (1986) and the American Board of Thoracic Surgery (1987).

31.     Dr. Cohlmia is a member of the American Board of Laser Surgery, the American Heart Association, the International College of Surgeons--United States Section, a founding member of the International Society for Minimally Invasive Cardiac Surgery, a founding member of the International Society of Endovascular Specialists, a founding member of the National Cardiovascular Network, a member of the Oklahoma State Medical Society, Southern Medical Association, Tulsa County Medical Society, Tulsa County Surgical Society, and the Society of Thoracic Surgeons.  Dr. Cohlmia has also been a member of the Board of Directors of the Tulsa Chapter of the American Heart Association.

32.     Dr. Cohlmia has served as a professor and clinical instructor at the University of Southern California School of Medicine.  He continues to teach at the University of Oklahoma College of Medicine, and in 2002, he was named Outstanding Teacher of the Year at the University of Oklahoma College of Medicine, Tulsa, Department of Surgery.

33.     Prior to the actions and conduct complained of in this action, Dr. Cohlmia served as Member of the Thoracic Quality Assurance Committee, St. John Medical Center (1995 – 2000), Member of the Cardiovascular Nominating and Credentials Committee, St. John Medical Center, 1998-1999, Vice-Chief of the Section of Thoracic Surgery, St. John Medical Center (2003), Chairman of the Cardiovascular Surgery Quality Improvement Committee, Hillcrest Medical Center (1994 – January 2003), Co-Chairman of the Cardiovascular Service Line Quality Improvement Committee, Hillcrest Medical Center (1994 - January 2003), Chairman of the Thoracic Surgery Quality Assurance Committee, Hillcrest Medical Center (1994 – January 2003), Intensive Care Committee, Hillcrest Medical Center (1994 – January 2003), Medical Executive Committee, Hillcrest Medical Center (1994 – January 2003), and Chief of Thoracic Surgery, Hillcrest Medical Center (1994 – January 2003).

34.     Dr. Cohlmia co-developed and drafted the credentialing criteria and protocols for physicians to obtain privileges to perform endovascular specialty procedures at HMC in 1990. The credentialing criteria and protocols co-developed by Dr. Cohlmia are still in use today at HMC.

35.     Dr. Cohlmia is a specialist in the field of cardiovascular, thoracic, and vascular surgery and endovascular specialty procedures.  Since his arrival in Tulsa in 1984, he has performed over 20,000 surgeries.

36.     Dr. Cohlmia is one of only very few cardiovascular surgeons in the City of Tulsa and its surrounding area who will agree to perform life saving cardiovascular and thoracic surgery on extremely ill and/or dying patients or who are otherwise considered "high risk." Most surgeons in this field refuse to perform such high risk surgeries because they do not want their "raw," *i.e.*, non-risk stratified, mortality statistics to appear too high.

8

37.     A significant portion of the cardiovascular, thoracic, vascular, and endovascular patients treated by Dr. Cohlmia and Cardiovascular Surgical Specialists, are of Native American lineage and descent as Dr. Cohlmia enjoys an unparalleled reputation for quality and compassionate medical care, and therefore a significant referral base, from physicians at traditionally predominant Native American health care facilities in Oklahoma.  Accordingly, Dr. Cohlmia enjoys a unique association and relationship with Native American patients, which constitute a protected class of persons under the laws and Constitution of the United States of America.

38.     Unfortunately, Native American patients are often considered higher health risk patients and are not well received by other cardiovascular surgeons and health care facilities. Accordingly, due to the unique association and relationship Dr. Cohlmia enjoys with Native American patients, and his unparalleled willingness to treat all Native American patients regardless of health risk, Dr. Cohlmia is a *de facto* representative and advocate of the rights of Native American patients to receive quality health care as guaranteed to all citizens of the United States of America, and in particular, guaranteed to all citizens pursuant to 42 U.S.C. § 1981.

39.     Since 1984, and prior to the actions of Defendants complained of below, Dr. Cohlmia received no formal complaints about any surgeries he performed with the exception of one lawsuit tried to a jury which rendered a complete verdict in favor of Dr. Cohlmia and one which was dismissed.

## IV.

## OVERVIEW OF THE RELEVANT MARKET AND
## DR. COHLMIA'S ROLE IN THE SAME ("The Relevant Service Market")

9

40.     The relevant line of commerce in this action is the service market to patients of cardiology, cardiovascular, thoracic and vascular surgery and endovascular specialty procedures and related subsidiary medical treatments.

41.     The relevant geographical market in this action is the City of Tulsa and its surrounding areas, including a substantial number of patients from outside the State of Oklahoma, many of which are attracted to the skill, services offered, and reputation of Dr. Cohlmia.

42.     The amount of commerce is substantial and includes, *inter alia*, surgical fees, operating room costs, support personnel costs, medical equipment costs, pharmaceuticals and other related products and services.  A substantial amount of the fees and costs related to the relevant market are received from patients who reside outside the State of Oklahoma, many of whom are attracted to the Relevant Services Market by the skills, services offered by, and reputation of Dr. Cohlmia.

43.     The practice of cardiology, cardiovascular, thoracic, and vascular surgery and endovascular specialty services within the Relevant Services Market also affects interstate commerce by virtue of the fact that a substantial quantity of medical equipment, supplies and pharmaceuticals is purchased from manufacturers in states other than Oklahoma, and substantial amounts of income is received from out-of-state sources such as Medicare, Medicaid, and commercial private insurers.

44.     Prior to the actions of Defendants complained of below, Dr. Cohlmia and his company Cardiovascular Surgical Specialists, served a significant percentage of the existing cardiovascular, thoracic and vascular surgical and endovascular specialty market in the City of Tulsa and surrounding areas, including patients from outside the State of Oklahoma, many of

10

whom were attracted to the relevant market by the skill, services offered by, and reputation of Dr. Cohlmia.

45.     The skill, services offered by, and reputation of Dr. Cohlmia had been developed and fostered by Dr. Cohlmia and his company Cardiovascular Surgical Specialists, over the preceding two decades by a relentless pursuit of medical excellence and state-of-the-art technique coupled with unparalleled compassion, good-will, and accessibility offered to cardiac, thoracic, vascular and endovascular patients in the relevant service market.

46.     Because of the substantial percentage of the existing cardiovascular, thoracic, and vascular surgical and endovascular specialty services market enjoyed by Dr. Cohlmia and his company Cardiovascular Specialty Services, prior to the actions of Defendants complained of below, Dr. Cohlmia was perceived by Defendants as a significant economic competitor and threat to certain of Defendants' market share as well as certain Defendants' desired market share.

47.     Prior to the actions of Defendants complained of below, Dr. Cohlmia and his company Cardiovascular Surgical Specialists, Inc. served a significant percentage of the cardiovascular thoracic, and vascular surgical, and endovascular specialty services for patients at Defendant Hillcrest Medical Center.

48.     Prior to the actions of Defendants complained of below, Dr. Cohlmia and his company Cardiovascular Surgical Specialists, Inc. served a significant percentage of the cardiovascular, thoracic, and vascular surgical, and endovascular specialty services for patients at Defendant St. John Medical Center.

49.     The cardiovascular, thoracic, and vascular surgical and endovascular specialty services performed by Dr. Cohlmia at Defendant hospitals constituted the great majority of Dr. Cohlmia's total practice.

11

50.     As a cardiovascular, thoracic, and vascular surgeon who also specializes in endovascular specialty procedures, Dr. Cohlmia and his patients are dependant upon the provision of the surgical facilities, equipment, medicine, and staff provided by Defendants Hillcrest Medical Center and St. John Medical Center. The only way a surgeon, such as Dr. Cohlmia, has access to these essential facilities is by being credentialed and afforded privileges by Defendant hospitals. Without the credentials and privileges to perform surgical procedures at Defendant hospitals, Dr. Cohlmia has no way to properly care for and treat his patients and, in turn, engage in his lawful profession and earn a living. Likewise, patients are deprived of access to, and the option of being treated by, Dr. Cohlmia, who comprised a significant source of the services offered to patients in the Relevant Services Market.

51.     As a cardiovascular, thoracic and vascular surgeon who also specializes in endovascular specialty procedures, Dr. Cohlmia and his patients are dependant upon the pre and post surgical cardiological medical support of the cardiologists at Defendant Oklahoma Heart Institute. Without pre and post cardiology medical support of his cardiovascular surgical patients, Dr. Cohlmia has a significantly limited ability to properly care for his patients and, in turn, engage in his lawful profession and earn a living. Likewise, patients are deprived of access to, and the option of being treated by, Dr. Cohlmia, who comprised a significant source of the services offered to patients in the Relevant Services Market.

52.     As a cardiovascular, thoracic and vascular surgeon who also specializes in endovascular specialty procedures, Dr. Cohlmia and patients in the Relevant Services Market are also dependant upon the professional referrals from Oklahoma Heart Institute which comprises the largest, most significant referral source for cardiovascular, thoracic and vascular surgeons in the Relevant Service Market. Without such referrals, patients are deprived of access to, and the

12

option of being treated by, Dr. Cohlmia, who comprised a significant source of the services offered to patients in the Relevant Services Market.

53.     Prior to the actions of Defendants complained of below, Dr. Cohlmia was in the process of developing an independent specialty heart and vascular hospital. The new heart and vascular specialty hospital was being developed by Dr. Cohlmia to provide an alternative source of state-of-the-art medical cardiology, interventional cardiology, cardiac cathertization, cardiovascular surgery, and endovascular specialty services to the citizens of the City of Tulsa and its surrounding areas, including a substantial number of patients from outside the State of Oklahoma.

54.     The new heart and vascular specialty hospital would have been capable of providing medical cardiology, interventional cardiology, cardiac cathertization, cardiovascular surgery, and endovascular specialty services to a significant percentage of the existing services market as well as attract patients from outside the existing services market and therefore increase the Relevant Services Market by a significant percentage.

55.     The broadening and expansion of the existing services market for medical cardiology, interventional cardiology, cardiac cathertization, cardiovascular surgery, and endovascular specialty services to the citizens of the City of Tulsa and surrounding areas including patients from outside the State of Oklahoma would have increased and strengthened market competition and therefore benefited patients and the cardiovascular health care system as a whole.

## V.

## OPERATIVE ALLEGATIONS AND FACTS OF THE CASE

56.     Unless otherwise noted, all acts and/or omissions of Defendants as set forth below are asserted upon information and belief with a good faith understanding and knowledge of the factual accuracy and evidentiary support of the assertions, either known or anticipated to be the subject of discovery in the course of litigation.

## A.     SOME UNDERLYING MOTIVATIONAL CONSIDERATIONS, HMC AND OHI UNLAWFUL ACTIONS, AND "THE DR. YOUSUF MATTER."

57.     In or around the spring of 2002, Dr. Cohlmia and his company Cardiovascular Surgical Specialists, Inc., enjoyed a significant share of the Relevant Service Market by virtue of the skill, services offered, and reputation developed and fostered by Dr. Cohlmia over the preceding two decades and by a relentless pursuit of medical excellence and state-of-the-art technique coupled with unparalleled compassion, good-will, and accessibility offered to cardiac and endovascular patients in the Tulsa and surrounding areas.

58.     Because of the substantial share of the existing Relevant Services Market enjoyed by Dr. Cohlmia and his company, Dr. Cohlmia was perceived by Defendants as a significant economic competitor and threat to Defendants' market share as well as certain Defendants' desired market share.

59.     At about this same time, around the spring of 2002, information was divulged by members of Defendants OHI and CVT that Dr. Cohlmia was in the process of developing an independent heart and vascular specialty hospital to serve the citizens of Tulsa, Oklahoma and its surrounding area.

60.     At the time such information was divulged regarding the new heart and vascular hospital, Dr. Cohlmia had commissioned and paid for extensive and costly feasibility studies and plans for the new hospital as well as purchased options on real property to serve as the location

14

of the hospital. The new hospital was projected to be constructed and operational by late 2003 or early 2004.

