# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

GEORGE S. COHLMIA, JR., M.D., and )
CARDIOVASCULAR SURGICAL )
SPECIALISTS CORP., an Oklahoma corporation, )
                                      )
            Plaintiffs, )
                                      )
v. )      Case No.  05-CV-384-P
                                      )
ARDENT HEALTH SERVICES, LLC, a )
Delaware limited liability company; AHS )
OKLAHOMA HEALTH SYSTEM, LLP, )
an Oklahoma limited liability partnership; )
AHS HILLCREST MEDICAL CENTER, LLC, )
a Delaware limited liability company; )
HILLCREST HEALTHCARE SYSTEM, )
an Oklahoma corporation d/b/a/ Hillcrest )
Healthcare System; HILLCREST MEDICAL )
CENTER, an Oklahoma corporation; )
OKLAHOMA HEART INSTITUTE, INC., )
d/b/a Oklahoma Heart Institute, an Oklahoma )
corporation; OKLAHOMA HEART, INC., an )
Oklahoma corporation; ST. JOHN MEDICAL )
CENTER, an Oklahoma corporation; CVT )
SURGERY, INC., an Oklahoma corporation; )
FRED GARFINKEL, M.D.; STEVEN )
LANDGARTEN, M.D.; STEVE DOBBS; )
RONALD C. ELKINS, M.D.; MARC S. )
MILSTEIN, M.D.; THOMAS D. ROBERTS, )
M.D.; JAMES A. JOHNSON, M.D.; WAYNE N. )
LEIMBACH, JR., M.D.; ELLEN H. CHEN, )
M.D.; PAUL W. KEMPE, M.D.; WILLIAM C. )
BURNETT, M.D.; and HOWARD W. ALLRED, )
M.D., )
                                      )
            Defendants. )

# <u>ORDER and OPINION</u>

1

Before the Court are Defendants' Motions to Dismiss for failure to state a claim upon which relief may be granted, pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. #61-64),[1] Plaintiffs' combined Response in opposition (Dkt. #68), and Defendants' combined Reply thereto (Dtk. #71).  At issue are Count I for Combination and Conspiracy in Restraint of Trade in Violation of Section I of the Sherman Act and Section IV of the Clayton Act, Count II for Violation of Section II of the Sherman Act and Section IV of the Clayton Act, Count III for Illegal Boycott, Count IV for Violation of the Oklahoma Antitrust Reform Act, Count V for Tortious Interference with Contract and Prospective Advantage, Count VI for Defamation, Count VII for Violation of 42 U.S.C. § 1981, and Count VIII for Intentional Infliction of Emotional Distress. For reasons stated herein, Counts II (and the corresponding state law claim under Count IV), VI and VII are hereby DISMISSED without prejudice as to all Defendants, and Count V is DISMISSED without prejudice as to Defendant Elkins only. Counts III and VIII are hereby DISMISSED with prejudice.  Defendants' Motions are therefore GRANTED IN PART and, as to Count I (and the corresponding state law claim under Count IV), DENIED IN PART.

Also before the Court are Plaintiffs' Motion to Lift Seal (Dkt. #34), Defendants' joint Response in opposition (Dkt. #54), and Plaintiffs' Reply thereto (Dkt. #65), which were filed in response to the Court's Order of July 20, 2005 directing parties to seek a judicial determination regarding the peer review privilege and confidentiality.  In so directing the parties, the Court hoped to prevent unwarranted and/or repetitive arguments over the application of the privilege

---

[1] Although three separate Motions were filed, the Court will address them collectively, except where otherwise noted.  Plaintiffs did not assert all claims against all Defendants, and any action taken herein should be construed to apply only as to those Defendants who actually challenged the claim at issue and asserted against them.

during initial disclosures and discovery. Accordingly, Plaintiffs moved the Court to lift the seal

on their Amended Complaint and to enter a finding that evidence related to any peer review

process is not privileged or confidential in this case.  Defendants initially requested that the

Court postpone its ruling on the issue of privilege until after its ruling on the instant Motions,

and now argue that a determination on the issue would still be premature.  In this regard,

however, the Court finds that, upon careful consideration of the briefs on this issue, as well as

the briefs filed in conjunction with Defendants' Motions to Dismiss, there is indeed enough

information upon which to base such determination.  For reasons stated herein, Plaintiffs'

Motion to Lift Seal is GRANTED in its entirety.

## Background

Plaintiff George S. Cohlmia, Jr., M.D. is a licensed physician in the state of Oklahoma

specializing in cardiovascular, thoracic, vascular and endovascular surgery. [Am. Compl. ¶¶ 1,

35.]  Dr. Cohlmia practices in Tulsa and engages in intra- and inter-state commerce. [Id. ¶ 1.]

Dr. Cohlmia is the sole owner and shareholder of Plaintiff Cardiovascular Surgical Specialists,

Inc., an Oklahoma corporation which provides cardiovascular, thoracic, vascular and

endovascular surgical care in Tulsa and engages in intra- and inter-state commerce. [Id. ¶ 2.]

Plaintiffs have been engaged in the relevant line of commerce (*i.e.*, provision of cardiology,

cardiovascular, thoracic and vascular surgery and endovascular speciality procedures and related

subsidiary medical treatments) in the relevant geographical market (*i.e.*, Tulsa) since 1984. [Id.

¶¶ 30, 35, 40, 41, 45.] Plaintiffs further engage in interstate commerce by purchasing equipment,

supplies, and pharmaceuticals from manufacturers outside the state of Oklahoma, and by

accepting payment from out-of-state sources such as Medicare, Medicaid, and commercial

private insurers. [Id. ¶ 43.]

Prior to the events giving rise to this lawsuit, Plaintiffs served a significant percentage of the cardiovascular, thoracic, vascular and endovascular surgery patients in the relevant market. [Id. ¶ 44.]  Plaintiffs' patients come from both inside and outside Oklahoma. [Id. ¶ 42.]  A significant portion of their patients are Native American. [Id. ¶ 37.]  Dr. Cohlmia possesses the skill, expertise, and willingness to operate on high risk patients. [Id. ¶ 36.]  Native American patients are often considered to be high risk, and therefore are not always well received by other cardiovascular surgeons and health care facilities. [Id. ¶ 38.]  Dr. Cohlmia treated a substantial percentage of his patients at Defendant hospitals.  [Id. ¶ 49.]  The only way a surgeon, such as Dr. Cohlmia, may access facilities, such as Defendant hospitals, is by gaining credentials and privileges at each facility. [Id. ¶ 50.]

