## N THE UNITED STATE DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF  OKLAHOMA

GEORGE S. COHLMIA, JR. , M.D., and )
CARDIOVASCULAR SURGICAL SPECIALISTS )
CORP., an Oklahoma corporation, )
  )
      Plaintiffs, )
  )
vs. )    Case No. 05-CV-0384 JHP-PJC
  )
ARDENT HEALTH SERVICES, LLC, )
a Delaware limited liability company; AHS )
OKLAHOMA HEALTH SYSTEM, LLP, an )
Oklahoma limited liability partnership; )
HILLCREST MEDICAL CENTER, LLC, )
a Delaware limited liability company; )
HILLCREST HEALTHCARE SYSTEM, AN )
OKLAHOMA CORPORATION d/b/a Hillcrest )
Healthcare System; HILLCREST MEDICAL )
CENTER, an Oklahoma corporation; )
OKLAHOMA HEART INSTITUTE, INC., d/b/a )
Oklahoma Heart Institute, an Oklahoma )
corporation; OKLAHOMA HEART, INC.,  an )
Oklahoma corporation; ST. JOHN MEDICAL )
CENTER, an Oklahoma corporation; CVT )
SURGERY, INC., an Oklahoma corporation; )
FRED GARFINKEL, M.D.; STEVEN )
LANDGARTEN, M.D.; DON LORACK; STEVE )
DOBBS; KEVIN GROSS; MARC S. MILSTEN, )
M.D.; THOMAS D. ROBERTS, M.D.; JAMES )
A. JOHNSON, M.D.; GARY DECKER, M.D.; )
DALE HARRIS; WAYNE N. LEIMBACH, JR., )
M.D.; ROGER D. DES PREZ, M.D.; JOHN )
G. IVANOFF, M.D.; ALAN M. KANESHIGE, )
M.D.; JAMES A. COMAN, M.D.; REBECCA )
L. SMITH, M.D.; ROBERT BLANKENSHIP, )
M.D.; PAUL W. KEMPE, M.D.; FRANK N. )
FORE, M.D.; ROBERT COLE GARRETT, M.D.; )
WILLIAM C. BURNETT, M.D.; HOWARD W. )
ALLRED, M.D.; and JOHN B. FORREST, M.D., )
  )
      Defendants. )

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

Plaintiffs, George S. Cohlmia, Jr. and Cardiovascular Surgical Specialists, (referred to collectively as "Dr. Cohlmia" and/or Plaintiffs), submits their Second Amended Complaint in this matter. For their claims against Defendants, Plaintiffs allege and state as follows:

## I.

## **PARTIES**

1.      Plaintiff, George S. Cohlmia, Jr., M.D. is a resident of the City of Tulsa, County of Tulsa, State of Oklahoma and is a licensed physician in the State of Oklahoma specializing in cardiovascular, thoracic, vascular, and endovascular surgery. Dr. Cohlmia provides cardiovascular and endovascular surgical care to patients in the City of Tulsa, State of Oklahoma and the United States of America and engages in both intrastate and interstate commerce.

2.      Plaintiff, Cardiovascular Surgical Specialists, is an Oklahoma Corporation which provides cardiovascular, thoracic, vascular, and endovascular surgical care to patients in the City of Tulsa, the State of Oklahoma, and the United States of America and engages in both intrastate and interstate commerce. Plaintiff, Dr. George S. Cohlmia, Jr. is the sole owner and shareholder of Cardiovascular Surgical Specialists, Inc (Plaintiffs will be referred to jointly as "Dr. Cohlmia").

3.      Defendant, Ardent Health Services, LLC is a Delaware corporation with its principal offices in Tennessee purposely availing itself of this Oklahoma forum by acquiring and operating healthcare facilities in the State of Oklahoma, along with those facilities' incumbent assets, liabilities and claims in the State of Oklahoma.

4.      Defendant AHS Oklahoma Health System, LLP is a Delaware corporation domesticated and doing business in the State of Oklahoma.

5.     Defendant AHS Hillcrest Medical Center, LLC, is a Delaware corporation domesticated in the State of Oklahoma with principal offices m the State of Oklahoma and doing business as Hillcrest Medical Center.

6.     Defendant Hillcrest Healthcare System is an Oklahoma corporation with principal offices in Tulsa, County, Oklahoma.

7.     Defendant, Hillcrest Medical Center is an Oklahoma corporation with principal offices in Tulsa County, Oklahoma.

8.     Defendants Ardent, AHS Oklahoma, AHS Hillcrest, Hillcrest Healthcare System, and Hillcrest Medical Center (collectively referred to herein as "Hillcrest Medical Center" or "HMC") were, at all times relevant to this action, engaged in the business of providing healthcare, negotiating healthcare agreements, managing physician privileges, and similar activities, in and around the Tulsa, Oklahoma based Hillcrest Medical Center. HMC was and is an economic competitor of Dr. Cohlmia in the subject marketplace.

9.     Defendant Oklahoma Heart Institute, Inc. is an Oklahoma corporation with its principal offices in Tulsa County, Oklahoma.

10.     Defendant Oklahoma Heart, Inc. is an Oklahoma corporation with its principal offices in Tulsa County, Oklahoma.

11.     Defendants Oklahoma Heart Institute, Inc. and Oklahoma Heart, Inc. (collectively referred to herein as "OHI") is a joint venture made up of cardiologists primarily doing business and practicing medicine in the City of Tulsa. OHI was and is an economic competitor of Dr. Cohlmia in the subject marketplace.

12.     Defendant, St. John Medical Center, Inc. ("SJMC") is an Oklahoma Corporation with its principal place of business in Tulsa, Oklahoma. SJMC was and is an economic competitor of Dr. Cohlmia in the subject marketplace.

13.     Defendant, CVT Surgery, Inc. ("CVT") is an Oklahoma corporation with its principal place of business in Tulsa County, Oklahoma. CVT was and is an economic competitor of Dr. Cohlmia in the subject marketplace.

14.     Defendant, Steven Landgarten, M.D. is a doctor of internal medicine and is an employee of Hillcrest Medical Center. At all times relevant to this action, Dr. Landgarten was the Medical Director of HMC and served on the HMC Medical Executive Committee and Credentials Committee. At all times relevant to this action, Dr. Landgarten acted on behalf of himself and HMC.

15.     Defendant, Steve Dobbs, is and at all times relevant to this action was Chief Executive Officer of Hillcrest Medical Center and acted on behalf of himself and HMC,

16.     Defendant, Fred Garfinkel, M.D. is a doctor of internal medicine and served as a member of the HMC Medical Executive Committee and Credentials Committee of HMC and also as the Chairman of the Board of Trustees of HMC. At all times relevant to this action, Dr. Garfinkel acted on behalf of himself and HMC.

17.     Defendant, Thomas D. Roberts, M.D. is a radiologist and was at all times relevant to this action Chief of Radiology at Hillcrest Medical Center. Prior to 2004, Dr. Roberts served as HMC Medical Staff President, and at all times relevant to this action was a member of the HMC Credentialing Committee and Medical Executive Committee. Dr. Roberts is an economic competitor of Dr. Cohlmia in the subject marketplace and acted on behalf of himself and HMC.

18.     Defendant, Marc S. Milsten, M.D. is a urologist and was from 2002 to 2003 the President of the Medical Staff, and in 2004 the Chairman of the Credentials Committee at HMC and has been at all times relevant to this action a member of the HMC Medical Executive Committee. Prior to serving as President of the Medical Executive Committee, Dr. Milsten was President of the Medical Staff at HMC. At all times relevant to this action, Dr. Milsten acted on

4

behalf of himself and HMC.

19.     Defendant, James A. Johnson, M.D., is a general surgeon and at all times relevant to this action served as the Medical Director of the Operating Room Surgical Services of HMC, and was a member of the HMC Credentials Committee and Medical Executive Committee. At all times relevant to this action, Dr. Johnson acted on behalf of himself and HMC.

20.     Defendant, Ronald C. Elkins, M.D., is a cardiovascular and thoracic surgeon and at all times relevant to this action Dr. Elkins acted on behalf of himself and HMC.

21.     Defendant, Wayne N. Leimbach, M.D. is a cardiologist and member of Defendant OHI, as well as a member of the HMC Cardiology Quality Assurance Committee, Peer Review Committee, and Credentials Committee. Dr. Leimbach was and is an economic competitor of Dr. Cohlmia in the subject marketplace and all times relevant to this action Dr. Leimbach acted on behalf of himself, OHI and HMC.

22.     Defendant, Ellen H. Chen, M.D. is a cardiologist and former member of Defendant OHI. Dr. Chen was and is an economic competitor of Dr. Cohlmia in the subject marketplace and all times relevant to this action Dr. Chen acted on behalf of herself, OHI and HMC.

23.     Defendant, Paul W. Kempe, M.D., is a cardiovascular surgeon and member of Defendant CVT.  Dr. Kempe also serves on the HMC Medical Executive Committee, Credentials Committee, and is the HMC Chief of the Section of Cardiothoracic Surgery. Dr. Kempe is an economic competitor of Dr. Cohlmia in the subject marketplace. At all times relevant to this action, Dr. Kempe acted on behalf of himself, CVT, SJMC, and HMC.

24.     Defendant, William C. Burnett, M.D., is a doctor of internal medicine specializing in cardiovascular disease and intervention and is a member of the St. John Heart institute and

was President Elect of the Medical Staff at SJMC. At all times relevant to this action, Dr. Burnett

was an economic competitor of Dr. Cohlmia and acted on behalf of himself, SJMC, and HMC.

25.     Defendant, Howard William Allred, M.D., is a doctor of general surgery

specializing in rectal and colon surgery and was Vice President of Medical Affairs at SJMC. At

all times relevant to this action, Dr. Allred acted on behalf of SJMC and HMC.

## II.

## JURISDICTION AND VENUE

26.     Jurisdiction is proper in this Court based on Federal Question Jurisdiction, 28

U.S.C. § 1331 and 1337 because Plaintiffs claims arise, in part, pursuant to the laws of the

United States of America as enacted by Act of Congress regulating commerce and protecting

trade.

27.     This action is instituted, in part, under Section 4 of the Clayton Act, 15 U.S.C. §

15, 16, and 26, to recover damages for, and to obtain injunctive relief from, injury caused by

Defendants to competition and commerce in the subject marketplace and to the business,

property, and livelihood of Dr. Cohlmia, sustained by reason of violations by Defendants, as

alleged below, of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. § 1 and 2. This action

is further brought under the laws and Constitution of the United States for the violation of civil

rights protected by 42 U.S.C. § 1981.

28.     This Court also has pendent jurisdiction to hear claims brought under the laws of

the State of Oklahoma as asserted by Dr. Cohlmia below.  Jurisdiction is also proper in this

Court pursuant to Oklahoma Antitrust Reform Act, Okla. Stat. Tit. 79, § 202, et. seq., and 76

O.S. § 25-29.

29.     Venue is proper in this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C.

§ 22, and 28 U.S.C. § 1391(b) and (c) because Dr. Cohlmia resides in this District and because

each Defendant transacts business and/or is registered or licensed to transact business in this District and the unlawful actions and conduct of Defendants were carried out within this District.

## III.

## BACKGROUND OF DR. COHLMIA AND CARDIOVASCULAR SURGICAL CONSULTANTS, INC.

30.     Plaintiff, George S. Cohlmia, Jr., M.D. ( "Dr. Cohlmia") is a duly licensed physician in the State of Oklahoma and has practiced cardiovascular, thoracic, vascular and endovascular surgery in Tulsa, Oklahoma since 1984. Dr. Cohlmia is board certified by the American Board of Surgery (1986) and the American Board of Thoracic Surgery (1987).

31.     Dr. Cohlmia is a member of the American Board of Laser Surgery, the American Heart Association, the International College of Surgeons--United States Section, a founding member of the International Society for Minimally Invasive Cardiac Surgery, a founding member of the International Society of Endovascular Specialists, a founding member of the National Cardiovascular Network, a member of the Oklahoma State Medical Society, Southern Medical Association, Tulsa County Medical Society, Tulsa County Surgical Society, and the Society of Thoracic Surgeons. Dr. Cohlmia has also been a member of the Board of Directors of the Tulsa Chapter of the American Heart Association.

32.     Dr. Cohlmia has served as a professor and clinical instructor at the University of Southern California School of Medicine. He has taught at the University of Oklahoma College of Medicine, and in 2002, he was named Outstanding Teacher of the Year at the University of Oklahoma College of Medicine, Tulsa, Department of Surgery.

33.     Prior to the actions and conduct complained of in this action, Dr. Cohlmia served as Member of the Thoracic Quality Assurance Committee, St. John Medical Center (1995-2000), Member of the Cardiovascular Nominating and Credentials Committee, St. John Medical

Center, 1998-1999, Vice-Chief of the Section of Thoracic Surgery, St. John Medical Center (2003), Chairman of the Cardiovascular Surgery Quality Improvement Committee, Hillcrest Medical Center (1994 — January 2003), Co-Chairman of the Cardiovascular Service Line Quality Improvement Committee, Hillcrest Medical Center (1994 - January 2003), Chairman of the Thoracic Surgery Quality Assurance Committee, Hillcrest Medical Center (1994 — January 2003), Intensive Care Committee, Hillcrest Medical Center (1994 — January 2003), Medical Executive Committee, Hillcrest Medical Center (1994 — January 2003), and Chief of Thoracic Surgery, Hillcrest Medical Center (1994 — January 2003).

34.     Dr. Cohlmia co-developed and drafted the credentialing criteria and protocols for physicians to obtain privileges to perform endovascular specialty procedures at HMC in 1990. The credentialing criteria and protocols co-developed by Dr. Cohlmia are still in use today at HMC.

35.     Dr. Cohlmia is a specialist in the field of cardiovascular, thoracic, and vascular surgery and endovascular specialty procedures. Since his arrival in Tulsa in 1984, he has performed over 20,000 surgeries.

36.     Dr. Cohlmia possesses the skill, expertise, and willingness necessary to perform life saving cardiovascular and thoracic surgery on extremely iii and/or dying patients or who are otherwise considered "high risk."

37.     A significant portion of the cardiovascular, thoracic, vascular, and endovascular patients treated by Dr. Cohlmia and Cardiovascular Surgical Specialists are of Native American lineage and descent as Dr. Cohlmia enjoys a reputation for quality and compassionate medical care, and therefore a significant referral base, from physicians at traditionally predominant Native American health care facilities in the subject marketplace. Accordingly, Dr. Cohlmia

enjoys a unique association and relationship with Native American patients, which constitute a protected class of persons under the laws and Constitution of the United States of America.

38.    Unfortunately, Native American patients are considered by Defendant SJMC to be higher health risk patients due to their race and are therefore undesirable patients in that health care facility. However, due to the unique association and relationship Dr. Cohlmia enjoys with Native American patients, and his unparalleled willingness to treat all Native American patients regardless of perceived race related risk factors , Dr. Cohlmia is a *de facto* representative and advocate of the rights of Native American patients to receive quality health care as guaranteed to all citizens of the United States of America, and in particular, guaranteed to all citizens pursuant to 42 U.S.C. § 1981.

39.    Since 1984, and prior to the actions of Defendants complained of below, Dr. Cohlmia received no formal complaints about any surgeries he performed with the exception of one lawsuit tried to a jury which rendered a complete verdict in favor of Dr. Cohlmia and one which was dismissed but recently refiled in response to this lawsuit.

## IV.

## OVERVIEW OF THE SUBJECT MARKETPLACE

40.    The relevant line of commerce in this action involves the provision to patients of cardiology, cardiovascular, thoracic and vascular surgery and endovascular specialty procedures and related subsidiary medical treatments. The line of commerce includes the complimentary products of cardiology and interventional cardiology supplied by Defendant OHI and its members; cardiovascular, thoracic, vascular and endovascular surgery supplied by Defendants CVT, HMC, and their members and employees; and hospital and surgical facilities and support supplied by Defendants HMC and SJMC and its members and employees. Patients in need of cardiovascular, thoracic, endovascular or vascular surgical treatment are typically charged and

required to purchase each product separately but must always purchase them all. Accordingly, the complimentary products described above form the composite product and line of commerce which is the provision to patients of cardiology, cardiovascular, thoracic and vascular surgery and endovascular specialty procedures and related subsidiary medical treatments.

41.     The relevant geographical market in this action is the City of Tulsa, Oklahoma.

42.     The amount of commerce is substantial and includes, *inter alia*, surgical fees, operating room costs, support personnel costs, medical equipment costs, pharmaceuticals and other related products and services. A portion of the fees and costs associated with such commerce in the subject marketplace are received from patients who travel from outside the State of Oklahoma into the geographic market and therefore affects interstate commerce.

43.     The practice of cardiology, cardiovascular, thoracic, and vascular surgery and endovascular specialty services within the subject marketplace also affects interstate commerce by virtue of the fact that a substantial quantity of medical equipment, supplies and pharmaceuticals is purchased from manufacturers in states other than Oklahoma, and substantial amounts of income are received from out-of-state sources such as Medicare, Medicaid, and commercial private insurers.

44.     Prior to the actions of Defendants complained of below, Dr. Cohlmia and his company Cardiovascular Surgical Specialists, served a significant percentage of the existing cardiovascular, thoracic and vascular surgical and endovascular specialty market in the subject marketplace.

45.     The skill, services offered by, and reputation of Dr. Cohlmia had been developed and fostered by Dr. Cohlmia and his company Cardiovascular Surgical Specialists, over the preceding two decades by a relentless pursuit of medical excellence and state-of-the-art

technique coupled with unparalleled compassion, good-will, and accessibility offered to cardiac, thoracic, vascular and endovascular patients in the subject marketplace.