61.     The new specialty heart and vascular hospital was viewed by Defendants, and would in fact have been, a direct economic competitor to certain Defendants in the Relevant Services Market of medical cardiology, interventional cardiology, cardiac cathertization, cardiovascular surgery, and endovascular specialty services.

62.     The economic threat of the new heart and vascular hospital, as well as the ongoing threat and economic competition already posed by Dr. Cohlmia and his company, caused Defendants to begin and/or set in motion unlawful actions, individually and in concert and combinations, to interfere with Dr. Cohlmia's ability to practice medicine as well as his existing and future business relationships and opportunities.

63.     The unlawful plans and actions of Defendants were aimed at restricting and/or interfering with Dr. Cohlmia's ability to enter into contracts to practice cardiovascular, thoracic, and vascular surgery and endovascular specialty procedures, and by taking unlawful actions to discredit, defame, and destroy the professional reputation of Dr. Cohlmia with the intention of removing him as a competitor in the Relevant Service Market and thereby reducing competition.

64.     In furtherance of the plan to remove Dr. Cohlmia as a competitor and thereby reduce competition in the Relevant Service Market, in or around the spring of 2002, Hillcrest Medical Center ("HMC"), where Dr. Cohlmia performed the majority of his surgical procedures, sought to hire a full time employee cardiovascular surgeon in an effort to consume Dr. Cohlmia's practice there.

65.     HMC's desire to hire an employee cardiovascular surgeon was unusual on its face. Normally, cardiovascular surgeons are independent contractors associated with hospitals

15

though obtaining privileges to practice various fields of medicine at the hospital. Hiring an *employee* cardiovascular surgeon is out of the ordinary.

66.     HMC sought the aid of Oklahoma Heart Institute in its endeavor to hire an employee cardiovascular surgeon in furtherance of its plan to subvert Dr. Cohlmia's practice at the hospital and in the Relevant Services Market.

67.     OHI agreed to help HMC recruit and hire an employee cardiovascular surgeon. OHI also agreed to make surgical referrals only to the new employee surgeon and to boycott Dr. Cohlmia and his professional services.

68.     OHI desired to see Dr. Cohlmia removed from the Relevant Services Market and/or otherwise harmed professionally because OHI viewed Dr. Cohlmia as being too honest with his patients by occasionally noting deficiencies in the cardiological care performed by OHI physicians in a patient's chart. OHI believed that if such information "ever got out" about its doctors, it might be sued. Thus, OHI viewed Dr. Cohlmia as "whistle blower." This perception was a strong motivating factor behind OHI's continued unlawful actions against Dr. Cohlmia.

69.     In furtherance of its own desire to see Dr. Cohlmia harmed as well in furtherance of its agreement with HMC, OHI cardiologist Dr. Rebecca Smith identified, located, and helped HMC lure Dr. Arshad Yousuf to Tulsa to become HMC's new employee cardiovascular surgeon.

70.     As part of his duties as HMC Chief of the Section of Cardiothoracic Surgery, Dr. Cohlmia dutifully evaluated the credentials file of Dr. Yousuf in order to approve him as competent to treat patients and perform surgeries safely at HMC. The credentials file on Dr. Yousuf was presented to Dr. Cohlmia for review by HMC Medical Director Dr. Steven Landgarten. Dr. Cohlmia approved Dr. Yousuf to perform surgeries and treat patients based on the information provided in Dr. Yousuf's credentials file.

16

71.     Although Dr. Cohlmia had no reason to take him seriously at the time, Dr. Yousuf stated the intentions of HMC right away. In one of their first meetings after Dr. Yousuf joined the HMC employee staff, Dr. Yousuf told Dr. Cohlmia that he was there to "take over" Dr. Cohlmia's practice at HMC.

72.     Dr. Cohlmia was made aware of problems with Dr. Yousuf almost immediately. Indeed, Dr. Yousuf's first surgical patient died. Over the course of the summer and fall of 2002, Dr. Cohlmia was approached by many HMC nurses, surgical assistants, and scrub techs who voiced their concerns about Dr. Yousuf's lack of surgical judgment and skill.

73.     In or around the winter of 2002, Dr. Cohlmia was contacted by another physician at another facility who asked Dr. Cohlmia why he had approved Dr. Yousuf based on the contents of his credentials file. Dr. Cohlmia did not know what the physician was talking about. The physician then told Dr. Cohlmia about a letter in Dr. Yousuf's credentials file by a thoracic surgeon named Dr. Valerie Rusch from The Sloan-Kettering Hospital in New York City who had observed Dr. Yousuf in a surgical residency program in 2000. The letter was nothing less than a frightening account of Dr. Yousuf's deficient surgical skill, knowledge, understanding and judgment. The letter, however, was not contained in the credentials file of Dr. Yousuf presented to Dr. Cohlmia by HMC Medical Director Steven Landgarten.

74.     Upon discovery that such important information concerning Dr. Yousuf's competence had been withheld from him in his role as Chief of Section and because of his duty to screen applicants in furtherance of patient safety, Dr. Cohlmia sought to discuss the matter with HMC administration and Board of Trustees. Dr. Cohlmia's repeated requests for an explanation as to what was going to be done about the problem were rebuffed and/or ignored by the HMC administration and Board of Trustees.

75.     Left with no choice after being stonewalled by HMC administration and Board of Trustees, in January of 2003 Dr. Cohlmia made public statements about the significant patient safety issue at hand and that HMC withheld important patient safety information from him and was now ignoring the problem.

76.     Dr. Cohlmia's exposure of HMC's cover-up of the Dr. Yousuf issues infuriated and embarrassed Defendants. Now, not only did Dr. Cohlmia pose an ongoing and increasingly greater economic threat to Defendants in the Relevant Service Market, in the minds of Defendants, Dr. Cohlmia was a "whistle blower" because he violated a code of silence with regard to issues or situations that could expose them to legal liability. As such, Dr. Cohlmia was *persona non grata* to Defendants.

77.     Accordingly, in January of 2003, Defendants, individually and in combinations, embarked on a merciless campaign to strip Dr. Cohlmia of his hospital privileges, destroy his reputation, and, in turn, eliminate the economic competition he posed in the Relevant Service Market, shrink and damage the relevant services market to the detriment of patients, and mete out retribution upon Dr. Cohlmia personally. Defendants' designs to oust Dr. Cohlmia from the Relevant Services Market would be without regard for him, his family, his patients, and the patient community at large in the Tulsa area.

## B.     DEFENDANTS HMC, OHI, AND CVT'S CONTINUED UNLAWFUL ACTION AGAINST DR. COHLMIA.

78.     In January 2003, HMC through Defendant Dr. Fred Garfinkel, terminated Dr. Cohlmia from his position as Chief of Section and informed him that his actions might lead to being stripped of his hospital privileges.

79.     HMC replaced Dr. Cohlmia as Chief of Section with Defendant Dr. Paul Kempe, a cardiovascular surgeon with Defendant CVT group. Dr. Kempe and his group of fellow

18

cardiovascular surgeons at CVT are direct economic competitors of Dr. Cohlmia, and up to this point in time, practiced almost exclusively at Defendant SJMC and held positions of leadership at SJMC.

80.     Dr. Kempe is also the former business associate of Dr. Cohlmia and is personally bitter and biased toward Dr. Cohlmia as a result of being ordered by an arbitrator to pay Dr. Cohlmia monies owed pursuant to a contractual obligation. In fact, Dr. Kempe expressed his disdain toward Dr. Cohlmia by writing on the two payment checks to Dr. Cohlmia that he thought Dr. Cohlmia was "evil" and that payment of the amounts ordered was an "injustice."

81.     In furtherance of its unlawful designs against Dr. Cohlmia, HMC enlisted Dr. Kempe and the other cardiovascular surgeons from CVT and through their positions of leadership and authority at SJMC, employed or attempted to employ the cooperation of SJMC against Dr. Cohlmia.

82.     In February 2003, HMC unilaterally terminated a long standing exclusive contract with Dr. Cohlmia to handle all of HMC's "managed care" patients. The exclusive contract was then granted to the cardiovascular surgeons of Defendant CVT.

83.     HMC, its administration, and members of its Medical Executive Committee and Credentialing Committee, acting with great impunity, made it clear that Dr. Cohlmia was the target of their unlawful designs, and that Defendants CVT, OHI, and their respective members, were working independently and in combinations to oust Dr. Cohlmia from the Relevant Services Market and harm him personally and professionally. Actions evidencing this include, but are not limited to, the following:

a.     In or around January of 2003, HMC administrators, Medical Executive Committee members and Credentials Committee members formed an *ad hoc* committee, which included Defendant OHI Dr. Wayne Leimbach, to research

19

"mortality and morbidity" statistics of Dr. Cohlmia in an effort to compile data for use in stripping Dr. Cohlmia of his medical staff privileges.

b.   In or around January of 2003, HMC administrators, Medical Executive Committee members and Credentials Committee members directed HMC nurses and medical staff to secretly scrutinize and follow day-by-day all of Dr. Cohlmia's patient charts in an effort to find something for use in stripping Dr. Cohlmia of his medial staff privileges.

c.   In or around February of 2003, Defendant Dr. James A. Johnson, of the HMC Medical Executive Committee and Credentials Committee, told nurses at HMC that Dr. Cohlmia's medical staff privileges at HMC were going to be revoked.

d.   In or around March of 2003, Defendant Dr. James A. Johnson told Dr. Craig Adams, an associate of Dr. Cohlmia's, that Dr. Cohlmia had angered HMC and that HMC directed OHI to send all of their patients to Defendant CVT surgeons Defendant Drs. Blankenship, Fore, Kempe, and Garrett at SJMC rather than to Dr. Cohlmia.

e.   In or around March of 2003, Defendant Dr. James A. Johnson told Dr. Adams that he should "just wait six months and see what happens to Dr. Cohlmia."

f.   In or around March of 2003, Defendant Dr. James A. Johnson told nurses at HMC that all the cardiovascular surgeons in town had been rallied to help get Dr. Cohlmia's medical staff privileges revoked and then all the other surgeons could come back to HMC.

g.   In or around April of 2003, Defendant OHI Dr. Alan Kaneshige informed Dr. Adams that he would never get another referral from OHI unless he disassociated himself from Dr. Cohlmia.

h.   In or around May of 2003, HMC physician Dr. Kent Townsley told a group of physicians in Bristow, Oklahoma, that HMC was waging a "turf war" against Dr. Cohlmia.

i.   In or around May of 2003, Defendant and Chief Executive Officer of HMC Steve Dobbs, told medical personnel at HMC that Dr. Cohlmia was "history."

j.   In or around May of 2003, Defendant CEO of HMC Steve Dobbs affirmed that OHI had agreed not to refer any more cases to Dr. Cohlmia and that if a patient at OHI requests Dr. Cohlmia for their surgical care, OHI will tell the patient to find another cardiologist.

20

k.      In or around June of 2003, Defendant and Medical Director of HMC Dr.
        Steven Landgarten stated that it was "too bad" that Dr. Adams was not going
        to make any money because of his affiliation with Dr. Cohlmia since OHI
        had agreed not to refer patients to Dr. Cohlmia or his group Cardiovascular
        Surgical Specialists, Inc.

l.      In or around August of 2004, HMC Medical Executive Committee member
        Dr. Tom Roberts and HMC Chairman of the Board of Trustees, Dr. Fred
        Garfinkel told Dr. Craig Adams (who performs surgical procedures exactly
        the same as Dr. Cohlmia) not to worry about losing any privileges because
        "Dr. Cohlmia brought this on himself."

## C.     DEFENDANTS USE PATIENTS AS PAWNS IN THEIR EFFORTS TO INJURE DR.
          COHLMIA AND THEREBY REDUCE COMPETITION IN THE RELEVANT
          SERVICES MARKET.

84.     The designs of Defendants to destroy Dr. Cohlmia and remove him as

competition in the Relevant Services Market were not impeded by any concern for the safety of

patients. To the contrary, *patients were used as pawns* in Defendants' illegal plans to harm Dr.