Because of Plaintiffs' relative market share, Defendants perceived Dr. Cohlmia as a significant economic competitor and a threat to certain of their actual and desired market share. [Id. ¶¶ 46, 58.] Further, Dr. Cohlmia was involved in the development of a specialty heart and vascular hospital, which facility Plaintiffs believe was also perceived as a threat by Defendants. [Id. ¶¶ 53, 61.] In or around the spring of 2002, after news of Dr. Cohlmia's plans for a specialty hospital had been divulged, Defendants, individually and in combinations, began to take actions interpreted by Plaintiffs as interfering with Plaintiffs' ability to practice medicine. [Id. ¶¶ 59, 62.] For example, Defendant OHI agreed to help Defendant HMC recruit and hire an employee cardiovascular surgeon, and to make surgical referrals only to the new employee surgeon, and to boycott Plaintiffs. [Id.¶ 67.] After the new employee surgeon was hired, Dr. Cohlmia, in his role as HMC's Chief of Cardiothoracic Surgery, grew concerned about the surgeon's competence and

was labeled by certain Defendants as a "whistle blower" for speaking out about his concern. [Id. ¶¶ 72-76.]

Around this time, Defendant HMC, together with Defendants Garfinkel, Kempe, CVT, OHI, Leimbach, Johnson, Dobbs, Landgarten, Roberts, Chen, and other non-party physicians affiliated with OHI and/or Defendant hospitals, began to tell other medical professionals and patients that Dr. Cohlmia was being stripped of his credentials and privileges, and to refuse to refer patients to Dr. Cohlmia or otherwise allow patients to see him, sign off or threaten to sign off of any cases in which Dr. Cohlmia was involved, and otherwise interfere with Plaintiffs' reputation and livelihood. [See id. ¶¶ 78-91.] When Dr. Cohlmia began to admit more patients to SJMC as a result, Defendants SJMC, Kempe, Allred, CVT, Burnett, and other non-party physicians began to complain about Dr. Cohlmia and his under- or uninsured Native American patients, and to scrutinize his files for something to use against him, resulting in his being "summarily suspended" for "bizarre" and "profoundly deranged" medical judgment with regard to two surgeries he performed at SJMC. [See id. ¶¶ 92-111.]

Summary suspension is usually reserved for situations in which a physician's conduct requires immediate action to be taken to protect the life of any patient or to reduce the substantial likelihood of immediate injury or damage to the health of any person in the hospital, such as when the physician is under the influence of drugs or alcohol. [Id. ¶¶ 112-113.] Other measures, such as peer review, letter of admonition, or appearance before the Medical Executive Committee, are available to address perceived problems with a physician's standard of care [id. ¶ 114], but SJMC's chosen course of action was calculated to avoid the peer review process and related paper trail [id. ¶ 115].  Dr. Cohlmia requested a hearing regarding his summary

5

suspension [id. ¶ 116]; however, the decision was affirmed by the non-physician hearing officer whom SJMC selected to preside [id. ¶ 118], even after testimony that would tend to establish that SJMC's summary suspension of Dr. Cohlmia was inappropriate and/or in bad faith [see id. ¶¶ 116-117, 119].

Dr. Cohlmia's summary suspension at SJMC was reported to the National Practitioner Data Bank as an adverse action. [Id. ¶ 121.] Relying in part on the adverse action, HMC imposed severe restrictions on Dr. Cohlmia's privileges there. [Id. ¶ 123.] HMC and Defendants Roberts and Landgarten also continued to conduct "reviews" of Dr. Cohlmia's procedures outside the normal course of quality assurance or peer review. [Id. ¶¶ 126-128.] Based on these reviews, as well as on representations made by Defendant Milsten, HMC sought summary suspension of Dr. Cohlmia's endovascular privileges. [Id. ¶¶ 135-139.] Dr. Cohlmia objected to HMC's actions, and ultimately suspended his endovascular practice voluntarily until the issue could be resolved. [Id. ¶¶ 143-144, 146.]  During the time that Dr. Cohlmia was appealing HMC's findings on his endovascular procedures, however, HMC and Defendants Lardgarten and Kempe also began targeting Dr. Cohlmia's carotid endarterectomy procedures. [Id. ¶¶ 152-153.]  Results of this review were presented to the HMC Medical Executive Committee without any notice to Dr. Cohlmia. [Id. ¶ 154.] Based on all of these findings, HMC voted not to renew Dr. Cohlmia's staff privileges [id. ¶ 160], which decision was also reported to the National Practitioner Data Bank as an adverse action [id. ¶ 172].

Dr. Cohlmia appealed HMC's decision not to renew his privileges. [Id. ¶¶ 162-165.] Initial findings on review indicated that HMC's decision was unreasonable, but upheld the restrictions placed on Dr. Cohlmia's practice. [Id. ¶ 166.] The findings also included concerns

about bias and conflicts of interest with regard to HMC's case against Dr. Cohlmia. [Id. ¶ 167.] HMC and Dr. Cohlmia have cross-appealed the ruling on review, but without resolution to date. [Id. ¶ 171.][2]

## Discussion

In considering a 12(b)(6) motion to dismiss, the Court accepts all well-pleaded matters in the complaint as true, and resolves all doubts in the light most favorable to the plaintiff. Scott v. Hern, 216 F.3d 897, 906 (10th Cir. 2000). Of course, well-pleaded facts are distinguished from conclusory allegations, and "unsupported conclusions of the pleader may be disregarded, especially when limited or negated by the substance of facts pleaded." Lillard v. Stockton, 267 F. Supp. 2d 1081, 1093 (N.D. Okla. 2003) (internal citations and quotations omitted). The plaintiff must make at least minimal factual allegations, either direct or inferential, as to every material element of the claim. Gooley v. Mobil Oil Co., 851 F.2d 513, 515 (1st Cir. 1988); Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). Only if it "appears beyond doubt that plaintiff could prove no set of facts entitling it to relief," will the Court grant a 12(b)(6) motion to dismiss. Brannon v. Boatmen's Bancshares, 952 F. Supp. 1478, 1482 (W.D. Okla. 1997) (internal citations and quotations omitted). If the plaintiff clearly cannot prevail on the facts alleged, and amending the complaint would be futile, dismissal with prejudice may be appropriate. Curley v. Perry, 246 F.3d 1278, 1281-82 (10th Cir. 2001).

--------

[2]At the time of filing of this lawsuit and the instant motions, the appellate process was still underway. Plaintiffs have since filed a Motion to File Second Amended Complaint (docket number 79) in order to address the outcome of these proceedings. Plaintiffs also request leave to file a supplemental reply to the instant Motions to Dismiss (docket number 80), which request is MOOT upon entry of this Order. Plaintiffs' Motion to File Second Amended Complaint, however, is GRANTED, and Plaintiffs are hereby given leave to add the new information proposed in their Motion, and to address the concerns raised herein.