46.    Because of the substantial percentage of the existing cardiovascular, thoracic, and vascular surgical and endovascular specialty services market enjoyed by Dr. Cohlmia and his company Cardiovascular Specialty Services, prior to the actions of Defendants complained of below, Dr. Cohlmia was perceived by Defendants as a significant economic competitor and threat to certain Defendants' market share as well as certain Defendants' desired market share.

47.    Prior to the actions of Defendants complained of below, Dr. Cohlmia and his company Cardiovascular Surgical Specialists, Inc. served a significant percentage of the cardiovascular thoracic, and vascular surgical, and endovascular specialty services for patients at Defendant Hillcrest Medical Center.

48.    Prior to the actions of Defendants complained of below, Dr. Cohlmia and his company Cardiovascular Surgical Specialists, Inc. served a significant percentage of the cardiovascular, thoracic, and vascular surgical, and endovascular specialty services for patients at Defendant St. John Medical Center.

49.    The cardiovascular, thoracic, and vascular surgical and endovascular specialty services performed by Dr. Cohlmia at Defendant hospitals constituted a substantial percentage of Dr. Cohlmia's practice.

50.    As a cardiovascular, thoracic, and vascular surgeon who also specializes in endovascular specialty procedures, Dr. Cohlmia and his patients are dependant upon the provision of the surgical facilities, equipment, medicine, and staff provided by Defendants Hillcrest Medical Center and St. John Medical Center.  The only way a surgeon, such as Dr. Cohlmia, has access to these facilities is by being credentialed and afforded privileges by Defendant hospitals.  Without the credentials and privileges to perform surgical procedures at

Defendant hospitals, Dr. Cohlmia is significantly limited in his ability to properly care for and treat his patients and, in turn, engage in his lawful profession and earn a living. Likewise, patients are deprived of access to, and the option of being treated by Dr. Cohlmia, who comprised a significant source of the services offered to patients in the subject marketplace.

51.     As a cardiovascular, thoracic and vascular surgeon who also specializes in endovascular specialty procedures, Dr. Cohlmia and his patients are dependant upon the pre and post surgical cardiological medical support of the cardiologists at Defendant Oklahoma Heart Institute.   Without pre and post cardiology medical support of his cardiovascular surgical patients, Dr. Cohlmia has a significantly limited ability to properly care for his patients and, in turn, engage in his lawful profession and earn a living.  Likewise, patients are deprived of access to, and the option of being treated by, Dr. Cohlmia, who comprised a significant source of the services offered to patients in the subject marketplace.

52.     As a cardiovascular, thoracic and vascular surgeon who also specializes in endovascular specialty procedures, Dr. Cohlmia and patients in the subject marketplace are also dependant upon the professional referrals from Oklahoma Heart Institute which comprises a large and significant referral source for cardiovascular, thoracic and vascular surgeons in the subject marketplace.  Without such referrals, patients are deprived of access to, and the option of being treated by, Dr. Cohlmia, who comprised a significant source of the services offered to patients in the subject marketplace.

53.     Prior to the actions of Defendants complained of below, Dr. Cohlmia was developing an independent specialty heart and vascular hospital.  The new heart and vascular specialty hospital was being developed by Dr. Cohlmia to provide an alternative source of state-of-the-art medical cardiology, interventional cardiology, cardiac cathertization, cardiovascular surgery, and endovascular specialty services to patients in the subject marketplace. The new

hospital would have restructured and fostered greater efficiency and quality in the provision of such medical care to patients in the subject marketplace, reduced the high concentration of the market with its associated supracompetitive prices and market entry barriers as maintained by Defendants and the small number of existing firms, and therefore lowered costs to consumers, and strengthened and benefited competition.

54.     The new heart and vascular specialty hospital would have provided lower cost, better, more efficient, medical cardiology, interventional cardiology, cardiac cathertization, cardiovascular surgery, and endovascular specialty services to a significant percentage of patients in the subject marketplace and therefore strengthened and benefited competition.

55.     The betterment of quality and efficiency in the provision of medical cardiology, interventional cardiology, cardiac cathertization, cardiovascular surgery, and endovascular specialty services to patients in the subject marketplace would have strengthened competition and therefore benefited patients and the cardiovascular health care system as a whole.

**V.**

**OPERATIVE ALLEGATIONS AND FACTS OF THE CASE**

56.     Unless otherwise noted, all acts and/or omissions of Defendants as set forth below are asserted upon information and belief with a good faith understanding and knowledge of the factual accuracy and evidentiary support of the assertions, either known or anticipated to be the subject of discovery in the course of litigation.

**A.**     **SOME UNDERLYING MOTIVATIONAL CONSIDERATIONS, HMC AND OHI UNLAWFUL ACTIONS, AND THE "THE DR. YOUSUF MATTER."**

57.     In or around the spring of 2002, Dr. Cohlmia and his company Cardiovascular Surgical Specialists, Inc., enjoyed a significant market share of the subject marketplace by virtue of the skill, services offered, and reputation developed and fostered by Dr. Cohlmia over the

preceding two decades and by a relentless pursuit of medical excellence and state-of-the-art technique coupled with unparalleled compassion, good-will, and accessibility offered to cardiac, thoracic, and endovascular patients in the subject marketplace.

58.     Because of the substantial market share of the existing subject marketplace enjoyed by Dr. Cohlmia and his company, Dr. Cohlmia was perceived by Defendants as a significant economic competitor and threat to Defendants' market share as well as certain Defendants' desired market share.

59.     At about this same time, around the spring of 2002, information was divulged by members of Defendants OHI and CVT that Dr. Cohlmia was in the process of developing an independent heart and vascular specialty hospital to provide better, lower cost, and more efficient cardiac medical care patients in the subject marketplace.

60.     At the time such information was divulged regarding the new heart and vascular hospital, Dr. Cohlmia had commissioned and paid for extensive and costly feasibility studies and plans for the new hospital as well as purchased options on real property to serve as the location of the hospital.   The new hospital was projected to be constructed and operational by late 2003 or early 2004.

61.     The market entry of Dr. Cohlmia's new specialty heart and vascular hospital, which would provide better and more efficient state-of-the-art medical cardiology, interventional cardiology, cardiac cathertization, cardiovascular surgery, and endovascular specialty services was perceived by Defendants, including HMC, OHI, SJMC, and CVT, and their individual members, as a direct economic competitor and threat to Defendants' existing and desired market share in the subject marketplace.

62.     The economic threat posed by the market entry of Dr. Cohlmia's new heart and vascular specialty hospital, as well as the ongoing threat and economic competition already

posed by Dr. Cohlmia and his company, caused Defendants to engage in unlawful actions, individually and in combinations, to interfere with Dr. Cohlmia' s ability to practice medicine, destroy his professional reputation, and prevent the market entry of the new heart and vascular specialty hospital.

63.     The unlawful plans and actions of Defendants were also aimed at restricting and/or interfering with Dr. Cohlmia's ability to enter into contracts to practice cardiovascular, thoracic, and vascular surgery and endovascular specialty procedures, and to discredit, defame, and destroy the professional reputation of Dr. Cohlmia with the intention of removing him as a competitor in the subject marketplace and prevent the market entry of Dr. Cohlmia's new heart and vascular specialty hospital and thereby cause harm to competition.

64.     In furtherance of the plan to destroy Dr. Cohlmia as a competitor, prevent the market entry Dr. Cohlmia's new heart and vascular specialty hospital and harm competition in the subject marketplace, in or around the spring of 2002, HMC sought to hire a full time employee cardiovascular surgeon in an effort to consume and supplant Dr. Cohlmia's practice and convert Dr. Cohlmia's patient base into its own.

65.     HMC's desire to hire an employee cardiovascular surgeon was unusual on its face. Normally, cardiovascular surgeons are independent contractors associated with hospitals though obtaining privileges to practice various fields of medicine at the hospital. Hiring an employee cardiovascular surgeon is out of the ordinary.

66.     HMC sought and obtained the aid of Oklahoma Heart Institute in its endeavor to hire an employee cardiovascular surgeon in furtherance of its plan to consume and subvert Dr. Cohlmia's practice at the hospital and in the subject marketplace.

67.     In furtherance of its desire to destroy Dr. Cohlmia and prevent the market entry of the new heart and vascular specialty hospital, OHI agreed to help HMC recruit and hire an

employee cardiovascular surgeon. OHI also agreed to make surgical referrals only to the new employee surgeon and to boycott Dr. Cohlmia and his professional services.

68.     OHI and its individual members also desired to see Dr. Cohlmia removed from the subject marketplace and/or otherwise harmed professionally because OHI and its members viewed Dr. Cohlmia as being too honest with his patients by occasionally noting deficiencies in the cardiological care performed by OHI physicians in a patient's chart.  OHI believed that if such information "ever got out" about its doctors, it might be sued. Thus, OHI viewed Dr. Cohlmia as a "whistleblower."  This perception was an additional motivating factor behind OHI's and its members continued unlawful actions against Dr. Cohlmia.

69.     In furtherance of its own desire to see Dr. Cohlmia harmed as well in furtherance of its agreement with HMC, OHI cardiologist Dr. Rebecca Smith identified, located, and helped HMC lure Dr. Arshad Yousuf to Tulsa to become HMC's new employee cardiovascular surgeon.

70.     As part of his duties as HMC Chief of the Section of Cardiothoracic Surgery, Dr. Cohlmia dutifully evaluated the credentials file of Dr. Yousuf in order to approve him as competent to treat patients and perform surgeries safely at HMC.  The credentials file on Dr. Yousuf was presented to Dr. Cohlmia for review by HMC Medical Director Dr. Steven Landgarten. Dr. Cohlmia approved Dr. Yousuf to perform surgeries and treat patients based on the information provided in Dr. Yousuf's credentials file.

71.     Although Dr. Cohlmia had no reason to take him seriously at the time, Dr. Yousuf stated the intentions of HMC right away.  In one of their first meetings after Dr. Yousuf joined the HMC employee staff, Dr. Yousuf told Dr. Cohlmia that he was there to "take over" Dr. Cohlmia's practice at HMC.

72.     Dr. Cohlmia was made aware of problems with Dr. Yousuf almost immediately. Indeed, Dr. Yousuf's first surgical patient died. Over the course of the summer and fall of 2002,

Dr. Cohlmia was approached by many HMC nurses, surgical assistants, and scrub techs who voiced their concerns about Dr. Yousuf s lack of surgical judgment and skill.

73.     In or around the winter of 2002, Dr. Cohlmia was contacted by another physician at another facility who asked Dr. Cohlmia why he had approved Dr. Yousuf based on the contents of his credentials file.  Dr. Cohlmia did not know what the physician was talking about. The physician then told Dr. Cohlmia about a letter in Dr. Yousuf's credentials file by a thoracic surgeon named Dr. Valerie Rusch from the Sloan-Kettering Hospital in New York City who had observed Dr. Yousuf in a surgical residency program in 2000.  The letter was nothing less than a frightening account of Dr. Yousuf's deficient surgical skill, knowledge, understanding and judgment. The letter, however, was not contained in the credentials file of Dr. Yousuf presented to Dr. Cohlmia by HMC Medical Director Steven Landgarten.

74.     Upon discovery that such important information concerning Dr. Yousuf's competence had been withheld from him in his role as Chief of Section and because of his duty to screen applicants in furtherance of patient safety, Dr. Cohlmia sought to discuss the matter with HMC administration and Board of Trustees. Dr. Cohlmia's repeated requests for an explanation as to what was going to be done about the problem were rebuffed and/or ignored by the HMC administration and Board of Trustees.

75.     Left with no choice after being stonewalled by HMC administration and Board of Trustees, in January of 2003 Dr. Cohlmia made public statements about the significant patient safety issue at hand and that HMC withheld important patient safety information from him and was now ignoring the problem.

76.     Dr. Cohlmia's exposure of HMC's cover-up of the Dr. Yousuf issues infuriated and embarrassed Defendants.  Now, not only did Dr. Cohlmia pose an ongoing and increasingly greater economic threat by virtue of the market entry of a better, more efficient heart and

vascular specialty hospital, Dr. Cohlmia was now labeled a "whistle blower" because he violated a code of silence with regard to issues or situations that could expose Defendants to legal liability for negligent patient care.  As such, Dr. Cohlmia was *persona non grata* to Defendants.

77.     Accordingly, in January of 2003, Defendants, individually and in combinations, embarked on a merciless campaign to strip Dr. Cohlmia of his hospital privileges, destroy his reputation and, in turn, eliminate the economic competition he posed, prevent the market entry of a better and more efficient heart and vascular specialty hospital, shrink and damage the subject marketplace to the detriment of patients and competition, and mete out retribution upon Dr. Cohlmia personally.  Defendants' designs to oust Dr. Cohlmia from the subject marketplace would be without regard for him, his family, his patients, and the patient community at large in the subject marketplace.

### B.     DEFENDANTS HMC, OHI, AND CVT'S CONTINUED UNLAWFUL ACTION AGAINST  DR. COHLMIA.

78.     In January 2003, in furtherance of the illegal plans set forth above, HMC through Defendant Dr. Fred Garfinkel, terminated Dr. Cohlmia from his position as Chief of Section and informed him that his actions might lead to being stripped of his hospital privileges.

79.     HMC replaced Dr. Cohlmia as Chief of Section with Defendant Dr. Paul Kempe, a cardiovascular surgeon with Defendant CVT group. Dr. Kempe and his group of fellow cardiovascular surgeons at CVT are direct economic competitors of Dr. Cohlmia, and up to this point in time, practiced almost exclusively at Defendant SJMC and held positions of leadership at SJMC.

80.     Dr. Kempe is also a former business associate of Dr. Cohlmia and is personally bitter and biased toward Dr. Cohlmia as a result of being ordered by an arbitrator to pay Dr. Cohlmia money owed pursuant to a contractual obligation.  In fact, Dr. Kempe expressed his

disdain toward Dr. Cohlmia by writing on the two payment checks to Dr. Cohlmia that he thought Dr. Cohlmia was "evil" and that payment of the amounts ordered was an "injustice."

81.     In furtherance of its unlawful designs to eliminate Dr. Cohlmia as a competitor and prevent the market entry of Dr. Cohlmia's new heart and vascular specialty hospital, HMC enlisted Dr. Kempe and the other cardiovascular surgeons from CVT and through their positions of leadership and authority at SJMC, employed or attempted to employ the cooperation of SJMC against Dr. Cohlmia.

82.     In February 2003, HMC unilaterally terminated a long standing exclusive contract with Dr. Cohlmia to handle all of HMC's managed care patients.  The exclusive contract was then granted to the cardiovascular surgeons of Defendant CVT.

83.     HMC, its administration, and members of its Medical Executive Committee and Credentialing Committee, acting with great impunity, made it clear that Dr. Cohlmia was the target of their unlawful designs, and that Defendants CVT, OHI, and their respective members, were working independently and in combinations to oust Dr. Cohlmia from the subject marketplace and harm him personally and professionally.  Actions evidencing this include, but are not limited to, the following:

a. In or around January of 2003, HMC administrators, Medical Executive Committee members and Credentials Committee members formed an *ad hoc* committee, which included Defendant OHI Dr. Wayne Leimbach, to research "mortality and morbidity" statistics of Dr. Cohlmia in an effort to compile data for use in stripping Dr. Cohlmia of his medical staff privileges.

b. In or around January of 2003, HMC administrators, Medical Executive Committee members and Credentials Committee members directed HMC nurses and medical staff to secretly scrutinize and follow day-by-day all of Dr. Cohlmia's patient charts in an effort to find something for use in stripping Dr. Cohlmia of his medial staff privileges.

c. In or around February of 2003, Defendant Dr. James A. Johnson, of the HMC Medical Executive Committee and Credentials Committee, told nurses at HMC that Dr. Cohlmia's medical staff privileges at HMC were going to be revoked.

d.  In or around March of 2003, Defendant Dr. James A. Johnson told Dr. Craig Adams, an associate of Dr. Cohlmia's, that Dr. Cohlmia had angered HMC and that HMC directed OHI to send all of their patients to Defendant CVT surgeons Defendant Drs. Blankenship, Fore, Kempe, and Garrett at SJMC rather than to Dr. Cohlmia.

e.  In or around March of 2003, Defendant Dr. James A. Johnson told Dr. Adams that he should "just wait six months and see what happens to Dr. Cohlmia."

f.  In or around March of 2003, Defendant Dr. James A. Johnson told nurses at HMC that all the cardiovascular surgeons in town had been rallied to help get Dr. Cohlmia's medical staff privileges revoked and then all the other surgeons could come back to HMC.

g.  In or around April of 2003, Defendant OHI Dr. Alan Kaneshige informed Dr. Adams that he would never get another referral from OHI unless he disassociated himself from Dr. Cohlmia.

h.  In or around May of 2003, HMC physician Dr. Kent Towsley told a group of physicians in Bristow, Oklahoma, that HMC was waging a "turf war" against Dr. Cohlmia.

i.  In or around May of 2003, Defendant and Chief Executive Officer of HMC Steve Dobbs, told medical personnel at HMC that Dr. Cohlmia was "history."

j.  In or around May of 2003, Defendant CEO of HMC Steve Dobbs affirmed that OHI and its members had agreed not to refer any more cases to Dr. Cohlmia and that if a patient at OHI requests Dr. Cohlmia for their surgical care, OHI will tell the patient to find another cardiologist.

k.  In or around June of 2003, Defendant and Medical Director of HMC Dr. Steven Landgarten stated that it was "too bad" that Dr. Adams was not going to make any money because of his affiliation with Dr. Cohlmia since OHI had agreed not to refer patients to Dr. Cohlmia or his group Cardiovascular Surgical Specialists.