Cohlmia and the economic competition he posed within the Relevant Services Market.

85.     Indeed, Defendant OHI, in furtherance of its own desire to harm Dr. Cohlmia as

well as its agreement with other Defendants to remove Dr. Cohlmia as competition, agreed and

adopted the policy to cease providing cardiological medical care to any patient of Dr. Cohlmia

who refused to be referred to a different cardiovascular surgeon or who requested the services of

Dr. Cohlmia from the outset. This outrageous policy and practice of OHI continues to this day.

Examples of this conduct, include, but are not limited to, the following:

a.      In or around February 2003, OHI Drs. Roger Des Prez and Ellen Chen refused the
        request of a patient to have Dr. Cohlmia perform necessary surgery. When the
        patient insisted, Dr. Chen became angry at the patient and slammed the patient's
        hospital room door.

b.      In or around February of 2003, rather than have recent HMC cardiac cathertization
        patients followed-up by Dr. Cohlmia, OHI Dr. Wayne Leimbach sent the patients

21

*home* with orders with orders to follow-up with surgeons from Defendant CVT at another facility.

c. In or around March of 2003, OHI Dr. Roger Des Prez informed a referring primary care physician of a patient treated previously by Dr. Cohlmia, that it was OHI's policy to "sign off the case" of any patient being treated by Dr. Cohlmia. Dr. Des Prez warned the physician to stop referring patients to Dr. Cohlmia if he wanted OHI to provide cardiology support to his patients.

d. In or around March of 2003, OHI Dr. Roger Des Prez marked out Dr. Cohlmia's name on a cardiac patient's medical chart where Dr. Cohlmia was listed as the surgeon on the case.

e. In or around March of 2003, OHI Dr. Wayne Leimbach refused the requests of primary care physicians to refer Dr. Cohlmia to the cases of several Native American patients. Dr. Leimbach informed the physicians that OHI would drop the patients if they continued to request Dr. Cohlmia on their cases.

f. In or around April 2003, OHI Dr. Robert Lynch informed a primary care physician who requested Dr. Cohlmia for surgery on his patient's case, that OHI would cease providing medial care for the patient if the physician continued to insist on Dr. Cohlmia for surgery.

g. In or around April of 2003, the family of a patient of Dr. Cohlmia was told by OHI physicians that HMC was getting rid of Dr. Cohlmia and that Dr. Cohlmia was no longer welcome at HMC, and therefore that patient should use CVT surgeons Drs. Garrett or Kempe.

h. In or around May of 2003, physicians from OHI and HMC falsely stated to patients of Dr. Cohlmia that he had been "kicked off" of HMC's insurance plan and was therefore unavailable to them.

i. In or around May of 2003, Dr. Cohlmia's associate, Dr. Craig Adams, was called emergently to perform surgery on a patient with an infected pacemaker device which had previously been placed in the patient by a physician at OHI. Dr. Adam's called OHI Dr. Roger Des Prez to learn the sequence to deactivate the device prior to beginning surgery. Dr. Des Prez refused to tell Dr. Adams how to deactivate the device because of Dr. Adam's association with Dr. Cohlmia. Dr. Adams was therefore forced to deactivate the device with a magnet so that he could safely perform surgery.

j. In or around June of 2003, OHI Dr. Ellen Chen told a referring physician that she would "sign off the case" of a patient in need of heart bypass surgery if the referring physician insisted on sending the patient to Dr. Cohlmia.

22

k. In or around September of 2003, OHI Dr. Rebecca L. Smith terminated her care of a patient of Dr. Cohlmia's associate Dr. Craig Adams. When Dr. Adams made inquiry to OHI about what happened, OHI Dr. Robert Sonnenschein informed Dr. Adams that he was sorry but OHI would no longer consult with patients of Dr. Cohlmia or his associates.

l. In or around January of 2004, OHI Dr. Robert Lynch informed a patient in need of a carotid endarterectomy who requested Dr. Cohlmia for the procedure that OHI would not refer the patient to Dr. Cohlmia and that if the patient wanted Dr. Cohlmia for surgery, OHI would cease to provide cardiology care.

m. In or around January of 2004, OHI Dr. Raj Chandwaney terminated his cardiology care of a patient who requested Dr. Cohlmia for surgery.

n. In or around March of 2004, OHI Dr. Robert Lynch told a long time cardiac patient of Dr. Cohlmia's that OHI no longer associated with Dr. Cohlmia and that OHI would cease to serve as the patient's cardiologist if the patient insisted on continuing to see Dr. Cohlmia.

o. In or around May of 2004, a patient in need of a carotid endarterectomy requested that Dr. Cohlmia perform the procedure. OHI Dr. Wayne Leimbach told the patient to find another cardiologist if the patient chose to use Dr. Cohlmia.

p. In or around June of 2004, a long time cardiac patient of Dr. Cohlmia in need of a carotid endarterectomy asked OHI Dr. Alan Kaneshige to refer him to Dr. Cohlmia for the procedure. Dr. Kaneshige told the patient to find a new cardiologist if the patient wanted to see Dr. Cohlmia.

q. In or around June of 2004, a long time patient of Dr. Cohlmia's with chest pain requested a referral to Dr. Cohlmia from OHI Dr. James Coman, Jr. Dr. Coman refused and told the patient to find a new cardiologist if the patient insisted on seeing Dr. Cohlmia.

r. In or around August of 2004, the referring physician of a Native American patient referred to Dr. Cohlmia for surgery was berated by a physician at OHI for making the referral to Dr. Cohlmia and told that the referral should be made to another surgeon.

s. In or around August of 2004, a long time Native American patient of Dr. Cohlmia who was awaiting surgery was told by a physician from OHI that Dr. Cohlmia no longer worked at HMC and that the surgery should be performed by a surgeon from CVT.

t. In or around September of 2004, OHI Dr. Sonnenschein made the false statement to a patient who requested Dr. Cohlmia for surgery that Dr. Cohlmia would not be able to perform the surgery since Dr. Cohlmia no longer worked at HMC.

23

u. In or around September of 2004, OHI Dr. Alan Kaneshige told a patient who requested Dr. Cohlmia to perform a carotid endarterectomy that he would not continue to be the patient's cardiologist if the patient used Dr. Cohlmia for surgery.

v. In or around September 2004, a patient referred to Dr. Cohlmia for surgery was informed by OHI Drs. Leimbach and Sonnenschein that OHI was "signing off the patient" as cardiologists because Dr. Cohlmia was involved in the patient's care.

w. In or around November 2004, a patient referred to Dr. Cohlmia for carotid endarterectomy was intercepted by OHI Dr. Wayne Leimbach before surgery and told to either get another surgeon to perform the surgery or else OHI would cease providing cardiology care for the patient.

x. In or around December of 2004, a long time patient of Dr. Cohlmia was told by OHI Drs. Leimbach and Sonnenschein to get another surgeon or OHI would terminate its care of the patient.

86. The above examples of the length that OHI and other Defendants have gone to destroy Dr. Cohlmia personally and the economic competition he poses are not exhaustive. Indeed, to this day OHI continues to refuse to treat patients of Dr. Cohlmia, threaten to stop treating patients who request Dr. Cohlmia, threaten other physicians who refer patients to Dr. Cohlmia, and lie to patients about the professional status of Dr. Cohlmia. In fact, OHI's policy against Dr. Cohlmia is so strong that he has been made part of the normal agenda for discussion at OHI's weekly internal meetings.

87. Another method employed by Defendant OHI to harm Dr. Cohlmia and the competition he presents is to send cardiac patients who request Dr. Cohlmia to surgeons in Oklahoma City or out-of-state for surgery.

88. For the most part, however, OHI referrals which used to go to Dr. Cohlmia, now go to the surgeons of Defendant CVT, Defendant Drs. Fore, Blankenship, Kempe, and Garrett.

89. Using patients as pawns in the illegal campaign to harm Dr. Cohlmia and the competition he poses is not unique to OHI. To the contrary, HMC and its administration and

staff have resorted to egregious tactics to harm Dr. Cohlmia without concern for the safety of the

patients it uses to accomplish its goals. Examples of such conduct included, but are not limited

to:

a.   In or around October of 2003, a cardiac patient pre-approved by Blue Lincs
     HMO for surgery with Dr. Cohlmia, was abruptly canceled by HMC after
     HMC unilaterally canceled Dr. Cohlmia's Blue Lincs HMO approval. The
     patient was then referred to CVT surgeon Dr. Frank Fore.

b.   In or around February of 2004 a severely ill Native American cardiac patient
     of Dr. Cohlmia was refused admission to HMC's cardiac step-down floor
     despite the availability of at least two beds upon direct orders by HMC
     CEO Steve Dobbs who told admissions personnel that the floor was reserved
     for OHI patients only and that a patient of Dr. Cohlmia's would not be
     admitted.

c.   In or around September of 2004, a patient requesting surgery from Dr.
     Cohlmia was told by OHI Dr. Wayne Leimbach and HMC Medical Director
     Dr. Steve Landgarten that the patient was "high risk" for surgery and had to
     be cleared by a pulmonologist. The pulmonologist cleared the patient for
     surgery. Despite having clearance, Dr. Landgarten personally cancelled the
     surgery and discharged the patient.

## D.   DEFENDANTS' UNLAWFUL INTERFERENCE WITH THIRD-PARTY HEALTH CARE GROUPS AGAINST DR. COHLMIA.

90.   Patients are not the only innocent parties used by Defendants in the effort to

destroy Dr. Cohlmia and the economic competition he poses. In or around March of 2004, OHI

Dr. James Coman, Jr., HMC CEO Steve Dobbs, and HMC Medical Director Dr. Steven

Landgarten threatened representatives of the medical device company "Medtronic"

to not provide support for Dr. Cohlmia or his associate Dr. Adams with Medtronic products or

else OHI and HMC would "blackball" Medtronic products from their facilities and use entirely.

91.   Defendants are not restricted to the confines of their own facilities in their efforts

to harm Dr. Cohlmia and the economic competition he poses. They have also unlawfully

interfered with Dr. Cohlmia's business and professional dealings with third-party health care

25

organizations, especially the traditionally Native American health care organizations of

Northeast Oklahoma in which Dr. Cohlmia has enjoyed long standing business and professional

relationships. Examples of such conduct include, but are not limited to:

a.     Defendant HMC through representatives Kevin Gross and Dale Harris, OHI
       through its representatives Dr. Wayne Leimbach and Dr. Roger Des Prez
       attempted to persuade the Cherokee Nation and the Cherokee Indian Hospital
       to enter into an exclusive contract whereby HMC and OHI would receive all
       cardiology and cardiac patient referrals. Part of the proposed contract
       included the provision that the Cherokee Nation and the Cherokee Indian
       Hospital would cease making referrals to or requesting the services of Dr.
       Cohlmia. Defendant Dale Harris attempted to persuade the Cherokee Nation
       and the Cherokee Indian Hospital to boycott Dr. Cohlmia by
       falsely stating that Dr. Cohlmia was soon going to lose his medical staff
       privileges at HMC.

b.     Similarly, Defendants HMC through Kevin Gross and Dale Harris, and OHI
       attempted to obtain an exclusive contract with Tahlequah City Hospital, the
       terms of which required the cessation of all referrals to Dr. Cohlmia. As part
       of the pitch to persuade Tahlequah City Hospital to boycott Dr. Cohlmia,
       Defendants falsely stated that Dr. Cohlmia does too many surgeries with poor
       results, has problems with patients, and that he lost his privileges at HMC.

**E.     ST. JOHN MEDICAL CENTER ACTS INDIVIDUALLY AND IN CONJUNCTION WITH
        DEFENDANTS TO HARM DR. COHLMIA; ST. JOHN UNHAPPY WITH THE   PROFILE
        OF DR. COHLMIA'S PATIENTS.**

92.     The continued harassment and unlawful actions of HMC and its administration,

individually and in combinations with OHI and CVT, forced Dr. Cohlmia to admit a greater

number of patients to St. John Medical Center for surgery.