## I.   Antitrust Claims in Counts I , II, III and IV

Plaintiffs allege a variety of federal and state antitrust violations, all of which have been challenged by Defendants.  By its own terms, the Oklahoma Antitrust Reform Act must be "interpreted in a manner consistent with Federal Antitrust Law 15 U.S.C., Section 1 et seq. and the case law applicable thereto."  79 Okla. Stat. § 212.  The Court will therefore conflate its discussion of Plaintiffs' antitrust claims, with the understanding that such discussion applies to both the federal and state claims.

Antitrust claims may be dismissed for lack of standing or lack of merit.  *See* Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc., 123 F.3d 301 *passim* (5th Cir. 1997). The Court will address the issue of antitrust standing first, because it touches all of Plaintiffs' antitrust claims, and will then address the merits of each individual count.

### A.   Antitrust Standing

Defendants' primary argument in favor of dismissal is that Plaintiffs fail to allege an "antitrust injury" and therefore lack "antitrust standing."  In considering Defendants' Motions to Dismiss on this basis, the Court must determine whether Plaintiffs "could show any set of facts, consistent with the allegations of [the] complaint, that would constitute a violation of the antitrust laws."  Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 735 (9th Cir. 1987). In so doing, the Court draws all reasonable inferences in Plaintiffs' favor.  *See* Scott, 216 F.3d at 906.

In order to have standing under the Sherman Act, a private party must show (1) injury-in-fact, which is an injury to plaintiff proximately caused by defendant's conduct; (2) antitrust injury, which ensures that "plaintiff's demand for relief ultimately serves the purposes of antitrust

law to increase consumer choice, lower prices and assist competition, not competitors"; and (3) proper plaintiff status, which assures that other parties are not better situated to bring suit. Doctor's Hosp. of Jefferson, 123 F.3d at 305-06.  Only the second prong – antitrust injury – is at issue here.

In order to establish an antitrust injury, a plaintiff must show harm "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  Id. at 305 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)) (internal citation and quotation omitted).  Because "the purpose of antitrust law is the promotion of consumer welfare," an anti-competitive act by the defendant which harms "allocative efficiency" and results in an increase in prices or a decrease in quality may be considered an antitrust injury.  See Ginzburg v. Mem'l Healthcare Sys., 993 F. Supp. 998, 1015 (S.D. Tex. 1997) (citing Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1443 (9th Cir. 1995)).  With regard to antitrust standing, the Court views Plaintiffs' complaint liberally under Summit Health, Ltd. v. Pinhas, 500 U.S. 322 (1991).  See Horst v. Laidlaw Waste Sys., 917 F. Supp. 739, 742 (10th Cir. 1996) (applying Summit Health's "relaxed standard" to find potential impact on interstate commerce).  The Court further notes that "the adequacy of a physician's contentions regarding the effect on competition [i.e., the existence of an antitrust injury] is typically resolved after discovery, either on summary judgment or after trial."  See Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 876 (3d Cir. 1995).

In describing their "antitrust injury," Plaintiffs first allege that Defendants individually and in combinations improperly used the peer review process, normally thought to enhance competition, in order to drive Plaintiffs out of the market and thus harm competition.  "[T]he

elimination of a competitor by means other than the economic freedom of participants in the relevant market" is an antitrust injury.  *See* Full Draw Prods. v. Easton Sports, Inc., 182 F.3d 745, 755 (10th Cir. 1999).  Second, Plaintiffs allege that Defendants individually and in combinations directly interfered with Plaintiffs' existing and potential patients, including those with "high risk" medical or financial profiles, to prevent them from exercising free choice in the market and indeed, to prevent some of them from receiving the best medical care possible. Where coercion of customers exists, an agreement to restrain trade may be considered unlawful, even if competition is not entirely driven out of the market.  Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 528 (1983).  Third, Plaintiffs allege a per se illegal boycott whereby Defendants "cut off access to a supply, facility or market necessary to enable the boycotted [Plaintiffs] to compete."  *See* Full Draw, 182 F.3d at 750.  Thus, Plaintiffs have effectively alleged that Defendants have used their leverage to induce – or force – their cardiology patients to use their "approved" surgeons (or not to use Plaintiffs), even when their actions compromise patient care.  *See* Jefferson Parish Hosp. v. Hyde, 466 U.S. 2, 13-14 & n.20 (1984).

The Court finds these facts to be sufficient at this preliminary stage of litigation to avoid dismissal for lack of "antitrust standing."  The Court now turns to the merits of Plaintiffs' various antitrust claims.

### B.   Section 1 Violation

Section I of the Sherman Act prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  15

U.S.C. § 1.[3]  In order to state a claim under Section 1, a plaintiff must show that the defendants

entered into a contract, combination or conspiracy that unreasonably restrains competition in the

relevant market.  TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d

1022, 1027 (10th Cir. 1992).  Here, Plaintiffs have alleged several combinations and possible

conspiracies among Defendants to drive Plaintiffs out of the market.  Specifically, Plaintiffs

allege that Defendants staged a *per se* illegal boycott and abused the peer review process in order

to prevent Plaintiffs' development of a specialty hospital and to impede their existing practice.

A doctor's unreasonable exclusion from the relevant market via adverse and unfair peer review

proceedings obviously affects patient choice and concomitantly, interferes with competition in

the marketplace.  *See, e.g.,* Boczar v. Manatee Hosp. & Health Sys., Inc., 993 F.2d 1514, 1519

(11th Cir. 1993); Bolt v. Halifax Hosp. Med. Ctr., 891 F.2d 810, 820 (11th Cir. 1990); Mishler v.

St. Anthony Hosp. Sys., 694 F.2d 1225, 1228 (10th Cir. 1981).  Under the "rule of reason"

analysis most typically applied to Section 1 cases, *see* Levine v. Central Fla. Med. Affiliates,

Inc., 72 F.3d 1538, 1549, 1551 (11th Cir. 1996), misuse of the peer review process is clearly

unjustified.  Indeed, the Health Care Quality Improvement Act of 1986, which confers immunity

from antitrust actions upon compliant peer review programs, specifically excludes "illegitimate

actions taken under the guise of furthering the quality of health care [such as a]ctions . . . that are

really taken for anticompetitive purposes . . . ."  *See* Summit Health, 500 U.S. at 332 n.12; *see*

*also* Levine, 72 F.3d at 1551 (quoting DOJ Enforcement Policy at *42 for the proposition that

---

[3]The corresponding state law claim alleged in Plaintiffs' Amended Complaint as Count
IV falls under 79 Okla. Stat. § 203(A), which states, "Every act, agreement, contract, or
combination in the form of a trust, or otherwise, or conspiracy in restraint of trade or commerce
within this state is hereby declared to be against public policy and illegal."

"exclusion [of a doctor from a provider network] may present competitive concerns if providers are unable to compete effectively without access to the network, and competition is thereby harmed").