1.  In or around August of 2004, HMC Medical Executive Committee member Dr. Tom Roberts and HMC Chairman of the Board of Trustees, Dr. Fred Garfinkel told Dr. Craig Adams (who performs surgical procedures exactly the same as Dr. Cohlmia) not to worry about losing any privileges because "Dr. Cohlmia brought this on himself."

### C.   DEFENDANTS USE PATIENTS AS PAWNS IN THEIR EFFORTS TO INJURE DR. COHLMIA AND THEREBY HARM COMPETITION IN THE SUBJECT MARKETPLACE.

84.    The designs of Defendants to destroy Dr. Cohlmia, remove him as competition in the subject marketplace, and prevent the market entry of a better, more efficient heart and

vascular specialty hospital, were not impeded by any concern for the safety of patients.  To the contrary, patients were used as pawns in Defendants' illegal plans.

85.   Indeed, Defendant OHI and its members agreed and adopted the policy to cease providing cardiological medical care to any patient of Dr. Cohlmia who refused to be referred to a different cardiovascular surgeon or who requested the services of Dr. Cohlmia from the outset. This outrageous policy and practice of OHI continues to this day.  Examples of this conduct, include, but are not limited to, the following:

a. In or around February 2003, OHI Drs. Roger Des Prez and Ellen Chen refused the request of a patient to have Dr. Cohlmia perform necessary surgery.  When the patient insisted, Dr. Chen became angry at the patient and slammed the patient's hospital room door.

b. In or around February of 2003, rather than have recent HMC cardiac cathertization patients followed-up by Dr. Cohlmia, OHI Dr. Wayne Leimbach sent the patients home with orders to follow-up with surgeons from Defendant CVT at another facility.

c. In or around March of 2003, OHI Dr. Roger Des Prez informed a referring primary care physician of a patient treated previously by Dr. Cohlmia, that it was OHI's policy to "sign off the case" of any patient being treated by Dr. Cohlmia.  Dr. Des Prez warned the physician to stop referring patients to Dr. Cohlmia if he wanted OHI to provide cardiology support to his patients.

d. In or around March of 2003, OHI Dr. Roger Des Prez marked out Dr. Cohlmia's name on a cardiac patient's medical chart where Dr. Cohlmia was listed as the surgeon on the case.

e. In or around March of 2003, OHI Dr. Wayne Leimbach refused the requests of primary care physicians to refer Dr. Cohlmia to the cases of several Native American patients.  Dr. Leimbach informed the physicians that OHI would drop the patients if they continued to request Dr. Cohlmia on their cases.

f. In or around April 2003, OHI Dr. Robert Lynch informed a primary care physician who requested Dr. Cohlmia for surgery on his patient's case, that OHI would cease providing medial care for the patient if the physician continued to insist on Dr. Cohlmia for surgery.

g. In or around April of 2003, the family of a patient of Dr. Cohlmia was told by OHI physicians that HMC was getting rid of Dr. Cohlmia and that Dr. Cohlmia was no longer welcome at HMC, and therefore that patient should use CVT surgeons, Drs. Garrett or Kempe.

h.  In or around May of 2003, physicians from OHI and HMC falsely stated to patients of Dr. Cohlmia that he had been "kicked off" of HMC's insurance plan and was therefore unavailable to them.

i.  In or around May of 2003, Dr. Cohlmia's associate, Dr. Craig Adams, was called emergently to perform surgery on a patient with an infected pacemaker device which had previously been placed in the patient by a physician at OHI.  Dr. Adam's called OHI Dr. Roger Des Prez to learn the sequence to deactivate the device prior to beginning surgery. Dr. Des Prez refused to tell Dr. Adams how to deactivate the device because of Dr. Adam's association with Dr. Cohlmia.  Dr. Adams was therefore forced to deactivate the device with a magnet so that he could safely perform surgery.

j.  In or around June of 2003, OHI Dr. Ellen Chen told a referring physician that she would "sign off the case" of a patient in need of heart bypass surgery if the referring physician insisted on sending the patient to Dr. Cohlmia.

k.  In or around September of 2003, OHI Dr. Rebecca L. Smith terminated her care of a patient of Dr. Cohlmia's associate Dr. Craig Adams.  When Dr. Adams made inquiry to OHI about what happened, OHI Dr. Robert Sonnenschein informed Dr. Adams that he was sorry but OHI would no longer consult with patients of Dr. Cohlmia or his associates.

1.  In or around January of 2004, OHI Dr. Robert Lynch informed a patient in need of a carotid endarterectomy who requested Dr. Cohlmia for the procedure that OHI would not refer the patient to Dr. Cohlmia and that if the patient wanted Dr. Cohlmia for surgery, OHI would cease to provide cardiology care.

m. In or around January of 2004, OHI Dr. Raj Chandwaney terminated his cardiology care of a patient who requested Dr. Cohlmia for surgery.

n.  In or around March of 2004, OHI Dr. Robert Lynch told a long time cardiac patient of Dr. Cohlmia's that OHI no longer associated with Dr. Cohlmia and that OHI would cease to serve as the patient's cardiologist if the patient insisted on continuing to see Dr. Cohlmia.

o.  In or around May of 2004, a patient in need of a carotid endarterectomy requested that Dr. Cohlmia perform the procedure.  OHI Dr. Wayne Leimbach told the patient to find another cardiologist if the patient chose to use Dr. Cohlmia.

p.  In or around June of 2004, a long time cardiac patient of Dr. Cohlmia in need of a carotid endarterectomy asked OHI Dr. Alan Kaneshige to refer him to Dr. Cohlmia for the procedure.   Dr. Kaneshige told the patient to find a new cardiologist if the patient wanted to see Dr. Cohlmia.

q.  In or around June of 2004, a long time patient of Dr. Cohlmia's with chest pain requested a referral to Dr. Cohlmia from OHI Dr. James Coman, Jr.  Dr Coman refused and told the patient to find a new cardiologist if the patient insisted on seeing Dr. Cohlmia.

r.  In or around August of 2004, the referring physician of a Native American patient referred to Dr. Cohlmia for surgery was berated by a physician at OHI for making the referral to Dr. Cohlmia and told that the referral should be made to another surgeon.

s. In or around August of 2004, a long time Native American patient of Dr. Cohlmia who was awaiting surgery was told by a physician from OHI that Dr. Cohlmia no longer worked at HMC and that the surgery should be performed by a surgeon from CVT.

t.  In or around September of 2004, OHI Dr. Sonnenschein made the false statement to a patient who requested Dr. Cohlmia for surgery that Dr. Cohlmia would not be able to perform the surgery since Dr. Cohlmia no longer worked at HMC.

u. In or around September of 2004, OHI Dr. Alan Kaneshige told a patient who requested Dr. Cohlmia to perform a carotid endarterectomy that he would not continue to be the patient's cardiologist if the patient used Dr. Cohlmia for surgery.

v. In or around September 2004, a patient referred to Dr. Cohlmia for surgery was informed by OHI Drs. Leimbach and Sonnenschein that OHI was "signing off the patient" as cardiologists because Dr. Cohlmia was involved in the patient's care.

w. In or around November 2004, a patient referred to Dr. Cohlmia for carotid endarterectomy was intercepted by OHI Dr. Wayne Leimbach before surgery and told to either get another surgeon to perform the surgery or else OHI would cease providing cardiology care for the patient.

x. In or around December of 2004, a long time patient of Dr. Cohlmia was told by OHI Drs. Leimbach and Sonnenschein to get another surgeon or OHI would terminate its care of the patient.

y. In or around August of 2005, CVT surgeon Dr. Frank Fore, working in cooperation with HMC and OHI, told the family of a cardiac patient who requested to see Dr. Cohlmia that if they did so, he would pull the entire cardiology team off of the patient and that they would be left without proper medical care.  Dr. Fore also made false and disparaging statements to the patient's family that Dr. Cohlmia was "sue happy" in reference to this lawsuit.

86.    The above examples of the length that OHI, its members, and other Defendants have gone to destroy Dr. Cohlmia personally and the competition he posed are not exhaustive. Indeed, to this day OHI and its members continues to refuse to treat patients of Dr. Cohlmia, threaten to stop treating patients who request Dr. Cohlmia, threaten other physicians who refer patients to Dr. Cohlmia, and lie to patients about the professional status of Dr. Cohlmia.  In fact,

OHI's policy against Dr. Cohlmia is so strong that he has been made part of the normal agenda for discussion at OHI's weekly internal meetings.

87.     Another method employed by Defendant OHI and its members to harm Dr. Cohlmia and the competition he presents is to send cardiac patients who request Dr. Cohlmia to surgeons in Oklahoma City or out-of-state for surgery.

88.     For the most part, however, OHI referrals which used to go to Dr. Cohlmia, now go to the surgeons of Defendant CVT, Defendant Drs. Fore, Blankenship, Kempe, and Garrett. Thus, patients have been deprived of access to and the option of choosing Dr. Cohlmia as their surgeon.

89.     Using patients as pawns in the illegal campaign to harm Dr. Cohlmia and the competition he poses is not unique to OHI, CVT and their member physicians.  To the contrary, HMC and its administration and staff have resorted to egregious tactics without concern for the safety of the patients to accomplish its goals. Examples of such conduct included, but are not limited to:

a. In or around October of 2003, a cardiac patient pre-approved by Blue Lincs HMO for surgery with Dr. Cohlmia, was abruptly canceled by HMC after HMC unilaterally canceled Dr. Cohlmia's Blue Lincs HMO approval. The patient was then referred to CVT surgeon Dr. Frank Fore.

b. In or around February of 2004 a severely ill Native American cardiac patient of Dr. Cohlmia was refused admission to HMC's cardiac step-down floor despite the availability of at least two beds upon direct orders by HMC CEO Steve Dobbs who told admissions personnel that the floor was reserved for OHI patients only and that a patient of Dr. Cohlmia's would not be admitted.

c. In or around September of 2004, a patient requesting surgery from Dr. Cohlmia was told by OHI Dr. Wayne Leimbach and HMC Medical Director Dr. Steve Landgarten that the patient was "high risk" for surgery and had to be cleared by a pulmonologist. The pulmonologist cleared the patient for surgery. Despite having clearance, Dr. Landgarten personally cancelled the surgery and discharged the patient.

**D.**     **DEFENDANTS' UNLAWFUL INTERFERENCE WITH THIRD-PARTY HEALTH CARE GROUPS AGAINST DR. COHLMIA.**

24

90.     Patients are not the only innocent parties used by Defendants in the effort to destroy Dr. Cohlmia and the competition he posed.  In or around March of 2004, OHI Dr. James Coman, Jr., HMC CEO Steve Dobbs, and HMC Medical Director Dr. Steven Landgarten threatened representatives of the medical device company "Medtronic" to not provide support for Dr. Cohlmia or his associate Dr. Adams with Medtronic products or else OHI and HMC would "blackball" Medtronic products from their facilities and use entirely.

91.     Defendants are not restricted to the confines of their own facilities in their efforts to harm Dr. Cohlmia and the competition he poses.  They have also unlawfully interfered with Dr. Cohlmia's business and professional dealings with third-party health care organizations, including the traditionally Native American health care organizations in which Dr. Cohlmia has enjoyed long standing business and professional relationships.   Examples of such conduct include, but are not limited to:

a. Defendant HMC through representatives Kevin Gross and Dale Harris, OHI through its representatives Dr. Wayne Leimbach and Dr. Roger Des Prez attempted to persuade the Cherokee Nation and the Cherokee Indian Hospital to enter into an exclusive contract whereby HMC and OHI would receive all cardiology and cardiac patient referrals.  Part of the proposed contract included the provision that the Cherokee Nation and the Cherokee Indian Hospital would cease making referrals to or requesting the services of Dr. Cohlmia.  Defendant Dale Harris attempted to persuade the Cherokee Nation and the Cherokee Indian Hospital to boycott Dr. Cohlmia by falsely stating that Dr. Cohlmia was soon going to lose his medical staff privileges at HMC.

b. Similarly, Defendants HMC through Kevin Gross and Dale Harris, and OHI attempted to obtain an exclusive contract with Tahlequah City Hospital, the terms of which required the cessation of all referrals to Dr. Cohlmia.  As part of the pitch to persuade Tahlequah City Hospital to boycott Dr. Cohlmia, Defendants falsely stated that Dr. Cohlmia does too many surgeries with poor results, has problems with patients, and that he lost his privileges at HMC.

c. In or around August of 2005, representatives of HMC made disparaging and false statements about Dr. Cohlmia to the head of contract health for the Creek Nation in an effort to persuade the Creek Nation from referring patients to Dr. Cohlmia.

**E.     St. John Medical Center Acts Individually and in Combination with Defendants  to Harm Dr. Cohlmia and Competition;  St. John Racially Discriminates Against Native American Patients.**

92.     The continued harassment and unlawful actions of HMC and its administration, individually and in combinations with OHI, CVT, and their member physicians, forced Dr. Cohlmia to admit a greater number of patients to St. John Medical Center for surgery.

93.     In 2003, Dr. Cohlmia had had privileges at SJMC for 19 years.  He had been fully re-credentialed to the SJMC medical staff only one year previously and elected by his peers Vice-Chief of the Section of Thoracic Surgery.  In 19 years of practice at SJMC, Dr. Cohlmia had an unblemished record of treatment and care for patients.

94.     Included in the increased number of patients Dr. Cohlmia was forced to refer to SJMC for surgery was a large percentage of Native American patients from traditionally Native American health care organizations with which Dr. Cohlmia had a long standing association for providing treatment.

95.     At the time, SJMC served as the primary surgical facility for surgeons from Defendant CVT, including Dr. Paul Kempe, Dr. Frank Fore, Dr. Robert Blankenship, Dr. Paul Kempe, and Dr. Robert Garrett.

96.     Because Dr. Cohlmia was then sending more patients to SJMC for surgery, CVT and its surgeons had to share operating room facilities with Dr. Cohlmia.

97.     CVT, it surgeons, and SJMC believed this situation was causing them to lose lucrative operating room time and reduce their per-patient profit.

98.     This situation, coupled with the economic competition already posed by Dr. Cohlmia, the economic threat posed by the market entry of Dr. Cohlmia's new heart and vascular specialty hospital, as well as being labeled by Defendants as a "whistle blower," motivated SJMC, alone and in combinations with other Defendants, to promote an unlawful campaign to force Dr. Cohlmia and his patients out of SJMC, destroy his professional reputation, and provide

a catalyst for continued detrimental actions by other Defendants in order to injure Dr. Cohlmia and harm competition in the subject marketplace.

99.     To accomplish this end, in or around May of 2003, directives were made by SJMC administration, including SJMC Medical Director Dr. Howard William Allred and SJMC Chief of Medical Staff, Dr. John Bennett Forrest, M.D., to SJMC nursing and medical staff to secretly search and scrutinize all of Dr. Cohlmia's patient files to look for something to use against Dr. Cohlmia.

100.    At around the same time, CVT surgeon Dr. Frank Fore affirmed that SJMC was secretly scrutinizing Dr. Cohlmia.

101.    Per the directives of SJMC to scrutinize Dr. Cohlmia's cases, on or around June 7, 2003, the charts of two advanced lung cancer patients who underwent thoracotomy surgeries the previous day by Dr. Cohlmia were brought up by a nurse to SJMC Medical Director Dr. Howard William Allred.

102.    There are no universally recognized standards or protocols for pre-surgical work-up for lung cancer patients.  Dr. Cohlmia had treated each patient previously and evaluated x-rays and CT scans of each patient as well as their medical history prior to surgery.  Dr. Cohlmia also explained in great detail the benefits and risks of the surgeries to both patients and their families as well as the option of obtaining additional diagnostic testing.  Both patients and their families made informed decisions to carry on with surgery.  Due to dreadful nature of the disease of lung cancer, both surgeries were complicated and required the removal of large cancerous tumors which had attached themselves to lung and other thoracic tissues and organs.

103.    SJMC and its administration saw these two lung cancer surgeries, due to their inherent complexity, variability, and graphic nature, as an opportunity to unlawfully remove Dr. Cohlmia and his patients from the SJMC facility, and in turn, from the subject marketplace.

104.    In furtherance of its unlawful design, SJMC made the outlandish assertion that the two lung cancer thoracotomies evidenced "bizarre" and "profoundly deranged" medical judgment by Dr. Cohlmia.

105.    The basis for such an inflammatory assertion, however, was only that Dr. Cohlmia and the two patients chose to proceed to surgery without additional and/or cumulative diagnostic testing.

106.    Indeed, SJMC made the allegation in bad faith and without a reasonable basis in fact since it knew that neither of the patients had the means to pay for additional and/or cumulative testing, that such testing had previously been ordered by Dr. Cohlmia for other patients and denied by Medical Director Dr. Howard William Allred, that such testing posed significant risks to the patients, and that such testing would have delayed the surgeries -- placing both patients at greater risk of death from the cancer.

107.    Nevertheless, on July 8, 2003, thirty-three days after the two surgeries took place, SJMC unlawfully, in bad faith, and without a reasonable belief or basis in fact that Dr. Cohlmia posed a danger to the safety of patients, "summarily suspended" Dr. Cohlmia based solely on the two thoracotomies which took place on June 6, 2003.

108.    Without any prior notice whatsoever, Dr. Cohlmia was literally locked out of the SJMC facility on July 8, 2003 while attempting to enter the premises to care for patients.