93.     In 2003, Dr. Cohlmia had had privileges at SJMC for 19 years. He had been fully

re-credentialed to the SJMC medical staff only one year previously and elected by his peers

Vice-Chief of the Section of Thoracic Surgery. In 19 years of practice at SJMC, Dr. Cohlmia

had an unblemished record of treatment and care for patients.

94. Included in the increased number of patients Dr. Cohlmia was forced to refer to SJMC for surgery was a large percentage of Native American patients from traditionally Native American health care organizations with which Dr. Cohlmia had a long standing association for providing treatment to patients without regard to financial condition. Unfortunately, many of the Native American patients Dr. Cohlmia treats are underinsured or uninsured and are of modest means.

95. At the time, SJMC served as the primary surgical facility for surgeons from Defendant CVT, including Dr. Paul Kempe, Dr. Frank Fore, Dr. Robert Blankenship, Dr. Paul Kempe, and Dr. Robert Garrett.

96. Because Dr. Cohlmia was then sending more patients to SJMC for surgery, CVT and its surgeons had to share operating room facilities with Dr. Cohlmia.

97. CVT, it surgeons, and SJMC believed this situation was causing them to lose lucrative operating room time and reduce their per-patient profit.

98. This situation, coupled with the economic competition already posed by Dr. Cohlmia, as well as being labeled by Defendants as "whistle blower," motivated SJMC, alone and in combinations with other Defendants, to promote an unlawful campaign to force Dr. Cohlmia and his patients out of SJMC, destroy his reputation, and provide a catalyst for continued detrimental actions by other Defendants in order to injure Dr. Cohlmia and reduce competition in the Relevant Service Market.

99. To accomplish this end, in or around May of 2003, directives were made by SJMC administration, including SJMC Medical Director Dr. Howard William Allred and SJMC Chief of Medical Staff, Dr. John Bennett Forrest, M.D, to SJMC nursing and medical staff to

27

secretly search and scrutinize all of Dr. Cohlmia's patient files to look for something to use against Dr. Cohlmia.

100.    At around the same time, CVT surgeon Dr. Frank Fore affirmed that SJMC was scrutinizing Dr. Cohlmia and was concerned about Dr. Cohlmia's bringing many Native American patients without insurance to SJMC for surgery as it was costing SJMC hundreds of thousands of dollars.

101.    Per the directives of SJMC to scrutinize Dr. Cohlmia's cases, on or around June 7, 2003, the charts of two advanced lung cancer patients who underwent thoracotomy surgeries the previous day by Dr. Cohlmia were brought up by a nurse to SJMC Medical Director Dr. Howard William Allred.

102.    The surgeries were both on Native American lung cancer patients who were either underinsured or uninsured.

103.    There are no universally recognized standards or protocols for pre-surgical work-up for lung cancer patients.  Dr. Cohlmia had treated each patient previously and evaluated x-rays and CT scans of each patient as well as their medical history prior to surgery.  Dr. Cohlmia also explained in great detail the benefits and risks of the surgeries to both patients and their families as well as the option of obtaining additional diagnostic testing.  Both patients and their families made informed decisions to carry on with surgery.  Due to dreadful nature of the disease of lung cancer, both surgeries were complicated and required the removal of large cancerous tumors which had attached themselves to lung and other thoracic tissues and organs.

104.    SJMC and its administration saw these two lung cancer surgeries, due to their inherent complexity, variability, and graphic nature, as a basis to unlawfully remove Dr. Cohlmia and his patients from the SJMC facility, and in turn, from the Relevant Service Market.

105. In furtherance of its unlawful design, SJMC made the outlandish assertion that the two lung cancer thoracotomies evidenced "bizarre" and "profoundly deranged" medical judgment by Dr. Cohlmia.

106. The basis for such an inflammatory assertion, however, was only that Dr. Cohlmia and the two patients chose to proceed to surgery without additional and/or cumulative diagnostic testing.

107. Indeed, SJMC made the allegation in bad faith and without a reasonable basis in fact since it knew that neither of the patients had the means to pay for additional and/or cumulative testing, that such testing had previously been ordered by Dr. Cohlmia for other uninsured patients and denied by Medical Director Dr. Howard William Allred, that such testing posed significant risks to the patients, and that such testing would have delayed the surgeries -- placing both patients at greater risk of death from the cancer.

108. Nevertheless, on July 8, 2003, *thirty-three days* after the two surgeries took place, SJMC unlawfully, in bad faith, and without a reasonable belief or basis in fact that Dr. Cohlmia posed a danger to the safety of patients, "summarily suspended" Dr. Cohlmia based solely on the two thoracotomies which took place on June 6, 2003.

109. Without any prior notice whatsoever, Dr. Cohlmia was literally locked out of the SJMC facility on July 8, 2003 while attempting to enter the premises to care for patients.

110. The "summary suspension" was clearly levied in bad faith and without a reasonable belief or basis in fact that Dr. Cohlmia posed an immediate threat to the health or safety of patients given that:

    a.    Dr. Cohlmia had practiced and performed surgeries for 19 years at SJMC without any incident or problem whatsoever and had an unblemished record;

29

b.     During the 33 days between the two thoracotomies (June 6, 2003) and the "summary suspension" (July 8, 2003), no one from St. John asked Dr. Cohlmia about the two surgeries or gave him notice that the two surgeries were being investigated;

c.     Dr. Cohlmia was permitted to perform 34 surgeries, including thoracic surgeries, between June 6th and July 8th at SJMC without incident, problem or complication. Thus, there was no reasonable belief that the sanction of "summary suspension" was warranted to protect the health and safety of patients;

d.     "Summary suspension" was an inappropriate sanction for the complained of problem, *i.e.*, *total revocation of all privileges* in response to an alleged problem with an isolated and unique type of surgery;

e.     No reasonable effort to obtain the facts of the matter ever occurred prior to SJMC's "summary suspension" of Dr. Cohlmia, *i.e*, no thoracic surgeon or other specialist in the field of lung cancer surgery was ever asked to evaluate the procedures before the summary suspension, and no peer review or quality assurance process was ever instituted.

111.    Instead, Defendant Dr. William Burnett, a cardiologist who has never performed surgery, Defendant Dr. Howard William Allred, a rectal and colon doctor with no experience treating lung cancer, and urologist Dr. John B. Forrest decided to "summarily suspend" Dr. Cohlmia in furtherance of the illegal plan of SJMC to force Dr. Cohlmia and his patients out of SJMC and, eventually, out of the Relevant Service Market.

112.    "Summary Suspension" is an extremely harsh, professionally damaging action permitted to be implemented by the SJMC administration in only rare cases. The SJMC by-laws set forth the criteria necessary for implementing "summary suspension" against a staff physician as follows:

Whenever a Practitioner's conduct requires that *immediate* action be taken to protect the life of any patient(s) or to reduce the *substantial likelihood of immediate injury or damage* to the health of any patient, employee or other person present in the Hospital, any person or body authorized to initiate corrective action pursuant to 7.1-1, shall have

30

the authority to summarily suspend the Medical Staff membership status or all or any portion of the Clinical privileges of such Practitioner.

113.    Unlike the two surgeries of Dr. Cohlmia complained of, "summary suspension" is utilized in situations typically where a physician is believed to be impaired on alcohol, drugs, or exhibits dangerous, erratic, or violent behavior, *i.e.*, conduct which carries the "*substantial likelihood of immediate injury or damage* to the health of any patient, employee or other person present in the Hospital."

114.    Other, less draconian, measures are available and utilized by SJMC for perceived problems associated with the medical care provided a patient by a Practitioner. These include: peer review and/or quality assurance review, letter of admonition, revocation of privileges for a limited time, modification of privileges, *i.e* , imposition of proctoring or monitoring, reduction of privileges, limitation of privileges, or revocation of privileges in part, and appearance before the Medical Executive Committee.

115.    SJMC and its administration chose to utilize the "summary suspension" action against Dr. Cohlmia *33 days after* the subject medical treatment rendered by Dr. Cohlmia in a bad faith, calculated effort to avoid the peer review and/or quality assurance process and the associated paper trail, outside physician involvement, and *any involvement* by Dr. Cohlmia himself.

116.    Following the bad faith and unreasonable "summary suspension" on July 8, 2003, Dr. Cohlmia, in accordance with SJMC by-laws, had no choice but to request a hearing on the matter. The hearing was commenced on August 21, 2003 and was no more fair than the "summary suspension" itself. Evidence of the bad faith and unreasonable nature of the SJMC hearing includes, but is not limited to, the following:

31

a.      SJMC was represented by the same law firm who represented HMC and Dr.
        Arshad Yousuf in every medical malpractice case then pending and also
        represented HMC in a separate, unrelated medical negligence case involving
        Dr. Cohlmia which was later dismissed. Dr. Cohlmia did not agree to waive
        the conflict of interest;

b.      Without any prior notice, SJMC utilized confidential information from a
        separate and unrelated HMC case against Dr. Cohlmia in support of SJMC's
        "summary suspension" action;

c.      SJMC unilaterally appointed a single, non-physician, hearing officer to
        preside over the case and render a medical opinion on the merits and medical
        aspects of two complex thoracotomy surgeries;

d.      SJMC presented false statements of fact to the hearing officer regarding the
        two thoracotomy surgeries;

e.      SJMC presented evidence in support of its summary suspension action
        against Dr. Cohlmia that such action was endorsed by CVT surgeons Drs.
        Fore, Blankenship, and Garrett, who are direct economic competitors of Dr.
        Cohlmia;

f.      During the 33 days between the two thoracotomies (June 6, 2003) and the
        "summary suspension" (July 8, 2003), no notice was given to Dr. Cohlmia
        about any investigation. Thus, SJMC had no reasonable belief that the
        sanction of "summary suspension" was warranted to protect the health and
        safety of patients;

g.      Dr. Cohlmia was permitted to perform 34 surgeries, including thoracic
        surgeries, between June 6th and July 8th at SJMC without incident, question,
        problem or complication. Thus, SJMC had no reasonable belief that the
        summary suspension" was warranted to protect the immediate health and
        safety of patients;

h.      "Summary suspension" was an inappropriate sanction for the complained of
        problem, *i.e.*, *total revocation of all privileges* in response to an alleged
        problem with an isolated and unique type of surgery.

117.    Moreover, no evidence at the hearing supported SJMC's position that "summary

suspension" action against Dr. Cohlmia was appropriate. To the contrary, the testimony at the

hearing established the following:

32

a.  Dr. Cohlmia has never suffered from a "profound derangement of medical judgment" and has never been known to do anything "bizarre" or "deranged" as asserted by SJMC;

b.  The sanction of "summary suspension" should not be imposed based on a medical review of two isolated cases. Rather, peer review or quality assurance review should have been implemented with proper notice given to Dr. Cohlmia and review of the cases by experts in the field of thoracic lung cancer surgery;

c.  Dr. Cohlmia did not breach any universally accepted standard of care or protocol of SJMC;

d.  Dr. Cohlmia does not pose any immediate threat of harm to any patient;

e.  No "pattern of poor judgment" by Dr. Cohlmia can be identified at any time before or after the day of June 6, 2003.

f.  A medical disagreement over two thoracotomy cases on the same day does not indicate a "pattern of poor medical judgment" or justify the sanction of "summary suspension;"

g.  There are no cross-disciplinary protocols for the pre-operative workup of suspected lung cancer cases;

h.  No protocol at SJMC requires pre-surgical biopsies of suspected lung cancers;

i.  The summary suspension was implemented without notice to Dr. Cohlmia and without any expert review of the cases;

j.  Notice of the two thoracic surgeries was received by SJMC administration on June 7, 2003. Thirty-three days elapsed wherein Dr. Cohlmia was permitted to perform 34 surgeries, including thoracic surgeries with question, restriction or incident, before "summary suspension" was implemented by SJMC against Dr. Cohlmia on July 8, 2003;

k.  From the time Dr. Cohlmia was first credentialed at SJMC 19 years prior, he has never received a warning, admonition, criticism, revocation, suspension, modification, reduction, or limitation of any privileges, nor has he ever been called before any peer review or quality assurance committee;

l.  Other than the two thoracotomies on June 6, 2003, no cases of Dr. Cohlmia's have ever been evaluated or looked at by SJMC;

118. SJMC "summary suspension" was affirmed as might be expected by any solitary non-physician hearing officer, selected by the hospital, and asked to sanctify a decision made by a hospital administration who purports to have taken the action for reasons of "patient safety." No decision was rendered, however, with regard to legal adequacy or objective bad faith of SJMC as such issues were not the subject of the proceedings.