Defendants here repeatedly urge that ouster of **one** physician and the resulting injury to his practice does not equal harm to competition, but merely harm to that competitor.  The Court notes well that "antitrust laws are intended to protect competition, not competitors, and we will not depart from that purpose in order to improve [a doctor's] income standings in the physician league or help him win the Super Bowl of remuneration."  Id.  The Court is willing, however, at this early stage of litigation, to give Plaintiffs the benefit of the doubt, for the sake of their patients – *i.e.*, the consumers in this market – who are described as high risk and low income, and may therefore have real difficulty securing comparable services.  Simply put, these consumers "suffer because the market make-up changed as a result of inefficient anticompetitive means."  Full Draw Prods., 182 F.3d at 755.  Of course, there is case law to the contrary.  *See, e.g.*, Tarabishi v. McAlester Reg'l Hosp., 951 F.2d 1558, 1569 n.15 (10th Cir. 1991) (holding that physician's suspension did not have an actual detrimental effect on competition because it did not result in restriction of choice to consumers); Wagner v. Magellan Health Servs., Inc., 121 F. Supp. 2d 673, 682 n.5 (N.D. Ill. 2000) ("Choice of physician should not be a factor . . . . The issue is whether the services were available, not who provided them.").  At this early stage of litigation, however, the Court finds that Plaintiffs have alleged sufficient facts to survive dismissal of the Section 1 (and corresponding state law) claim.

### C.   Section 2 Violation

Plaintiffs allege that Defendants OHI, HMC, SJMC, and CVT have engaged in an

unlawful attempt to monopolize the market, in violation of Section 2 of the Sherman Act. Section 2 prohibits "monopolizing, or attempting to monopolize, or combining or conspiring with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2.[4]   To state a claim of attempted monopolization under this section, a plaintiff must plead "(1) relevant market (including geographic market and relevant product market); (2) dangerous probability of success in monopolizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of such an attempt." Full Draw Prods., 182 F.3d at 756 (quoting TV Commc'ns Network, 964 F.2d at 1025).  Defendants argue that Plaintiffs' claim of attempted monopolization does not make economic sense, largely because HMC and SJMC lack the "market power" and intent to monopolize, and that Plaintiffs have failed to allege a "dangerous probability" of success in any event.

"To have a dangerous probability of successfully monopolizing a market the defendant must be close to achieving monopoly power."  Levine, 72 F.3d at 1555 (citing U.S. Anchor Mfg. v. Rule Indus., 7 F.3d 986, 994 (11th Cir. 1993)) (internal quotations omitted).  In turn, "[m]onopoly power requires proof of **both** power to control prices and power to exclude competition." Full Draw Prods., 182 F.3d at 757 (emphasis added).[5]  Here, Defendants' use of

---

[4]The corresponding state law claim alleged in Plaintiffs' Amended Complaint as Count IV falls under 79 Okla. Stat. § 203(B), which states, "It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce in a relevant market within this state."

[5]All jurisdictions do not appear to require both elements.  For example, the Eleventh Circuit defines monopoly power as "the power to raise prices to supra-competitive levels **or** . . . the power to exclude competition . . . by either restricting entry of new competitors or by driving existing competitors out of the market."  Levine, 72 F.3d at 1555 (citing U.S. Anchor Mfg., 7 F.3d at 994) (emphasis added).

the peer review process to oust Plaintiffs clearly demonstrates their ability to drive an existing competitor out of the market, particularly when such adverse actions were reported to the National Practitioner Data Bank, which could affect Plaintiffs' reputation and/or employment opportunities nation wide.  *See* <u>Summit Health</u>, 500 U.S. at 327-28.  Defendants could conceivably use the same or similar techniques to harm other established competitors as well as to prevent entry of new competitors, and thereby achieve greater market power.  Defendants' ability to control prices is less clear, although Plaintiffs have demonstrated that low-income patients may suffer as a direct result of Defendants' actions.

For purposes of this Order, however, the Court need not conclusively determine whether Defendants **possess** monopoly power in the market.  Instead, the more pressing issue is whether a "dangerous probability" exists that Defendants could actually **obtain** monopoly power.  Plaintiffs do make the bald assertion that Defendants "posed a dangerous likelihood of success" in achieving a monopoly [*see* Am. Compl. ¶ 175], yet Plaintiffs point to no facts in support of this proposition [*see* Resp. Br. at 19 n.10 (referencing facts in support of all other elements of the attempted monopolization claim **except** "dangerous probability of success")].  The Court is inclined to overlook such conclusory allegations as being insufficient to support the "dangerous probability of success" prong, or the attempted monopolization claim more generally.  *See* <u>TV Commc'ns Network</u>, 964 F.2d at 1024 ("Although the modern pleading requirements are quite liberal, a plaintiff must do more than cite relevant antitrust language to state a claim for relief.  A plaintiff must allege sufficient facts to support a cause of action under the antitrust laws.  Conclusory allegations that the defendant violated those laws are insufficient.").  More facts are clearly needed here, particularly when considering the alleged monopolists are competitors not

14

only of Plaintiffs, but of each other, and at least two other hospitals in the relevant geographic market.  Because Plaintiffs failed to allege sufficient facts to support a coherent Section II claim, Plaintiffs' Count II (and any corresponding claim under state law) is DISMISSED without prejudice.

### D.   Illegal Boycott Claim

Certain business relationships may be deemed *per se* violations of the antitrust law. Frackowiak v. Farmers Ins. Co., 411 F. Supp. 1309, 1317 (D. Kan. 1976) (citing, *inter alia*, Klor's v. Broadway-Hale Stores, Inc., 359 U.S. 207 (1959)).  In this case, Plaintiffs allege that Defendants OHI and HMC engaged in a *per se* illegal boycott aimed at eliminating Dr. Cohlmia and Cardiovascular Surgical Specialists from the marketplace, in violation of Sections 1 and 2 of the Sherman Antitrust Act.  Group boycotts, such as that alleged here, "have long been held to be in the forbidden category.  They  have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality."  Klor's, 359 U.S. at 212. If a plaintiff can make out a *per se* violation, it may be spared the usual "rule of reason" analysis employed by the courts in antitrust cases.  *See* Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 8 (1979).  If the plaintiff cannot make out a *per se* violation, the rule of reason governs.  Id.

The rule of reason is the "prevailing standard of analysis" under Section 1 of the Sherman Act.  Continental TV, Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49 (1977).  Under the rule of reason, the finder of fact must consider all the circumstances, including "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *See*

15

Goss v. Mem'l Hosp. Sys., 789 F.2d 353, 354 (5th Cir. 1986); *see also* Diaz v. Farley, 215 F.3d 1175,1182 (10th Cir. 2000).  The plaintiff bears the burden of showing that the conduct at issue has had an adverse effect on competition.  Coffey v. Healthtrust, Inc., 955 F.2d 1388, 1393 (10th Cir. 1992).