109.    The "summary suspension" was clearly levied in bad faith and without a reasonable belief or basis in fact that Dr. Cohlmia posed an immediate threat to the health or safety of patients given that:

a. Dr. Cohlmia had practiced and performed surgeries for 19 years at SJMC without any incident or problem whatsoever and had an unblemished record;

b. During the 33 days between the two thoracotomies (June 6, 2003) and the "summary suspension" (July 8, 2003), no one from St. John asked Dr. Cohlmia about the two surgeries or gave him notice that the two surgeries were being investigated;

c. Dr. Cohlmia was permitted to perform 34 surgeries, including thoracic surgeries, between June 6th and July 8th at SJMC without incident, problem or complication. Thus, there was no reasonable belief that the sanction of "summary suspension" was warranted to protect the health and safety of patients;

d. "Summary suspension" was an inappropriate sanction for the complained of problem, *i.e.*, total revocation of all privileges in response to an alleged problem with an isolated and unique type of surgery;

e. No reasonable effort to obtain the facts of the matter ever occurred prior to SJMC's "summary suspension" of Dr. Cohlmia, *i.e.*, no thoracic surgeon or other specialist in the field of lung cancer surgery was ever asked to evaluate the procedures before the summary suspension, and no peer review or quality assurance process was ever instituted.

110.    Instead, Defendant Dr. William Burnett, a cardiologist who has never performed surgery, Defendant Dr. Howard William Allred, a rectal and colon doctor with no experience treating lung cancer, and urologist Dr. John B. Forrest decided to "summarily suspend" Dr. Cohlmia in furtherance of the illegal plan of SJMC to force Dr. Cohlmia and his patients out of SJMC and, eventually, out of the subject marketplace.

111.    "Summary Suspension" is an extremely harsh, professionally damaging action permitted to be implemented by the SJMC administration in only rare cases.  The SJMC by-laws set forth the criteria necessary for implementing "summary suspension" against a staff physician as follows:

Whenever a Practitioner's conduct requires that ***immediate*** action be taken to protect the life of any patient(s) or to reduce the ***substantial likelihood of <u>immediate</u> injury or damage*** to the health of any patient, employee or other person present in the Hospital, any person or body authorized to initiate corrective action pursuant to 7.1-1, shall have the authority to summarily suspend the Medical Staff membership status or all or any portion of the Clinical privileges of such Practitioner.

112.    Unlike the two surgeries of Dr. Cohlmia complained of, "summary suspension" is utilized in situations typically where a physician is believed to be impaired on alcohol, drugs, or exhibits dangerous, erratic, or violent behavior, *i.e.* conduct which carries the ***"substantial***

29

***likelihood of <u>immediate</u> injury or damage*** to the health of any patient, employee or other person present in the Hospital."

113.     Other, less draconian, measures are available and utilized by SJMC for perceived problems associated with the medical care provided a patient by a Practitioner. These include: peer review and/or quality assurance review, letter of admonition, revocation of privileges for a limited time, modification of privileges, *i.e.*, imposition of proctoring or monitoring, reduction of privileges, limitation of privileges, or revocation of privileges in part, and appearance before the Medical Executive Committee.

114.     SJMC and its administration chose to utilize the "summary suspension" action against Dr. Cohlmia *33 days after* the subject medical treatment rendered by Dr. Cohlmia in a bad faith, calculated effort to avoid the peer review and/or quality assurance process and the associated paper trail, outside physician involvement, and *any involvement* by Dr. Cohlmia himself.

115.     Following the bad faith and unreasonable "summary suspension" on July 8, 2003, Dr. Cohlmia, in accordance with SJMC by-laws, had no choice but to request a hearing on the matter.   The hearing was commenced on August 21, 2003 and was no more fair than the "summary suspension" itself. Evidence of the bad faith and unreasonable nature of the SJMC hearing includes, but is not limited to, the following:

a.  SJMC was represented by the same law firm who represented HMC and Dr. Arshad Yousuf in every medical malpractice case then pending and also represented HMC in a separate, unrelated medical negligence case involving Dr. Cohlmia. Dr. Cohlmia did not agree to waive the conflict of interest;

b. Without any prior notice, SJMC utilized confidential information from a separate and unrelated HMC case against Dr. Cohlmia in support of SJMC's "summary suspension" action;

c. SJMC unilaterally appointed a single, non-physician, hearing officer to preside over the case and render a medical opinion on the merits and medical aspects of two complex thoracotomy surgeries;

30

d. SJMC presented false statements of fact to the hearing officer regarding the two thoracotomy surgeries;

e. SJMC presented evidence in support of its summary suspension action against Dr. Cohlmia that such action was endorsed by CVT surgeons Drs. Fore, Blankenship, and Garrett, who are direct economic competitors of Dr. Cohlmia;

f. During the 33 days between the two thoracotomies (June 6, 2003) and the "summary suspension" (July 8, 2003), no notice was given to Dr. Cohlmia about any investigation and no thoracic surgery expert was consulted to review the cases.  Thus, SJMC had no reasonable belief that the sanction of "summary suspension" was warranted to protect the health and safety of patients;

g. Dr. Cohlmia was permitted to perform 34 surgeries, including thoracic surgeries, between June 6th and July 8th at SJMC without incident, question, problem or complication.  Thus, SJMC had no reasonable belief that the summary suspension" was warranted to protect the immediate health and safety of patients;

h. "Summary suspension" was an inappropriate sanction for the complained of problem, *i.e.*, total revocation of all privileges in response to an alleged problem with an isolated and unique type of surgery.

116.    Moreover, no evidence at the hearing supported SJMC's position that "summary suspension" action against Dr. Cohlmia was appropriate. To the contrary, the testimony at the hearing established the following:

a. Dr. Cohlmia has never suffered from a "profound derangement of medical judgment" and has never been known to do anything "bizarre" or "deranged" as asserted by SJMC;

b. The sanction of "summary suspension" should not be imposed based on a medical review of two isolated cases.  Rather, peer review or quality assurance review should have been implemented with proper notice given to Dr. Cohlmia and review of the cases by experts in the field of thoracic lung cancer surgery;

c. Dr. Cohlmia did not breach any universally accepted standard of care or protocol of SJMC;

d. Dr. Cohlmia does not pose any immediate threat of harm to any patient;

e. No "pattern of poor judgment" by Dr. Cohlmia can be identified at any time before or after the day of June 6, 2003.

f. A medical disagreement over two thoracotomy cases on the same day does not indicate a "pattern of poor medical judgment" or justify the sanction of "summary suspension;"

g. There are no cross-disciplinary protocols for the pre-operative workup of suspected lung cancer cases;

h. No protocol at SJMC requires pre-surgical biopsies of suspected lung cancers;

i. The summary suspension was implemented without notice to Dr. Cohlmia and without any expert review of the cases;

j. Notice of the two thoracic surgeries was received by SJMC administration on June 7, 2003. Thirty-three days elapsed wherein Dr. Cohlmia was permitted to perform 34 surgeries, including thoracic surgeries without question, restriction or incident, before "summary suspension" was implemented by SJMC against Dr. Cohlmia on July 8, 2003;

k. From the time Dr. Cohlmia was first credentialed at SJMC 19 years prior, he has never received a warning, admonition, criticism, revocation, suspension, modification, reduction, or limitation of any privileges, nor has he ever been called before any peer review or quality assurance committee;

1. Other than the two thoracotomies on June 6, 2003, no cases of Dr. Cohlmia's have ever been evaluated or looked at by SJMC;

117.    The SJMC "summary suspension" was affirmed as might be expected by any solitary non-physician hearing officer, selected by the hospital, and asked to sanctify a decision made by a hospital administration who purports to have taken the action for reasons of "patient safety."  No decision was rendered, however, with regard to legal adequacy or objective bad faith of SJMC as such issues were not the subject of the proceedings.

118.    Under the objective circumstances of the matter, the SJMC "summary suspension" against Dr. Cohlmia, as well as the hearing in support of such action, was most definitely carried out in bad faith, without reasonable notice, without any reasonable investigation of the facts, without any reasonable belief that the "summary suspension" was warranted for the protection of patients, and for an illegal purpose and motive.

119.   Indeed, the fact that the SJMC "summary suspension" was done in bad faith and in furtherance of an illegal motive was confirmed in or around January of 2004, when CVT surgeon Dr. Robert Blankenship, whose primary cardiovascular surgical practice was at SJMC, expressed that he was hopeful the SJMC suspension would lead to Dr. Cohlmia's suspension at HMC and St. Francis Hospital, and that Dr. Cohlmia "should leave town for a while and come back with his hat in his hand" and then "he might be allowed to practice in Tulsa."

120.   As also might be expected, the summary suspension at SJMC accomplished at least three of the illegal goals intended: i) Dr. Cohlmia and his patients, including Native American patients whom Defendant SJMC considered undesirable due to perceived high health risks related to their race were kicked out of SJMC for good; ii) Dr. Cohlmia's name and reputation was now irreparably tarnished as the revocation is reported to the National Practitioner Data Base as an adverse action; and iii) a catalyst was now available for other institutions, such as Hillcrest Medical Center, to further its illegal design to destroy Dr. Cohlmia and the competition he presented and threatened to present through the market entry of a better and more efficient heart and vascular specialty hospital in the subject marketplace.

**F.**      **HMC, OHI, CVT, and Their Members, Continue Their Unlawful Actions Against Dr. Cohlmia, Attempt to Capitalize Upon and Replicate the Unlawful SJMC "Summary Suspension."**

121.    No time was wasted by Defendants in continuing their unlawful actions against Dr. Cohlmia under the guise of being "forced' to do so by virtue of the SJMC summary suspension.  Such thinly veiled pretext is belied by the fact that HMC and other Defendants, as shown previously in this Complaint, were already working individually and in combinations in furtherance of the goal of eliminating Dr. Cohlmia from the subject marketplace and preventing the market entry of a new specialty hospital  since the spring of 2002.

**i.**     **HMC places unreasonable and unwarranted restrictions on Dr. Cohlmia's practice.**

122.     Ten days following SJMC's unlawful and bad faith "summary suspension" of Dr. Cohlmia, on July 18, 2003, HMC, its administration, Medical Executive Committee, Credentials Committee, and their members, used the SJMC action as a pretext for imposing the following restrictions on Dr. Cohlmia's medical privileges at HMC:

a. Dr. Cohlmia must conduct and document a comprehensive pre-operative patient evaluation and review based on and consistent with recognized standards of care which must be presented to and approved by Defendant Dr. James A. Johnson, a general surgeon, and HMC Medical Director of Operating Room Surgical Services and a member of HMC Credentials Committee and Medical Executive Committee;

b. Obtain consultation from an HMC physician within four hours of admission of a patient, for assessment and patient care management of all non-surgical patients; and

c. Be personally responsible for the management of all patients and arrange for appropriate consultation and follow-up for all aspects of care.

123.     The restrictions imposed by HMC were unreasonable, unwarranted and intended to be obstructive to Dr. Cohlmia.  For example, submitting cardiovascular, endovascular, and carotid artery surgical patients for review and approval by Dr. James Johnson, a general surgeon with no expertise in cardiovascular and/or endovascular surgery, made no sense since Dr. Johnson does not have the experience, training or expertise to review such procedures.

124.     Moreover, the requirement that Dr. Cohlmia be personally responsible for all appropriate medical consultation for his patients was deliberately imposed as an obstructive condition since HMC and the cardiologists at OHI had already agreed to refuse to treat any patients under Dr. Cohlmia 's care.  As a cardiovascular surgeon, Dr. Cohlmia must have cardiologist support for his patients.  OHI and its members' admitted refusal to treat Dr. Cohlmia's patients and threatening patients to either stop seeing Dr. Cohlmia or find a new

cardiologist artificially supplied HMC with the argument that Dr. Cohlmia could not comply with one of its restrictions.

>**ii.** **HMC, along with other Defendants, target Dr. Cohlmia's endovascular procedures. (angioplasties, angiography, vascular stenting and grafting, etc.)**

125. HMC, its administration and members of its Medical Executive Committee continued to secretly scrutinize the patient files of Dr. Cohlmia in an effort to find something to use to strip Dr. Cohlmia of his privileges and remove him as a competitor in the subject marketplace.

126.   One of the physicians utilized to secretly scrutinize Dr. Cohlmia's patient charts was Defendant radiologist Dr. Thomas D. Roberts, a member of HMC's Credentials Committee and Medical Executive Committee who also performs endovascular specialty procedures, and was therefore a direct competitor of Dr. Cohlmia.  Dr. Roberts secretly reviewed Dr. Cohlmia's endovascular procedures (angioplasties, angiography, vascular stenting and grafting etc.) and reported his findings directly to HMC medical director Dr. Steve Landgarten.

127.   Dr. Roberts "review" of Dr. Cohlmia's endovascular procedures was not done in the normal course of "retrospective review" of a physician, nor was the "review" done as the result of any quality assurance criteria being "tripped" or "triggered."   To the contrary, each of Dr. Cohlmia's cases were pulled and scrutinized by Dr. Roberts the same day the procedure was performed by Dr. Cohlmia.  Each case was also sent by "carbon copy" to HMC Medical Director Dr. Steven Landgarten.  No other physician's cases were "reviewed" in this manner.

128.   On March 16, 2004, Dr. Thomas Roberts presented a "report" to the HMC Credentials Committee of **14** endovascular cases (none of which are specifically identified) of Dr. Cohlmia which allegedly raised concerns of sub-standard care to Dr. Roberts.  Dr. Robert's primary criticism of the procedures was that they were performed under general anesthesia by a

surgeon in an operating room rather than under local anesthetic by a radiologist in the radiology suite.

129.    Dr. Roberts' "criticisms" are based primarily on an economically driven disagreement between cardiovascular surgeons, who traditionally perform endovascular procedures, and interventional radiologists, who recently began performing such procedures themselves and would like to perform more.

130.    Nevertheless, Dr. Roberts' "report" (which was not shown to Dr. Cohlmia) was presented to the HMC Credentials Committee and Medical Executive Committee, which in turn, called for the **14** cases to be sent to an "outside reviewer" for evaluation.

131.    The "outside reviewer" chosen by HMC to look at Dr. Cohlmia's endovascular procedures was Dr. Michael E. Gorton of the University of Kansas Hospital.  Dr. Gorton has no training in endovascular procedures and does not perform any endovascular procedures in his practice.

132.    Curiously, Dr. Gorton was only provided **12** endovascular cases to review which had been hand selected by HMC Medical Director Dr. Steve Landgarten and included some cases that had been performed after Dr. Roberts' March 16, 2004 report.

133.    Dr. Gorton' s primary criticism of the **12** procedures was that they were performed by a surgeon under general anesthesia in an operating room rather than by a radiologist under local anesthetic in the radiology suite.  Again, this "criticism" merely reiterates an economically driven disagreement between cardiovascular surgeons and radiologists who now wish monopolize the market for endovascular procedures.

134.    On July 16, 2004, HMC Medical Director Dr. Steven Landgarten, Medical Executive Committee Chairman Dr. Marc Milsten and HMC Medical Staff President Dr. Gary Decker called Dr. Cohlmia to attend a meeting wherein he was told for the first time that the

Medical Executive Committee had already sent **12** of his endovascular procedure cases to an undisclosed "outside reviewer" who believed the cases were "sub-standard." Dr. Cohlmia was not given information about the specific cases or the name or credentials of the "outside reviewer."

135.    During the July 16th meeting, Dr. Cohlmia was not asked by anyone to voluntarily cease performing endovascular procedures nor was he told that any adverse action was pending against him. Dr. Cohlmia, sensing that he was being targeted, however, prudently stated that he was willing to do whatever the Committee wanted him to do to cooperate and investigate the cases.  Drs. Milsten, Decker, and Landgarten each specifically agreed that Dr. Cohlmia had been absolutely cooperative.

136.    Despite what actually transpired at the July 16th meeting, Dr. Milsten made a presentation to the HMC Medical Executive Committee on July 20, 2004 wherein he falsely stated that Dr. Cohlmia was "defiant" during the July 16th meeting, and "refused to voluntarily cease performing endovascular procedures."  Based on the false information presented by Dr. Milsten, the Medical Executive Committee moved for and passed a motion to request immediate summary suspension by the Credentials Committee all of Dr. Cohlmia's endovascular privileges at HMC.

137.    The decision of the Medical Executive Committee to summarily suspend Dr. Cohlmia's endovascular privileges was communicated to Dr. Cohlmia in a letter dated July 22, 2004 which falsely stated that Dr. Cohlmia had been requested to voluntarily cease performing endovascular procedures and he refused.  The letter went on to falsely state that Dr. Cohlmia's "refusal to voluntarily cease performing endovascular procedures" may result in imminent danger to the life, health or safety of patients and that summary suspension of [Dr. Cohlmia' s]

endovascular privileges is necessary to prevent future admissions or inpatient care to patients who could be endangered."

138.    On the same day, Dr. Gary Decker reported to HMC Medical Director Dr. Steven Landgarten that the Medical Executive Committee had voted to request immediate summary suspension of Dr. Cohlmia's endovascular privileges based on an outside review of **11** endovascular procedures.   Dr. Landgarten, in turn, sent immediate notice of the requested summary suspension to HMC CEO Steve Dobbs.

139.    The HMC Medical Executive Committee's request for "summary suspension" was unwarranted, in bad faith, and founded on entirely false information. The action was no more than a thinly veiled attempt at replicating the unlawful and bad faith action to remove Dr. Cohlmia previously undertaken by SJMC.

140.    Indeed, Dr. Cohlmia performed all his endovascular procedures in the same manner as called for by HMC protocols for such procedures which were co-designed and drafted by Dr. Cohlmia himself.