119. Under the objective circumstances of the matter, the SJMC "summary suspension" against Dr. Cohlmia, as well as the hearing in support of such action, was most definitely carried out in bad faith, without reasonable notice, without any reasonable investigation of the facts, without any reasonable belief that the "summary suspension" was warranted for the protection of patients, and for an illegal purpose and motive.

120. Indeed, the fact that the SJMC "summary suspension" was done in bad faith and in furtherance of an illegal motive was confirmed in or around January of 2004, when CVT surgeon Dr. Robert Blankenship, whose primary cardiovascular surgical practice was at SJMC, expressed that he was hopeful the SJMC suspension would lead to Dr. Cohlmia's suspension at HMC and St. Francis Hospital, and that Dr. Cohlmia "should leave town for a while and come back with his hat in his hand" and then "he might be allowed to practice in Tulsa."

121. As also might be expected, the summary suspension at SJMC accomplished at least three of the illegal goals intended: i) Dr. Cohlmia and his patients, including the less profitable Native American patients of Dr. Cohlmia, were kicked out of SJMC for good; ii) Dr. Cohlmia's name and reputation was now irreparably tarnished as the revocation is reported to the National Practitioner Data Base as an adverse action; and iii) a catalyst was now available for other institutions, such as Hillcrest Medical Center, to further its illegal design to destroy Dr. Cohlmia and the competition he presents in the Relevant Service Market.

34

**F.** **HMC, OHI AND CVT CONTINUE THEIR UNLAWFUL ACTIONS AGAINST DR. COHLMIA, ATTEMPT TO CAPITALIZE UPON AND REPLICATE THE UNLAWFUL SJMC "SUMMARY SUSPENSION."**

122.    No time was wasted by Defendants in continuing their unlawful actions against Dr. Cohlmia under the guise of being "forced" to do so by virtue of the SJMC summary suspension. Such thinly veiled pretext is belied by the fact that HMC and other Defendants, as shown previously in this Complaint, were already working individually and in combinations in furtherance of the goal of eliminating Dr. Cohlmia from the Relevant Service Market since the early spring of 2002.

**i.**    **HMC places unreasonable and unwarranted restrictions on Dr. Cohlmia's practice.**

123.    Ten days following SJMC's unlawful and bad faith "summary suspension" of Dr. Cohlmia, on July 18, 2003, HMC, its administration, Medical Executive Committee, Credentials Committee, and their members, used the SJMC action as a pretext for imposing the following restrictions on Dr. Cohlmia's medical privileges at HMC:

a.      Dr. Cohlmia must conduct and document a comprehensive pre-operative patient evaluation and review based on and consistent with recognized standards of care which must be presented to and approved by Defendant Dr. James A. Johnson, a general surgeon and HMC Medical Director of Operating Room Surgical Services and a member of HMC Credentials Committee and Medical Executive Committee;

b.      Obtain consultation from an HMC physician within four hours of admission of a patient, for assessment and patient care management of all non-surgical patients; and

c.      Be *personally* responsible for the management of all patients and arrange for appropriate consultation and follow-up for all aspects of care.

35

124.   The restrictions imposed by HMC were unreasonable, unwarranted and intended to be obstructive to Dr. Cohlmia. For example, submitting cardiovascular, endovascular, and carotid artery surgical patients for review and approval by Dr. James Johnson, a general surgeon with no expertise in cardiovascular and/or endovascular surgery, made no sense since Dr. Johnson does not have the experience, training or expertise to review such procedures.

125.   Moreover, the requirement that Dr. Cohlmia be personally responsible for all appropriate medical consultation for his patients was deliberately imposed as an obstructive condition *since HMC and the cardiologists at OHI had already agreed to refuse to treat any patients under Dr. Cohlmia's care.* As a cardiovascular surgeon, Dr. Cohlmia must have cardiologist support for his patients. OHI's admitted refusal to treat Dr. Cohlmia's patients and threatening patients to either stop seeing Dr. Cohlmia or find a new cardiologist artificially supplied HMC with the argument that Dr. Cohlmia could not comply with one of its restrictions.

## ii.   HMC, along with other Defendants, target Dr. Cohlmia's endovascular procedures. (angioplasties, angiography, vascular stenting and grafting, etc.)

126.   HMC, its administration and members of its Medical Executive Committee continued to secretly scrutinize the patient files of Dr. Cohlmia in an effort to find something to use to strip Dr. Cohlmia of his privileges and remove him as a competitor in the Relevant Service Market.

127.   One of the physicians utilized to secretly scrutinize Dr. Cohlmia's patient charts was Defendant radiologist Dr. Thomas D. Roberts, a member of HMC's Credentials Committee and Medical Executive Committee who also performs endovascular specialty procedures, and was therefore a direct economic competitor of Dr. Cohlmia. Dr. Roberts secretly reviewed Dr.

36

Cohlmia's endovascular procedures (angioplasties, angiography, vascular stenting and grafting etc.) and reported his findings directly to HMC medical director Dr. Steve Landgarten.

128.     Dr. Roberts "review" of Dr. Cohlmia's endovascular procedures was not done in the normal course of "retrospective review" of a physician, nor was the "review" done as the result of any quality assurance criteria being "tripped" or "triggered." To the contrary, each of Dr. Cohlmia's cases were pulled and scrutinized by Dr. Roberts the same day the procedure was performed by Dr. Cohlmia. Each case was also sent by "carbon copy" to HMC Medical Director Dr. Steven Landgarten. No other physician's cases were "reviewed" in this manner.

129.     On March 16, 2004, Dr. Thomas Roberts presented a "report" to the HMC Credentials Committee of 14 endovascular cases (none of which are specifically identified) of Dr. Cohlmia which allegedly raised concerns of sub-standard care to Dr. Roberts. Dr. Robert's primary criticism of the procedures was that they were performed under general anesthesia by a surgeon in an operating room rather than under local anesthetic by a radiologist in the radiology suite.

130.     Dr. Roberts' "criticisms" are based primarily on an economically driven, nationwide disagreement between cardiovascular surgeons, who traditionally perform endovascular procedures, and interventional radiologists, who recently began performing more of such procedures themselves and would like to perform more.

131.     Nevertheless, Dr. Roberts' "report" (which was not shown to Dr. Cohlmia) was presented to the HMC Credentials Committee and Medical Executive Committee, which in turn, called for the 14 cases to be sent to an "outside reviewer" for evaluation.

132.     The "outside reviewer" chosen by HMC to look at Dr. Cohlmia's endovascular procedures was Dr. Michael E. Gorton of the University of Kansas Hospital. Dr. Gorton has no

training in endovascular procedures and does not perform any endovascular procedures in his practice.

133. Curiously, Dr. Gorton was only provided **12** endovascular cases to review which had been hand selected HMC Medical Director Dr. Steve Landgarten and included some cases that had been performed *after* Dr. Roberts' March 16, 2004 report.

134. Dr. Gorton's primary criticism of the **12** procedures was that they were performed by a surgeon under general anesthesia in an operating room rather than by a radiologist under local anesthetic in the radiology suite. Again, this "criticism" merely reiterates the economically driven disagreement between cardiovascular surgeons and radiologists who now wish monopolize the market for endovascular procedures.

135. On July 16, 2004, HMC Medical Director Dr. Steven Landgarten, Medical Executive Committee Chairman Dr. Marc Milsten and HMC Medical Staff President Dr. Gary Decker called Dr. Cohlmia to attend a meeting wherein he was told for the first time that the Medical Executive Committee had already sent **12** of his endovascular procedure cases to an undisclosed "outside reviewer" who believed the cases were "sub-standard." Dr. Cohlmia was not given information about the specific cases or the name or credentials of the "outside reviewer."

136. During the July 16th meeting, Dr. Cohlmia was not asked by anyone to voluntarily cease performing endovascular procedures nor was he told that any adverse action was pending against him. Dr. Cohlmia, sensing that he was being targeted, however, prudently stated that he was willing to do whatever the Committee wanted him to do to cooperate and investigate the cases. Drs. Milsten, Decker, and Landgarten each specifically agreed that Dr. Cohlmia had been absolutely cooperative.

137.    Despite what actually transpired at the July 16th meeting, Dr. Milsten made a presentation to the HMC Medical Executive Committee on July 20, 2004 wherein he falsely stated that Dr. Cohlmia was "defiant" during the July 16th meeting, and "refused to voluntarily cease performing endovascular procedures." Based on the false information presented by Dr. Milsten, the Medical Executive Committee moved for and passed a motion to request immediate *summary suspension* by the Credentials Committee all of Dr. Cohlmia's endovascular privileges at HMC.

138.    The decision of the Medical Executive Committee to summarily suspend Dr. Cohlmia's endovascular privileges was communicated to Dr. Cohlmia in a letter dated July 22, 2004 which falsely stated that Dr. Cohlmia had been requested to voluntarily cease performing endovascular procedures and he refused. The letter went on to falsely state that Dr. Cohlmia's "refusal to voluntarily cease performing endovascular procedures" may result in imminent danger to the life, health or safety of patients and that summary suspension of [Dr. Cohlmia's] endovascular privileges is necessary to prevent future admissions or inpatient care to patients who could be endangered."

139.    On the same day, Dr. Gary Decker reported to HMC Medical Director Dr. Steven Landgarten that the Medical Executive Committee had voted to request immediate summary suspension of Dr. Cohlmia's endovascular privileges based on an outside review of 11 endovascular procedures. Dr. Landgarten, in turn, sent immediate notice of the requested summary suspension to HMC CEO Steve Dobbs.

140.    The HMC Medical Executive Committee's request for "summary suspension" was unwarranted, in bad faith, and founded on entirely false information. The action was no

39

more than a thinly veiled attempt at replicating the unlawful and bad faith action to remove Dr. Cohlmia previously undertaken by SJMC.

141.    Indeed, Dr. Cohlmia performed all his endovascular procedures in the same manner as called for by HMC protocols for such procedures which were co-designed and drafted by Dr. Cohlmia himself.

142.    In fact, other surgeons at HMC performed endovascular procedures exactly the same as Dr. Cohlmia and no other surgeon has been criticized or scrutinized by HMC.

143.    After receiving notice of the Medical Executive Committee requested "summary suspension," Dr. Cohlmia rightfully voiced his objection that the entire "review" of his endovascular procedures was founded on the alleged findings of Dr. Thomas Roberts who was a direct economic competitor of Dr. Cohlmia.  Dr. Cohlmia also rightfully voiced objection over the fact that the review was done secretly and that none of the cases "reviewed" had ever been disclosed to him.  Dr. Cohlmia requested an opportunity to address the Credentialing Committee and also have an opportunity to have the cases reviewed by an outside expert of his own choosing.

144.    The HMC Credentialing Committee reluctantly agreed on July 22, 2004 to allow Dr. Cohlmia to address the Committee and have the files reviewed by an outside expert of his choosing.

145.    At the same Credentialing Committee meeting, CVT surgeon, direct economic competitor, and biased ex-partner, Dr. Paul Kempe offered his own opinion about the 12 supposed sub-standard endovascular procedures of Dr. Cohlmia's.  Dr. Kempe opined to the Credentials Committee that he agreed with the outside reviewer report and believed Dr. Cohlmia's endovascular privileges were below the standard of care.  Dr. Kempe offered this

40

critique despite having never seen the case files and despite having little experience and no formal training in endovascular procedures.