In contrast, *per se* treatment may be appropriate if the conduct at issue appears on its face to be a practice that would nearly always have anticompetitive effects.  Broad. Music, 441 U.S. at 19-20.  The rationale for the *per se* rule is to avoid a burdensome inquiry in situations which do not require same.  *See* FTC v. Super. Ct. Trial Lawyers Ass'n, 493 U.S. 411, 433 (1990).  Although group boycotts have frequently been cited as examples of a *per se* antitrust violation, not all alleged  boycotts are predominantly anticompetitive.  *See* Registered Physical Therapists, Inc. v. Intermountain Health Care, Inc., 1988 U.S. Dist. LEXIS 13806 at *19 (D. Utah 1988).  Indeed, "the category of restraints classed as group boycotts is not to be expanded indiscriminately."  Id. at **11-12 (quoting FTC v. Indep. Fed'n of Dentists, 476 U.S. 447, 458 (1986)).  Thus, while "[a]llegations of a concerted refusal to deal arise frequently in the health care industry [and d]enial of hospital staff privileges is frequently alleged to be the product of a group boycott organized by competing health care providers[, i]n such cases, the courts have generally applied the rule of reason, holding that a hospital must be allowed, in conjunction with its medical staff, to exclude individual doctors on the basis of their lack of professional competence or unprofessional conduct."  Diaz, 215 F.3d at 1184; *see also* Pontius v. Children's Hosp., 552 F. Supp. 1352, 1369-70 (W.D. Pa. 1982) ("Because actions on the part of hospitals and physicians, which might resemble group boycotts, may well be mandated by an ethically grounded concern for the patients' well-being, we hold that such behavior, in the medical service

industry, should be analyzed in terms of the rule of reason.").

Because the facts of the instant case do not constitute an "immediately obvious" antitrust violation, the Court must proceed under the rule of reason, and require Plaintiffs to make some showing of anticompetitive effect. *See* Registered Physical Therapists, 1988 U.S. Dist. LEXIS 13806 at *15 (quoting Indep. Fed'n of Dentists, 476 U.S. at 449). Plaintiffs' Count III is therefore DISMISSED with prejudice insofar as it advocates for a *per se* analysis of Plaintiffs' claims.[6]

## II.   Tortious Interference with Contract Claim in Count V

Defendant Elkins's Motion to Dismiss includes a challenge to Plaintiffs' Count V for tortious interference with contract and prospective advantage on the basis that Elkins was acting at all times on behalf of HMC and was therefore a party to the contract between HMC and Dr. Cohlmia.

In order to state a claim for tortious interference with contract, a plaintiff must show that (1) he had a business or contractual right that was interfered with; (2) the interference was wrongful and malicious, and not justified, privileged, or excusable; and (3) the interference proximately caused his damages. Waggoner v. Town & Country Mobile Homes, Inc., 808 P.2d

---

[6]Although Plaintiffs argue that the determination of *per se* analysis versus the rule of reason is not properly made on a motion to dismiss, Plaintiffs cite no authority for their position. Further, the Court does not recognize Plaintiffs' Count III as a separate claim, but rather as an alternative approach to their claims under Sections 1 and 2 of the Sherman Antitrust Act.  In this case, because of the confidential nature of the peer review process and the subsequent deference with which the courts approach issues of health and safety, the Court finds that Plaintiffs could plead no set of facts that would warrant *per se* treatment in this case.  Thus, although Plaintiffs are not foreclosed from arguing, *inter alia*, the existence of an illegal boycott in support of their claim under Section 1 of the Sherman Act, such argument must be accompanied by some showing of anticompetitive effect, pursuant to the rule of reason analysis the Court must perform.

649, 654 (Okla. 1990).  However, "a claim for wrongful interference with contract will not lie where the alleged interferer is a party to the contract with which he allegedly interfered." Chouteau v. Enid Mem'l Hosp., 992 F.2d 1106, 1107 (10th Cir. 1993).  Moreover, in the context of the peer review process, such interference may be justified and/or privileged.  *See* id. at 1108.

Thus, to the extent Plaintiffs here complain that Defendant Elkins interfered with their contract with HMC, Defendant's objection that the claim will not lie is correct, because Elkins was allegedly acting on behalf of HMC, a party to the contract.  However, Plaintiffs also allege interference with their patient relationships, as well as their professional relationships with hospitals, insurance companies, other doctors, etc., to which Elkins is clearly not a party.  To the extent that Elkins's actions on behalf of HMC wrongfully interfered with these contracts, such actions may be considered as relevant.  Subject to Defendant's good faith, such actions could be privileged under the peer review laws; however, the Court does not here reach that determination.  Because Plaintiffs do not allege that Elkins was acting on his own behalf, however, Elkins cannot be personally liable for any damages for tortious interference.  Defendant Elkins's Motion is therefore GRANTED as to Count V, and is otherwise disposed of in accordance with the other relevant rulings herein.  Accordingly, Plaintiffs' Count V is DISMISSED without prejudice as to Defendant Elkins only.

### III.   Defamation Claim in Count VI

Defamation may be of two types: libel, which consists of the publication of defamatory matter by written means, and slander, which consists of oral publication of defamatory matter. *See* Restatement (2d) of Torts § 568.  Such publication must be false and unprivileged, and serve to malign the subject with respect to his profession or otherwise injure him in his occupation.  In

18

pleading defamation, the plaintiff must "afford defendant sufficient notice of the communications complained of to enable him to defend himself." Kelly v. Schmidberger, 806 F.2d 44, 46 (2d Cir. 1986) (citing Liguori v. Alexander, 495 F. Supp. 641, 647 (S.D. N.Y. 1980)) (internal quotations omitted); *see also* 12 Okla. Stat. § 303. The plaintiff must also bring a cause of action for defamation within one year of publication. 12 Okla. Stat. § 95(A)(4). In this case, any claim for defamation based on communications which allegedly occurred prior to July 7, 2004 is time-barred.[7]

Unless otherwise noted herein, the Court finds that Plaintiffs' defamation claims generally satisfy the liberal pleading standard set forth in Fed. R. Civ. P. 8 and the case law cited *supra*.[8] The Court also agrees that the statements as a whole tend to malign the Plaintiffs with respect to their profession. Nonetheless, certain of these statements, however injurious to Plaintiffs' professional reputation, may not constitute defamation as a matter of law.

_____

[7]Plaintiffs filed suit on July 7, 2005, and any actionable defamation claims must have arisen within one year prior to that date. Claims not surviving the statute of limitations include, but are not limited to, those stated in the Amended Complaint at paragraphs 83(a)-(k), 85(a)-(q), 90, 99-101, 105-107, 116(a)-(h), 117(a)-(l), 120, 127-129, and 131. These claims are DISMISSED with prejudice.