141.    In fact, other surgeons at HMC performed endovascular procedures exactly the same as Dr. Cohlmia and no other surgeon has been criticized or scrutinized by HMC.

142.    After receiving notice of the Medical Executive Committee requested "summary suspension," Dr. Cohlmia rightfully voiced his objection that the entire "review" of his endovascular procedures was founded on the alleged findings of Dr. Thomas Roberts who was a direct economic competitor of Dr. Cohlmia.  Dr. Cohlmia also rightfully voiced objection over the fact that the review was done secretly and that none of the cases "reviewed" had ever been disclosed to him.  Dr. Cohlmia requested an opportunity to address the Credentialing Committee and also have an opportunity to have the cases reviewed by an outside expert of his own choosing.

143.    The HMC Credentialing Committee reluctantly agreed on July 22, 2004 to allow Dr. Cohlmia to address the Committee and have the files reviewed by an outside expert of his choosing.

144.    At the same Credentialing Committee meeting, however, CVT surgeon, direct economic competitor, and biased ex-associate, Dr. Paul Kempe offered his own opinion about the **12** supposed sub-standard endovascular procedures of Dr. Cohlmia's.  Dr. Kempe opined to the Credentials Committee that he agreed with the outside reviewer report and believed Dr. Cohlmia's endovascular privileges were below the standard of care.  Dr. Kempe offered this critique despite having never seen the case files and despite having little experience and no formal training in endovascular procedures.

145.    On July 23, 2004, Dr. Cohlmia made a presentation to the HMC Credentials Committee.    Dr. Cohlmia noted that every one of his endovascular procedures over the last year had been pre-approved pursuant to the restrictions placed on him by HMC.  Dr. Cohlmia stated that he disagreed with the conclusions drawn by the Medical Executive Committee, but wanted to cooperate in every way.    Dr. Cohlmia therefore agreed to suspend his own endovascular practice, pending the review by an outside expert of what Dr. Cohlmia believed at the time to be **12** endovascular cases.  The Credentials Committee decided that based on Dr. Cohlmia's agreement, and because Dr. Cohlmia's medical staff privileges reappointment application was up for consideration anyway, summary suspension need not be imposed.

146.    On July 26, 2004, Dr. Cohlmia requested in writing the production of what he all along was told to be **12** endovascular cases of concern to HMC but which had still never been disclosed to him.

147.    On August 16, 2004, Dr. Cohlmia received a letter from HMC Medical Staff President Dr. Gary Decker which listed the names of only **8** patients which Dr. Decker admitted

for the first time were the only endovascular cases of concern.  This was a damning revelation given that Dr. Milsten and the HMC Medical Executive Committee voted to summarily suspend Dr. Cohlmia's endovascular privileges allegedly based on **12** "sub-standard" cases.  It was also inconsistent with Dr. Kempe' s purported agreement with the "outside reviewer' s" alleged criticisms of **12** endovascular cases.

148.    Even more damning is that one of the 12 cases used previously by the HMC Medical Executive Committee to recommend summary suspension of Dr. Cohlmia's endovascular privileges (purportedly to protect patients from Dr. Cohlmia) was an endovascular procedure *performed by another physician.*

149.    Dr. Cohlmia's outside expert reviewer was Dr. Mary Bourland, a board certified cardiovascular surgeon practicing in Joplin, Missouri, with extensive training and experience performing endovascular procedures on patients.  Dr. Bourland has opined that Dr. Cohlmia is an excellent surgeon who performs all surgical procedures within the recognized standards of care.

150.    Dr. Bourland issued a report of her review of Dr. Cohlmia's endovascular procedures on October 18, 2004. In her report, Dr. Bourland found no deviations from the standard of care in any of the endovascular procedures.  In one case, Dr. Bourland disagreed with Dr. Cohlmia's choice to combine an endovascular procedure (angioplasty) with another procedure (carotid endarterectomy).   She has explained, however, that her disagreement is simply her choice not to combine such procedures and not a comment on any standard of care issue.

      **<u>iii.</u>**     **HMC, along with other Defendants, target Dr. Cohlmia's carotid endarterectomy procedures. (surgical clearing of blockage in the <u>carotid arteries</u>).**

151.    In or around August of 2004, HMC began another secret investigation of Dr. Cohlmia' s cases in preparation to deny Dr. Cohlmia' s pending application to renew his medical

staff privileges.  This time, HMC chose Dr. Cohlmia's carotid endarterectomy procedures (surgical clearing of blockage in the carotid arteries) as the target.

152.   In furtherance of this plan, HMC Medical Director Dr. Steven Landgarten selected CVT surgeon, direct economic competitor, and bitter ex-business associate, Dr. Paul Kempe to review a selection of hand-picked (by Dr. Landgarten) carotid endarterectomy cases of Dr. Cohlmia.  Dr. Kempe secretly reviewed between 14 and 17 of Dr. Cohlmia's carotid endarterectomy procedures.

153.   On October 19, 2004, without any notice to Dr. Cohlmia, Dr. Kempe reported his findings to the HMC Medical Executive Committee.  Of the 14 to 17 cases reviewed, Dr. Kempe found that:  i) none were inappropriate or contraindicated; and  ii) no surgical technical error by Dr. Cohlmia could be identified.  Despite these findings, however, Dr. Kempe opined that he identified 7 cases which he believed had "bad outcomes" and therefore Dr. Cohlmia "must have" improperly selected the patient or used poor technique.

154.   None of the 7 cases, however, actually had "bad outcomes" related to the endarterectomy procedures.  In fact, Dr. Kempe later admitted that in his opinion, only 3 of the 7 cases were of "real concern."

155.   Dr. Kempe further offered the nonsensical criticism that Dr. Cohlmia unnecessarily "inflated" or "altered" the amount/percentage of arterial blockage (stenosis) in the post-operative notes of the 7 cases from the amount/percentage of blockage viewed by arteriogram in those cases preoperatively.  This criticism is nonsensical because:  i) a surgeon can see with his own eyes more blockage in an artery when looking directly at it during surgery than can be viewed by a pre-operative arteriogram; and  ii) Dr. Kempe agreed that the arterial blockage shown on the preoperative arteriogram was significant enough to indicate surgery in each of the cases anyway.

156.    Dr. Kempe also made the unsubstantiated, unsupported and inaccurate allegation that Dr. Cohlmia's "stroke rate" during carotid endarterectomy procedures was "too high" despite the fact that there are no published national or HMC standards for such a measurement. In fact, Dr. Cohlmia's overall "stroke rate," otherwise known as "cardiovascular accident" or "CVA," is significantly lower than HMC's and the national average for carotid endarterectomy procedures.

157.    Not disclosed to the Medical Executive or Credentials Committee was the fact that two of the three cases which Dr. Kempe criticized, were cases already reviewed, cleared and closed with no action taken by HMC's Peer Review Committee over a year prior to their submission for review by Dr. Kempe.

### iv.    HMC unlawfully strips Dr. Cohlmia of his medical staff privileges.

158.    At the same October 19, 2004 Medical Executive Committee meeting, Dr. Milstcn intentionally misrepresented Dr. Bourland's report regarding Dr. Cohlmia's endovascular procedures and falsely stated that Dr. Bourland found one of Dr. Cohlmia's endovascular cases to be sub-standard and another one case to be questionable.  The actual report was not presented to the Committee members.

159.    Based on the "findings" of Dr. Kempe regarding the carotid endarterectomy procedures, the misrepresented report of Dr. Bourland regarding Dr. Cohlmia's endovascular procedures, and the already discredited (and still undisclosed to Dr. Cohlmia) reports of radiologist Dr. Thomas Roberts and "outside reviewer" Dr. Michael Gorton, as well as the baseless assertion that Dr. Cohlmia's mortality rate on cardiac surgery cases was "too high," the Medical Executive Committee voted to not renew Dr. Cohlmia' s medical staff privileges at HMC.

160.    The vote was taken by "secret ballot" — a procedure not previously employed by the Medical Executive Committee — and purportedly passed, although the reported vote count of "all in favor, two abstentions, and none against," is false.

161.    The bad faith, unreasonable and illegally motivated action by HMC's Medical Executive Committee to not renew Dr. Cohlmia's medical staff privileges is grossly apparent. Nevertheless, as required by HMC by-laws and the HMC Fair Hearing Plan, following notification of the decision to not renew his privileges, Dr. Cohlmia had no choice but to request a hearing on the matter.

162.    At the hearing, HMC falsely, in bad faith, and without any reasonable belief or basis in fact whatsoever, charged that since his last re-appointment, Dr. Cohlmia has "displayed a pattern of patient care substantially below the standards for [his] specialty and [HMC] as follows:

a. Endovascular procedures: patient selection, lack of appropriate medical management, surgical judgment and inadequate pre-op and post-op management;

b. Carotid endarterectomy procedures. Due to poor patient selection or technical error [Dr. Cohlmia's] stroke rate was 8.6 percent, compared to 2 percent for all other surgeons at HMC, and 3 percent as the national standard;

c. Open heart procedures. Patient selection, pre-op care and intraoperative management, failure to obtain consistently available comprehensive pre-op and post-op cardiology assistance in the medical management of patients; and

d. Unacceptably high morbidity and mortality rates in the areas of cardiovascular, endovascular, and carotid endarterectomy procedures"

163.    HMC further falsely, in bad faith, and without any reasonable belief or basis in fact whatsoever, charged that:

a. To "indefinitely continue the existing conditions on and the required monitoring for certain of [Dr. Cohlmia' s] surgical privileges under the circumstances would impose an undue hardship on the Department of Surgery without assurance of a commensurate improvement in patient care or outcomes;" and

b. "Contrary to all evidence, it appears that [Dr. Cohlmia believes] that [he is] practicing good medicine at HMC and [refuses] to accept the validity of the concerns raised by Dr. Cohlmia's] colleagues and outside experts."

164.    The hearing on HMC's decision to not renew Dr. Cohlmia's staff privileges occurred on February 28, 2005, and March 2nd and 3rd, 2005 and was fraught with bad faith, false testimony, and previously non-disclosed and new allegations.   There were also many admissions, however, that the proceedings, events, and information underlying HMC's actions were false, in bad faith, biased, unreasonable, and not based on a genuine or warranted concern for the health and safety of patients.   Examples of this include, but are not limited to, the following:

a. OHI Dr. Wayne Leimbach offered previously undisclosed "negative" case examples involving the monitoring of patient IVs and subtherapeutic doses of anti-arrhythmic mediation against Dr. Cohlmia never before identified as under "review" and in which were completely unrelated to the charges against Dr. Cohlmia.  The cases were never investigated by HMC and no notice of the cases was given to Dr. Cohlmia in order to respond prior to the hearing;

b. OHI Dr. Wayne Leimbach and HMC Medial Director Dr. Steven Landgarten offered previously undisclosed information regarding an "exit interview" with Dr. Ronald Elkins in January of 2003 wherein Dr. Elkins made the baseless, defamatory and false statements that "Dr. Cohlmia had not learned anything in 18 years of practice," that "Dr. Cohlmia's surgical technique stinks;" that his "operative notes describe all patients as disasters," and that he does not use enough "retrograde cardioplegia" in his surgeries. Dr. Elkins authorized his statements to be asserted in the proceedings against Dr. Cohlmia despite a written report submitted by Dr. Elkins on January 28, 2003 which renders no criticism of Dr. Cohlmia's knowledge, training, or technique.  Dr. Cohlmia had no notice of the supposed "exit interview" or of Dr. Elkins statements prior to the hearing and Dr. Elkins was not called to testify;

c. None of the "expert reports" which formed the primary basis for the Medical Executive Committee action were made available to Dr. Cohlmia until just days before the hearing;

d. Dr. Marc Milsten gave false testimony that Dr. Cohlmia's endovascular surgical procedures were reviewed because of the "increase in number of procedures" and by "routine retrospective review."  It was revealed and admitted, however, that there was no increase in the number of procedures and that HMC radiologist Dr. Thomas Roberts and HMC Medical Director Dr. Steve Landgarten secretly obtained and reviewed charts from Dr. Cohlmia's endovascular procedures the same day as the procedures occurred;

e. Dr. Marc Milsten, gave false testimony that Dr. Cohlmia's mortality and morbidity statistics for cardiac surgeries were the highest of all surgeons at HMC and higher that national standards.  Dr. Milsten later revealed and admitted, however, that neither he nor the Medical Executive Committee ever actually looked at the HMC documented cardiac mortality and morbidity statistics which show that Dr. Cohlmia's mortality and morbidity rates are lower than other HMC cardiovascular surgeons and lower than the national standard.  Dr. Milsten further admitted that the information he and the Medical Executive Committee proceeded upon was merely told to him in a personal conversation by HMC Medical Director Dr. Steven Landgarten;

f. HMC offered false testimony that its overall mortality rate dropped after restrictions were placed on Dr. Cohlmia's ability to do surgery.  It was revealed and admitted, however, that the drop in overall mortality rates was due to a hospital-wide moratorium placed on all "high-risk" (Parsonnet Level V and VI) patients.  In this regard, it was established that prior to the moratorium, of the last 53 "high risk" cardiovascular surgeries performed by Dr. Cohlmia, 49 patients survived.  Thus, had the moratorium on "high risk" cardiac surgeries been in place at the time, the 49 surgical patients Dr. Cohlmia saved would have been turned away by HMC;

g. Contrary to the false charges by HMC, it was established that in the 237 endovascular procedures performed by Dr. Cohlmia prior to HMC's refusal to reappoint his privileges, Dr. Cohlmia experienced zero deaths and only three complications for a combined mortality and morbidity rate of 1.27% which is well below HMC and national averages;

h. Contrary to the false charges by HMC, it was established that in 330 carotid endarterectomy cases performed by Dr. Cohlmia, there were only five cardiovascular accidents (strokes) and only three deaths, for a combined morbidity and mortality percentage of 2.43%, a stroke rate percentage of only 1.52%, and a mortality rate of only 0.9 1%.  These rates are far below HMC and national averages;

i.  Contrary to the false charges by HMC, it was established that in 483 cardiac surgery cases performed by Dr. Cohlmia he experienced only 22 deaths.  Of the 483 cases, the predicted mortality percentage given the risk factors for the patients operated on was 16.58%.  Dr. Cohlmia's actual mortality rate was 4.5 5% -- a fraction of the predicted mortality rate and well below HMC and national averages;

j. Dr. Kempe admitted that it was inappropriate for him to offer opinions with regard to Dr. Cohlmia's medical procedures because of his status as a member of CVT and a direct economic competitor of Dr. Cohlmia's;

k. Dr Wayne Leimbach admitted that OHI has engaged in a group boycott of Dr. Cohlmia, and therefore Dr. Cohlmia does not have access to adequate cardiology support.  The two reasons Dr. Leimbach gives for the group boycott are:  i) OHI doctors were uncomfortable with some negative facts regarding patient care that Dr. Cohlmia recorded in patient charts which could get "somebody in trouble for if it ever came out;"

and  2) OHI sided with HMC and against Dr. Cohlmia in the Dr. Arshad Yousuf matter. Patient care by Dr. Cohlmia was not a basis for OHI's boycott of Dr. Cohlmia;

l.  Dr. Leimbach admitted that as part of its group boycott of Dr. Cohlmia, OHI and its member physicians terminates its care of patients who wish to use Dr. Cohlmia;

m. Contrary to the false charges of HMC, Dr. Steven Landgarten admitted Dr. Cohlmia was not defiant, and indeed has been "absolutely cooperative," "conciliatory," "bent over backwards," "did everything he possible could have done;"

n. Contrary to false charges of HMC, Dr. Marc Milsten admitted that Dr. Cohlmia was never asked by anyone at SJMC to voluntarily stop performing endovascular procedures.  Thus, Dr. Cohlmia could not have, and did not, refuse to voluntarily stop performing endovascular procedures" as charged by HMC;

o. Cases were presented to the Medical Executive Committee as evidence of sub-standard care of Dr. Cohlmia which had already been reviewed and cleared by Peer Review over a year previously.  That fact was never disclosed to the Medical Executive Committee, nor were Dr. Cohlmia's written responses and explanations of those cases to Peer Review ever presented to the MEC members or the outside reviewers;

p. Upon learning that Dr. Milsten misleadingly used her October 2004 report regarding Dr. Cohlmia's endovascular procedures to strip him of his privileges, Dr. Bourland testified on behalf of Dr. Cohlmia for no fee because she believed it was a moral and ethical issue and that what HMC was doing was wrong.  Dr. Bourland, who reviewed Dr. Cohlmia's last 200 surgical cases chronologically, testified that Dr. Cohlmia is an excellent surgeon and that it would be a crime to prevent someone so talented from giving his gift to a patient population;

q. A physician who was a member of the HMC Medical Executive Committee while it was deciding Dr. Cohlmia's fate stated that the actions taken against Dr. Cohlmia by HMC and SJMC were politically motivated, not in furtherance of patient safety, and a travesty of justice unprecedented in Tulsa;

r. Physicians familiar with the matter stated that the actions taken against Dr. Cohlmia have harmed the medical community by denying a huge following of patients and families the right to be treated by the physician they want, and that since HMC's conduct against Dr. Cohlmia began, many patients formerly being treated in the Tulsa area by Dr. Cohlmia area have moved into the Joplin, Missouri area for treatment.

165.  On March 14, 2005, the Fair Hearing Committee returned matter of HMC's refusal to reappoint Dr. Cohlmia to its hospital staff.  Committee ruled that it was unreasonable to deny Dr. Cohlmia staff maintained the status quo with regard to the restrictions already placed practice.