146.    On July 23, 2004, Dr. Cohlmia made a presentation to the HMC Credentials Committee. Dr. Cohlmia noted that every one of his endovascular procedures over the last year *had been pre-approved pursuant to the restrictions placed on him by* HMC. Dr. Cohlmia stated that he disagreed with the conclusions drawn by the Medical Executive Committee, but wanted to cooperate in every way. Dr. Cohlmia therefore agreed to suspend his own endovascular practice, pending the review by an outside expert of what Dr. Cohlmia believed at the time to be **12** endovascular cases.    The Credentials Committee decided that based on Dr. Cohlmia's agreement, and because Dr. Cohlmia's medical staff privileges reappointment application was up for consideration anyway, summary suspension need not be imposed.

147.    On July 26, 2004, Dr. Cohlmia requested in writing the production of what he all along was told to be **12** endovascular cases of concern to HMC but which had still never been disclosed to him.

148.    On August 16, 2004, Dr. Cohlmia received a letter from HMC Medical Staff President Dr. Gary Decker which listed the names of only **8** patients which Dr. Decker admitted for the first time were the only endovascular cases of concern. This was a damning revelation given that Dr. Milsten and the HMC Medical Executive Committee voted to *summarily suspend* Dr. Cohlmia's endovascular privileges allegedly based on **12** "sub-standard" cases. It was also inconsistent with Dr. Kempe's purported agreement with the "outside reviewer's" alleged criticisms of **12** endovascular cases.

149.    Even more damning is that one of the **12** cases used previously by the HMC Medical Executive Committee to recommend *summary suspension* of Dr. Cohlmia's

41

endovascular privileges (purportedly to protect patients from Dr. Cohlmia) was an endovascular procedure *performed by another physician.*

150. Dr. Cohlmia's outside expert reviewer was Dr. Mary Bourland, a board certified cardiovascular surgeon practicing in Joplin, Missouri, with extensive training and experience performing endovascular procedures on patients. Dr. Bourland has opined that Dr. Cohlmia is an excellent surgeon who performs all surgical procedures within the recognized standards of care.

151. Dr. Bourland issued a report of her review of Dr. Cohlmia's endovascular procedures on October 18, 2004. In her report, Dr. Bourland found no deviations from the standard of care in any of the endovascular procedures. In one case, Dr. Bourland disagreed with Dr. Cohlmia's choice to combine an endovascular procedure (angioplasty) with another procedure (carotid endarterectomy). She has explained, however, that her disagreement is simply her choice not to combine such procedures and not a comment on any standard of care issue.

### iii. HMC, along with other Defendants, target Dr. Cohlmia's carotid endarterectomy procedures. (surgical clearing of blockage in the carotid arteries).

152. In or around August of 2004, HMC began another secret investigation of Dr. Cohlmia's cases in preparation to deny Dr. Cohlmia's pending application to renew his medical staff privileges. This time, HMC chose Dr. Cohlmia's carotid endarterectomy procedures (surgical clearing of blockage in the carotid arteries) as the target.

153. In furtherance of this plan, HMC Medical Director Dr. Steven Landgarten selected CVT surgeon, direct economic competitor, and bitter ex-business associate, Dr. Paul Kempe to review a selection of hand-picked (by Dr. Landgarten) carotid endarterectomy cases of

Dr. Cohlmia. Dr. Kempe secretly reviewed between 14 and 17 of Dr. Cohlmia's carotid endarterectomy procedures.

154.    On October 19, 2004, without any notice to Dr. Cohlmia, Dr. Kempe reported his findings to the HMC Medical Executive Committee. Of the 14 to 17 cases reviewed, Dr. Kempe found that: i) none were inappropriate or contraindicated; and ii) no surgical technical error by Dr. Cohlmia could be identified. Despite these findings, however, Dr. Kempe opined that he identified 7 cases which he believed had "bad outcomes" and therefore Dr. Cohlmia "must have" improperly selected the patient or used poor technique.

155.    None of the 7 cases, however, actually had "bad outcomes" related to the endarterectomy procedures. In fact, Dr. Kempe later admitted that in his opinion, only 3 of the 7 cases were of "real concern."

156.    Dr. Kempe further offered the nonsensical criticism that Dr. Cohlmia unnecessarily "inflated" or "altered" the amount/percentage of arterial blockage (stenosis) in the post-operative notes of the 7 cases from the amount/percentage of blockage viewed by arteriogram in those cases preoperatively. This criticism is nonsensical because: i) a surgeon can see with his own eyes more blockage in an artery when looking directly at it during surgery than can be viewed by a pre-operative arteriogram; and ii) Dr. Kempe agreed that the arterial blockage shown on the preoperative arteriogram was significant enough to indicate surgery in each of the cases anyway.

157.    Dr. Kempe also made the unsubstantiated, unsupported and inaccurate allegation that Dr. Cohlmia's "stroke rate" during carotid endarterectomy procedures was "too high" despite the fact that there are no published national or HMC standards for such a measurement. In fact, Dr. Cohlmia's overall "stroke rate," otherwise known as "cardiovascular accident" or

43

"CVA," is significantly lower than HMC's and the national average for carotid endarterectomy procedures.

158.    *Not disclosed* to the Medical Executive or Credentials Committee was the fact that two of the three cases which Dr. Kempe criticized, were cases *already reviewed, cleared and closed with no action taken* by HMC's Peer Review Committee *over a year prior* to their submission for review by Dr. Kempe.

### iv.    HMC unlawfully strips Dr. Cohlmia of his medical staff privileges.

159.    At the same October 19, 2004 Medical Executive Committee meeting, Dr. Milsten intentionally misrepresented Dr. Bourland's report regarding Dr. Cohlmia's endovascular procedures and falsely stated that Dr. Bourland found one of Dr. Cohlmia's endovascular cases to be sub-standard and another one case to be questionable. The actual report was not presented to the Committee members.

160.    Based on the "findings" of Dr. Kempe regarding the carotid endarterectomy procedures, the misrepresented report of Dr. Bourland regarding Dr. Cohlmia's endovascular procedures, and the already discredited (and still undisclosed to Dr. Cohlmia) reports of radiologist Dr. Thomas Roberts and "outside reviewer" Dr. Michael Gorton, as well as a new but baseless assertion that Dr. Cohlmia's mortality rate on cardiac surgery cases was "too high," the Medical Executive Committee voted to not renew Dr. Cohlmia's medical staff privileges at HMC.

161.    The vote was taken by "secret ballot" -- a procedure not previously employed by the Medical Executive Committee – and purportedly passed, although the reported vote count of "all in favor, two abstentions, and none against," is false.

162.    The bad faith, unreasonable and illegally motivated action by HMC's Medical

Executive Committee to not renew Dr. Cohlmia's medical staff privileges is grossly apparent.

Nevertheless, as required by HMC by-laws and the HMC Fair Hearing Plan, following

notification of the decision to not renew his privileges, Dr. Cohlmia had no choice but to request

a hearing on the matter.

163.    At the hearing, HMC falsely, in bad faith, and without any reasonable belief or

basis in fact whatsoever, charged that since his last re-appointment, Dr. Cohlmia has "displayed

a pattern of patient care substantially below the standards for [his] specialty and [HMC] as

follows:

- a.    Endovascular procedures: patient selection, lack of appropriate medical management, surgical judgment and inadequate pre-op and post-op management;

- b.    Carotid endarterectomy procedures. Due to poor patient selection or technical error [Dr. Cohlmia's] stroke rate was 8.6 percent, compared to 2 percent for all other surgeons at HMC, and 3 percent as the national standard;

- c.    Open heart procedures. Patient selection, pre-op care and intraoperative management, failure to obtain consistently available comprehensive pre-op and post-op cardiology assistance in the medical management of patients; and

- d.    Unacceptably high morbidity and mortality rates in the areas of cardiovascular, endovascular, and carotid endarterectomy procedures"

164.    HMC further falsely, in bad faith, and without any reasonable belief or basis in

fact whatsoever, charged that:

- a.    To "indefinitely continue the existing conditions on and the required monitoring for certain of [Dr. Cohlmia's] surgical privileges under the circumstances would impose an undue hardship on the Department of Surgery without assurance of a commensurate improvement in patient care or outcomes;" and

- b.    "Contrary to all evidence, it appears that [Dr. Cohlmia believes] that [he is] practicing good medicine at HMC and [refuses] to accept the validity of the concerns raised by [Dr. Cohlmia's] colleagues and outside experts."

45

165.    The hearing on HMC's decision to not renew Dr. Cohlmia's staff privileges occurred on February 28, 2005, and March 2nd and 3rd, 2005 and was fraught with bad faith, false testimony, and previously non-disclosed and new allegations. There were also many admissions, however, that the proceedings, events, and information underlying HMC's actions were false, in bad faith, biased, unreasonable, and not based on a genuine or warranted concern for the health and safety of patients. Examples of this include, but are not limited to, the following:

a.      OHI Dr. Wayne Leimbach offered previously undisclosed "negative" case examples involving the monitoring of patient IVs and subtherapeutic doses of anti-arrhythmic mediation against Dr. Cohlmia never before identified as under "review" and in which were completely unrelated to the charges against Dr. Cohlmia. The cases were never investigated by HMC and *no notice* of the cases was given to Dr. Cohlmia in order to respond prior to the hearing;

b.      OHI Dr. Wayne Leimbach and HMC Medial Director Dr. Steven Landgarten offered previously undisclosed information regarding a supposed "exit interview" with Dr. Ronald Elkins in January of 2003 wherein Dr. Elkins allegedly made the baseless and false statements that "Dr. Cohlmia had not learned anything in 18 years of practice," that "Dr. Cohlmia's surgical technique stinks;" that his "operative notes describe all patients as disasters," and that he does not use enough "retrograde cardioplegia" in his surgeries. These statements are contrary to a written report submitted by Dr. Elkins on January 28, 2003 which renders no criticism of Dr. Cohlmia's knowledge, training, or technique. Dr. Cohlmia had no notice of this supposed "exit interview" prior to the hearing and Dr. Elkins was not called to testify;

c.      None of the "expert reports" which formed the primary basis for the Medical Executive Committee action were made available to *Dr. Cohlmia until just days before the hearing;*

d.      Dr. Marc Milsten gave false testimony that Dr. Cohlmia's endovascular surgical procedures were reviewed because of the "increase in number of procedures" and by "routine retrospective review." It was revealed and admitted, however, that there was no increase in the number of procedures and that HMC radiologist Dr. Thomas Roberts and HMC Medical Director

46

Dr. Steve Landgarten secretly obtained and reviewed charts from Dr. Cohlmia's endovascular procedures the same day as the procedures occurred;

e.   Dr. Marc Milsten, gave false testimony that Dr. Cohlmia's mortality and morbidity statistics for cardiac surgeries were the highest of all surgeons at HMC and higher that national standards. Dr. Milsten later revealed and admitted, however, that neither he nor the Medical Executive Committee ever actually looked at the HMC documented cardiac mortality and morbidity statistics which show that Dr. Cohlmia's mortality and morbidity rates are *lower* than other HMC cardiovascular surgeons and *lower* than the national standard. Dr. Milsten further admitted that the information he and the Medical Executive Committee proceeded upon was merely told to him in a personal conversation by HMC Medical Director Dr. Steven Landgarten;

f.   HMC offered false testimony that its overall mortality rate dropped after restrictions were placed on Dr. Cohlmia's ability to do surgery. It was revealed and admitted, however, that the drop in overall mortality rates was due to a hospital-wide moratorium placed on all "high-risk" (Parsonnet Level V and VI) patients. In this regard, it was established that prior to the moratorium, of the last 53 "high risk" cardiovascular surgeries performed by Dr. Cohlmia, 49 patients survived. Thus, had the moratorium on "high risk" cardiac surgeries been in place at the time, the 49 surgical patients Dr. Cohlmia saved would have been turned away by HMC;

g.   Contrary to the false charges by HMC, it was established that in the 237 endovascular procedures performed by Dr. Cohlmia prior to HMC's refusal to reappoint his privileges, Dr. Cohlmia experienced zero deaths and only three complications for a combined mortality and morbidity rate of 1.27% which is well below HMC and national averages;

h.   Contrary to the false charges by HMC, it was established that in 330 carotid endarterectomy cases performed by Dr. Cohlmia, there were only five cardiovascular accidents (strokes) and only three deaths, for a combined morbidity and mortality percentage of 2.43%, a stroke rate percentage of only 1.52%, and a mortality rate of only 0.91%. These rates are far below HMC and national averages;

i.   Contrary to the false charges by HMC, it was established that in 483 cardiac surgery cases performed by Dr. Cohlmia he experienced only 22 deaths. Of the 483 cases, the predicted mortality percentage given the risk factors for the patients operated on was 16.58%. Dr. Cohlmia's actual mortality rate was 4.55% -- a fraction of the predicted mortality rate and well below HMC and national averages;