The Court also notes that Plaintiffs have not dated many of their defamation claims, including, but not limited to, those stated in the Amended Complaint at paragraphs 91(a)-(c), 98, 134, and 157. Because these claims do not afford Defendants here sufficient notice to raise the statute of limitations defense that they have successfully raised elsewhere, such claims are DISMISSED without prejudice. *See* Ellison v. Sobeck-Lynch, 1997 U.S. Dist. LEXIS 20215 at *5 (W.D. N.Y. 1997) (dismissing defamation claims which did not allege "when the communications were made, whether they were written or oral, the substance of the communications or to whom they were directed").

[8]The Court does note, however, that Plaintiffs' defamation claim consists of four paragraphs stating the claim and one paragraph incorporating the previous 192 paragraphs by reference, thereby necessitating no small amount of speculation as to which statements Plaintiffs allege to be defamatory.

For example, the fact of termination does not itself constitute defamation.  *See, e.g.*,

Chouteau v. Enid Mem'l Hosp., 1991 U.S. Dist. LEXIS 21011 *passim* (W.D. Okla. 1991)

(finding that jurors would be unlikely to find letters, statements, and peer review process

surrounding plaintiff's termination to be defamatory).  Thus, reports made to the National

Practitioner Data Bank would not be defamatory.  Similarly, communications between and

among hospital officers, employees, and/or agents regarding Dr. Cohlmia's termination are also

not defamatory.  *See* Thornton v. Holdenville Gen. Hosp., 36 P.3d 456, 460 (Okla. Civ. App.

2001) ("Communication inside a corporation, between its officers, employees, and agents, is

never a publication for the purposes of actions for defamation.  Although it is called an 'intra-

corporate privilege,' this really is a rule that intra-corporate communications – those between a

corporation's officers, employees, and agents – never reach the point of requiring a privilege,

because they are never actually published if they never go outside the corporation."); Starr v.

Pearle Vision Inc., 54 F.3d 1548, 1553 (10th Cir. 1995) (same).  Claims appearing to allege

intra-corporate communications include, but are not limited to, those stated in Plaintiffs'

Amended Complaint at paragraphs 83(l), 86 (as it relates to OHI's weekly internal meetings),

137, 139, 145, 154, 156, 159, 163-165, and 170 (at least as it relates to Dr. Wexler's comments).

Defendants also allege that these and other claims are privileged and therefore not

actionable, because the statements were made during the peer review process.  *See* Meistrall v.

McPhail, 788 P.2d 1387, 1388-89 (Okla. Civ. App. 1989).  Hospitals have a duty to hire and

retain only those physicians who are competent and in so doing, confer a "moral imprimatur" on

such physicians in the eyes of the public.  *See* id. at 1389.  For this reason, "[c]ommunication in

matters concerning the safety and health of the public must be unrestricted," and certain

communications are therefore privileged and not actionable as defamation.  Id.  In order for the privilege to attach, however, the speakers must be acting in good faith and with reasonable belief that the information is true.[9]  Id. at 1388-89.  Plaintiffs in this case, therefore, have the burden to plead malice (and, in large part, have done so) with regard to statements made during the peer review process, see id. at 1389, including, but not limited to, those alleged in the Amended Complaint at paragraphs 135-137, 139-140, 145, and 154-165.

To the extent that Plaintiffs' allegations of defamation are time-barred, Plaintiffs' Count VI is DISMISSED with prejudice.  Because Plaintiffs' remaining allegations are sometimes unclear as to the relationships between the parties involved in the communications, the timing of the communications, and/or the statements deemed actionable, Count VI is DISMISSED without prejudice, and Plaintiffs are granted leave to amend as necessary to state a claim for defamation.

### IV.   Claim for Violation of 42 U.S.C. § 1981 in Count VII

Plaintiffs allege that Defendant SJMC's summary suspension of Dr. Cohlmia was motivated in part by the unlawful desire to deprive Native American patients of cardiothoracic surgical services at SJMC by eliminating their preferred physician, Dr. Cohlmia. [Am. Compl. ¶ 208.]  Apparently, SJMC was concerned about Dr. Cohlmia's bringing uninsured Native American patients to SJMC for surgery because they were costing the facility money. [Id. ¶ 100.]  Plaintiffs therefore complain that they were unlawfully discriminated against because of their association with members of a protected class, and that they are de facto representatives and

---

[9]Under Oklahoma law, participants in the peer review process are granted immunity from liability in such circumstances.  See 76 Okla. Stat. §§ 25-28.  However, the protection against liability is not available in antitrust or civil rights claims.  Id. § 27.  The question therefore arises whether the antitrust exception might logically extend to the applicability of the privilege against disclosure.  See  infra Section VI.

advocates of the rights of Native American patients to contract for quality health care with the physician of their choice.

The Court does not question Plaintiffs' standing to bring this claim. Although the beneficiaries of § 1981 protections have traditionally been racial minorities, said protections extend to all victims of racial discrimination. *See, e.g.,* Patrick v. Miller, 953 F.2d 1240, 1249-50 (10th Cir. 1992) (citing, *inter alia*, McDonald v. Santa Fe Trail Transp. Co., 472 U.S. 273, 296 (1976), for the proposition that rights of white citizens terminated from employment for their association with protected class members are clearly established); *see also* Solomon v. Waffle House, Inc., 365 F. Supp. 2d 1312, 1321 (N.D. Ga. 2004) (finding that non-minorities may avail themselves of § 1981). However, Plaintiffs must still plead the necessary facts to support the elements of a *prima facie* case under § 1981.

In order to state a claim under § 1981, Plaintiffs must show that (1) Defendants had the intent to discriminate on the basis of race, and (2) said discrimination interfered with an activity protected under the law. *See* Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1102 (10th Cir. 2001). In this case, Plaintiffs make conclusory allegations that SJMC "was motivated, **in part**, by the unlawful desire to deprive Native American patients . . . of cardiothoracic surgical services offered at SJMC" [Am. Compl. ¶ 208 (emphasis added)], but the Court finds these allegations to be largely unsupported, if not nonsensical.

First, the Court notes that Plaintiffs specifically defined their Native American patients as "underinsured," "uninsured," "of modest means," and/or "less profitable," and their association with these patients as being "without regard [for] financial condition." [Id. §§ 93, 121.] Plaintiffs also expressly allege that SJMC was concerned about Dr. Cohlmia bringing Native American

patients **without insurance** to SJMC because it was costing the hospital money. [Id. § 100.]