166.    The Fair Hearing Committee noted, however, that there were serious concerns with **bias and conflicts of interest with regard to HMC's case against Dr. Cohlmia** and recommended that the HMC Credentials Committee and Medical Executive Committee *take care in future proceedings "to select well qualified, recognized experts in the field of practice under review from outside the HMC System to review the medical records that are part of the investigation of the physician in question."*

167.    An objective look at HMC's actions against Dr. Cohlmia, as well as the hearing in support of such actions, most definitely reveals that it was carried out in bad faith, without reasonable notice, without any reasonable investigation of the facts, without any reasonable belief that the action was warranted for the protection of patients, and for an illegal purpose and motive.

168.    Indeed, the fact that HMC actions against Dr. Cohlmia have been done in bad faith and in furtherance of an illegal motive has been confirmed.  In or around October of 2004, HMC Medical Staff President Dr. Gary Decker candidly told Dr. Cohlmia that the proceedings against Dr. Cohlmia were "unfair," and that he (Dr. Decker) would not have accepted the position of President of the Medical Staff if he knew this kind of thing was going to happen.

169.    Moreover, the HMC actions against Dr. Cohlmia are also revealed as being in bad faith and in furtherance of an illegal motive since HMC did not bother to keep the proceedings confidential.  For example, prior to the Medical Executive Committee's decision to not reappoint Dr. Cohlmia's staff medical privileges, Dr. Lewis Wexler, an anesthesiologist not involved in the matter at all, asked a surgical scrub tech of Dr. Cohlmia's what she planned to do once Dr. Cohlmia's lost his privileges at HMC.  Further, in or around January of 2005, Defendant Dr. Marc Milsten told Dr. David Miller, D.O., a cardiovascular surgeon at SouthCrest Hospital, that the proceedings to strip Dr. Cohlmia of his privileges would soon be underway.  In turn, Dr.

Miller asked a nurse who worked with Dr. Cohlmia what she planned to do once Dr. Cohlmia was stripped of his privileges.

170.    HMC and Dr. Cohlmia cross appealed the ruling.  HMC, however, failed to take any action on the appeal within the time allowed pursuant the HMC "Fair Hearing Plan" and therefore waived its positions with regard to all charges against, and restrictions imposed upon, Dr. Cohlmia. Nevertheless, the unreasonable and unwarranted restrictions remained in place against Dr. Cohlmia.

171.    HMC's "Fair Hearing Plan" clearly states that any appellate review "shall be no more than 60 days from the receipt of the appellate review request."

172.    Thus, pursuant to HMC's own "Fair Hearing Plan," the last date it could conduct an "appellate review" of the decision of the "Fair Hearing Committee" was May 23, 2005 — 60 days following Dr. Cohlmia's written request.  HMC never sent notice of any scheduled date for appellate review and never extended the time for scheduling any appellate review.   HMC simply ignored the May 23, 2005 deadline and allowed the time for appellate review under its own "Fair Hearing Plan" administrative process to lapse without cause or explanation.

173.    Plaintiffs filed their Original Complaint [Docket No. 2] in this case on July 7, 2005.

174.    In Plaintiffs' Original Complaint filed on July 7, 2005 (and again in Plaintiffs' Amended Complaint filed on September 2, 2005 [Docket No. 43], Plaintiffs' stated and alleged that: "HMC has failed to take any action on the [appellate review] within the time allowed pursuant to the 'Fair Hearing Plan' and has therefore waived it positions with regard to all charges against, and restrictions imposed upon, Dr. Cohlmia.   Nevertheless, the unreasonable and unwarranted restrictions remain in place against Dr. Cohlmia." (See, Plaintiffs' Original

Complaint, [Docket No.21 at ¶ 171], and Plaintiffs' Amended Complaint, [Docket No. at ¶ 171]).

175.    Because any authority HMC may have claimed pursuant to its unilaterally imposed "Fair Hearing Plan" to review Dr. Cohlmia's staff privileges and/or restrictions placed upon those staff privileges was waived and abandoned by HMC, Plaintiff requested Injunctive Relief from this Federal Court, *inter alia*, reinstating him to full staff privileges without restrictions at HMC and a retraction of any and all negative information regarding Dr. Cohlmia from the National Practitioner Data Bank and all other information organizations. (See, Plaintiff's Original Complaint [Docket No. 2 at ¶¶ 211-214], and Plaintiffs Amended Complaint [Docket No 43, at ¶¶ 218-221]).

176.    In direct response to Plaintiffs' filing and service of the Original Complaint in this Federal Court, Defendant HMC and Defendant Fred Garfinkel, M.D. sent a letter to Dr. Cohlmia dated July 15, 2005 advising him that the "appellate review committee" was now ready to convene for appellate review and suggested dates for oral argument.

177.    In response, Dr. Cohlmia sent a letter dated July 21, 2005 setting forth in detail the fact that HMC had intentionally or negligently failed to abide by its own "Fair Hearing Plan's" requirement that any appellate review shall be conducted no later than 60 days following a written request from the practitioner.   Accordingly, it was pointed out that HMC had no authority or jurisdiction over issues pertaining to Dr. Cohlmia's privileges and/or restrictions and could not convene an *ultra vires ad hoc* "appellate review" committee.   It was also noted that HMC never sought nor communicated any "good cause" need or desire for an extension of the deadline whatsoever.   As a matter of fact, HMC was already aware that the issues it was seeking to determine in its *ultra vires ad hoc* "appellate review" were already properly pending before this Court.

178.    Following Dr. Cohlmia's July 21,2005 letter, HMC again ceased pursuing an "appellate review" apparently in recognition of its absence of authority to do so and the fact that the issues were now pending in this Federal District Court.

179.    In late September and early October of 2005, HMC and all other Defendants filed Motions to Dismiss Plaintiffs' claims.  In the Motions to Dismiss, HMC and other Defendants took the erroneous position that Dr. Cohlmia had no cause of action under the Sherman or Clayton Antitrust Acts because he still had "privileges" to practice at HMC under "specific clinical protocols."  (See, HMC's Brief in Support of its Motion to Dismiss, [Docket No. 62] at ¶. 7-8).  Indeed, HMC falsely asserted that Dr. Cohlmia "acknowledges that the peer review process at HMC is still underway. . ." *Id.*

180.    In response to HMC's bald-faced misrepresentation to this Court, Plaintiffs responded as follows:

> Defendants falsely state that Plaintiffs "acknowledge" that "the peer review process at HMC is still underway and [Dr. Cohlmia] retains active privileges there although he must abide by specific 'clinical protocols." First, Plaintiffs do not "acknowledge" any such thing. (See, AC [Amended Complaint] at ¶ 171). HMC refused to act upon the appeal within the time it is required to so under its By-laws (sic) - such time expiring long before this lawsuit was filed.  Accordingly, Dr. Cohlmia's privileges should have been reinstated long ago. The fact that HMC still refuses to reinstate his privileges is further evidence of its ongoing anticompetitive intent. Second, Defendants' assertion that Dr. Cohlmia is operating at HMC under "specific clinical protocols" is farcical.  The restrictions placed on Dr. Cohlmia are intended to unreasonably impede his ability to admit and treat patients and therefore create an artificial environment meant to induce patient morbidity and mortality for the purpose of manufacturing ways to exclude Dr. Cohlmia. (AC at ¶¶ 122, 123, 124, and 125).

(See, Plaintiffs' Response and Objection to Motions to Dismiss, [Docket No. 68] at p. 6, fn. 2).

181.    While Defendants' Motions to Dismiss Plaintiffs' Amended Complaint were pending before this Court, Defendant Steven Landgarten, M.D., on behalf of Defendant HMC, sent a letter to Dr. Cohlmia on January 30, 2006 expressing HMC's intention of conducting an

*ultra vires, ad hoc* "appellate review" once again. The letter unilaterally scheduled the *ultra vires* "hearing" on the matter on February 28,2006.

182. Dr. Cohlmia responded by reiterating that HMC had no authority or jurisdiction pursuant to the "Fair Hearing Plan" or anything else to conduct any "appellate review" and that all issues were now properly before the United States District Court for the Northern District of Oklahoma in this action. HMC ignored Dr. Cohlmia's response and held an *ex parte* sham proceeding (the *ultra vires* "appellate review") on February 28, 2006. This *ex parte* sham "appellate review" occurred 341 days, or 11 months and 4 days, after the expiration of HMC's own "Fair Hearing Plan" deadline for the occurrence of any "appellate review."

183. Not surprisingly, given the impudent conduct of HMC throughout, the *ex parte* sham "appellate review committee" reversed the original "Fair Hearing Committee's" refusal to strip Dr. Cohlmia's privileges on March 10, 2006.

184. On May 1st and 2nd, 2006, HMC officially notified Dr. Cohlmia that he no longer had any staff privileges at HMC whatsoever and kicked him out of its facility. Thus, HMC forced Dr. Cohlmia to leave several critically ill patients without proper medical care. HMC has consistently calculated the timing of its unlawful actions against Dr. Cohlmia to create situations in which a negative patient medical outcome may be induced, thereby providing HMC with an artificial "patient safety" issue to raise against Dr. Cohlmia. Such callous and despicable use of patients as pawns in its designs against Dr. Cohlmia has again been exhibited by HMC.

185. HMC's conduct in continuing a sham proceeding against Dr. Cohlmia which violates its own unilaterally imposed "Fair Hearing Plan" and its willingness to thumb its nose at the authority and jurisdiction of this Federal Court cannot be permitted.

186. As pointed out in Plaintiffs' Response and Objection to Defendants' Motions to Dismiss [Docket No. 68], it is not necessary to show absolute exclusion from a relevant market

to maintain an antitrust action.  Nevertheless, HMC's recent "final" termination of Dr. Cohlmia's already drastically restricted ability to practice has now absolutely excluded him as a competitor in the Relevant Market and has caused additional harm to the market and patients and is further conduct supporting each of Plaintiffs' claims in this case.

187.    Because of the foreseeable domino-effect of the illegal actions taken against him by HMC and SJMC, as described above, Dr. Cohlmia was forced to forego his re-application for privileges at SouthCrest Hospital and St. Francis Hospital.  Thus, the illegal actions of HMC and SJMC, which caused negative reports to be submitted to the National Practitioner Database ("NPDB"), actually and constructively destroyed Dr. Cohlmia's ability to practice medicine in the subject marketplace and destroyed his development and the market entry of a better, more efficient, heart and vascular specialty hospital in the subject marketplace.

## VI.

## CAUSES OF ACTION

## COUNT I

## COMBINATION AND CONSPIRACY IN RESTRAINT OF TRADE IN VIOLATION OF SECTION I OF THE SHERMAN ACT AND SECTION IV OF THE CLAYTON ACT (All Defendants)

188.    Plaintiffs incorporate each of the preceding paragraphs of this Complaint as though fully set forth herein.

189.    The acts of Defendants and their members where applicable, in combinations, conspiracies, and conscious commitment to a common scheme to achieve an illegal objective were undertaken in an unlawful effort to eliminate Dr. Cohlmia and his company Cardiovascular Surgical Specialists, Inc. as competitors in the subject marketplace, thereby reducing and harming competition, avoiding price competition, maintaining supracompetitive prices and

market entry barriers, and preventing the market entry of a new and more efficient heart and vascular specialty hospital in the subject marketplace.

190.    Defendants, and their members' where applicable, unlawful combinations, conspiracies, and conscious commitment to a common scheme to achieve an illegal objective to eliminate Dr. Cohlmia and his company Cardiovascular Surgical Specialists, Inc. as competitors in the subject marketplace, thereby reducing and harming competition, avoiding price competition, maintaining supracompetitive prices and market entry barriers, and preventing the market entry of a new and more efficient heart and vascular specialty hospital in the subject marketplace, posed a dangerous likelihood of success and are also unlawful in and of themselves, whether or not successful, in that Defendants' unlawful combinations, conspiracies, and conscious parallelism, if successful, would unlawfully restrain trade, reduce competition, and prevent the market entry of a new and more efficient competitor in the subject marketplace.

191.    Defendants' and their members' where applicable, efforts to eliminate Dr. Cohlmia, reduce competition, and prevent the market entry of a new and more efficient heart and vascular specialty hospital in the subject marketplace have also succeeded, *inter alia*:

   a.    by limiting, reducing or eliminating Dr. Cohlmia's services from the significant percentage of the subject marketplace he served prior to Defendants' conduct;

   b.    by limiting, reducing or eliminating Dr. Cohlmia's services from the significant percentage of the subject marketplace he would have served but for Defendants' conduct;

   c.    by limiting, reducing or eliminating access to and the choice and/or option of patients in the subject marketplace from utilizing the services of Dr. Cohlmia for their treatment;

   d.    by tarnishing or destroying the reputation of Dr. Cohlmia in the subject marketplace by unlawfully causing negative reports to be submitted to the National Practitioner Data Bank and other information organizations, thereby reducing or eliminating Dr. Cohlmia' s ability to provide medical services at other facilities within the subject marketplace and elsewhere;

e.      by eliminating Dr. Cohlmia's access to surgical facilities, equipment, medicine, and staff, and thereby prohibiting Dr. Cohlmia's ability to properly care for and treat patients and, in turn, engage in his lawful profession and earn a living;

f.      by eliminating or significantly limiting Dr. Cohlmia and his patients' access to essential pre and post surgical cardiological medical support and thereby prohibiting or significantly limiting Dr. Cohlmia's ability to properly care for his patients and, in turn, engage in his lawful profession and earn a living;

g.      by eliminating or significantly limiting Dr. Cohlmia's professional referrals and thereby depriving Dr. Cohlmia and his patients' access to, and the option of being treated by, Dr. Cohlmia;

h.      by depriving patients in the subject marketplace of access to, and the option of being treated by Dr. Cohlmia, who comprised a significant source of the services offered to patients in the subject marketplace prior to Defendants' actions;

i.      by destroying the development and market entry of a new and more efficient independent specialty heart and vascular hospital capable of providing cardiovascular medical services to patients in the subject marketplace which would have strengthened market competition, reduced prices, and offered better service and quality of care to patients but for Defendants' actions.

192.    Defendants, and their members where applicable, also unilaterally and in combination and conspiracy, engaged in an illegal boycott/concerted refusal to deal with Dr. Cohlmia with the goal of eliminating Dr. Cohlmia and his company Cardiovascular Surgical Specialists from the subject marketplace, reducing competition, avoiding price competition, maintaining supracompetitive prices and market entry barriers, and preventing the market entry of a new and more efficient heart and vascular hospital into the subject marketplace. Among other things, Defendants accomplished or attempted to accomplish this by:

a. Diverting all OHI patient referrals for surgery previously made to Dr. Cohlmia to surgeons at Defendant CVT;

b. Terminating the cardiology care of all patients of Dr. Cohlmia which had previously been available from OHI;

c. Intimidating and frightening patients of Dr. Cohlmia or who request Dr. Cohlmia by threatening to terminate cardiological care for the patient and in fact terminating cardiological care if the patient does not acquiesce;

d. Intimidating and threatening referring physicians, third party payors and insurers, and health care facilities to stop requesting and/or using Dr. Cohlmia, cut off Dr. Cohlmia, or else lose the benefit of Defendants services and facilities;

e. Preventing the admission of Dr. Cohlmia's patients to the necessary level of cardiac care by instituting a policy of reserving such area for patients of OHI, which refused to see any of Dr. Cohlmia's patients.

f. Eliminating Dr. Cohlmia and his patients' access to surgical facilities, equipment, medicine, staff, and other medical care and thereby prohibiting Dr. Cohlmia' s ability to properly care for and treat patients.

193.    Defendants' and their members' where applicable unlawful actions in furtherance of their combinations, conspiracies and conscious commitment to a common scheme to achieve an illegal objective to eliminate Plaintiffs as competitors, reduce competition, reduce quality, avoid price competition, maintain supracompetitive prices and market entry barriers, and prevent the entry of a new and more efficient heart and vascular specialty hospital in the subject marketplace have caused irreparable harm and damage to Dr. Cohlmia, consumers in the subject marketplace, and to interstate commerce.

194.    Defendants' and their members where applicable, actions were and are in violation of federal law and entitle Dr. Cohlmia to threefold actual damages to be proven at trial, punitive damages, attorney fees, costs, and all other relief deemed just and proper by the Court.

## COUNT II

### VIOLATION OF SECTION II OF THE SHERMAN ACT
### AND SECTION IV OF THE CLAYTON ACT
(Defendants OHI, HMC, SJMC, CVT)

195.    Dr. Cohlmia incorporates each of the preceding paragraphs of this Complaint as though fully set forth herein.

196.    The acts of Defendants, individually, and in combinations, conspiracies, and conscious commitment to a common scheme to achieve an illegal objective, were undertaken in

an intentional and unlawful attempt to monopolize and/or assert monopoly power over relevant lines of commerce as described previously in this Complaint in the subject marketplace.

197.    Defendants OHI (cardiology and interventional cardiology) and its members controlled a significant percentage of market power in the relevant market.  Upon information and belief, OHI controlled a minimum of between one third and one half of the market share in its service line.  This market power, alone and in conjunction with actual and tacit agreements with the small number of other firms in the highly concentrated market, permitted OHI, its members, as well as the other small number of established firms, to maintain supracompetitive prices, prevent price competition, maintain significant market entry barriers, and prevent the market entry of a new and more efficient heart and vascular specialty hospital which would have created significant competition to OHI, lowered prices in the market, and significantly reduced market concentration.