47

j.      Dr. Kempe admitted that it was inappropriate for him to offer opinions with regard to Dr. Cohlmia's medical procedures because of his status as a member of CVT and a direct economic competitor of Dr. Cohlmia's;

k.      Dr Wayne Leimbach admitted that OHI has engaged in a group boycott of Dr. Cohlmia, and therefore Dr. Cohlmia does not have access to adequate cardiology support. The two reasons Dr. Leimbach gives for the group boycott are: i) OHI doctors were uncomfortable with some negative facts regarding patient care that Dr. Cohlmia recorded in patient charts which could get "somebody in trouble for if it ever came out;" and 2) OHI sided with HMC and against Dr. Cohlmia in the Dr. Arshad Yousuf matter. Patient care by Dr. Cohlmia was not a basis for OHI's boycott of Dr. Cohlmia;

l.      Dr. Leimbach admitted that as part of its group boycott of Dr. Cohlmia, OHI terminates its care of patients who wish to use Dr. Cohlmia;

m.      Contrary to the false charges of HMC, Dr. Steven Landgarten admitted Dr. Cohlmia *was not* defiant, and indeed has been "absolutely cooperative," "conciliatory," "bent over backwards," "did everything he possible could have done;"

n.      Contrary to false charges of HMC, Dr. Marc Milsten admitted that Dr. Cohlmia *was never asked by anyone at HMC to voluntarily stop performing endovascular procedures.* Thus, Dr. Cohlmia could not have, and did not, *refuse* to voluntarily stop performing endovascular procedures" as charged by HMC;

o.      Cases were presented to the Medical Executive Committee as evidence of sub-standard care of Dr. Cohlmia which had already been reviewed and cleared by Peer Review over a year previously. That fact was never disclosed to the Medical Executive Committee, nor were Dr. Cohlmia's written responses and explanations of those cases to Peer Review ever presented to the MEC members or the outside reviewers;

p.      Upon learning that Dr. Milsten misleadingly used her October 2004 report regarding Dr. Cohlmia's endovascular procedures to strip him of his privileges, Dr. Bourland testified on behalf of Dr. Cohlmia for no fee because she believed it was a moral and ethical issue and that what HMC was doing was wrong. Dr. Bourland, *who reviewed Dr. Cohlmia's last 200 surgical cases chronologically*, testified that Dr. Cohlmia is an excellent surgeon and that it would be a crime to prevent someone so talented from giving his gift to a patient population;

q.      A physician who was a member of the HMC Medical Executive Committee while it was deciding Dr. Cohlmia's fate stated that the actions taken against Dr. Cohlmia by HMC and SJMC were politically motivated, not in

furtherance of patient safety, and a travesty of justice unprecedented in Tulsa;

r.    Physicians familiar with the matter stated that the actions taken against Dr. Cohlmia have harmed the medical community by denying a huge following of patients and families the right to be treated by the physician they want, and that since HMC's conduct against Dr. Cohlmia began, many patients formerly being treated in the Tulsa service area by Dr. Cohlmia area have moved into the Joplin, Missouri service area for treatment.

166.    On March 14, 2005, the Fair Hearing Committee returned its decision in the matter of HMC's refusal to reappoint Dr. Cohlmia to its hospital staff. The Fair Hearing Committee ruled that it was *unreasonable* to deny Dr. Cohlmia staff reappointment but maintained the status quo with regard to the restrictions already placed on Dr. Cohlmia's practice.

167.    The Fair Hearing Committee noted, however, that there were serious concerns with *bias and conflicts of interest* with regard to HMC's case against Dr. Cohlmia and recommended that the HMC Credentials Committee and Medical Executive Committee take care in future proceedings *"to select well qualified, recognized experts in the field of practice under review from outside the HMC System to review the medical records that are part of the investigation of the physician in question."*

168.    An objective look at HMC's actions against Dr. Cohlmia, as well as the hearing in support of such actions, most definitely reveals that it was carried out in bad faith, without reasonable notice, without any reasonable investigation of the facts, without any reasonable belief that the action was warranted for the protection of patients, and for an illegal purpose and motive.

169.    Indeed, the fact that HMC actions against Dr. Cohlmia have been done in bad faith and in furtherance of an illegal motive has been confirmed. In or around October of 2004,

HMC Medical Staff President Dr. Gary Decker candidly told Dr. Cohlmia that the proceedings against Dr. Cohlmia were "unfair" that he (Dr. Decker) would not have accepted the position of President of the Medical Staff if he knew this kind of thing was going to happen.

170.     Moreover, the HMC actions against Dr. Cohlmia are also revealed as being in bad faith and in furtherance of an illegal motive since HMC did not bother to keep the proceedings confidential. For example, prior to the Medical Executive Committee's decision to not reappoint Dr. Cohlmia's staff medical privileges, Dr. Lewis Wexler, an anesthesiologist not involved in the matter at all, asked a surgical scrub tech of Dr. Cohlmia's what she planned to do once Dr. Cohlmia's lost his privileges at HMC. Further, in or around January of 2005, Defendant Dr. Marc Milsten told Dr. David Miller, D.O., a cardiovascular surgeon at SouthCrest Hospital, that the proceedings to strip Dr. Cohlmia of his privileges would soon be underway. In turn, Dr. Miller asked a nurse who worked with Dr. Cohlmia what she planned to do once Dr. Cohlmia was stripped of his privileges.

171.     HMC and Dr. Cohlmia have cross appealed the ruling. HMC, however, has failed to take any action on the appeal within the time allowed pursuant the HMC "Fair Hearing Plan" and has therefore waived its positions with regard to all charges against, and restrictions imposed upon, Dr. Cohlmia. Nevertheless, the unreasonable and unwarranted restrictions remain in place against Dr. Cohlmia.

## VI.

## CAUSES OF ACTION

## COUNT I

## COMBINATION AND CONSPIRACY IN RESTRANT OF TRADE IN VIOLATION OF SECTION I OF THE SHERMAN ACT AND SECTION IV OF THE CLAYTON ACT
### (All Defendants)

50

172.    Dr. Cohlmia incorporates each of the preceding paragraphs of this Complaint as though fully set forth herein.

173.    The acts of Defendants in combinations, conspiracies, and conscious parallelism with each other were undertaken in an unlawful effort to eliminate Dr. Cohlmia and his company Cardiovascular Surgical Specialist, Inc. as a competitor in the Relevant Service Market, as defined above in this Complaint, and thereby reduce competition in said market.

174.    Defendants unlawful combinations, conspiracies, and conscious parallelism to eliminate Dr. Cohlmia and thereby reduce competition in the Relevant Service Market, as alleged in this Complaint, are unlawful in and of themselves, whether or not successful, in that Defendants' unlawful combinations, conspiracies, and conscious parallelism, if successful, would unlawfully restrain trade and reduce competition in the Relevant Service Market.

175.    Defendants' effort to eliminate Dr. Cohlmia and thereby reduce competition in the Relevant Service Market have also succeeded, *inter alia*:

    a.    by limiting, reducing or eliminating Dr. Cohlmia from the significant percentage of the Relevant Services Market he served prior to Defendants' conduct;

    b.    by limiting, reducing or eliminating Dr. Cohlmia from the significant percentage of the Relevant Services Market he gained to serve but for Defendants' conduct;

    c.    by limiting, reducing or eliminating the choice and/or option of patients in the Relevant Services Market from utilizing the services of Dr. Cohlmia for their treatment;

    d.    by tarnishing or destroying the reputation of Dr. Cohlmia in the Relevant Service Market by unlawfully causing negative reports to be submitted to the National Practitioner Data Bank and other information organizations, thereby reducing or eliminating Dr. Cohlmia's ability to provide medical services at other facilities within the Relevant Services Market and elsewhere;

51

e.      by eliminating or significantly limiting Dr. Cohlmia's access to essential surgical facilities, equipment, medicine, and staff, and thereby prohibiting or significantly limiting Dr. Cohlmia's ability to properly care for and treat his patients and, in turn, engage in his lawful profession and earn a living;

f.      by eliminating or significantly limiting Dr. Cohlmia and his patients' access to essential pre and post surgical cardiological medical support and thereby prohibiting or significantly limiting Dr. Cohlmia's ability to properly care for his patients and, in turn, engage in his lawful profession and earn a living;

g.      by eliminating or significantly limiting Dr. Cohlmia's professional referrals and thereby depriving Dr. Cohlmia and his patients' access to, and the option of being treated by, Dr. Cohlmia;

h.      by depriving patients in the Relevant Services Market of access to, and the option of being treated by, Dr. Cohlmia, who comprised a significant source of the services offered to patients in the Relevant Services Market prior to Defendants' actions;

i.      by destroying the development of an independent specialty heart and vascular hospital capable of providing services to a significant percentage of the Relevant Services Market as well as attract patients from outside the market and thereby increase the Relevant Services Market, strengthen market competition, and benefit patients.

176.    Defendants' unlawful actions in furtherance of their combinations, conspiracies and conscious parallelism to eliminate Dr. Cohlmia and reduce competition in the Relevant Services Market have caused irreparable harm and damage to Dr. Cohlmia and to intrastate and interstate commerce.

177.    Defendants actions were and are in violation of federal law and entitle Dr. Cohlmia to threefold actual damages to be proven at trial, punitive damages, attorney fees, costs, and all other relief deemed just and proper by the Court.

## COUNT II

### ILLEGAL BOYCOTT - *PER SE* ANTITRUST VIOLATION
### (Defendants OHI and HMC)

178.    Dr. Cohlmia incorporates each of the preceding paragraphs of this Complaint as though fully set forth herein.

179.    Beginning at least as early as January 2003, Defendants OHI and HMC, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, engaged in an illegal boycott of Dr. Cohlmia with the goal of eliminating Dr. Cohlmia from the Relevant Service Market and harming competition in the Relevant Service Market.    Among other things, Defendants accomplished or attempted to accomplish the illegal boycott by:

    a.    Diverting all OHI patient referrals for cardiovascular surgery previously made to Dr. Cohlmia to other surgeons;

    b.    Terminating the cardiology care of all patients of Dr. Cohlmia which had previously been available from OHI;

    c.    Intimidating and frightening cardiovascular patients of Dr. Cohlmia or who request Dr. Cohlmia by threatening to terminate cardiological care for the patient and in fact terminating cardiological care if the patient does not acquiesce;

    d.    Intimidating and threatening referring physicians and health care facilities to stop requesting and/or using Dr. Cohlmia or else lose the services of OHI cardiology for their patients.

180.    Defendants' unlawful actions in furtherance of their of their illegal boycott of Dr. Cohlmia in the Relevant Services Market have caused irreparable harm and damage to Dr. Cohlmia and to both intrastate and interstate commerce.

181.    Defendants actions constitute *per se* violations of federal law and entitle Dr. Cohlmia to threefold actual damages to be proven at trial, punitive damages, attorney fees, costs, and all other relief deemed just and proper by the Court.

## COUNT III

### VIOLATION OF 79 O.S. § 202 et. seq.
### OKLA. ANTITRUST REFORM ACT

53

182.    Dr. Cohlmia incorporates each of the preceding paragraphs of this Complaint as though fully set forth herein.

183.    The acts of Defendants both unilaterally and in combinations, conspiracies and conscious parallelism with each other were undertaken in an unlawful effort to eliminate Dr. Cohlmia and his company Cardiovascular Surgical Specialist, Inc. as a competitor in the Relevant Service Market, as defined above in this Complaint, and thereby reduce competition in said market.