Notably, however, Plaintiffs do not allege that these Native American patients were treated any

differently than other under- or uninsured patients of different races or ethnic backgrounds; or

that SJMC demonstrated any animus toward Native American cardiothoracic surgery patients

who were, in fact, insured or otherwise able to pay; or that SJMC discriminated against Native

Americans in any other department.  In short, Plaintiffs do not establish that SJMC's concerns

about rising costs were **not** race-neutral, or that SMJC was motivated by animus directed at

anyone – protected class members or not – other than Dr. Cohlmia himself.  Allegations that

Defendants' acts were intentionally discriminatory and racially motivated are essential to an

action under § 1981.  *See, e.g.*, Hampton, 247 F.3d 1091 *passim*.  Here, Plaintiffs allege, at best,

that Defendants' acts were **financially** motivated, and intentionally discriminatory toward Dr.

Cohlmia, with only collateral or coincidental effects on his Native American patients.

Second, the Court notes that Plaintiffs' allegations that Native American patients have

been deprived of their right to contract for quality health care at SJMC is only true insofar as

they cannot contract for Dr. Cohlmia's services there.  Plaintiffs do not expressly state that

SJMC denied treatment to Dr. Cohlmia's Native American patients, only that Dr. Cohlmia

himself was not able to admit them.  In this regard, Plaintiffs' allegations are somewhat similar

to those in Hall v. N.Y. Hosp., 2003 WL 22902125 (S.D. N.Y. 2003), wherein the court found,

"Plaintiff's complaint contains no allegation regarding the § 1981 contract rights he sought to

vindicate.  Rather, plaintiff appears to base his § 1981 claim on the termination of his own

employment contract."  Id. at *6.  The Hall court went on to find:

> Plaintiff's complaint here merely states that he sought to vindicate his black
> patients' rights to not have the hospital depart from their standard duty of care.

23

> Plaintiff makes no other allegations in support of his claim.  Plaintiff fails to
> allege what specific, § 1981 rights he was vindicating.  He fails to allege how and
> when those rights were being violated.  He fails to allege who, specifically, the
> violators were.  **The Section 1981 rights being vindicated by white plaintiffs
> must be identified with some particularity in order to limit actions under
> that statute to its purpose.**

Id. (citing, *inter alia*, Albert v. Carovano, 851 F.2d 561, 572 (2d Cir. 1988)) (internal citations

and quotations omitted).  Although Plaintiffs' claims here are marginally better defined than

those described in Hall, they are nonetheless poorly supported.  Accordingly, because Plaintiffs

failed to allege sufficient facts to support a *prima facie* case under 42 U.S.C. § 1981, Count VII

of Plaintiffs' Amended Complaint is hereby DISMISSED without prejudice.

### V.   Claim for Intentional Infliction of Emotional Distress in Count VIII

Plaintiffs' claim for intentional infliction of emotional distress is challenged by all

Defendants on grounds that (1) Defendants' behavior was not so outrageous as to go beyond all

bounds of civilized society, and (2) Plaintiffs did not suffer severe emotional distress.  The Court

agrees that Plaintiffs have failed to allege facts sufficient to support all the necessary elements of

an intentional infliction of emotional distress claim.  Defendants' Motions to dismiss Count VIII

are therefore GRANTED.

### A.  Defendants' behavior was not sufficiently outrageous.

In order for the tort of intentional infliction of emotional distress to lie, a plaintiff must

allege conduct by the defendant that "has been so outrageous in character, and so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and

utterly intolerable in a civilized community."  Breeden v. League Servs. Corp., 575 P.2d 1374,

1377-78 (Okla. 1978) (quoting Restatement (Second) of Torts, § 46, cmt. d).  The trial court

bears the initial responsibility of determining whether this standard has been met.  Eddy v.

Brown, 715 P.2d 74, 76-77 (Okla. 1986).  Simply stated, Plaintiffs' claim here is little more than

Defendants ousted them from the Tulsa cardiovascular surgery market without good cause,

which conduct is not extreme and outrageous.  *See* Pytlik v. Prof'l Res., Ltd., 887 F.2d 1371,

1379 (10th Cir. 1989).  Oklahoma courts have set a high bar for "outrage," *see, e.g.*, Mirzaie v.

Smith Cogeneration, Inc., 962 P.2d 678 (Okla. Civ. App. 1998), which, given the circumstances

of this case, even at their most dire, the Court finds Plaintiffs would not be able to satisfy.

### B.  Plaintiffs did not allege severe emotional distress.

Plaintiffs' intentional infliction of emotional distress claim fails on a second prong as

well.  First, with regard to Plaintiff Cardiovascular Surgical Specialists Corp., because a

corporation does not have feelings, and therefore cannot suffer emotional distress, this claim

simply cannot lie.  FDIC v. Hulsey, 22 F.3d 1472, 1489 (10th Cir. 1994).  Second, although

Plaintiff Dr. Cohlmia, as an individual, is certainly capable of experiencing emotional distress,

he did not so allege.  Dr. Cohlmia claims to have been "irreparably injured and damaged" but

does not set forth any facts regarding his mental or emotional state, much less distress which "'is

so severe that no reasonable man could be expected to endure it."  *See* Meyer v. Conlon, 162

F.3d 1264, 1275 (10th Cir. 1998) (internal citations and quotations omitted).  Because the Court

does not see how Dr. Cohlmia could possibly succeed on these facts, nor ever plead any that

would satisfy this standard, which is in any event "a hard row to hoe," id., the Court dismisses

Plaintiffs' Count VIII with prejudice, pursuant to the standard set forth in Curley, 246 F.3d at

1281-82 (citing Hall v. Bellmon, 935 F.2d at 1110).

### VI.  The peer review process is not privileged in this case.

Plaintiffs anticipate, and Defendants do not deny, that Defendants may attempt to seek

25

privilege and confidentiality protection under Oklahoma's peer review statutes, 63 Okla. Stat. §§ 1-1709 to 1-1709.1.  Pursuant to the Court's Order of July 20, 2005, the parties filed briefs on the issue of privilege, which reveal the parties' disagreement as to the applicability of the privilege doctrine in this case.  Although Defendants argue that the issue is "not ripe" because they have not yet asserted the privilege "in the context of discovery," the Court notes its Order directed both the subject matter and the time for a decision.  Moreover, because the Complaint was filed under seal, confidentiality is, and has been, an issue in the case, and the Motion to Lift Seal is obviously justiciable.  Accordingly, the matter being fully briefed, the question is now before the Court for determination, in an effort to avoid the frustration noted in the similar case of <u>Teasdale, M.D. v. Marin General Hospital</u>, 138 F.R.D. 696 (N.D. Cal. 1991):

> To date, this litigation, ongoing for several years now, has consisted of one long and contentious discovery battle.  Once again, in the instant motions, defendants hospitals, this time joined by the individual defendants, are attempting to deny plaintiff access to discovery which plaintiff claims is essential to his Sherman Act claim alleging conspiracy and anticompetitive behavior.  Once again, the Court must intervene to settle the matter.
> * * *
> Most easily dispatched is the claim of the individual defendants that California's "peer review privilege" operates to block the requested discovery.  The court thoroughly discussed and rejected defendants' peer review privilege argument, vis-a-vis plaintiff's credentials file, in its [prior order].  The privilege is no more applicable today than it was [then] . . . .
> * * *
> The court notes . . . that it does not intend to tolerate the relitigation of every discovery issue – particularly where, as with the peer review issue, the question has already been litigated twice – via the device of various defendants making the same claims at different times during the litigation.