198.    Defendants, HMC (cardiovascular/thoracic surgical facilities and support) and SJMC (cardiovascular/thoracic surgical facilities and support), controlled a significant percentage of market power and share in the relevant market.  Upon information and belief, HMC and SJMC controlled a minimum of one half of the market share in its service lines and a significant percentage alone.  This market power, alone and in conjunction with actual and tacit agreements with each other and the small number of other hospitals in the highly concentrated market, permitted them, and the small number of other hospitals, to maintain supracompetitive prices, prevent price competition, maintain significant market entry barriers, and prevent the market entry of a new and more efficient heart and vascular specialty hospital which would have created significant competition to HMC and SJMC, lowered prices in the market, and significantly reduced market concentration.

199.    Defendant CVT and its members (cardiovascular/thoracic surgery), controlled a significant percentage of market power and share in the relevant market.  Upon information and belief, CVT controlled a minimum of between one third and one half of the market share in its service line.  This market power, alone and in conjunction with actual and tacit agreements with the limited number of other firms in the highly concentrated market as well as its own individual members, permitted CVT, as well as the other small number of established firms, to maintain supracompetitive prices, prevent price competition, maintain significant market entry barriers, and prevent the market entry of a new and more efficient heart and vascular specialty hospital which would have created significant competition to CVT and its members, lowered prices in the market, and significantly reduced market concentration.

200.    Defendants and their members where applicable, individually and in combinations, conspiracies and conscious commitment to a common scheme to achieve an illegal objective, through the conduct set forth previously in this Complaint, posed a dangerous likelihood of success in that Defendants' unlawful conduct would have permitted and has allowed them to maintain and/or achieve monopoly power by enabling them to maintain supracompetitive prices, prevent price competition, maintain significant market entry barriers, prevent the market entry of a more efficient, lower cost and better quality specialty heart and vascular hospital, and maintain the highly concentrated nature of the relevant market, all to the extreme detriment of consumers.

201.    Defendants and their members where applicable, unlawful conduct has additionally harmed competition by eliminating the substantial source of competition in the subject marketplace once posed by Dr. Cohlmia and his company Cardiovascular Surgical Specialists and by preventing the market entry of a new more efficient  and lower cost heart and vascular specialty hospital as a competitor in the subject marketplace and has permitted them to

57

maintain and/or achieve monopoly power by enabling them to maintain supracompetitive prices, prevent price competition, maintain significant market entry barriers, prevent the market entry of more efficient, lower cost and better quality specialty heart and vascular hospital, and maintain the highly concentrated nature of the relevant market, all to the extreme detriment of consumers.

202.   Defendants' and their members where applicable, actions were and are in violation of federal law and entitle Plaintiffs to threefold actual damages to be proven at trial, punitive damages, attorney fees, costs, and all other relief deemed just and proper by the Court.

## COUNT III[1]

### ILLEGAL BOYCOTT/CONCERTED REFUSAL TO DEAL
### (All Defendants)

203.   Dr. Cohlmia incorporates each of the preceding paragraphs of this Complaint as though fully set forth herein.

204.   Beginning at least as early as January 2003, Defendants and their members where applicable, individually and collectively, and in a conscious commitment to a common scheme to achieve an illegal objective, in violation of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. § 1 & 2, engaged in an illegal boycott/concerted refusal to deal with Dr. Cohlmia and his company with the goal of eliminating Dr. Cohlmia and his company Cardiovascular Surgical Specialists from the subject marketplace, preventing the market entry of a new and more efficient heart and vascular specialty hospital, and thereby harming competition in the subject marketplace. Among other things, Defendants accomplished or attempted to accomplish the illegal boycott/concerted refusal to deal by:

    a.   Diverting all OHI patient referrals for cardiovascular surgery previously made to Dr. Cohlmia to other surgeons;

---

[1]   This cause of action was previously dismissed with prejudice by the Court.  It is included in this Second Amended Complaint for record preservation purposes.

b.      Terminating the cardiology care of all patients of Dr. Cohlmia which had previously been available from OHI;

c.      Intimidating and frightening cardiovascular patients of Dr. Cohlmia or who request Dr. Cohlmia by threatening to terminate cardiological care for the patient and in fact terminating cardiological care if the patient does not acquiesce;

d.      Intimidating and threatening referring physicians, third party payors and insurers, and health care facilities to stop requesting and/or using Dr. Cohlmia, cut off Dr. Cohlmia, or else lose the benefit of Defendants services and facilities;

e.      Preventing the admission of Dr. Cohlmia' s patients to the necessary level of cardiac care by instituting a policy of reserving such area for patients of OHI, which refused to see any of Dr. Cohlmia's patients.

f.      Eliminating Dr. Cohlmia and his patients' access to surgical facilities, equipment, medicine, staff, and other medical care and thereby prohibiting Dr. Cohlmia' s ability to properly care for and treat patients.

205.    Defendants' unlawful actions in furtherance of their of their illegal boycott/concerted refusal to deal with Dr. Cohlmia in the subject marketplace have caused irreparable harm and damage to Dr. Cohlmia, consumers in the subject marketplace, and to interstate commerce.

206.    Defendants' actions constitute violations of federal law and entitle Dr. Cohlmia to threefold actual damages to be proven at trial, punitive damages, attorney fees, costs, and all other relief deemed just and proper by the Court.

## COUNT IV

**VIOLATION OF 79 O.S. § 202 et. seq.**
**OKLA. ANTITRUST REFORM ACT**

207.    Dr. Cohlmia incorporates each of the preceding paragraphs of this Complaint as though fully set forth herein.

208.    The acts of Defendants both unilaterally and in combinations, conspiracies and conscious commitment to a common scheme to achieve an illegal objective, as set forth previously in this Complaint, were undertaken in an intentional and unlawful effort to eliminate

Dr. Cohlmia and his company Cardiovascular Surgical Specialist, Inc. as competitors in the subject marketplace and to prevent the market entry of a new and more efficient heart and vascular hospital into the subject marketplace and thereby reduce and harm competition in subject marketplace.  Such conduct also permitted Defendants to maintain and/or achieve monopoly power by enabling them to maintain supracompetitive prices, prevent price competition, maintain significant market entry barriers, prevent the market entry of a  more efficient, lower cost and better quality specialty hospital, and maintain the highly concentrated nature of the relevant market.

209.    Defendants unlawful unilateral actions as well as combinations, conspiracies and conscious commitment to a common scheme to achieve an illegal objective to eliminate Dr. Cohlmia and his company Cardiovascular Surgical Specialist, Inc. as competitors in the subject marketplace and to prevent the market entry of a new and more efficient heart and vascular hospital into the subject marketplace and thereby reduce and harm competition as set forth previously in this Complaint, posed a dangerous likelihood of success and are also unlawful in and of themselves, whether or not successful, in that Defendants' unlawful unilateral actions as well as combinations, conspiracies, and conscious parallelism, if successful, would unlawfully restrain trade, reduce competition, permit Defendants to maintain and/or achieve monopoly power by enabling them to maintain supracompetitive prices, prevent price competition, maintain significant market entry barriers, prevent the market entry of a  more efficient, lower cost and better quality specialty hospital, and maintain the highly concentrated nature of the relevant market.

210.  Defendants' effort to eliminate Dr. Cohlmia, reduce competition, and prevent the market entry of a new and more efficient heart and vascular specialty hospital in the subject marketplace have also succeeded, *inter alia*:

a.     by limiting, reducing or eliminating Dr. Cohlmia's services from the significant percentage of the subject marketplace he served prior to Defendants' conduct;

b.     by limiting, reducing or eliminating Dr. Cohlmia's services from the significant percentage of the subject marketplace he would have served but for Defendants' conduct;

c.     by limiting, reducing or eliminating access to and the choice and/or option of patients in the subject marketplace from utilizing the services of Dr. Cohlmia for their treatment;

d.     by tarnishing or destroying the reputation of Dr. Cohlmia in the subject marketplace by unlawfully causing negative reports to be submitted to the National Practitioner Data Bank and other information organizations, thereby reducing or eliminating Dr. Cohlmia's ability to provide medical services at other facilities within the subject marketplace and elsewhere;

e.     by eliminating or significantly limiting Dr. Cohlmia's access to surgical facilities, equipment, medicine, and staff, and thereby prohibiting or significantly limiting Dr. Cohlmia' s ability to properly care for and treat patients and, in turn, engage in his lawful profession and earn a living;

f.     by eliminating or significantly limiting Dr. Cohlmia and his patients' access to essential pre and post surgical cardiological medical support and thereby prohibiting or significantly limiting Dr. Cohlmia's ability to properly care for his patients and, in turn, engage in his lawful profession and earn a living;

g.     by eliminating or significantly limiting Dr. Cohlmia' s professional referrals and thereby depriving Dr. Cohlmia and his patients' access to, and the option of being treated by, Dr. Cohlmia;

h.     by depriving patients in the subject marketplace of access to, and the option of being treated by, Dr. Cohlmia, who comprised a significant source of the services offered to patients in the subject marketplace prior to Defendants' actions;

i.     by destroying the development and market entry of a new and more efficient independent specialty heart and vascular hospital capable of providing cardiovascular medical services to patients in the subject marketplace which would have strengthened market competition, reduced prices, and offered better service and quality of care to patients but for Defendants' actions.

211.     Defendants, both unilaterally and in combination and conspiracy, engaged in an illegal boycott/concerted refusal to deal with Dr. Cohlmia with the goal of eliminating Dr. Cohlmia and his company Cardiovascular Surgical Specialists from the subject marketplace as

well as preventing the market entry of a new and more efficient heart and vascular hospital into the subject marketplace. Among other things, Defendants and their members where applicable, accomplished or attempted to accomplish this by:

a. Diverting all OHI patient referrals for surgery previously made to Dr. Cohlmia to surgeons at Defendant CVT;

b. Terminating the cardiology care of all patients of Dr. Cohlmia which had previously been available from OHI;

c. Intimidating and frightening patients of Dr. Cohlmia or who request Dr. Cohlmia by threatening to terminate cardiological care for the patient and in fact terminating cardiological care if the patient does not acquiesce;

d. Intimidating and threatening referring physicians, third party payors and insurers, and health care facilities to stop requesting and/or using Dr. Cohlmia, cut off Dr. Cohlmia, or else lose the benefit of Defendants services and facilities;

e. Preventing the admission of Dr. Cohlmia's patients to the necessary level of cardiac care by instituting a policy of reserving such area for patients of OHI, which refused to see any of Dr. Cohlmia's patients.

f. Eliminating Dr. Cohlmia and his patients' access to surgical facilities, equipment, medicine, staff, and other medical care and thereby prohibiting Dr. Cohlmia' s ability to properly care for and treat patients.

212.    Defendants' unlawful actions as set forth previously in this Complaint have caused irreparable harm and damage to Plaintiffs, competition in the subject marketplace, consumers, and interstate commerce.

213.    Defendants' actions were and are in violation of the Oklahoma Antitrust Reform Act, 79 O.S. § 202, *et. seq.* and entitle Dr. Cohlmia to threefold actual damages to be proven at trial, punitive damages, attorney fees, costs, and all other relief deemed just and proper by the Court.

### COUNT V

**TORTIOUS INFERENCE WITH CONTRACT
AND PROSPECTIVE ADVANTAGE
(All Defendants)**

62

214.     Dr. Cohlmia incorporates each of the preceding paragraphs of this Complaint as though fully set forth herein.

215.     The acts charged in this Complaint by each of Defendants, inclusive of Defendant Ronald C. Elkins, M.D., both individually and collectively constitute the tortious interference with already existing contractual relationships enjoyed by Dr. Cohlmia, including but not limited to contractual relationships with patients, patient referral sources, patient payment sources, hospitals, clinics, Native American Tribal Authorities, insurance contracts and participation agreements.

216.     The acts charged in this Complaint by each of Defendants, inclusive of Defendant Ronald C. Elkins, M.D., both individually and collectively constitute the tortious interference with prospective business advantage enjoyed by Dr. Cohlmia, including but not limited to prospective business advantage with patients, patient referral sources, patient payment sources, hospitals, clinics, Native American Tribal Authorities, insurance contracts and participation agreements.

217.     As a result of Defendants' actions, Dr. Cohlmia has been irreparably injured and damaged and is entitled to actual, consequential, and punitive damages in an amount to be determined at trial as well as attorney fees, costs, and all other relief deemed just and appropriate by the Court.

## COUNT VI

### DEFAMATION - LIBEL, LIBEL PER SE, SLANDER, SLANDER PER SE
### 76 O.S. 7, 12 0.5. 1441, 1442, Common law

218.     Dr. Cohlmia incorporates each of the preceding paragraphs of this Complaint as though fully set forth herein.

219.    The acts charged in this Complaint by each of Defendants, constitutes defamation as defined by common law and Oklahoma Statutes.

220.    Defendant Thomas Roberts, M.D. is a radiologist, and a member, shareholder, employee, and/or joint venturer with Tulsa X-Ray.

221.    Defendant Wayne Leimbach, M.D. is a cardiologist, and a member, shareholder, employee, and/or joint venturer with Defendant OHI.

222.    Defendant Marc Milsten, M.D. is a urologist, and a member, shareholder, employee, and/or joint venturer with Urologic Specialists of Oklahoma.

223.    Defendant Paul Kempe, M.D. is a cardiothoracic surgeon, and a member, shareholder, employee, and/or joint venturer with CVT Surgery, Inc.

224.    Defendant Dr. James Johnson is a general surgeon, and a member, shareholder, employee, and/or joint venturer with Oklahoma Surgery, Inc.

225.    On information and belief, in or around July 28, 2004, and ending around March of 2005, Defendant Dr. Thomas Roberts did begin falsely stating to members of the Tulsa medical community that Dr. Cohlmia had twelve (12) cases of endovascular procedures that fell below the standard of care (i.e. malpractice); that the charts had been reviewed by an outside expert, and that she had opined that Dr. Cohlmia had committed malpractice.

226.    On information and belief, Dr. Roberts made these false publications in August of 2004 to, *inter alia,* Gary Decker, M.D., Sue King, Susie Cartwright, Steve Landgarten, Marc Milsten, M.D., Dr. James Giddens, Craig  Adams, M.D., Dr. Fred Garfinkel, M.D., and Steve Anagnost, M.D.

227.    On information and belief, Dr. Roberts did publish this falsehood, knowing there was no truth in the representation and with malice, in bad faith, and with the intent that such representations would aid in the destruction of Dr. Cohlmia's reputation and practice.   Dr.

Roberts knew that no outside expert had come to such a conclusion, and that there were not twelve (12) files that were the subject of review.

228.   On information and belief, on or about September 23, 2004, Dr. Roberts, along with Drs. Milsten, Landgarten, Johnson, and Kempe did, with actual knowledge, or with reckless disregard for the truth or falseness of the words they spoke, did represent that they had found eleven (11) cases where Dr. Cohlmia had practiced below the standard of care in endovascular procedures and that these eleven (11) cases were found in "routine peer review."

229.   Such representations were blatantly false, were made with malice, in bad faith and with the intent that that such representations would aid in the destruction of Dr. Cohlmia's reputation and practice.  Drs. Milsten, Landgarten, Johnson, Roberts, and Kempe knew, or did not care, that: a) no outside expert had come to such a conclusion; b) that there were not eleven (11) files that were the subject of review; and c) that the cases were not pulled during the course of "routine peer review."

230.   On information and belief, on or about September 23, 2004, Dr. Roberts, along with Drs. Milsten, Landgarten, Johnson, Roberts, and Kempe did, with actual knowledge, and with reckless disregard for the truth or falseness of the words they spoke, represent that Dr. Cohlmia performed unnecessary surgeries on patients that did not have indications for carotid endarterectomies, and wrongly accusing him of defrauding such patients.

231.   Such representations were blatantly false, were made with malice, in bad faith and with the intent that that such representations would aid in the destruction of Dr. Cohlmia's reputation and practice.  Drs. Milsten, Landgarten, Johnson, Roberts, and Kempe knew that Dr. Cohlmia's surgeries were not fraudulently performed, were indicated by the circumstances, and that other doctors regularly performed these procedures under the same circumstances.

232.   On information and belief the false representations by Drs. Milsten, Landgarten, Johnson, Roberts, and Kempe on or about September 23, 2004 were made to, *inter alia,* Drs. Jeff Galles, John Anthony, Rodney Myers, James Giddens, and Jim Beeson.

233.   On or about August 24, 2004, Dr. Robert Blankenship of Defendant CVT, acting on behalf of CVT, its partners, shareholders, and/or joint venturers, did tell Patient 001 that that Dr. Cohlmia could not do Patient 001's bypass surgery because Dr. Cohlmia did not work at Hillcrest anymore.

234.   CVT surgeon, Dr. Blankenship's representation was false, made with malice, in bad faith, and intended to contribute to the destruction of Dr. Cohlmia's reputation and practice.

235.   On or about August 28, 2004, an OHI physician, acting on behalf of OHI, its partners, shareholders, and/or joint venturers, did tell Patient No. 002 that Dr. Cohlmia no longer worked at HMC and could not perform the surgery for which Patient No. 002 had come to HMC. OHI then referred the patient to its co-conspirators in this campaign of deception, CVT, who performed the surgery.

236.   On or about September 1, 2004, Robert Sonnenschein, M.D. of OHI, acting on behalf of OHI, its partners, shareholders, and/or joint venturers, did tell the wife of Patient No. 003 that Dr. Cohlmia no longer practiced at HMC.

237.   OHI cardiologist, Dr. Sonnenschein's representation was false, made with malice, in bad faith, and intended to contribute to the destruction of Dr. Cohlmia's reputation and practice.

238.   On or about October 7, 2004, Dale Harris, Defendant HMC's and Ardent's representative for rural contracts, did represent to: a) Claremore Indian Hospital's manager of contract health, Sally Foster; and b) Gloria Grim, Medical Director of the Cherokee Nation, that

CIH should sign an exclusive contract with HMC, disallowing referrals to Dr. Cohlmia, because Dr. Cohlmia's privileges were being revoked due to practice below the standard of care.