184.    Defendants unlawful unilateral actions as well as combinations, conspiracies and conscious parallelism to eliminate Dr. Cohlmia and thereby reduce competition in the Relevant Service Market, as alleged in this Complaint, are unlawful in and of themselves, whether or not successful, in that Defendants' unlawful combinations and conspiracies, if successful, would unlawfully restrain trade and reduce competition in the Relevant Service Market.

185.    Defendants' effort to eliminate Dr. Cohlmia and thereby reduce competition in the Relevant Service Market have also succeeded, *inter alia*:

    a.      by limiting, reducing or eliminating Dr. Cohlmia from the significant percentage of the Relevant Services Market he served prior to Defendants' conduct;

    b.      by limiting, reducing or eliminating Dr. Cohlmia from the significant percentage of the Relevant Services Market he gained to serve but for Defendants' conduct;

    c.      by limiting, reducing or eliminating the choice and/or option of patients in the Relevant Services Market from utilizing the services Dr. Cohlmia for their treatment;

    d.      by tarnishing or destroying the reputation of Dr. Cohlmia in the Relevant Service Market by unlawfully causing negative reports to be submitted to the National Practitioner Data Bank and other information organizations,

54

thereby reducing or eliminating Dr. Cohlmia's ability to provide cardiovascular services at other facilities within the Relevant Services Market and elsewhere;

e.      by eliminating or significantly limiting Dr. Cohlmia's access to essential surgical facilities, equipment, medicine, and staff, and thereby prohibiting or significantly limiting Dr. Cohlmia's ability to properly care for and treat his patients and, in turn, engage in his lawful profession and earn a living;

f.      by eliminating or significantly limiting Dr. Cohlmia and his patients' access to essential pre and post surgical cardiological medical support and thereby prohibiting or significantly limiting Dr. Cohlmia's ability to properly care for his patients and, in turn, engage in his lawful profession and earn a living;

g.      by eliminating or significantly limiting Dr. Cohlmia's professional referrals and thereby depriving Dr. Cohlmia and his patients' access to, and the option of being treated by, Dr. Cohlmia;

h.      by depriving patients in the Relevant Services Market of access to, and the option of being treated by, Dr. Cohlmia, who comprised a significant source of the services offered to patients in the Relevant Services Market prior to Defendants' actions;

i.      by destroying the development of an independent specialty heart and vascular hospital capable of providing services to a significant percentage of the Relevant Services Market as well as attract patients from outside the market and thereby increase the Relevant Services Market, strengthen market competition, and benefit patients.

186.    Defendants OHI and HMC, both unilaterally and in combination, engaged in an illegal boycott of Dr. Cohlmia with the goal of eliminating Dr. Cohlmia and harming competition in the Relevant Service Market. Among other things, Defendant OHI and/or HMC accomplished or attempted to accomplish the illegal boycott by:

a.      Diverting all OHI patient referrals for surgery previously made to Dr. Cohlmia to surgeons at Defendant CVT;

b.      Terminating the cardiology care of all patients of Dr. Cohlmia which had previously been available from OHI;

c.      Intimidating and frightening patients of Dr. Cohlmia or who request Dr. Cohlmia by threatening to terminate cardiological care for the patient and in fact terminating cardiological care if the patient does not acquiesce;

d. Intimidating and threatening referring physicians and health care facilities to stop requesting and/or using Dr. Cohlmia or else lose the services of OHI cardiology for their patients.

187. Defendants' unlawful actions in furtherance of their unlawful designs to eliminate Dr. Cohlmia, illegally boycott Dr. Cohlmia, and reduce competition in the Relevant Services Market have caused irreparable harm and damage to Dr. Cohlmia and to both intrastate and interstate commerce.

188. Defendants' actions were and are in violation of the Oklahoma Antitrust Reform Act, 79 O.S. § 202, *et. seq.* and entitle Dr. Cohlmia to threefold actual damages to be proven at trial, punitive damages, attorney fees, costs, and all other relief deemed just and proper by the Court.

## COUNT IV

### TORTIOUS INFERENCE WITH CONTRACT
### AND PROSPECTIVE ADVANTAGE
### (All Defendants)

189. Dr. Cohlmia incorporates each of the preceding paragraphs of this Complaint as though fully set forth herein.

190. The acts charged in this Complaint by each of Defendants, both individually and collectively constitute the tortious interference with already existing contractual relationships enjoyed by Dr. Cohlmia, including but not limited to contractual relationships with patients, patient referral sources, patient payment sources, hospitals, clinics, Native American Tribal Authorities, insurance contracts and participation agreements.

191. The acts charged in this Complaint by each of Defendants, both individually and collectively constitute the tortious interference with prospective business advantage enjoyed by

Dr. Cohlmia, including but not limited to prospective business advantage with patients, patient referral sources, patient payment sources, hospitals, clinics, Native American Tribal Authorities, insurance contracts and participation agreements.

192.     As a result of Defendants' actions, Dr. Cohlmia has been irreparably injured and damaged and is entitled to actual, consequential, and punitive damages in an amount to be determined at trial as well as attorney fees, costs, and all other relief deemed just and appropriate by the Court.

## COUNT V

## DEFAMATION – LIBEL, LIBEL *PER SE*, SLANDER, SLANDER *PER SE*
### 76 O.S. § 7, 12 O.S. §§ 1441, 1442, Common law
### (All Defendants)

193.     Dr. Cohlmia incorporates each of the preceding paragraphs of this Complaint as though fully set forth herein.

194.     The acts charged in this Complaint by each of Defendants, both individually and collectively constitutes defamation as defined by common law and Oklahoma statutes.

195.     Beginning in at least January of 2003 and ongoing and continuing to the present day, Defendants, both individually and collectively, have published and continue to publish, false and/or malicious and unprivileged materials and statements, that directly injured Dr. Cohlmia in his office, profession, trade and business by imputing disqualification in said office, profession, trade and business.

196.     Beginning in at least January of 2003 and ongoing and continuing to the present day, Defendants, both individually and collectively, have published and continue to publish, false and/or malicious materials and statements which expose(d) Dr. Cohlmia to public hatred,

57

contempt, ridicule, and obloquy and which tended to deprive Dr. Cohlmia of public confidence and injure(d) him in his occupation.

197.     As a result of Defendants' actions, Dr. Cohlmia has been irreparably injured and damaged and is entitled to actual, consequential, and punitive damages in an amount to be determined at trial as well as attorney fees, costs, and all other relief deemed just and appropriate by the Court.

## COUNT VI

## VIOLATION OF 42 U.S. C. § 1981, EQUAL RIGHTS UNDER THE LAW
### (Defendant SJMC)

198.     Dr. Cohlmia incorporates each of the preceding paragraphs of this Complaint as though fully set forth herein.

199.     A significant portion of the cardiovascular and endovascular patients treated by Dr. Cohlmia and Cardiovascular Surgical Specialists, Inc. are of Native American lineage and descent as Dr. Cohlmia enjoys an unparalleled reputation for quality and compassionate medical care, and therefore a significant referral base, from physicians at traditionally predominant Native American health care facilities in Oklahoma. Accordingly, Dr. Cohlmia enjoys a unique association and relationship with Native American patients, which constitute a protected class of persons under the laws and Constitution of the United States of America.

200.     Due to the unique association and relationship Dr. Cohlmia enjoys with Native American patients, and his unparalleled willingness to treat all Native American patients regardless of health risk or ability to pay, Dr. Cohlmia is a *de facto* representative and advocate of the rights of Native American patients to receive quality health care as guaranteed to all

58

citizens of the United States of America, and in particular, guaranteed to all citizens pursuant to 42 U.S.C. § 1981.

201. Defendant SJMC's conduct against Dr. Cohlmia was motivated, in part, by the unlawful desire to deprive Native American patients, a protected class, of cardiothoracic surgical services offered at SJMC, by eliminating the source of those patients, Dr. Cohlmia.

202. Native American patients are entitled to enter into contracts for and receive the same medical services as those available to and offered to white citizens. This right is protected and guaranteed under the laws and Constitution of the United States of America and particularly 42 U.S.C. § 1981.

203. The action by SJMC against Dr. Cohlmia was both intentional and *de facto* discrimination against Native American patients, a protected class, in violation of 42 U.S.C. § 1981.

204. As a result of the discriminatory and disparate treatment by Defendant SJMC in violation of 42 U.S.C. § 1981, Native American patients have been deprived of the same quality and availability of medical services available to white citizens at SJMC and have been irreparably damaged thereby.

205. Dr. Cohlmia, as the *de facto* representative of a large population of Native American cardiovascular and cardiothoracic patients, has legal standing to assert the Constitutional rights of said patients.

206. Accordingly, Defendant SJMC is liable for all actual, consequential, and punitive damages, to be proven at trial, resulting from its discriminatory and disparate treatment of Native American patients, as well as attorney fees, costs, and all other relief deemed just and appropriate by the Court.

## COUNT VII

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Defendants)

207.    Dr. Cohlmia incorporates each of the preceding paragraphs of this Complaint as though fully set forth herein.

208.    Defendants' actions, individually and collectively, when viewed specifically and as a whole, constitutes conduct which is beyond the reasonable and acceptable boundaries of acceptable behavior in civilized society.

209.    Indeed, Defendants' conduct, individually and collectively, when viewed specifically and as a whole, constitutes conduct which can only be described as utterly outrageous and outside acceptable standards of behavior in civilized society.

210.    As a result of Defendants' actions, Dr. Cohlmia has been irreparably injured and damaged and is entitled to actual, consequential, and punitive damages in an amount to be determined at trial as well as attorney fees, costs, and all other relief deemed just and appropriate by the Court.

## COUNT VIII

## INJUNCTIVE RELIEF

211.    Dr. Cohlmia incorporates each of the preceding paragraphs of this Complaint as though fully set forth herein.

212.    Defendants' actions have harmed and threaten to harm the general public by interfering with the orderly practice of medicine in the community, by depriving patients of the quality of medical care they would have received but for Defendants' actions against Dr. Cohlmia, and by jeopardizing patient safety by using patients as pawns in their unlawful attempts to harm Dr. Cohlmia and reduce competition in the Relevant Services Market.

213.    As a result of the numerous and ongoing violations of federal and state law, Dr. Cohlmia is entitled to injunctive relief prohibiting Defendants from restraining competition within the Relevant Service Market, defaming Dr. Cohlmia and his practice, unreasonably scrutinizing Dr. Cohlmia and his practice, boycotting Dr. Cohlmia and his patients, and interfering with the ongoing and prospective contractual relationships of Dr. Cohlmia.

214.    As a result of the numerous and ongoing violations of federal and state law, Dr. Cohlmia is further entitled to injunctive relief reinstating him to full privileged status on the medical staffs of both HMC and SJMC and requiring Defendants to cause to be retracted any and all negative information regarding Dr. Cohlmia from the National Practitioner Data Bank and all other information organizations.

**WHEREFORE**, Plaintiffs, Dr. George S. Cohlmia, Jr. and Cardiovascular Surgical Specialists, pray for judgment in their favor and against each of Defendants upon each cause of action as set forth above, including but not limited to, injunctive relief, actual damages, compensatory damages, consequential damages, treble damages, and punitive damages, all in an amount to be proven at trial, as well as attorneys' fees, costs and all other relief deemed just and appropriate by the Court.

Respectfully submitted,

Michael L. Barkett, OBA#16171
Daniel B. Graves, OBA#16656
GRAVES & BARKETT, PLLC
Boulder Towers, Suite 1010
1437 S. Boulder
Tulsa, OK 74119
Telephone: (918) 582-6900
Facsimile: (918) 582-6907
Attorneys for Plaintiffs George S. Cohlmia, Jr.,
M.D. and Cardiovascular Surgical Specialists.