<u>Id.</u> at 698 & n.5.

The Court finds that the peer review privilege is not applicable in this case.  Plaintiffs have asserted federal antitrust claims, "the public interest in private enforcement of [which] is

simply too strong to permit the exclusion of relevant and possibly crucial evidence by application of the [peer review] privilege."  *See* Mem'l Hosp. for McHenry County v. Shadur, 664 F.2d 1058, 1063 (7th Cir. 1981) (citing Robinson v. Magovern, 83 F.R.D. 79 (W.D. Pa. 1979) and  Feminist Women's Health Ctr. v. Mohammad, 586 F.2d 530 (5th Cir. 1978)).   The Court finds this policy to be particularly applicable where, as here and in the Shadur case, the peer review proceedings themselves are alleged to be a "sham."  Indeed, federal law (*i.e.*, the Health Care Quality Improvement Act of 1986) expressly seeks to protect "innocent and often helpless consumers from abuses by bad doctors without insulating improper anticompetitive behavior from redress."  H.R. Rep. No. 99-903, at 3, 1986 U.S.C.C.A.N. at 6385-86; Teasdale, 138 F.R.D. at 694 ("Congress not only considered the importance of maintaining the confidentiality of the peer review process, but took the action it believed would best balance protecting such confidentiality with other important federal interests.  **Congress spoke loudly with its silence in *not* including a privilege against discovery of peer review materials in the HCQIA.**").  Moreover, in a case involving peer review in academic tenure cases, the U.S. Supreme Court noted, "We are especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself."  Univ. of Pa. v. EEOC, 493 U.S. 182, 189 (1990).

Although Plaintiffs also make claims under state antitrust and tort laws, the peer review privilege still does not apply.  Shadur, 664 F.2d at 1061 ("Although the complaint states a pendent state claim to which the information sought would also be relevant, this fact does not require a different result [because] it would be meaningless to hold the communication privileged for one set of claims and not the other.")(internal citations omitted); Syposs v. U.S.,

63 F. Supp. 2d 301, 305 (W.D. N.Y. 1999) ("Based on the Supreme Court's explicit rejection of a peer review privilege in the University of Pennsylvania and Congress' failure to enact a peer review privilege in HCQIA, this court found no reason to defer to [state] statutory privileges asserted here."); Robinson, 83 F.R.D. at 84 (holding that federal law controlled on the question of privilege in a federal antitrust action, notwithstanding the presence of a state law claim). Moreover, although 63 Okla. Stat. § 1-1709.1 does create a far-reaching peer review privilege for health care professionals, other Oklahoma law is more consistent with the federal law on point.[10] *See, e.g.*, 76 Okla. Stat. § 26 (limiting immunity from tort liability to "[a]ny person who supplies information **in good faith and with reasonable belief that such information is true** to a professional review body") (emphasis added); Id. § 27 (withdrawing protection from liability in antitrust and civil rights cases); Meistrall, 788 P.2d at 1389 n.2 (finding that 76 Okla. Stat. § 24 *et seq.* creates a "conditional privilege" for peer reviewers acting **in good faith**) (emphasis added).

Upon careful consideration, the Court agrees with the court in Atteberry v. Longmont United Hosp., 221 F.R.D. 644 (D. Colo. 2004), that "[e]very legislative and controlling judicial indication is that federal policy under these circumstances, opposes recognition of the quality management and peer review privileges enacted by the [state]." Id. at 647. Plaintiffs' Motion to

---

[10]It is unclear what the interplay between 63 Okla. Stat. § 1-709.1 and 76 Okla. Stat. § 24 *et seq.* might be, if any, as there is remarkably little case law on either statute. Defendants point out that "where a state holds out the expectation of protection to its citizens, they should not be disappointed by a mechanical and unnecessary application of the federal rule." Shadur, 664 F.2d at 1061. However, Oklahoma law holds out not only the expectation of near-absolute confidentiality in the peer review process (63 Okla. Stat. § 1-709.1), but also the expectation that such protection will not apply in antitrust cases (76 Okla. Stat. § 27) or in case of bad faith (76 Okla. Stat. § 26).

Lift Seal is therefore GRANTED in its entirety.  The Amended Complaint in this case may be unsealed, and discovery may proceed unfettered, pursuant to the Court's findings herein that the peer review information is not privileged.  Defendants point out, however, in certain cases involving these parties in Tulsa County, that state court judges have upheld application of the peer review privilege and this Court should therefore consider the instant Motion to Lift Seal "with caution."  To this end, the Court will entertain an agreed protective order pertaining to information disclosed herein that would otherwise be subject to the peer review privilege in state court.  *See, e.g.*, Teasdale, 138 F.R.D. at 700-01 (setting conditions on the compelled discovery of peer review materials to maintain).

### Conclusion

For the reasons stated herein, Defendants' Motions to Dismiss are GRANTED IN PART and DENIED IN PART.  Because Plaintiffs failed to allege sufficient facts to support all elements of a Section II claim under the Sherman Act, Plaintiffs' Count II (and any corresponding claim under state law) is DISMISSED without prejudice.  Likewise, because Plaintiffs failed to allege sufficient facts to support a *prima facie* case under 42 U.S.C. § 1981, Plaintiffs' Count VII is also DISMISSED without prejudice.  Plaintiffs' Count V is DISMISSED without prejudice as to Defendant Elkins only.  Plaintiffs' Count VI is DISMISSED with prejudice as to those defamation claims accruing before July 7, 2004, and without prejudice as to all other claims.  Because Plaintiffs failed to allege sufficient facts to support a *prima facie* case of intentional infliction of emotional distress, and the Court finds that amendment would be futile as to this claim, Plaintiffs' Count VIII is DISMISSED with prejudice.  Plaintiffs' Count III is also DISMISSED with prejudice.  In all other respects, Defendants' Motions to Dismiss are

DENIED.  Plaintiffs' Motion to Lift Seal is GRANTED in its entirety, as the Court finds that the peer review privilege is not applicable to this action.

Plaintiffs are granted leave of Court to file an amended Complaint to address the pleading deficiencies identified herein.  Plaintiffs' amended Complaint shall be filed within 60 days of the date of this Order.

IT IS SO ORDERED this 9th day of August 2006.

James H. Payne
United States District Judge
Northern District of Oklahoma