239.    Dale Harris's representations, made on behalf of HMC and Ardent about supposedly "privileged" and "highly confidential" peer review matters, were false, made with malice, in bad faith, and intended to contribute to the destruction of Dr. Cohlmia's reputation and practice.

240.    On information and belief, on or about October 30, 2004, Roger Des Prez, M.D. of OHI, acting on behalf of OHI, its partners, shareholders, and/or joint venturers, did tell the wife of Patient No. 004 that Dr. Cohlmia no longer practiced at HMC.

241.    OHI cardiologist, Dr. Des Prez's representation was false, made with malice, in bad faith, and intended to contribute to the destruction of Dr. Cohlmia's reputation and practice.

242.    On or about December 22, 2004, Dale Harris, Defendant HMC's and Ardent's representative for rural contracts, did represent to Tahlequah City Hospital's CEO, Brian Woodliff that Dr. Cohlmia did too many surgeries and that his outcomes were statistically worse than they should be, or words to that effect.

243.    In and around December of 2004, shareholders and agents of OHI, including, but not limited to Steve Struttman, Wayne Leimbach, M.D., and Roger Des Prez, M.D., were telling physicians practicing at Tahlequah City Hospital that Dr. Cohlmia did too many surgeries and that his outcomes were statistically worse than they should be, or words to that effect.

244.    Such representations by Dale Harris on behalf of HMC and Ardent, and by the OHI physicians were false, made with malice, in bad faith, and intended to contribute to the destruction of Dr. Cohlmia's reputation and practice.

245.    On information and belief, in or around January 19, 2005, Marc Milsten, M.D. did state to David Miller, D.O., that Dr. Cohlmia had practiced below the standard of care in eleven

(11) endovascular cases and for performing unnecessary surgeries, and was undergoing peer review for these matters.

246.     Marc Milsten's representations about supposedly "privileged" and "highly confidential" peer review matters, were false, made with malice, in bad faith, and intended to contribute to the destruction of Dr. Cohlmia's reputation and practice.

247.     On information and belief, in or around February of 2005, Paul Kempe, M.D., of Defendant CVT, acting on behalf of CVT, its partners, shareholders, and/or joint venturers, did falsely represent to, *inter alia,* Drs. Jeff Galles, John Anthony, Rodney Myers, James Giddens, and Jim Beeson, that Dr. Cohlmia had an 8-9% stroke rate for his carotid endarterectomy procedures.  Such a statistic is well above national average and is indicative of a pattern of physician malpractice.  Such a statistic was a blatant and objectively provable fabrication.

248.     CVT surgeon, Dr. Kempe's representation was false, made with malice, in bad faith, and intended to contribute to the destruction of Dr. Cohlmia's reputation and practice.

249.     On information and belief, on or around August 3, 20, and October 19, 2004, and on other dates not yet determined, Drs. Milsten, Landgarten, Johnson, Roberts, and Kempe told, *inter alia,* Drs. Jeff Galles, John Anthony, Rodney Myers, James Giddens, Gary Decker, and Jim Beeson, that Dr. Cohlmia was defiant, uncooperative, belligerent, would not accept criticism or modify his procedures in any way.  These representations were knowingly false and intended to show that expulsion from the medical staff was the only remedy for dealing with Dr. Cohlmia.

250.     Drs. Milsten's, Landgarten's, Johnson's, Roberts', and Kempe's representations were false, made with malice, in bad faith, and intended to contribute to the destruction of Dr. Cohlmia's reputation and practice.

251.     On information and belief, from a time preceding July 7, 2004 through present date, shareholders of OHI have published to other members, shareholders, and employees of

OHI, false statistics of Dr. Cohlmia's surgical outcomes, and false allegations that Dr. Cohlmia does contraindicated surgeries, and false allegations that Dr. Cohlmia is a bad surgeon with disproportionately bad outcomes.

252.    On information and belief these false representations were made at OHI weekly staff meetings and to employees of OHI by Steve Struttman and were made in bad faith, with malice, and intended to unite all OHI physicians and employees against Dr. Cohlmia, to damage him in his profession, and to contribute to the destruction of Dr. Cohlmia's reputation and practice.

253.    On information and belief, on September 22, 2004, an OHI employee conducted a test for Patient No. 005.  Patient No. 005 told the technician about a relationship to Dr. Cohlmia, whereupon the OHI technician said that Dr. Cohlmia is a "bad surgeon, talks bad about OHI, and does terrible things."

254.    Dr. Cohlmia is not affiliated with OHI as an agent, shareholder, or other member of that corporation.  Thus, these false and unprivileged communications from OHI shareholders to other OHI shareholders and employees is not "intracorporate" as to Dr. Cohlmia, and such representations are actionable.

255.    Such representations were false, made with malice, in bad faith, and intended to contribute to the destruction of Dr. Cohlmia's reputation and practice.

256.    In or around January of 2003, Defendant Dr. Wayne Leimbach hired Defendant Dr. Ronald Elkins to conduct some sort of mortality review of cardiothothoracic surgeries at HMC after Dr. Cohlmia had complained about Dr. Yousuf.  Dr. Elkins did a written report with no specific criticism of a particular surgeon, and no case-by-case analysis of the twenty-five (25) cases he reviewed.

257.    On or about February 28, 2005, March 2, 2005, or March 3, 2005, Defendant Steven Landgarten, M.D. and Defendant Wayne Leimbach, M.D. did purport to repeat a previously undisclosed meeting with Defendant Roger Elkins, M.D. in or around February of 2003.  This meeting was unknown, and could not have been known to Dr. Cohlmia using reasonable diligence, until Drs. Landgarten and Leimbach took the stand in the "fair hearing" of even date and disclosed it.

258.    Although Dr. Elkins did not include a case-by-case report, or single out a specific physician in the written report he drafted in January 2003, Drs. Landgarten and Leimbach claimed that Dr. Elkins had singled out Dr. Cohlmia as the source of problems with HMC's cardiothoracic surgery mortality rates.

259.    Regarding Dr. Elkins, Drs. Landgarten and Leimbach did testify that Dr. Elkins reported, in substance, that:

a)     Mortality rates at HMC are too high and that Dr. Cohlmia is the cause;

b)     That Dr. Cohlmia's methods were not up to date with acceptable standards of care;

c)     That Dr. Cohlmia's case selection was not properly performed because his patients were "too sick" to have the surgeries Dr. Cohlmia performed; and

d)     If these problems (caused by Dr. Cohlmia) existed at the Oklahoma City VA, it would be shut down.

260.    Dr. Elkins' statements are blatantly false made with malice, in bad faith, and intended to destroy Dr. Cohlmia's reputation and practice.

261.    If Drs. Landgarten and Leimbach lied about the content of this interview, and Dr. Elkins did not make these statements, then these false statements are actionable as to Drs. Landgarten and Leimbach, were made out of malice, in bad faith, and intended to destroy Dr. Cohlmia's reputation and practice.

262.    On February 28, March 2, and March 3, 2005, Defendant doctors Milsten, Leimbach, Kempe, Johnson, Roberts, and Landgarten did knowingly present false testimony to the HMC "Fair Hearing Committee" as follows:

a)      Dr. Cohlmia practiced below the standard of care for endovascular patients and should not be doing these procedures in operative suites, but rather in radiology. This assessment was made by Dr. Cohlmia's direct competitor for such procedures, interventional radiologist and Defendant, Dr. Thomas Roberts;

b)      Dr. Cohlmia's stroke rate for carotid endarterectomy procedures was 8.6% compared to 2% for all other HMC surgeons and 3% nationally.  This assessment was made by Dr. Cohlmia's former business partner and current competitor, who called Dr. Cohlmia "evil" on settlement checks, *i.e.*, cardiothoracic surgeon and Defendant, Dr. Paul Kempe;

c)      Dr. Cohlmia practiced below the standard of care for open heart procedures, for reasons, including "failure to obtain consistently available comprehensive pre-op and post-op assistance in the medical management of cardiology patients."  This assessment was made due to Defendant Dr. Leimbach's group, Defendant OHI's refusal to give cardiology support to any of Dr. Cohlmia's patients; and

d)      Unacceptably high morbidity and mortality rates in the areas of cardiovascular, endovascular and carotid endarterectomy procedures.

263.    Defendant doctors Milsten, Leimbach, Kempe, Johnson, Roberts, and Landgarten knew their statements were false, knew they had misrepresented the statistics, and did so out of malice, in bad faith, and with the intent to destroy Dr. Cohlmia's reputation and practice.

264.    The testimony presented to the HMC panel was so biased and presented with such obvious bad faith, that the panel stated, as follows:

The hearing was unduly and unnecessary extended by testimony of ***bias and conflict of interest of certain witnesses.***  The deliberations of the Hearing Committee were complicated by concerns over the same issues.  The Hearing Committee recommends that ***in future investigations of this type,*** the Credentials Committee and/or the Medical Executive Committee take care to ***select well-qualified, recognized experts in the field of practice under review*** from outside the HMC System to review the medical records that are part of the investigation of the physician in question.  [Emphasis supplied]

265.    On information and belief, on or about July of 2006, an Ardent and/or HMC employee, believed to be Steven Landgarten, M.D., did contact Dr. Cohlmia's insurer, PLICO,

and tell a PLICO representative that Dr. Cohlmia was performing heart surgeries in Tahlequah, Oklahoma without any on-call support to assist him.

266.    Such communication were blatantly false, made with malice, in bad faith, and intended to destroy Dr. Cohlmia's reputation and practice by leaving him without insurance coverage and to defame him with PLICO – a physician owned mutual insurance company.

267.    All of the representations set forth above are unprivileged in that they were made in bad faith, with malice, and with the specific intent of destroying Dr. Cohlmia's reputation and surgical practice for competitive reasons and for personal vendettas.

268.    Dr. Cohlmia was injured by all of the foregoing false representations in that he lost patients, income, his privileges, his insurance coverage, and his reputation built over a lifetime in surgical practice in the local medical community.  Furthermore, Dr. Cohlmia suffered severe emotional distress over the destruction of his reputation, practice, and the loss of his privileges resulting from the foregoing defamatory statements.

269.    All of the foregoing publications and statements are unprivileged, made in bad faith, with malice, and tend to, and did, cause direct harm Dr. Cohlmia in his profession and have expose(d) Dr. Cohlmia to public hatred, contempt, ridicule, and obloquy and which tended to deprive Dr. Cohlmia of public confidence and injure(d) him in his occupation.

270.    As a result of Defendants' actions, Dr. Cohlmia has been irreparably injured and damaged and is entitled to actual, consequential, and punitive damages in an amount to be determined at trial as well as attorney fees, costs, and all other relief deemed just and appropriate by the Court.

## COUNT VII

### VIOLATION OF 42 U.S. C. 1981, EQUAL RIGHTS UNDER THE LAW
### (Defendant SJMC)

271.    Dr. Cohlmia incorporates each of the preceding paragraphs of this Complaint as though fully set forth herein.

272.    A significant portion of the cardiovascular and endovascular patients treated by Dr. Cohlmia and Cardiovascular Surgical Specialists, Inc. are of Native American lineage and descent as Dr. Cohlmia enjoys a reputation for quality and compassionate medical care, and therefore a significant referral base, from physicians at traditionally predominant Native American health care facilities. Accordingly, Dr. Cohlmia enjoys a unique association and relationship with Native American patients, which constitute a protected class of persons under the laws and Constitution of the United States of America.

273.    Due to the unique association and relationship Dr. Cohlmia enjoys with Native American patients, and his willingness to treat all Native American patients regardless of perceived health risks associated with their race, Dr. Cohlmia is a *de facto* representative and advocate of the rights of Native American patients to receive quality health care as guaranteed to all citizens of the United States of America, and in particular, guaranteed to all citizens pursuant to 42 U.S.C. § 1981.

274.    Defendant SJMC's conduct against Dr. Cohlmia was motivated, in part, by the unlawful desire to deprive Native American patients, a protected class, of cardiothoracic surgical services offered at SJMC due to their race.

275.    Native American patients are entitled to enter into contracts for and receive the same medical services as those available to and offered to white citizens.  This right is protected and guaranteed under the laws and Constitution of the United States of America and particularly 42 U.S.C. § 1981.

276.    The action by SJMC against Dr. Cohlmia was intentional and *de facto* racial discrimination against Native American patients, a protected class, in violation of 42 U.S.C. §

1981.

277.     As a result of the discriminatory and disparate treatment by Defendant SJMC in violation of 42 U.S.C. § 1981, Native American patients have been deprived of the same quality and availability of medical services available to white citizens at SJMC and have been irreparably damaged thereby.

278.     Dr. Cohlmia, as the *de facto* representative of a large population of Native American cardiovascular and cardiothoracic patients, has legal standing to assert the Constitutional rights of said patients.

279.     Accordingly, Defendant SJMC is liable for all actual, consequential, and punitive damages, to be proven at trial, resulting from its discriminatory and disparate treatment of Native American patients on the basis of their race, as well as attorney fees, costs, and all other relief deemed just and appropriate by the Court.

## COUNT VIII[2]

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Defendants)

280.     Dr. Cohlmia incorporates each of the preceding paragraphs of this Complaint as though fully set forth herein.

281.     Defendants' actions, individually and collectively, when viewed specifically and as a whole, constitutes conduct which is beyond the reasonable and acceptable boundaries of behavior in civilized society.

282.     Indeed, Defendants' conduct, individually and collectively, when viewed specifically and as a whole, constitutes conduct which can only be described as utterly outrageous and outside acceptable standards of behavior in civilized society.

---

[2]     This cause of action was previously dismissed with prejudice by the Court.  It is included in this Second Amended Complaint for record preservation purposes.

283.   As a result of Defendants' actions, Dr. Cohlmia has been irreparably injured and damaged and is entitled to actual, consequential, and punitive damages in an amount to be determined at trial as well as attorney fees, costs, and all other relief deemed just and appropriate by the Court.

## COUNT IX

## INJUNCTIVE RELIEF

284.   Dr. Cohlmia incorporates each of the preceding paragraphs of this Complaint as though fully set forth herein.

285.   Defendants' actions have harmed and threaten to harm the general public by interfering with the orderly practice of medicine in the community, by depriving patients of the quality of medical care they would have received but for Defendants' actions against Dr. Cohlmia, and by jeopardizing patient safety by using patients as pawns in their unlawful attempts to harm Dr. Cohlmia and reduce competition in the subject marketplace

286.   As a result of the numerous and ongoing violations of federal and state law, Dr. Cohlmia is entitled to injunctive relief prohibiting Defendants from restraining competition within the subject marketplace, defaming Dr. Cohlmia and his practice, unreasonably scrutinizing Dr. Cohlmia and his practice, boycotting and refusing to deal with Dr. Cohlmia and his patients, and interfering with the ongoing and prospective contractual relationships of Dr. Cohlmia.

287.   As a result of the numerous and ongoing violations of federal and state law, Dr. Cohlmia is further entitled to injunctive relief reinstating him to full privileged status on the medical staffs of both HMC and SJMC and requiring Defendants to cause to be retracted any and all negative information regarding Dr. Cohlmia from the National Practitioner Data Bank and all other information organizations.

WHEREFORE, Plaintiffs Dr. George S. Cohlmia, Jr. and Cardiovascular Surgical Specialists, pray for judgment in their favor and against each of Defendants upon each cause of action as set forth above, including but not limited to, injunctive relief, actual damages, compensatory damages, consequential damages, treble damages, and punitive damages, all in an amount to be proven at trial, as well as attorneys' fees, costs, interest, and all other relief deemed just and appropriate by the Court.

Respectfully submitted,

s/Michael L. Barkett
Michael L. Barkett, OBA#16171
Daniel B. Graves, OBA#16656
GRAVES & BARKETT, PLLC
Boulder Towers, Suite 1010
1437 S. Boulder
Tulsa, Oklahoma 74119
Telephone: (918) 582-6900
Facsimile: (918) 582-6907
Attorneys for Plaintiffs George S. Cohlmia, Jr., M.D., and Cardiovascular Surgical Specialists.

## CERTIFICATE OF SERVICE

I certify that on October 10, 2006, a true and correct copy of the above Second Amended Complaint, was electronically transmitted to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the ECF registrants:

Murray E. Abowitz
mainmail@abowitzlaw.com mea@abowitzlaw.com

Jennifer Rae Annis
ECF@ahn-law.com jannis@ahn-law.com

Michael Pearce Atkinson
ECF@ahn-law.com

Michael Burrage
mburrage@burragelaw.com cmccoy@burragelaw.com
dburrage@burragelaw.com

Michael Sean Burrage
sburrage@soonerlaw.com thodges@soonerlaw.com

John Jay Carwile
ECF@ahn-law.com jcarwile@ahn-law.com

Darrell Wayne Downs
ddowns@soonerlaw.com thodges@soonerlaw.com
mmullins@soonerlaw.com

Donald Ralph Esposito, Jr.
desposito@wcsr.com  NEsparza@wcsr.com

Mark Joseph Horoschak
mhoroschak@wcsr.com pshores@wcsr.com
crystal.layton@wcsr.com

Jo Lynn Jeter
jlj@nwcdlaw.com

George Michael Lewis
mlewis@dsda.com

J. Daniel Morgan
jmorgan@gablelaw.com rhuckabee@gablelaw.com

Joel L. Wohlgemuth
jlw@nwcdlaw.com psg@nwcdlaw.com


_____/s/ Michael L. Barkett_____
              Michael L. Barkett