```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3

 4    GEORGE S. COHLMIA, JR., M.D.,   )
      and CARDIOVASCULAR SURGICAL     )
 5    SPECIALISTS CORP., an           )
      OKLAHOMA CORPORATION,           )
 6                                    )
                    Plaintiffs,       )
 7                                    )
      V.                              )   No. 05-CV-384-GKF-PJC
 8                                    )
      ARDENT HEALTH SERVICES, LLC     )
 9    a Delaware limited liability    )
      company, et al.,                )
10                                    )
                    Defendants.       )
11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              HAD ON FEBRUARY 12, 2009

16                    MOTION HEARING

17

18    BEFORE THE HONORABLE GREGORY K. FRIZZELL, Judge

19

20    APPEARANCES:

21    For the Plaintiffs:        Mr. Michael L. Barkett
                                 Graves & Barkett, PLLC
22                               1437 South Boulder, Suite 1010
                                 Tulsa, Oklahoma 74119
23
                                 Mr. Clark O. Brewster
24                               Brewster & De Angelis PLLC
                                 2617 East 21st Street
25                               Tulsa, Oklahoma 74114
```

```
 1    (APPEARANCES CONTINUED)

 2    For Oklahoma Heart Institute,   Mr. John J. Carwile
      Oklahoma Heart, Inc. and        Ms. Jamie Alison Rogers
 3    Wayne N. Leimbach, Jr.:         Atkinson Haskins Nellis Holeman
                                      Phipps Brittingham & Gladd
 4                                    325 South Main, Suite 1500
                                      Tulsa, Oklahoma 74103
 5
      For St. John Medical Center,    Mr. G. Michael Lewis
 6    Howard W. Allred and            Mr. William H. Spitler, IV
      William C. Burnett:             Doerner Saunders Daniel
 7                                     & Anderson
                                      320 South Boston Avenue,
 8                                    Suite 500
                                      Tulsa, Oklahoma 74103
 9
                                      Mr. James W. Connor
10                                    Richards & Connor
                                      525 South Main, Suite 12
11                                    Tulsa, Oklahoma 74103

12                         -    -    -    -    -

13                              PROCEEDINGS

14                          February 12, 2009

15         THE COURT:  Be seated, please.

16         THE CLERK:  We're here in the matter of George S.

17    Cohlmia, Jr., et al. vs. Ardent Health Services, LLC, et al.,

18    Case Number 05-CV-384-GKF.  Will the parties please enter their

19    appearance.

20         MR. BREWSTER:  Your Honor, on behalf of the

21    plaintiffs, Clark Brewster, Michael Barkett.  And with us is a

22    new lawyer that just joined our firm from New Hampshire, Darla

23    Sedgwick, who has made all the filings, but has not been sworn

24    in, Your Honor.

25         THE COURT:  Very well.  I understand that she has paid
```

1    the fee and is in good standing; is that correct?

2            MR. BREWSTER:  That's correct.

3            MS. SEDGWICK:  Yes, Your Honor.

4            THE COURT:  Very well, Ms. Sedgwick, for the purposes

5    of this case, you are admitted pro hac vice.  And I understand

6    you are waiting to be sworn in to the district; is that correct?

7            MS. SEDGWICK:  Correct, Your Honor.

8            THE COURT:  Welcome.

9            MS. SEDGWICK:  Thank you.

10           THE COURT:  How long have you practiced in New

11   Hampshire?

12           MS. SEDGWICK:  Fifteen years.

13           THE COURT:  Good.  Where?

14           MS. SEDGWICK:  I was practicing in Manchester, but

15   pretty much all over the state, but my office was in

16   Manchester.

17           THE COURT:  Great.  In the plaintiffs' area or --

18           MS. SEDGWICK:  In various civil arenas and criminal as

19   well.

20           THE COURT:  Good.  Good.  Well, you know Paul

21   Barbadoro.

22           MS. SEDGWICK:  Yes, I do.

23           THE COURT:  He was one of my two mentor judges in baby

24   judges school and I'll tell you what, he is one tremendous

25   judge.

```
 1              MS. SEDGWICK:  He is.

 2              THE COURT:  He truly is.

 3              MS. SEDGWICK:  He's an icon there.

 4              THE COURT:  Well, he is.  He is.  For those of you who

 5    don't know, he was the judge who handled Tyco.  He was also

 6    Warren Rudman's right hand.  And he has some good stories about

 7    David Boren and the Senate Intelligence Committee and Sven

 8    Holmes who was there in senate intelligence about the same time

 9    and so he has some good senate war stories.  But I tell you

10    what, he is the best of the best.

11              Well, welcome to this court.

12              MS. SEDGWICK:  Thank you very much.

13              THE COURT:  Apparently you will need to file an entry

14    of appearance in this case.

15              MS. SEDGWICK:  Yes.

16              MR. LEWIS:  For St. John's Medical Center, Dr. Allred,

17    Dr. Burnett, Michael Lewis, Bill Spitler and Jim Connor.

18              MR. CARWILE:  For the Oklahoma Heart Institute and Dr.

19    Wayne Leimbach, John Carwile and Jamie Rogers.

20              THE COURT:  Very well.  Well, let's attack the

21    lower-numbered motion first.  I believe, Mr. Lewis, will you be

22    taking the laboring oar there?

23              MR. LEWIS:  Yes, I will, Your Honor.

24              THE COURT:  Very well, you may proceed.

25              MR. LEWIS:  Thank you.  As a result of the rulings of
```

1    the Court earlier, what we have today before the Court is a

2    motion for summary judgment by St. John's Medical Center, Dr.

3    Burnett, and Dr. Allred with regard to the plaintiffs' claim

4    for tortious interference with a contract.  The motion for

5    summary judgment which we filed along with the reply and the

6    response raised this question:  What evidence is there that

7    plaintiffs were damaged by the action at St. John of removing

8    Dr. Cohlmia's privileges?  That's the question to me.  The

9    principal question is what evidence is there that he was harmed

10   in any way, because if he wasn't harmed, then he has no claim

11   or cause of action.

12        The facts, you know them well, Dr. Cohlmia was a

13   cardiovascular thoracic surgeon.  He was suspended on July 8,

14   2003, at St. John Medical Center after two surgeries on June 6,

15   one of which resulted in death and one of which resulted in the

16   maiming of a patient.  This went through the normal procedures

17   at St. John, a hearing presided over by former Judge Brett.  It

18   was appealed to the Medical Executive Committee, affirmed,

19   appealed to the board of directors and affirmed all under the

20   St. John bylaws, medical staff bylaws.  The basis from St.

21   John's standpoint of the action taken against Dr. Cohlmia was

22   patient safety.

23        At the time of his suspension on July 8, 2003, and

24   it's important to this case, that Dr. Cohlmia still had

25   privileges to do surgery at Hillcrest Medical Center, Saint

1   Francis Hospital, SouthCrest Hospital and a couple of other

2   smaller hospitals that he at that point had privileges.  So he

3   had a place to take patients, a place to do his surgeries.  The

4   claim for tortious interference by Dr. Cohlmia --

5           THE COURT:  Explain to me --

6           MR. LEWIS:  I'm sorry.

7           THE COURT:  The plaintiffs' materials indicated in the

8   portion -- the three-page portion, Exhibit 20 here which was

9   unverified, unsigned talked about the plaintiff only having

10  privileges after being denied privileges at St. John and

11  Hillcrest, at Tahlequah.  I was trying to reconcile that with

12  your contention that he continued to have privileges at

13  SouthCrest and et cetera.

14          MR. LEWIS:  Well, the privileges at Hillcrest actually

15  were not removed or terminated until after the lawsuit was

16  filed.  So the lawsuit was filed in July 2006.  At that point he

17  still had privileges at Hillcrest.  This is three years after

18  he was suspended at St. John.  He had privileges at SouthCrest

19  as well and those were eventually removed by some kind of an

20  agreement.  He also had privileges at Saint Francis.  When he

21  came up, I can't tell you the date of this, but at some point

22  after 2003, he came up for reappointment which is usually every

23  two years at these hospitals.  He came up for reappointment and

24  he simply withdrew his application for reappointment.  He was

25  never suspended or his privileges terminated as far as I know

1    at either SouthCrest or Saint Frances.  He simply withdrew his

2    privileges, moved his practice to Tahlequah, and he is

3    practicing there today.  I don't recall whether he has

4    privileges anyplace else, but I think Tahlequah may be the only

5    place now.  That took place over a period of years.

6         We're talking about whether or not an act by St. John

7    interfered with his contract rights.  In the claim for tortious

8    interference in the contract, there are number of contracts

9    that are listed in the complaint.  A contract with patients,

10   patient referral sources, hospitals, clinics, Native American

11   authorities, insurance companies, third party payment sources,

12   participation agreements, I'm not sure what those are.  In his

13   deposition he was asked what contracts were interfered with and

14   at that time he identified a few:  Hillcrest Managed Care, Blue

15   Lincs, Aetna, Community Care, Cherokee Nation, Blue Cross Blue

16   Shield, PLICO and his patients.  In the response to St. John's

17   motion for summary judgment, on the other hand, he listed only

18   patient contracts, Cherokee Nation, Blue Cross Blue Shield and

19   Specialty Hospital.  That is the damages arise from the fact

20   that he -- from prospective business advantage and that he

21   claims that his termination privileges at St. John or

22   suspension privileges resulted in him not being able to open

23   his specialty hospital.

24        So as far as we're concerned, those are the contracts

25   that are in play here today.  I would point out to the Court

```
 1    that not a single one of those contracts is attached to the

 2    plaintiffs' materials in this case.  There are no contracts

 3    attached to the record for Your Honor to see or for the

 4    appellate court to see.

 5         THE COURT:  All right.  Just to make sure that I'm

 6    tracking with you, you've got patients, Cherokee Nation, Blue

 7    Cross Blue Shield.

 8         MR. LEWIS:  And the claim of, I think the claim of

 9    prospective business advantage, loss of business advantage goes

10    to the loss of the specialty hospital and they also cover

11    patients who didn't actually have a contract with Dr. Cohlmia.

12         THE COURT:  All right.

13         MR. LEWIS:  So patients out there who might use him in

14    the future and he wasn't -- and weren't able to because of the

15    actions of St. John.

16         THE COURT:  All right.

17         MR. LEWIS:  Essential elements of tortious

18    interference, in this case we have the law of the case.  Judge

19    Payne entered an order on August 9, 2006, setting forth the

20    three essential elements of tortious interference which are now

21    the law of the case.  Plaintiff had a business or contractual

22    right that was interfered with.  The interference was wrongful

23    and malicious and not justified, privileged, or excusable.  And

24    the interference proximately caused his damages.  And my

25    remarks today, while I would like to briefly talk about malice
```

1   and some of the issues like that, my remarks primarily will go

2   to the issue of proximate causation of damages.

3        Plaintiffs have cited the Applied Genetics Tenth

4   Circuit case on the issue of summary judgment responsibility.

5   I would point out that that case also says importantly, the

6   nonmoving party may not rest on its pleadings, but must set

7   forth specific facts showing that there is a genuine issue for

8   trial as to those dispositive issues for which it carries the

9   burden of proof.  That's the Celotex case which Your Honor is

10  very familiar.  So what we have to look at today, has the

11  nonmoving party come forward with specific facts that are shown

12  by affidavit or verification or from depositions or from

13  written discovery which demonstrate that there was some loss or

14  damage caused by the suspension of privileges at St. John.

15       First, I want to point out that there is but one act

16  of interference alleged as to St. John here, and I think

17  there's no question about this, and that is the suspension of

18  privileges.  There is no evidence or allegation supported by

19  any evidence in this case that the St. John defendants -- and

20  today, Your Honor, I'd appreciate it if when I refer to

21  St. John, we understand I'm referring to Dr. Burnett and

22  Dr. Allred.  Dr. Allred was the vice president of medical

23  affairs.  Dr. Burnett was the incoming president of medical

24  staff.  And they are defendants in this case and when I say St.

25  John, I mean them as well.

1          There is no evidence or allegation supported by any

2    evidence that these St. John defendants independently

3    communicated with any third party, with any insurance company,

4    with any patient of Dr. Cohlmia, or with any other person that

5    was involved in his hospital -- Heart Hospital idea.  There was

6    no direct communication.  There's no evidence of that in the

7    case.  So the case is unique in Oklahoma adjudicative history

8    in that the alleged interference arises solely from his

9    suspension from St. John surgical privilege suspension.  That

10   would be like a restaurant suing the state health -- or the

11   county health department that shut down the restaurant claiming

12   that it interfered with their contracts with their vendors,

13   their customers, their lenders, that sort of thing.  I find no

14   case in Oklahoma in which this cause of action was used in that

15   context.

16          The simplest way we believe to dispose of the

17   plaintiffs' tortious interference claim is by focusing on the

18   causation issue.  Because the defendants, while they have made

19   claims of the effect this suspension had on a broad range of

20   contracts, they have, in fact, not presented any evidence at

21   all of any causation or any actual damage.  As I said earlier,

22   there are no contracts attached to the plaintiffs' response.

23   They didn't attach the Blue Cross Blue Shield contract.  They

24   attached no evidence from any patient like an affidavit or a

25   statement.  They took no depositions of patients.  They took no

1    depositions of referring physicians.  There are no contracts

2    from the Cherokee Nation attached.  There are no contracts from

3    any of the Indian tribes that Dr. Cohlmia serves.

4         Let's look at the categories of damage alleged,

5    specifically the patient contracts.  As you know, under -- and

6    I don't want to make a big point of this, but under 15 O.S.

7    Section 1, contracts are defined as requiring offer,

8    acceptance, and consideration.  That's first year law school.

9    The only patients in my view who would qualify as being a

10   contract that could be interfered with were those who had

11   actually engaged Dr. Cohlmia to perform services.  I know that

12   he has a lot of people who, sitting in their dens at home,

13   think if I have a heart problem, I want Dr. Cohlmia to be my

14   surgeon, but there's no contract involved in that.  It's just

15   an expectancy of some kind.  The patient may die of something

16   else.  The patient may never have a heart problem.  So we see

17   no contracts there.

18        But there would have been patients that had, at the

19   time of the suspension, engaged Dr. Cohlmia to perform clinical

20   services or surgical services.  There is no evidence from any

21   of these people, none saying I was supposed to have surgery on

22   the 9th and I wasn't able to and I had to go someplace else and

23   I was -- there is just simply no evidence that any of these

24   patients' contracts with Dr. Cohlmia were interfered with.  And

25   without evidence, even if it might be logical that they were

1    interfered with, it doesn't matter.  Under the rules, there has

2    to be evidence.  And we point out also that at the time of the

3    suspension, they've agreed with us that he had -- or we have

4    one of our statements of fact that he had privileges at

5    Hillcrest Medical Center, Saint Francis and SouthCrest, all of

6    which were places where he could perform thoracic or

7    cardiovascular surgery.

8         Secondly, the health insurance plans.  Of course,

9    Dr. Cohlmia had contracts with various health insurers and

10   those have been listed in some of the pleadings.  In the

11   response to St. John's motion for summary judgment, they

12   mentioned only the Blue Cross Blue Shield contract and said

13   that that was interfered with, that there was some point in

14   time, it's not exactly clear at what point in time, but Blue

15   Cross Blue Shield indicated that they might not renew it.  Dr.

16   Cohlmia appealed that and Blue Cross Blue Shield backed down

17   and he continued to be insured.  So the issue then is how is it

18   that the suspension of privileges at St. John resulted in some

19   kind of damage to Dr. Cohlmia --

20        THE COURT:  Any idea why --

21        MR. LEWIS:  -- or their patients that he lost --

22   sorry.

23        THE COURT:  Any evidence as to why Blue Cross Blue

24   Shield initially declined to renew the contract?

25        MR. LEWIS:  Well, at some point in time after the

1    suspension, he was -- he got a letter from Blue Cross Blue

2    Shield, and this is in the speaking papers, that they were not

3    going to renew him.  And he appealed that, which he has a right

4    to do, and Blue Cross Blue Shield heard the appeal and decided

5    that he would continue to be a provider.  And he is a provider

6    for them today as far as I'm concerned.

7              THE COURT:  What damages did that interruption cause?

8              MR. LEWIS:  Well, theoretically it could have caused

9    patients who had only Blue Cross Blue Shield insurance and did

10   not -- and you know, they might have not been able to use

11   Dr. Cohlmia's services.  There's just no evidence of that.

12   There's not an affidavit from a patient saying I had Blue Cross

13   Blue Shield and for the four months he was appealing that, I

14   wasn't able to get my surgery and had to use another doctor.

15   There's no evidence of it.  So we have no evidence of causation

16   of damages with regard to the Blue Cross Blue Shield contract.

17   Again, for purposes of this argument we're assuming that this

18   is the only one of the elements of the cause of action that

19   we're dealing with.

20              It's possible, for example, that that information

21   could have been obtained from Blue Cross Blue Shield by taking

22   the deposition of a Blue Cross and Blue Shield agent or an

23   employee that would have information about what patients'

24   claims were denied during that period of time that involved Dr.

25   Cohlmia.  There's no evidence of that.  There's no discovery

1    conducted of Blue Cross Blue Shield.  There's no affidavit from

2    them.  There's absolutely no evidence in the record that he was

3    affected in any way as a result of Blue Cross Blue Shield

4    initially denying his reinstatement -- or his contract and then

5    reinstating it.

6            Another group in issue are what we call third party

7    providers which are really the tribal authorities.  Each of the

8    tribes has some kind of medical plan that their tribe members

9    can subscribe to.  And what happens is these tribes then enter

10   into contracts with hospitals and doctors and with other

11   providers to provide that at a certain cost just like the

12   insurance companies do.  So Dr. Cohlmia has contended in this

13   case -- and the only one he mentions is the Cherokee Nation

14   which is one of his primary contracts.  He says that the

15   suspension of him at St. John interfered with that contract.

16   Yet the depositions were taken of the individuals who were

17   functionaries, administrators within the Cherokee Nation

18   insurance plan and all agreed that he never lost his Cherokee

19   contracts.  He always had it.  Now, certainly if a patient

20   wanted to have surgery at St. John and wanted Dr. Cohlmia to do

21   the surgery, he would not have been able to do that.  He would

22   have had to do the surgery someplace else, but there's no

23   evidence of that.  There's no evidence that ever happened.

24   There's no evidence that a patient said to the Cherokee Nation

25   I want to go to St. John and I want Dr. Cohlmia and the

1    Cherokee Nation had to say no, just no evidence.  So we have no

2    evidence of interference with that Cherokee Nation contract as

3    a result of his suspension.

4         The fourth area that we have to deal with is the Heart

5    Hospital and this was -- it's a complicated thing and I don't

6    want to inject too much into it other than what both sides have

7    put in the pleadings.  But Dr. Cohlmia had an idea to form an

8    independent specialty hospital to do cardiovascular surgery and

9    it would involve cardiologists and so forth.  He in, I think,

10   September 2002, had a series of meetings, promotional meetings

11   at which he attempted to get doctors and cardiologists and

12   other surgeons to participate with him in this hospital to make

13   investments in it.  As far as we know, no doctor, no person

14   ever invested any money at all in his Heart Hospital.  After he

15   began this effort to form the Heart Hospital -- and again, this

16   is a year or so -- a year before the suspension, Saint Francis

17   decided to build a heart hospital.  And Dr. Cohlmia had gone so

18   far as to get an option on a piece of property out in South

19   Tulsa.  The Saint Francis Heart Hospital was just a mile from

20   that piece of property.  And the doctors, CV surgeons, the

21   cardiologists all decided to go with Saint Francis.

22        And by January of 2003, six months before the

23   suspension, the Heart Hospital of Dr. Cohlmia was essentially

24   dead.  There was no further effort.  There was never any

25   investment made.  But the concept that he has in this case with

1    regard to intentional interference is that this was a

2    prospective business advantage for him, that he would have

3    built this hospital and that the suspension by St. John

4    prevented him from doing that.

5         So we have to look to see what is the evidence of

6    that?  What is the evidence that anything that had to do with

7    the promotion of his Heart Hospital was affected by the

8    suspension at St. John.  There simply is no evidence.  There's

9    no evidence from potential investors, from other cardiologists,

10   from other CV surgeons.  There's no affidavits or evidence of

11   any -- deposition evidence of any other person that says the

12   reason I did not invest in his hospital or the reason this

13   hospital failed was because St. John suspended his privileges.

14   Now, Dr. Cohlmia says that, of course, in his head that he

15   believes that that had some impact on his ability with the

16   hospital.  He doesn't concede that the hospital was dead in

17   January of 2003.  But my point is we're here on summary

18   judgment today before the Court.  And the Court has to look in

19   this stuff and say where is the evidence that this Heart

20   Hospital was affected in any way.  And there is no evidence.

21   There's simply no evidence, no affidavits, no depositions, no

22   evidence.

23        Now, I take it back, there are three items of evidence

24   on the Heart Hospital that were tendered by the plaintiffs, not

25   in the nature of the things that I mentioned to you, but these

1    are facts that are substantiated and tendered to the Court.

2    These three are, first, that Dr. Burnett, one of the defendants

3    who is a cardiologist, attended by invitation a promotional

4    meeting for this Heart Hospital in September of 2002.  Attended

5    the meeting.  He was asked questions about it.  He said I went,

6    I wasn't interested.  Second, that St. John Medical Center's

7    president David Pynn testified that at some point in time he

8    recommended that St. John develop a comprehensive

9    cardiovascular services program because he was concerned and

10   people at St. John were concerned about Saint Francis' plan to

11   build a heart hospital.  They felt this would give Saint

12   Francis some competitive advantage and they felt like -- Mr.

13   Pen testified and this is presented by the plaintiffs in this

14   case to you, he testified St. John looked at this and was

15   concerned about it because of Saint Francis.  Mr. Pen didn't

16   even know about Dr. Cohlmia's hospital.  Dr. Cohlmia was

17   primarily a Hillcrest physician and Mr. Pen said we were

18   concerned about Saint Francis.  That's the second piece of

19   evidence that's tendered in support of their claim.

20          The third piece is about a 7-page document which came

21   up in the electronic search of our records at St. John which

22   appears to be the notes of some kind of marketing meeting

23   inside St. John's cardiovascular institute where people are

24   sitting down and talking about how are we going to market, how

25   are we going to meet competition.  And in those notes, there is

1    a statement that somebody, unidentified, expressed concern

2    about increased competition from a Hillcrest Heart Pavilion

3    which as now been built and the Saint Francis Heart Hospital.

4    No mention of Dr. Cohlmia, no mention of his Heart Hospital in

5    that document at all.

6            Those are the three pieces of evidence.  And we submit

7    that those are wholly inadequate to permit the Court to make a

8    finding that the suspension of Dr. Cohlmia at St. John resulted

9    in the loss of his Heart Hospital or loss of his business

10   opportunity.  The -- in fact, those three pieces of evidence

11   show no more than that St. John was legitimately concerned

12   about their position in the marketplace and that they were

13   looking to take steps to improve their own program.  Nothing

14   about let's get in touch with people out there and tell them

15   that Dr. Cohlmia is a bad man.  There was never any mention of

16   that anyplace and there's no evidence of that.

17           So with regard to all these alleged items of damages,

18   in summary the plaintiffs have simply failed to produce any

19   competent, admissible evidence that the cause of his losses

20   contractual and advantage-wise were affected in any way by the

21   St. John's suspension.

22           I want to make a couple of brief comments about the

23   fact of damage, whether there is or isn't any damage at all.

24   That's a different matter than causation of damages.  Did he

25   have damage?  Well, again, we don't know because there's no

```
 1    competent evidence of record that shows that he was damaged in
 2    any way with regard to these contracts, patient contracts,
 3    insurance contracts, Indian contracts, and the heart hospital;
 4    that he was damaged in any way.  Now, what they've done is
 5    attach to the response -- their response, the pieces of the
 6    expert reports of Dr. Winslade who is a peer review expert
 7    tendered by the plaintiffs and Dr. Riddle who is an economic
 8    expert.  And those expert reports were served on the parties
 9    earlier in the month or earlier in the month of January
10    actually and are attached as evidence of the fact that
11    Dr. Cohlmia suffered money loss because of the actions of both
12    hospitals, if you read those reports.  It doesn't break out St.
13    John and Hillcrest and OHI and all of these other people.  It
14    just says he should have earned this much and he earned this
15    much, therefore he had a loss of the difference between the
16    two.
17            Our point and the cases that we've tendered to Your
18    Honor state that those expert reports under Rule 56 are not
19    admissible unless they are sworn to.  Rule 56 provides for a
20    wide variety of materials that can be presented to the Court on
21    summary judgment, but it does not include unsworn statements or
22    hearsay.  And that's what those expert reports are, they are
23    simply unsworn statements.  So we contend that they cannot be
24    used and should not be used by the Court to show any damage
25    occurred.  Without those two reports, there is absolutely no
```

1    evidence in the case that Dr. Cohlmia ever suffered one dollar

2    of damage as a result of his suspension at St. John.

3          Finally, I want to cover just briefly the issue of

4    malice.  I don't want to make this case about malice because I

5    believe it's about failure to prove the causation of damages.

6    But we do have the Overbeck case which says that you have to

7    prove malice in order to establish a cause of action for

8    intentional or tortious interference with contract.  A recent

9    Oklahoma Supreme Court case, Tuffys vs. City of Oklahoma City,

10   which was decided in January of 2009 and has not been formally

11   released for publication, but it gives -- it's a case about

12   intentional inflection in the context of can this action be

13   brought against a municipality.  And malice was defined there

14   as "unreasonable and wrongful acts done intentionally without

15   just cause or excuse."  I think that's a fairly typical

16   definition.

17         There's no objective evidence in the record of malice

18   by St. John Medical Center, Dr. Allred, or Dr. Burnett.

19   Plaintiffs have, in their responses to the facts that we listed

20   in our motion for summary judgment, have made a number of

21   contentions that acts taken by people at St. John were done

22   poorly, that there was a perception of rudeness, that they

23   failed to talk to Dr. Cohlmia before they suspended him, that

24   they took 30 days to do the investigation which was a long

25   time, that he should have been suspended in the first place

1    instead of 30 days later.

2           There's several claims that they make, but none of

3    these rise to the level of malice.  There's nothing in there

4    which indicates that Dr. -- that Dr. Allred or Dr. Burnett were

5    out to get Dr. Cohlmia or did anything unfair or illegal or

6    that they never -- or that they did not essentially follow

7    their medical staff bylaws through the hearing with Judge Brett

8    and the approval of his report by the medical executive

9    committee and the board of directors.  If these actions are to

10   be the basis of a finding of malice by this Court, they have to

11   be illegal or wrongful or they have to be intentionally

12   unreasonable.  And it's not enough that Dr. Cohlmia believes

13   that they were.

14          Obviously he thinks he's a great surgeon and he

15   believes that the only reason he would have been removed or

16   suspended would be because somebody was out to get him, but

17   that -- what his subjective view is is beside the point.  What

18   Your Honor has to have in order to show malice is evidence that

19   somebody did something that was wrongful, illegal or was

20   grossly or intentionally unreasonable.  And there's simply

21   no -- no evidence of that.  Malice is really about proof of

22   intent, what was in the minds of the people who investigated

23   these two bad surgeries and the people who took action on it

24   including Judge Brett.

25          We say that the intent was to protect patients.  Dr.

1  Cohlmia says the intent was to destroy his Heart Hospital idea

2  and to destroy his career.  The point here is that there's no

3  evidence offered to the Court here that shows that St. John

4  intended to interfere with either patient contracts or to

5  interfere with insurance contracts.  There's no intent shown

6  that they were out to -- that they had something to gain by

7  interfering with insurance contracts, that they had something

8  to gain by interfering with patient contracts.  There's simply

9  no basis for a finding of malice and there is no evidence of

10 malice that's been tendered.

11          There's a couple of documents, one of which is a memo

12 that Dr. Allred says he wrote on June 26th.  Understand these

13 surgeries took place on June 6, so this is 20 days downstream

14 from the surgeries taking place.  Dr. Allred has been

15 conducting an investigation.  He's concerned, he's talked to a

16 number of other physicians.  He's talked to the management of

17 the hospital.  And he gets a visit from Tony de Leon who's a

18 doctor employed by the hospital, head of the Cardiovascular

19 Institute.  Dr. De Leon's deposition was taken, he's retired

20 now.  And Dr. de Leon came to him and said Sister Therese is

21 concerned, you've lost control of Dr. Cohlmia.  What are you

22 going to do about it?  And what that memo says is is that the

23 first thing Dr. Allred said to Dr. de Leon is this is not

24 Sister Therese's business, this is not the business of the

25 hospital management.  This is the medical staff's business and

1    I'll take care of it.  That's the first thing that memo says.

2    The second thing it says is he assures Dr. de Leon, who was

3    obviously concerned, and said we're looking at his cases, we're

4    watching the things he's doing.  We didn't suspend him, we're

5    watching the cases he's doing.

6            Now plaintiffs infer an intent there for malice, that

7    they were out to get Dr. Cohlmia because they were looking at

8    his cases and looking at what he was doing.  But in fact, an

9    equally logical conclusion from that would be that they are

10   simply trying to protect themselves.  They have not suspended

11   this guy who did two bad surgeries and now he's telling Dr. de

12   Leon we're watching him.  I've got the QA people looking at his

13   cases and everything is under control.  That's basically what

14   my view of that memo is.  But there's nothing in that memo that

15   indicates that anybody is out to get Dr. Cohlmia or to do

16   anything other than protect the hospital's patients.

17           So in summary, I will point the Court to the case of

18   Mac Adjustment cited by both cases.  In Mac Adjustment, it says

19   that Mac in that case failed because it could not establish any

20   evidence that the defendant intended to interfere with

21   contracts between plaintiffs and the defendants' member

22   companies.  And I would say that this case is just on point.

23   There is no evidence been tendered by the plaintiffs which

24   support their allegations of intentional interference with

25   either the contracts or with prospective business advantage.

1    Does the Court have any questions?

2              THE COURT:  No further, thank you.

3              Mr. Barkett.

4              MR. BARKETT:  Yes, Your Honor.

5              THE COURT:  How are you, sir?

6              MR. BARKETT:  First, let me point out that it's

7    interesting that Mr. Lewis seemed to raise all of the issues of

8    fact that exist in this case.  I think that everything he said

9    in here just highlights the issues that the jury is here to

10   determine with regard to malice, whether or not loss was

11   suffered in this case, and whether the actions of St. John

12   Medical Center indeed led to the following actions through

13   Hillcrest, SouthCrest, and Saint Francis which ultimately

14   eliminated him entirely from the Tulsa cardiovascular surgical

15   market, relegating him to practice in Tahlequah, losing his

16   entire patient base in Tulsa, losing his entire referral source

17   in Tulsa which is axiomatic in the fact that -- and the federal

18   courts, the supreme courts have all seen that adverse reporting

19   to the National Practitioner Base which is what was the

20   ultimate effect of St. John Medical Center's actions against

21   Dr. Cohlmia, led to his demise.  It's a domino effect.  When he

22   says that they took -- they didn't take any action against Dr.

23   Cohlmia outside, what they wanted to do, the facts don't --

24   what we presented as facts do not support what they are saying

25   existed in this case.

1          When Dr. Cohlmia -- they based their decision to

2     summarily suspend, not restrict, not take him through the

3     process of peer review, but summarily suspend him based on two

4     thoracic lung cancer cases that occurred in one day, on June 6,

5     2003.  There is a memo, as mentioned by Mr. Lewis, that was

6     drafted by Dr. Allred who is the head of St. John medical

7     staff, which talks about, and it's attached in our papers,

8     which talks about how he's been --

9          THE COURT:  Which number?

10          MR. BARKETT:  Gosh, I don't know the exhibit number,

11     Your Honor.  I can find that for you.  I can show you actually

12     the document if you'd like to -- that's it, yes.

13          THE COURT:  Number two.

14          MR. BARKETT:  Yeah.  Which I think is a smoking gun

15     here.  By the way, acts of conspiracy are rarely admitted.  And

16     we admit that we've not had a person from St. John admit they

17     were out to get Dr. Cohlmia, but certainly the indications from

18     all of the evidence in this case point to that.  It talks about

19     how Dr. Cohlmia, as a result, basically what happened was as a

20     result of his being boycotted by the physicians at Hillcrest,

21     had to take more of his patients over to St. John Medical

22     Center.  This memorandum talks about how he's gone from two

23     percent to 28 percent of the cases done there which infringes

24     upon the other surgeons' operating room time.  Quite

25     significantly he talks about these are primarily the Indian

1    health type cases that he brings to the hospital.  And the

2    inference there is that they are low pay, high risk patients.

3         He goes on to talk about how difficult it is to remove

4    someone from the staff once they have full privileges, clearly

5    indicating that the intent there is to remove him from the

6    staff.  And that he has directed the entire staff at Hillcrest

7    to conduct a hundred percent review of all of his cases.  We're

8    not talking about peer review, we're talking about clandestine

9    review of Dr. Cohlmia behind his back in an effort to find

10   something to latch onto.  Significantly, this June 26, 2003

11   memo, like Mr. Lewis said, is a month after the --

12   approximately 20 days after the two surgeries that they claim

13   warranted summary suspension, not peer review, but summary

14   suspension occurred.  There's no mention of those cases in

15   here.  In fact, between the time that Dr. Cohlmia performed

16   those surgeries, he was permitted to perform approximately 25

17   to 30 additional surgeries.  One of the physicians involved in

18   the decision to summarily suspend Dr. Cohlmia, Dr. Burnett in

19   fact referred patients to Dr. Cohlmia in that interim period.

20        So clearly the idea of summary suspension was not on

21   their minds until they saw it as a means to effectuate his

22   ouster which ultimately again led to the domino effect.  When

23   he was summarily suspended, they automatically issued a report

24   to the National Practitioner Data Bank.  That in turn caused or

25   purportedly caused the actions taken against Dr. Cohlmia by

1    Hillcrest Medical Center, SouthCrest, and ultimately the

2    writing was on the wall with Saint Francis and he withdrew his

3    application there.  Also --

4         THE COURT:  What is there before me in terms of

5    evidence to support your domino effect theory, that losing

6    privileges ipso facto, results in staff losing privileges at

7    other hospitals?

8         MR. BARKETT:  Well, this is one thing.  And again, the

9    way these motions are broken down on this schedule, Your Honor,

10   a lot of the evidence that pertains to Hillcrest Medical Center

11   and what their ultimate motion for summary judgment will

12   provide and what we'll respond to, is so intertwined that it's

13   difficult simply to respond because there is such great

14   evidence of collusion here.  Not only did the National

15   Practitioner Data Bank report cause -- was the catalyst or the

16   excuse, pretext at least, for Hillcrest who immediately imposed

17   literally impossible restrictions on his practice there, but in

18   fact we believe Dr. Allred and, it's admitted, that someone

19   from St. John Medical Center called up Dr. Landgarten at

20   Hillcrest Medical Center the evening of or the day after

21   Dr. Cohlmia was locked out of St. John Medical Center based on

22   this quote/unquote summary suspension.

23        It's admitted in the papers that's a breach of

24   confidentiality, that's improper action.  Now, Dr. Cohlmia

25   would have an obligation to inform Hillcrest of the action

1    taken at St. John, but it had barely been 24 hours.  Someone

2    from St. John was on the phone to Hillcrest informing them that

3    they have indeed invoked the summary suspension and basically

4    the ball is in their court now.  They immediately imposed

5    impossible restrictions on his practice at Hillcrest which made

6    it impossible for him to admit patients --

7              THE COURT:  Where is the evidence of that phone call?

8              MR. BARKETT:  It's in a minute from Hillcrest Medical

9    Center medical executive committee meetings and it's also --

10             THE COURT:  Can you point that -- me to that?

11             MR. BARKETT:  I believe it's in our papers here.  I'm

12   not a hundred percent.  I can certainly supplement with that

13   evidence.  In fact, Dr. Landgarten --

14             THE COURT:  Well, I mean, we're here today for the

15   hearing so I'm going to need to -- if you need to take a few

16   minutes, feel free to do that.  But secondarily, with regard

17   you made the statement that there's no reference to the June

18   6th operations here in this June 26 memo, but, I mean, it's

19   implicit.  The subject here of the June 26 memo is operation

20   without consultation and that's the heart, without other

21   consultation.  That's the central focus of Judge Brett's

22   findings, right?

23             MR. BARKETT:  Well, I believe that what Judge Brett

24   first of all did not know is that this ongoing investigation

25   was there.  And a central theme of their claim, which

1    incidentally was never found to breach any standard of care,

2    was simply a finding that --

3          THE COURT:  In fact, he says it in his memorandum that

4    it does violate the national standard of care, correct?

5          MR. BARKETT:  My understanding is that the evidence

6    presented at the hearing was that there was not a breach of a

7    standard of care, that it was a judgment decision that they

8    called improper judgment.  However, Judge Brett's decision was

9    made without the knowledge that they were actively seeking

10   methods in order to strip his privileges.  Furthermore, Judge

11   Brett was not made aware of the fact that the two cases that

12   were actually at issue were not peer reviewed by any thoracic

13   surgeon.  Dr. Cohlmia was not involved in any explanation of

14   those surgeries.  And when they finally were peer reviewed

15   under the Q and A procedure that St. John had in place

16   approximately a year later, they were not found to be egregious

17   to the level -- egregious by variances to the level of

18   requiring a summary suspension.  In fact, one of the surgeries

19   was ranked a three out of five and one was ranked a four out of

20   five.  These were not even performed at the time that Judge

21   Brett was hearing that case.  We're not faulting Judge Brett in

22   this case.  What we're saying is that there was not a fair peer

23   review hearing.  The evidence was not presented and Dr. Cohlmia

24   was not given the opportunity to respond according to the

25   rules.

1          Now, the HCQIA immunity arguments, which we're sort of

2     getting astray to, have been held in abeyance on this --

3          THE COURT:  I don't know that we're really getting

4     into immunity here.  Mr. Lewis really focused on proximate

5     causation of damages here, and he did go into malice as a

6     secondary argument.  But I think his focus for today's

7     purposes, he sent the message that he's focusing on proximate

8     causation of damages, right?

9          MR. BARKETT:  That's correct.  And I was trying to

10    give the Court a little more background, since he said that

11    there was no evidence of any actions, improper actions taken.

12    But the damage to Dr. Cohlmia again is axiomatic.  It's a fact

13    question that needs to be decided by the jury.  Indeed,

14    Dr. Cohlmia addressed and talked about his loss of income, the

15    fact that he expended his entire savings, all his 401(k) in

16    order to survive during this period of time.  It's undisputed,

17    in fact, Mr. Lewis admits that Dr. Cohlmia lost -- he went from

18    the number one provider of cardiovascular surgical services in

19    this market to zero.  He was forced to leave.  He lost all of

20    the prospective business advantages of those patient -- patient

21    related services.  Undisputed that when the domino effect

22    started by St. John through an improper peer review, led to the

23    restrictions at Hillcrest, that he was indeed boycotted.  And

24    OHI physicians, cardiology support physicians who's necessary

25    component of the provision of cardiovascular surgical care,

1   coerced and persuaded patients not to use Dr. Cohlmia.  That if

2   they did insist on using Dr. Cohlmia, that they would no longer

3   provide them cardiology services.  This is egregious conduct.

4   This is conduct that goes beyond the pale of reasonableness.

5   This is using patients as pawns in this.  And it all started

6   with the improper and bad faith peer review process conducted

7   by St. John.

8          Contrary to what Mr. Lewis has said, Sally Foster, the

9   head of the Cherokee Nation that was deposed in this case and

10  her testimony is of record, talked about the impact on his

11  contract.  Although he didn't lose it, he had to go through a

12  peer review process and I believe a legitimate peer review

13  process at the Cherokee Nation based on the actions undertaken

14  by St. John Medical Center and Hillcrest which they found to be

15  no breach, but it certainly impeded his ability to practice

16  during that period of time.  Certainly Blue Cross and Blue

17  Shield and other insurance carriers at the time, based on the

18  National Practitioner Data Base that again was illegally

19  processed through an illegal peer review at St. John, caused

20  them to terminate his ability to accept patients under those

21  plans until he went through the appeal process.  Dr. Cohlmia

22  has to go through this appeal process now every year based on

23  this National Practitioner Data Base report out there from St.

24  John and ultimately Hillcrest that can never be removed.

25  Hopefully sometime at the conclusion of this case, we can get

1   an injunction removing that, but right now he's still living

2   with that.

3          Obviously the development of his Heart Hospital which

4   they want to minimize, but certainly was well on its way to

5   production, architectural plans had been drawn, investors had

6   been acquired including Dr. Cohlmia himself, including investor

7   groups from outside the city, and again, his massive patient

8   base that he had that he no longer has.  Those are all issues

9   of damages.  Those are all -- show clearly damages and impacted

10  his ability to practice and earn a living.  They don't even

11  dispute that it impacted his ability to earn a living.  So what

12  we're looking at here is the bad faith intent of the parties

13  involved, but there's a plethora of evidence of loss.  And I

14  don't even believe that's disputed.  At a minimum, it's a

15  question of fact for the jury to decide.

16         Your Honor, also if the Court pleases, we would

17  certainly offer -- on the issue of the expert reports, they

18  were attached.  We had a brief scheduling order here on these

19  particular motions.  The expert reports were attached and

20  incidentally the defendants have requested that the expert

21  depositions and have been provided with one of the -- with

22  dates for the expert depositions and we're in the process of

23  providing them with the dates for another expert which they'd

24  requested, as we have requested theirs and received no dates

25  but...  so they will testify to what they've talked about.  And

1    if the Court prefers us to, we certainly can go to these

2    experts and have them swear to the statements that they have

3    made in their expert reports.  The facts and the basis and the

4    law supports our claims.  And for it to be -- for their motion

5    for summary judgment on this issue to be granted based on that,

6    I think would be unjust.  And we're certainly willing to allow

7    them to take the depositions, test the reports, and then the

8    Court can see how that pans out.  Or in the alternative, we

9    would simply have them sign affidavits verifying the reports,

10   but the evidence is all there and the law is all there.

11          THE COURT:  Anything else?

12          MR. BARKETT:  That's all.

13          THE COURT:  Mr. Lewis.

14          MR. LEWIS:  Just one or two comments, Your Honor.

15   What comes to mind -- and I appreciate Mr. Barkett's remarks

16   and I think he was accurate on some of the items in the record,

17   many of the items.  Comes to mind is the old commercial that

18   Wendy's used to run with the little old lady that said where's

19   the beef.  It's not enough under Rule 56 to come into this

20   courtroom and before this Court in a matter that if it's

21   decided in favor of St. John, will be packaged and ready for

22   appeal when the case is over and have to be looked at by judges

23   up above.  It's not enough to come in here and say, well, we

24   can get this evidence, we know where it is, we can get it.  Why

25   didn't they get it?  There is no evidence there.  Where's the

1    beef?

2          This business about the National Practitioner Data

3    Bank, the impact it might have had on other hospitals, where is

4    that in the record.  Where is the information or deposition or

5    an affidavit from somebody that said we saw that National

6    Practitioner Data Bank result and, by golly, we immediately

7    pulled his privileges.  There's nothing there.  Where's the

8    beef?  He talks about the fact that this memo of Dr. Allred's

9    is a smoking gun.  My understanding of the law is this.  Malice

10   has to be proven.  And in this case on summary judgment, we do

11   have some things that we've had to establish by the record and

12   we've tried to establish those things.  But the law says that

13   they have to establish the things on which they have the burden

14   of proof.  And what they have the burden of proof is to show

15   the Court that this document that they call the smoking gun is,

16   in fact, a document that demonstrates malice on the part of St.

17   John and an intent to interfere with Dr. Cohlmia's legitimate

18   contracts with other parties.  It doesn't say that.  You might

19   read it that way, you can pull words out, but the law says that

20   if a document can be read equally to prove something or to

21   disprove it, then it doesn't prove it.

22          I agree that damages are a question of fact for the

23   jury.  What the jury decides is the amount of damages.  The

24   Court decides whether or not there's causation for damages.

25   The Court decides whether or not there's any damage at all.

1    And if the Court so decides, then the jury goes back in the

2    jury room and decides how much they are.  So the fact that

3    damage is a fact question for the jury is not an answer.  I

4    don't know anything about this Cherokee peer review process.

5    There's nothing I've seen come out in the depositions about

6    Dr. Cohlmia having to go through peer review with the Cherokees

7    and certainly where's the beef, there's no evidence in the

8    record.  We ask that you sustain our motion for summary

9    judgement.  Thank you.

10        MR. BREWSTER:  Your Honor, briefly can I comment on

11   two things?

12        THE COURT:  All right.  Well, he gets the last word.

13   Go ahead.

14        MR. BREWSTER:  Right, just briefly, Your Honor.  As I

15   understand the main issue for Mr. Lewis' proximate causation

16   and the issue he has a problem, I guess, with is the

17   termination of privileges or the suspension of privileges

18   proximately causing damage to a physician.  And Mr. Barkett

19   used the term, this axiomatic.  Well, there is circumstantial

20   evidence and inferences can be drawn from evidence.  And with

21   regard to a motion for summary judgment, the Court can

22   certainly consider that circumstantial evidence and those

23   inferences.

24        And I was trying to think of an analogy that would be

25   so clear to the Court.  It would be like if we had a case

1   involving, and a little farfetched from this analogy, but the

2   conclusion I think holds true, where you had a competitor, a

3   retail competitor just getting a bulldozer and dozing down the

4   other competitor's store.  And then the argument would be, did

5   this really impact, for summary judgment purposes, his ability

6   to conduct business with those customers.  And Mr. Lewis would

7   say, well, they don't have any customers that said they were

8   going to come that day and nobody is really complaining and

9   that that person who had a store bulldozed down had another

10  store in another part of town and, therefore, those customers

11  can come over there and there was no interference with the

12  relations with those customers.  Well, that would be -- that

13  would just be foolish.  And similarly situated here is they

14  take this doctor and wipe out his ability to practice medicine

15  and --

16        THE COURT:  It doesn't really.  It begs the

17  question -- this is an interesting question because if the

18  Court adopts your approach, and I understand, it's an

19  interesting argument here, then the termination of privileges

20  at one hospital under your domino theory would always support,

21  for purposes for summary judgment, proximate causation allowing

22  you to go to the jury, at least on that third prong, always.

23        MR. BREWSTER:  That's correct.  And the reason it

24  would -- I mean, there could be other issues that might be

25  summaried out, but if it was in bad faith, if it was

1    anticompetitive, if it met --

2           THE COURT:  Yeah, but I'm just focussing on the third

3    prong.

4           MR. BREWSTER:  On the damages.  And the answer would

5    be yes, absolutely.  And I think of the Tarabishi case that was

6    handed down by the Tenth Circuit.  I tried that case, a nine

7    week trial in front of Judge Cook.  And very similarly, once

8    you take action against a physician's privileges for the

9    purposes of that anticompetitive reason and not for good cause

10   and not for the reasons that peer review committees should act,

11   you are --

12          THE COURT:  Was tortious interference a cause of

13   action in that case?

14          MR. BREWSTER:  I'm sorry?

15          THE COURT:  Was tortious interference a cause of

16   action in that case?

17          MR. BREWSTER:  That case was tried twice.  The first

18   trial was on the tort claims.  It was tried by Senator Stipe as

19   Dr. Tarabishi's lawyer.  The antitrust claims were tried in the

20   second trial and I tried that one.  So the tort claims were

21   tried in front of a jury and they were allowed to go to the

22   jury on those claims and they returned a defense verdict in the

23   first trial and that may well happen here.  But it is fair --

24   for these physicians and these lawyers for these physicians to

25   say that wouldn't have a completely devastating effect on a

1    practitioner to be summarily suspended.  And the timing is

2    critical, too.  I mean, they're claiming about two events that

3    occurred in June and they summarily suspend him more than a

4    month later and in the interim we have this memo.

5            THE COURT:  Well, but he asked for the quick hearing,

6    right?

7            MR. BREWSTER:  No, the summary suspension was given a

8    month later.  In other words, he's practicing medicine --

9            THE COURT:  Oh, right, the request for the hearing

10   occurred after the summary suspension?

11           MR. BREWSTER:  Yes.

12           THE COURT:  Yes, that's right.

13           MR. BREWSTER:  He's practicing medicine --

14           THE COURT:  That's what triggered the Brett review.

15           MR. BREWSTER:  The very doctor that delivers the

16   summary suspension more than a month after the event of these

17   two cases is referring during the interim before they deliver

18   the summary suspension.  That is just incredible.  If they

19   would verily believed that this man needs to be summarily

20   suspended after these two deaths -- or one death, I'm sorry,

21   then they would have suspended him that day, next day, maybe a

22   week, but a month later.

23           THE COURT:  Well, but these are fact intensive.

24           MR. BREWSTER:  Right, correct.

25           THE COURT:  I mean, as you know, you've got to review

1    the facts.

2            MR. BREWSTER:  That's correct.

3            THE COURT:  I mean, what sense would it have made to

4    summarily suspend the next day?  There's no way that one can

5    gather the necessary facts to make that determination in a day

6    or two days, correct?

7            MR. BREWSTER:  No, no, that's not correct.  Summary

8    suspension is based upon a preliminary understanding of a very

9    bad event that might pose danger to patients coming in.

10   Summary suspension is a very extraordinary action and it's done

11   without a hearing and it's done to preserve the status, like an

12   ex parte order under exigent circumstances.  This was done five

13   weeks later and frankly I've never seen that happen.  Maybe

14   they can have other examples they can provide to the jury as

15   showing this is reasonable.  Five weeks after this gentleman

16   dies they do a summary suspension.  During that five week

17   period, they could have peer reviewed that case and made a

18   decision that wasn't summary in nature.

19           THE COURT:  Well, now he died after the second

20   surgery, correct?  He didn't die on June 6th, he died after the

21   second surgery.

22           MR. BARKETT:  One patient died after the second

23   surgery but that occurred, I believe, four days later.

24           THE COURT:  Okay.  There was only four days after June

25   6th?

1          MR. BARKETT:  About four to six days.  The other

2    patient didn't die.

3          THE COURT:  I understand that.  I understand.

4          MR. BREWSTER:  But it's still more than a month or

5    nearly a month later that they deliver this letter of summary

6    suspension without any review of the case, without any

7    conference with Dr. Cohlmia during those four or five weeks.

8    It just smacks clearly of a way to take him out now.  And it's

9    like the ex parte order from the Court, I mean, it gives a

10   tremendous advantage to the people prosecuting him if they have

11   him out of the -- escorted him out of the hospital and that's

12   what happened.  That goes to the bad faith nature of their

13   conduct, but they knew exactly what was going to happen to a

14   physician that would get a National Data Bank report of a

15   summary suspension.  That's a death blow.

16         THE COURT:  I mean, essentially you are arguing, as to

17   the third prong, that damages are presumed whenever there is a

18   loss of privileges.

19         MR. BREWSTER:  Absolutely.  And the expert will

20   testify to that.  And they won't be able to present a doctor

21   from their own ranks that will say anything differently than

22   that.  They all know that.  And medical malpractice defense

23   cases, the plaintiff, one of the things greatly negotiated

24   around is what's going to be the impact on this doctor of that

25   National Data Bank report of a settlement, for example, or a

1    verdict?  I mean, that is a critical pivot point.  And to have

2    a summary suspension, in other words, doctors saying you need

3    to leave now, you can't see anyone else, it is an imminent

4    immediate danger to patients going forward right now, and have

5    that delivered to the National Data Bank, it would be a death

6    blow.

7            THE COURT:  Does the National Data Bank distinguish

8    between a summary suspension and a suspension after more

9    review?

10           MR. BREWSTER:  Your Honor, as an officer of the Court,

11   I can't say certainly, but I believe yes, and I believe the

12   experts will testify to that.  A summary suspension is a very

13   grave report.  Now, I'd have to confirm that there is that

14   distinction, but I believe the answer is yes.  Thank you.

15           THE COURT:  Mr. Lewis.

16           MR. LEWIS:  To speak specifically to that, the

17   National Data Bank was set up so that any adverse action with

18   regard to privileges, even if they had come in and said okay,

19   we're not going to let you do thoracic surgery here anymore but

20   you can do all the cardiovascular surgery you want.  I mean,

21   that's one of the outcomes that they are going to argue should

22   have happened.  That has to be reported to the Data Bank,

23   anything that's adverse action as to privileges is reported to

24   the Data Bank.

25           You know, this is really a Monday morning quarterback

1    thing.  After a lot of years in the practice of law I see it a

2    lot.  But let's just look at this reasonably and I think this

3    has a lot to do with their argument.  If they had suspended

4    Dr. Cohlmia on the day of those two surgeries, then Clark

5    Brewster would be in here today arguing they had no

6    investigation, how could they do this, this man had practiced

7    for 20 years at this hospital and they suspend him without even

8    an investigation, that's terrible, it's malicious.  So you're

9    damned if you do, you're damned if you don't.

10           The same thing is true with regard to the issues on

11   whether or not he was reviewed by his fellow surgeons, his

12   fellow thoracic surgeons.  You know, look at the position St.

13   John's is in.  If they come in immediately after these

14   surgeries and bring in his competitors and say look at what he

15   did here, then Clark Brewster would be here today saying those

16   guys wanted to get him out of there because he was competing

17   with them and he was stealing their patients from them and

18   that's the reason they brought them in.  So what St. John did

19   is they just isolated those guys.  They hired experts.  They

20   hired surgeons from out of town, out of state to come in and

21   look at the cases and testify before Judge Brett.  So you know,

22   again damned if you do, damned if you don't.  If they had done

23   it the other way, Clark Brewster would be in here arguing that

24   Dr. Blankenship and Dr. Fore and those guys were just out to

25   get Dr. Cohlmia and that St. John allowed them to do it.

1      So what I want to get back to is the lack of evidence

2  under Rule 56, that's what really the key is here.  And the

3  Data Bank thing is not a part of the evidence.

4      THE COURT:  Right.  Now, essentially -- and Mr.

5  Brewster admits that with regard to your focus on the third

6  prong, that damages should be presumed under Rule 56 by this

7  Court whenever there is a suspension of privileges.  Your

8  reply.

9      MR. LEWIS:  I can't agree with that.  I don't know any

10  law that says that they be presumed.  The law says that on

11  summary judgment, the party that has the burden of proof has

12  the duty to come forward with the evidence.  So to the extent

13  that St. John, Dr. Allred, Dr. Burnett have the burden of proof

14  to establish to Your Honor that this cause of action doesn't

15  exist, we had a duty to do that and we've done it.  To the

16  extent that there are points or portions of the proof that have

17  to be made by the plaintiffs in this case, they can't rely on

18  their pleadings.  The law says that.  They can't rely on

19  speculation.  They can't rely on hearsay.  They have to come in

20  here with evidence that is under oath or that is established or

21  agreed to by the parties that establishes that there was damage

22  and they haven't done that.  It is not presumed.  There is no

23  law that I know, no case I know of that say that damages are

24  presumed when one party acts that causes some kind of detriment

25  to another party.

1          Somebody could take an act against me, could punch me

2    in the nose -- and John and I were talking about this

3    yesterday.  If he punched me in the nose and I was out for two

4    weeks from the office, it doesn't necessarily mean that I've

5    been damaged in my contracts.  My nose hurts a lot.  My

6    feelings may hurt a lot and I may be angry at John, but it

7    doesn't mean that I haven't been able to perform my contracts

8    or that my contracts have been interfered with.  That's what

9    we're here talking about today.  We'll be talking about this

10   other in June and I'm ready for that.

11          THE COURT:  Anything else?

12          MR. LEWIS:  That's all, Your Honor.

13          THE COURT:  Based on the briefs, the arguments of

14   counsel here, and the evidentiary materials submitted to the

15   Court, the Court would first note that there has been no Rule

16   56(f) affidavit filed by the plaintiffs to indicate that they

17   cannot present facts essential to justify its opposition.  So

18   with due respect, the oral request of Mr. Barkett essentially

19   to supplement here will be respectfully declined given that

20   Rule 56(f) has not been followed here.

21          As to the motion, I believe Mr. Lewis is correct, the

22   focus here in the motion is damage proximately sustained as a

23   result of the interference.  I don't believe there is -- and I

24   think this is at the heart of the argument today.  I do not see

25   case law for the proposition that damages should be

1    automatically presumed by the Court based upon a suspension of

2    privileges.  Because of the absence of proof of damages here,

3    the motion with respect to Counts Roman V and Roman VII set

4    forth in the motion for summary judgment of St. John Medical

5    Center, Howard W. Allred, M.D., and William C. Burnett, M.D.,

6    Docket Number 279 is granted.  Let's take a short recess and

7    we'll be back on the other motion.

8         (Recess.)

9         THE COURT:  For the record, the Court would correct

10   one statement that it made.  Insofar as the claims for tortious

11   interference with contract and prospective business advantage

12   were both incorporated in Count Roman V.  Count Roman VII was

13   the Section 1981 claim as to which a stipulation of dismissal

14   has been filed.  So the Court misspoke with regard to granting

15   summary judgment as to both Counts V and VII.  To be accurate,

16   the Court simply granted summary judgment on Count V.  The

17   motion for summary judgment is moot in light of the stipulation

18   of dismissal with regard to Count VII.  All right.

19         MR. BREWSTER:  One inquiry, Your Honor, if I may?

20         THE COURT:  Yes, sir.

21         MR. BREWSTER:  If I'm right, Count V also included

22   garden variety defamation.

23         THE COURT:  I think that is as to the next motion for

24   summary judgment.

25         MR. BREWSTER:  Did it not also include defamation on

1    St. John as well?

2            THE COURT:  Not as to St. John.

3            MR. LEWIS:  There are no defamation claims against St.

4    John.

5            THE COURT:  All right.  Let's address docket number

6    290, the motion for summary judgment Count V and VI of

7    defendants Oklahoma Heart Institute, Inc., Oklahoma Heart,

8    Inc., and Wayne N. Leimbach, Jr., M.D.  Mr. Carwile.

9            MR. CARWILE:  Thank you, Your Honor.  I think for

10   purposes of trying to move along and integrate what I expect to

11   hear as evidence of tortious interference, some of which

12   piggybacks on the defamation claim, with the Court's permission

13   I'll start first with the defamation claim.  And of course,

14   this amended petition docket 90 contains a myriad of

15   allegations of defamation by either employees unknown or known,

16   or named employees of OHI.  And, therefore, the discovery

17   undertaken was to depose or attempt to find the evidence of any

18   kind of actual defamation.  I think analytically for purposes

19   of summary judgment, of course, we want to address, was there

20   defamatory statement standing alone?  Is there evidence of it?

21   Is there evidence from which the finder of fact could find

22   publication or otherwise stated as a matter of law, are there

23   circumstances where under the facts there is no publication?

24   And number three, are there undisputed facts which lead to the

25   conclusion that as to some statements they're privileged as a

1   matter of law?

2          Now with respect to the count for defamation, we did

3   have as one grounds an immunity claim under HCQIA which has

4   been put in abeyance.  We agreed with counsel for the

5   plaintiffs that although we briefed it, that was before the

6   Court made its rulings on the extended discovery on some of the

7   peer review stuff.  So they didn't respond to it and we don't

8   advance that argument here today.  Of course, there's two other

9   axioms about defamation.  One is the statement has to be made

10  within a year of filing the amended petition -- or the original

11  petition.  And two, there are minimum levels, but they are not

12  de minimis as to what a plaintiff must establish to establish a

13  claim for defamation.  There has to be some level of

14  particularity as we set out in the cases.  You know, who was

15  the speaker?  What, near as one can recall, did the speaker

16  say?  To whom did the speaker say it?  And unless they can,

17  they, the plaintiffs, can come up with admissible evidence to

18  support a claim for a particular statement, then that

19  particular statement must fall.  It can't survive summary

20  judgment.

21          And of course, when faced with the kinds of

22  allegations we are at OHI and with Dr. Leimbach, in the amended

23  petition it's not our burden to prove that no defamation

24  occurred.  It's our burden to show enough evidence that there's

25  none in the record that we can find.  And it's on the plaintiff

1    to show a defamatory statement.  And I would agree that we need

2    to show uncontested facts, facts not in dispute, that would

3    establish no publication or privilege.  So with that in mind,

4    let's focus on what came back in the response to the motion for

5    summary judgment.

6         THE COURT:  Before you do that, I had looked at it

7    from the perspective of -- and I'll give plaintiffs a preview

8    of the way I had conceptually approached this.  I'm interested

9    in hearing from the plaintiffs to delineate any statements that

10   are either not time-barred, because Judge Payne decided that

11   statute of limitations bars any statements made prior to July

12   7th, 2004; statements that are not hearsay referencing your

13   level of particularity; and three, what statements are not

14   subject to intracorporate immunity.  So a lot of this motion

15   with regard to defamation will be addressed in your reply to

16   the response.

17        MR. CARWILE:  I agree, Your Honor.  Let's, though,

18   talk about what could be in the record that would clearly be a

19   defamatory statement.  What evidence could be proffered in the

20   plaintiffs' response that would defeat this motion as to a

21   single statement?  An admissible statement in admissible form

22   that somebody who heard it, that is heard one of my clients or

23   its employees make a defamatory statement.  One.  One affidavit

24   by one patient who was told something derogatory about the

25   doctor, Dr. Cohlmia.  Dr. Cohlmia testifying that it was made

1    to his face in the presence of somebody else, where anybody

2    could hear it.  A writing, we don't have any evidence of that.

3    Or a statement that clearly would not be hearsay.  And the

4    truth is when you read the response, there's not a single piece

5    of admissible evidence on a single statement that would meet

6    that criteria.  There is one statement by Dr. Adams that Dr.

7    Cohlmia said to him -- I mean, that Dr. Leimbach said to him,

8    Dr. Cohlmia is litigious.  Not published to anybody else, said

9    to Dr. Adams.  Our position is that as a matter of law, that's

10   opinion.  Not published to third parties, not published with

11   any intent, no damage.

12         Now, what does Dr. Cohlmia say in page after page

13   after page of his deposition when he's questioned?  That either

14   a patient who he can't remember told him, a patient who maybe

15   he can remember quoted and relayed to him the hearsay statement

16   of an unidentified OHI physician, or a patient who he thinks he

17   can remember, but can't tell when and where told him what an

18   OHI physician said.  All of that is hearsay or fails to

19   establish the elements of a defamatory statement.  We're really

20   down to, in this case, because there's -- as I said, you would

21   think that if there's a patient out there who heard something

22   of a defamatory nature, that affidavit, under the Rule 56

23   requirements, would be appended to that response.  There's not

24   a single one and there's not a single patient whose deposition

25   was taken who said that.  And there's not a single third party,

1    none of these healthcare providers, none of the people at the

2    Indian Health Services.  We put it in our brief but there isn't

3    a single statement that they testified to made by an OHI

4    employee or physician of a defamatory or disparaging nature.

5    It's not in the record.

6           We have two pieces of testimony, two doctors, Dr.

7    Decker and Dr. Giddens.  They say they heard -- one says he

8    heard Dr. Lynch of OHI make derogatory comments about Dr.

9    Cohlmia.  And the other says he doesn't remember who the

10   speakers were, but he remembered OHI doctors doing that.  But

11   both of them admit, plaintiffs don't dispute, and it's beyond

12   dispute in this case that the only time those statements were

13   made to which were testified, they were made in Hillcrest

14   medical committee or peer review meetings.  There is no

15   evidence in the record of a statement that a firsthand listener

16   has attested to that's in this response by the plaintiffs of a

17   statement, a derogatory statement outside of a peer review or a

18   medical committee meeting.  That's undisputed.

19          So if you presume just for purposes of argument that

20   Dr. Giddens and Dr. Decker's testimony established some

21   disparaging statement, the question is are my clients entitled

22   to summary judgment?  First, on the grounds of intracorporate

23   immunity, that is there is no publication as a matter of law.

24   It's undisputed that at all times Dr. Leimbach -- in fact, it's

25   number four of our facts to which they don't dispute, that at

1    all relevant times, he's sitting on one or more of these

2    committees.  That the evidence in the case is that he would be

3    on the peer review committee for a while and then go off and

4    another OHI doctor would go on peer review and he would go

5    off -- he being Dr. Leimbach, would go off to the medical

6    executive committee meeting and they would do that.  And the

7    question is, does that as an undisputed fact that these doctors

8    were sitting on these peer review committees, establish the

9    necessary basis to find that there's no publication?

10         Now, there's a second argument which is that it's a

11   privileged communication, but you don't have to get there if

12   you find that there's no doubt that this is an intracorporate

13   communication.  And the law is clearly that a doctor sitting on

14   a Hillcrest peer review committee, making statements in that

15   committee meeting to other peer review committee members, that

16   is an agent of Hillcrest in doing so, that is not a

17   publication.

18         We have established that the agency relationship

19   exists.  Now, the Thornton case talks about there's a

20   conditional privilege beyond that where one's good faith,

21   intent, those kinds of things matter.

22         THE COURT:  I don't think it's appropriate to get

23   there.

24         MR. CARWILE:  Don't need to do that for purposes of

25   today's motion.  We just have to find do we have admissible

1    evidence of a disparaging statement, a defamatory statement and

2    is, as a matter of law, is the no publication which we urge for

3    the limited number of statements, does it apply?

4         There is one final allegation by the plaintiffs and

5    that is in the fair hearing proceedings that occurred I believe

6    in 2006, the claim is that Dr. Leimbach came to those

7    proceedings and lied.  Lied in those proceedings.  And that, at

8    least on the record, clearly would be within the year before

9    the filing, although I think it may -- I don't know if this was

10   already on file before that happened or not, but it doesn't

11   really matter because as we set out in our -- I believe in our

12   response -- our reply brief, as a matter of law under the

13   Kirschstein case, the Oklahoma Supreme Court 1990 case, that is

14   a administrative or quasi judicial proceeding for which there's

15   absolute immunity, not related to HCQIA, but related to

16   Oklahoma law.  In that case, the Supreme Court specifically

17   noted that that absolute privilege had been deemed to apply in

18   such things as hearings on a physician's staff privileges

19   before the board of directors of a hospital district.

20        So the Oklahoma Supreme Court doesn't confine that

21   privilege defense solely to judicial proceedings under a state

22   court proceeding or a state administrative proceedings.

23   Clearly the Kirschstein v. Haynes case insulates Dr. Leimbach's

24   statements made at the fair hearing itself, without conceding

25   at all that they are defamatory.  If you take for purposes of

1    argument that they are false, they are absolutely privileged.

2    I believe I'm correct in saying, Your Honor, that the only

3    statement in the record that anybody, any witness made, or

4    anything that the plaintiffs point out as allegedly defamatory

5    that has any temporal certainty to it is that allegation that

6    Dr. Leimbach lied in the fair hearing proceeding.  Other than

7    that, there's not a date of when anything -- any evidence that

8    any of the statements that are complained about occurred --

9    admissible evidence, that any of those occurred within a year

10   of the filing of the lawsuit in this case.

11            THE COURT:  When was that alleged statement made by

12   Leimbach?

13            MR. CARWILE:  In the fair hearing, hearing at

14   Hillcrest.  And I want to say that occurred, Your Honor -- it

15   had to occur in 2006, I believe.  I could be corrected.  I

16   would say that's probably within a year, I know it's within a

17   year.  It didn't occur, I don't believe, in 2003 or 2004.

18            THE COURT:  So in your arguments, you do get to

19   privilege and immunity with respect to the alleged Leimbach

20   statement?

21            MR. CARWILE:  Yes, Your Honor, but not based on HCQIA.

22   Based on the absolute privilege afforded under the Kirschstein

23   case.  Kirschstein is a matter of Oklahoma law, Kirschstein v.

24   Haynes, 788 P.2d 941 case.  It doesn't, that's not a -- that is

25   essentially an interpretation of Oklahoma law and the

1    restatement on the immunity afforded starting with lawyers down

2    to witnesses and others, immunity from defamatory -- defamation

3    or libel liability for testifying in the kinds of proceedings

4    contemplated.   Kirschstein expressly recognizes the kinds of

5    board meetings, the kind of procedures here, physician staff

6    privileges proceedings within a hospital.  So that then we do

7    set that out in our -- I believe it's in our reply brief.

8         But that aside, you can wade through all the

9    deposition transcripts we appended to the motion.  And the

10   purpose was to show and to flesh out, to attempt to have the

11   plaintiffs come back and say no, here are 1, 2, 6, 8, 12

12   statements that meet the criteria of actionable defamation that

13   are in admissible form, but there's not a single one.  Even

14   Dr. Cohlmia's statement, I think he testified in his deposition

15   that he was present when a Dr. Des Prez, Dr. Des Prez of OHI

16   made a statement he couldn't identify when it was.  And clearly

17   this is exactly the kind of framework that Rule 56 contemplates

18   a party seeking relief for defamation must be able to satisfy.

19   It will not do to say I had a lot of patients and I've got a

20   lot of people that when I find them and come in, the jury will

21   hear about all these bad statements.  The time to do it is now.

22   And I was frankly quite startled that there wasn't a single

23   piece of admissible evidence on an actionable defamation that

24   wasn't, as a matter of law, intracorporate or privileged.  And

25   I think I say that again in the reply brief.  And I would -- I

1    will be listening to hear whether there is any such statement.

2    I don't believe there is here.  I've looked at the responding

3    papers a number of times.  There's not a single statement

4    that's in admissible form.  And the reason I say that is

5    because I anticipate that unlike -- and really that's all I've

6    got to say about the defamation, depend upon what will happen

7    on the reply, Your Honor, with all due respect.

8           But what I anticipate is because our case -- our

9    motion for summary judgment on tortious interference is

10   different from St. John's in the singular feature that, you

11   know, as you heard St. John's counsel say, they have one act,

12   you know, one suspension proceeding from which, you know, they

13   were defending any resulting liability for tortious

14   interference.  And clearly my clients don't have that.  In

15   other words, the allegations against them are that here was the

16   Oklahoma Heart Institute whose doctors throughout 2002, '3, '4,

17   '5, '6, sat on all these committees, whose doctors practiced in

18   that hospital, whose doctors would treat or not treat patients

19   of Dr. Cohlmia's, whose doctors sat on the medical

20   credentialing committee, whose doctors had conversations with

21   people who were involved in the Elkins report.

22          So clearly you can't -- I can't cast my argument as

23   driven from a single event.  But the thrust of my argument is

24   not much different from Mr. Lewis'.  But I anticipate that what

25   I'm going to hear is there's such evidence of malice here

1    because we've got all these statements, all these threats, all

2    these coercions, all these intimidations that, boy, there's so

3    much here, there's so much smoke there really has to be some

4    causation fire.  But when you boil it down, as we say in the

5    summary judgment brief, they don't dispute this.  There's no

6    evidence of any patient being threatened, intimidated, coerced,

7    frightened.  No evidence of anybody being abandoned, despite

8    the fact that Dr. Cohlmia felt that.  Again, you've got to go

9    say where -- who testified to that happening?  And the reason I

10   think as you could tell from the prior argument, I'm not going

11   to make a malice argument at this point.  I'm going to make an

12   argument that there's no causation, but it's not that different

13   from what you just heard.

14          But let's talk about this whole argument of tortious

15   interference.  The thing that I can't agree with is that

16   there's any theory of domino effect on tortious interference

17   because all intentional --

18          THE COURT:  It's an interesting argument.

19          MR. CARWILE:  Yes, Your Honor, but I don't think it

20   works and here is why.  One can commit a lot of torts and those

21   can have economic ramifications that may even go beyond what

22   you might expect or think of when a tort occurs.  But the tort

23   of tortious interference has an element to it that doesn't just

24   mean that anytime you commit a tort, you interfere with

25   somebody's livelihood or their economic well-being.  And since

1    we all hope to have some prospective economic well-being, any

2    tort that injures that is tortious interference.  The case law

3    is clear that the tort of tortious interference contemplates

4    some intentional interference with.

5         Your Honor, there is an intent to interfere with a

6    relationship that's a necessary element to a tortious

7    interference claim and that's why the domino theory doesn't

8    work.  It's not the fact that there might not be some

9    consequential damages flowing from a tort, take assault, take

10   negligence, take all of those things, take unintentional injury

11   to somebody's physical person.  Clearly you might have

12   consequential damages for that, are they reasonably

13   foreseeable, that sort of thing.  But if somebody gets disabled

14   by an assault and they lose their job and can't pay their

15   medical bills and their doctor sues them, who used to be their

16   good doctor, that in and of itself doesn't establish an

17   intentional interference, that I, the person who threw the

18   punch have -- I'm intending to interfere with the relationship

19   between my victim and his doctor.  I have to have some wrongful

20   act by which I intend to interfere with that relationship.

21        And under Oklahoma case law, that has to be my primary

22   intent, because there's all kinds of things I can do

23   intentionally that will interfere with somebody's economic

24   well-being.  I can compete with them.  Those are intentional

25   acts.  It's got to be wrongful and I have to intend to

1    interfere with the relationship.

2         THE COURT:  But there you are focused on intent and,

3    of course, the response that Mr. Brewster would make is that --

4    and he is experienced in these matters and he has made that

5    argument, this particular argument on the record here today.

6    That in terms of settling these medical malpractice cases, a

7    central concern is not showing up on this national database.

8    So it seems to me that you have moved over from proximate

9    causation of damages to intent.  And although you wanted to

10   avoid malice, and you will notice that I didn't touch malice in

11   terms of ruling on the previous motion, haven't you segued over

12   to another element here as opposed to proximate causation of

13   damages?

14        MR. CARWILE:  No, Your Honor, because I'm not going to

15   tell you that we're going to say that today as a matter of law

16   you will find no evidence of intent.  But the reason intent

17   matters, the reason you have to look at tortious interference

18   that way is because you have to look at the acts complained of

19   to see if those acts are the proximate cause of an injury to a

20   relationship or prospective economic advantage.  It won't do to

21   say they did a bunch of acts and overall globally I was injured

22   and therefore whatever they did in this amalgamation of things

23   that they did in working at Hillcrest injured me economically

24   and that's tortious interference with a particular contract or

25   relationship.

1          I'll give you an example.  We know that they say in

2     this case similar claims to what they said against St. John and

3     that is all of our acts, sitting on the peer review committees,

4     working at Hillcrest, deciding that we would no longer treat

5     patients who Dr. Cohlmia would treat while they were in the

6     hospital, that those interfered with the doctor's contract with

7     PLICO.  That's what they say.  But when asked what evidence do

8     you have that OHI did anything to interfere with your contract

9     with PLICO, paragraphs 19 and 20 of our response, there is

10    none.  When asked what evidence do you have that OHI took any

11    action to interfere with your contracts with native American

12    tribal authorities, paragraphs 28 to 32, well, they otherwise

13    interfered, but we don't have any evidence of it.  The

14    depositions of the people at those authorities were

15    consistently undisputed.  No, it wasn't interfered with, it

16    wasn't canceled, it wasn't terminated, and OHI didn't do

17    anything that caused any of that.

18          The insurance companies, the three insurance companies

19    we're accused of interfering with, are Community Care, Aetna,

20    Blue Cross Blue Shield.  The undisputed facts in paragraphs 22

21    through 27 are that there's no evidence that OHI caused or

22    interfered with those contracts.  They don't even have the

23    argument here that OHI suspended Dr. Cohlmia because it didn't.

24    The OHI physicians may have participated as members of peer

25    review committees and may have testified at the hearing, but

1   where is the evidence that any primary motivation of OHI or any

2   causal effect of what OHI did was to interfere with any one of

3   those three contracts?  There is none.  And it won't work to

4   say oh, it would have to, it would just have to, Judge, we

5   know, we're on a medical professional lot, it would have to

6   interfere.  No, there would need to be some admissible evidence

7   from Dr. Cohlmia or one of those health care insurance

8   companies saying because of these actions -- which if there's a

9   fact that OHI somehow partially, jointly, or individually

10   responsible for it.  We, the insurance companies, or some other

11   party could testify, took some adverse action that impaired

12   Dr. Cohlmia's economic relationship with those insurance

13   companies.  There's no evidence like that in this record.

14   None.

15            We're then down to Hillcrest Medical Center.  Okay.

16   We interfered with Dr. Cohlmia's relationship with Hillcrest

17   Medical Center.  Well, as a matter of law if we're sitting on

18   the peer review committees, if we're sitting on the medical

19   credentialing committees, we can't interfere with the contracts

20   between Hillcrest and Dr. Cohlmia because in those instances,

21   we're acting as the agents of Hillcrest.  You can't interfere

22   with that on contract.

23            So we're really down to two things, the Heart Hospital

24   and the patients.  That's what is left.  We have more

25   allegations against us than St. John does.  The Heart Hospital.

1    Where is the evidence that anything OHI did interfered with

2    Dr. Cohlmia's ability to establish a heart hospital?  The

3    evidence is the OHI physicians were not interested in joining a

4    heart hospital.  Dr. Leimbach testified they weren't interested

5    in joining anybody's heart hospital.  They'd heard about it for

6    so long they were tired of it.  So what evidence do they have

7    supposedly that OHI is in this, is it a conspiracy, is OHI

8    doing something itself to interfere?  Here's the evidence.  And

9    this deals with those several memos that are appended to their

10   response which we have pointed out to the Court.  One -- two

11   were written, I believe -- one was written by the person,

12   Mr. Ronning that was supposedly helping Dr. Cohlmia do it for

13   awhile until they had a falling out, an internet article I

14   believe that he wrote.  And then one of his former partners, I

15   think it's Ruffino who got into a tiff with Ronning.

16          The problem with those three exhibits is twofold.

17   Number one, they are not admissible.  None of those people were

18   deposed.  They are not submitted by affidavit.  They are just

19   stuck in the record, here's a memo, clearly hearsay.  Not

20   really even totally identified or authenticated by the author.

21   Not in admissible form, just put in the record.  And read this

22   and you can see lots of problems with the Heart Hospital.

23   Well, even assuming that they are admissible, read them.  They

24   do not say anything about OHI intentionally interfering with

25   the Heart Hospital.  They don't say anything about OHI having

1    designs or plans to interfere with the Heart Hospital.  There

2    is the selected testimony in the response brief that they tried

3    to slip by that said, well, Dr. Leimbach told Mr. Dobbs once

4    that he was -- that it would be the end of the heart practice

5    or it was really a real problem for Hillcrest if Cohlmia formed

6    that Heart Hospital.

7         The problem is when you read Dobbs' testimony, as we

8    pointed out in the reply brief.  They were asking Dobbs a

9    question from another deposition.  He said as to Leimbach,

10   Leimbach never said that to me.  Leimbach never said anything.

11   Where is the causational evidence that what OHI did in anything

12   caused Dr. Cohlmia not to be able to pursue or realize a heart

13   hospital?  What you're going to hear in response I bet is, oh,

14   these guys were saying so many bad things, threatening so many

15   people, creating so much trouble that it couldn't help but

16   defeat this doctor's dream of a heart hospital which is why I

17   tried to start on these statements and this evidence that's not

18   in admissible form.  But I challenge the plaintiffs to point

19   out one piece of admissible evidence that OHI took a wrongful

20   act with the purpose or primary purpose or that, in fact,

21   caused this heart hospital not to succeed.  There isn't any.

22        So what we're really down to is the patients.  And the

23   thrust of their case with the patients is that OHI -- well,

24   first they start we threatened to coerce, but the truth is in

25   the papers there is no evidence of threats or coercion in any

1    admissible form.  What they are really down to is the 2003

2    decision by OHI which admitted that they would not, because of

3    reasons they dispute -- they say it's because we had

4    anticompetitive reasons.  We say it's because Cohlmia didn't

5    want to do business with us anymore.  We decided, OHI decided

6    they would no longer stay on the cases of patients, nonemergent

7    patients while they were in the hospital if Dr. Cohlmia treated

8    them.  Okay.  So the argument of the plaintiffs is, well, there

9    you go, you've just interfered with the relationships with the

10   plaintiffs because how could it not interfere?  That's

11   basically their argument.  You would have to interfere if you

12   were treating the patient and then you didn't.

13         But here is what the evidence is.  Dr. Cohlmia

14   admitted this and Dr. Adams admitted this, the only two people

15   that had any evidence of any problem it caused, that there

16   wasn't a single patient who didn't receive cardiology care as a

17   result of that decision.  It's set out in our briefs in

18   paragraphs 12 and 16 as to Dr. Cohlmia and Dr. Adams.  They've

19   admitted, in fact, Dr. Cohlmia said he was able to take care of

20   every single patient.  So the causation argument is how did

21   OHI's decision, which was a lawful decision, they're not

22   required under law or any kind of a contract to treat any

23   patient if they choose not to outside of emergent and this was

24   nonemergent.  They're not required to.  Dr. Cohlmia admitted

25   that in our moving papers.  We have his testimony.  He admitted

1   the same thing.  He wasn't required to refer to OHI and they're

2   not required to refer to him.  They don't have contracts so to

3   speak, but clearly there -- I would, for purposes of this

4   argument, there's an expectancy.

5         But let's talk about a patient who is in the hospital

6   who OHI says we will no longer work side-by-side with

7   Dr. Cohlmia.  We'll sign off and you'll get another

8   cardiologist.  That's not actionable.  Where's the injury?

9   Where's the causational injury?  Is there any evidence in this

10  record from a patient from Dr. Cohlmia or anybody else that

11  what happened was the patient said, well, if that's the case,

12  Dr. Cohlmia, I don't want to use you.  You're not going to get

13  the revenue from my surgery, that that decision, if you want to

14  assume that it's wrongful, that that decision caused an injury

15  to Dr. Cohlmia.  There's not a single patient for whom that

16  argument is made by name or otherwise.  There's -- there's no

17  argument that he suffered a loss caused by that decision.

18        And now, did OHI constitute the large majority of the

19  cardiologists at Hillcrest at the time?  Yes.  Is it undisputed

20  there were other cardiologists available who weren't OHI?  Yes.

21  Is there any evidence they couldn't be used?  No.  Is there any

22  evidence they weren't used?  No.  Is there any evidence that

23  Dr. Cohlmia or his practice suffered a scintilla of a loss?

24  There's an argument made in unspecified cases claimed by

25  Dr. Cohlmia, well, there were some delays sometimes, I had some

1   delay.  Did it injure a patient?  No evidence of that.  Did it

2   injure you, Dr. Cohlmia?  No evidence of that.  Did that delay

3   cause you some attendant economic harm?  No evidence of that.

4   Okay.  And the undisputed evidence is that when those patients

5   would leave the hospital, they could and often did go back and

6   use the OHI cardiologists.  So I am talking about causation,

7   I'm talking about it, but you have to look at each particular

8   relationship, each prospective advantage and say what act did

9   the doctors at OHI take improperly that interfered with that,

10  caused a loss, caused a greater burden, caused an economic

11  difference?

12        Now, the one case relied upon by the plaintiffs to

13  say, well, you don't have to have a loss of the contract or the

14  relationship, for purposes of this argument I would say that's

15  true.  But it's like saying you don't have to have a loss of

16  the car completely in a wreck, you have to have an injury.  You

17  have to have some kind of damage.  What damages did Dr. Cohlmia

18  suffer because of the actions of OHI with respect to their

19  decision not to sign on cases with him?

20        Now, I suppose one of the arguments is, well, you

21  know, they participated in this peer review process and went to

22  this hearing and Hillcrest suspended his privileges ultimately.

23  So as a matter of law, an argument which I know the Court has

24  rejected, there's a loss automatically when privileges are

25  suspended.  But I would challenge the plaintiffs to come up

1    with a single instance of causational -- of evidence of

2    causation of loss, not what, oh, everybody knows it's

3    axiomatic.  If it's axiomatic, it ought to be pretty easy to

4    get an affidavit from someone as to the axiom which is lacking

5    here.  The affidavit of -- I mean, the report of the expert has

6    the same deficiency that's already been addressed, but again in

7    that report by a Dr. Winslade, unverified, unsupported.  You

8    know, there's a whole litany of what went wrong supposedly, but

9    it's not in verifiable or affidavit form and he's not even a

10   prescient witness as to it.

11        But you know, I think that the effort in the brief to

12   call things undisputed, when you look at their response to our

13   motion for summary judgment, they keep saying disputed,

14   disputed, disputed, see paragraphs six to ten, see paragraphs

15   six to ten.  What specific act by whom that interfered with

16   what relationship?  And I don't think it will work for purposes

17   of the allegations made here to say, well, there's so many that

18   they had to interfere with something because, I mean, he's a

19   doctor.  And when you do these kinds of things, you've got to

20   interfere with something as a matter of law.  Well, now is the

21   time to come in with evidence in the form of admissible

22   evidence to resist.  And although it's continuous supposedly

23   and, you know, more ongoing over a period of years, this same

24   analysis, this same framework that St. John used I think is

25   applicable here.

1        THE COURT:  Does Oklahoma's new business rule, you

2   contend, play a role in the damages issue here?

3        MR. CARWILE:  I'm not sure I understand that question,

4   Your Honor.

5        THE COURT:  Well, in terms of whether or not one can

6   claim damages for businesses that don't have a track record of

7   earning.

8        MR. CARWILE:  Well, there's a loss/profit speculation

9   standard for businesses that don't reach beyond a certain level

10  of, you know, initial startup and that sort of thing.  We

11  haven't made that argument in our brief.

12       THE COURT:  All right.  What about as to defamation?

13  Is the fair hearing proceeding subject to the intracorporate

14  immunity doctrine?

15       MR. CARWILE:  I don't know, I want to say yes, of

16  course, but I'm trying to think of a case that would say that,

17  Judge.  I will say this and this is important.  Under Magnolia

18  which is the main intracorporate immunity case and as reflected

19  in the later case of the Seal vs. Pearle Vision, I think is the

20  one, there's a statement by the court in there that when you're

21  talking about intracorporate immunity, intent and motivation

22  don't matter and I'm specifically talking about the language in

23  the --

24       THE COURT:  I tracked that.

25       MR. CARWILE:  Okay.  So is a fair hearing proceeding a

1    proceeding in which only -- I don't know the answer because you

2    have people that are in that proceeding who aren't all

3    necessarily officers, agents, and employees of Hillcrest.

4    You've got third parties --

5            THE COURT:  That's the question, that's the question,

6    are they officers, agents all?

7            MR. CARWILE:  Well, I mean, Dr. Cohlmia is not, I

8    don't think.  His lawyer who comes in is not.  The court

9    reporter who is sitting there.  I don't know the answer, I

10   haven't seen a case that goes that far and says that.

11           THE COURT:  Probably not.

12           MR. CARWILE:  Yeah, that's not the argument we make.

13   We say that under Kirschstein, there's absolute immunity when

14   people come testify at the kinds of proceedings Kirschstein

15   recognizes and that includes expressly in that decision, boards

16   of hospitals deciding staff privileges of physicians.  So

17   that's a separate -- that's downstream from intracorporate

18   immunity, if you will, or intracorporate --

19           THE COURT:  I think you've satisfied my question.  I

20   think the answer --

21           MR. CARWILE:  I wish I had a case that said it, but I

22   didn't find one.

23           THE COURT:  The answer is likely no.

24           MR. CARWILE:  I think so.

25           THE COURT:  Yes, all right.  Mr. Barkett.

1          MR. BARKETT:  I'll try and address take first issue

2     since it's on everyone's mind now.  But certainly the fair

3     hearing process in which Dr. Leimbach made objectively false

4     statements that were, in fact, even denied by the physicians he

5     alleged made them through him, Dr. Elkins that is, are not

6     subject to intracorporate immunity.

7          THE COURT:  I think that's clear.  What about

8     Kirschstein?

9          MR. BARKETT:  Well, I think you have to take into

10    context what the Oklahoma law and statutes say about the

11    immunity provided for any sort of professional review body and

12    actions performed by a professional review body that it's a

13    conditional privilege under 76 Section -- O.S. Section 25 and

14    76 O.S. Section 28 imposes the exact same requirements of good

15    faith and absence of malice for any privilege to apply to any

16    actions taken by a professional review committee.  So again,

17    we're getting back into the bad faith question here and again

18    we're talking about statements that are objectively false and

19    objectively proven to be false.

20         THE COURT:  Opposing counsel took the position that

21    under Kirschstein, there's an absolute privilege.  You argue

22    it's a conditional privilege.

23         MR. BARKETT:  I argue it's a conditional privilege

24    under the statutes of this State, Your Honor, yes, absolutely.

25    With regard to the statute of limitations on there, we were

1    directed by Judge Payne to identify in the second amended

2    complaint and we have done so.  In fact, these were all issues

3    that were addressed in the identical arguments posed against us

4    in the second round of motions to dismiss that this Court

5    overruled.  We specifically identified only statements that

6    were made, defamatory statements that were made post the year

7    preceding the filing of the date and those are the only ones

8    that we're relying on.  It is conceded that many of those

9    statements were made in the context of medical executive

10   committee meetings.  But it's our position and I think that the

11   circuit courts certainly take this position, and the Eleventh

12   Circuit in particular in Bolt vs. Halifax take the position

13   that intracorporate immunity, again you have to look at the

14   same privileges that might be applicable under HCQIA would have

15   to be looked at for it to be privileged under these other,

16   under these other privileges.  Otherwise, peer review and

17   things like that and the lifting of peer review under federal

18   law would be meaningless if they could still get away with such

19   conduct under a defamation privilege.

20        It's recognized under the Federal Circuits, I believe,

21   that hospital medical staffs are independent, separate economic

22   entities potentially in competition with other physicians and

23   therefore, is not an intracorporate proceeding.  That's exactly

24   what we have in this case where we have members of OHI who on

25   the one hand they want to argue cannot be argued to have

1    participated and have any of their actions resulting in damage

2    to Dr. Cohlmia because they're a separate legal entity even

3    though they were on the medical executive staff.  On the other

4    hand, they want to say that they were participating in

5    intracorporate activities when they made defamatory statements.

6    You just can't rectify the two positions which is certainly

7    consistent with the way the federal courts deal with these

8    privilege issues.  And that is if you don't -- if you're not

9    performing these activities in good faith, that you don't have

10   intracorporate immunity, that you don't have legal proceeding

11   immunity.  And certainly that the issues in this case show

12   objective bad faith, objective false statements and, in fact,

13   per se defamation because they all go toward Dr. Cohlmia's

14   ability to practice his profession.

15          With regard to the tortious interference with

16   contract.  It was obviously a foreseeable result to the OHI

17   physicians and Dr. Leimbach and we've presented the evidence of

18   their motivation and that is that they had a deal made with

19   Hillcrest Medical Center to develop their own Heart Hospital if

20   they took actions against Dr. Cohlmia.  Incidentally, Mr.

21   Carwile admits that the actions boycotting Dr. Cohlmia's

22   patients began in 2002 which preceded the letter they claim

23   where Dr. Cohlmia terminated his relationship.  And that letter

24   clearly is terminating a business deal real estate

25   relationship, has nothing to do with patient care.  What's

1     admitted by OHI in this case is that they not only threatened

2     patients with a loss, they not only stopped referring patients

3     to Dr. Cohlmia, but they actually stopped treating their own

4     patients who they had longstanding relations with simply

5     because they chose to utilize Dr. Cohlmia for surgery.  That's

6     clearly patient abandonment.  In fact, Dr. Kaneshige has

7     testified that such conduct and breaching the continuity of

8     care by a cardiologist which, again, is a component of

9     cardiovascular surgical care is an unethical act.

10         THE COURT:  Well, but that's not -- even if that's

11    true, you don't have standing to assert that on their behalf,

12    correct?

13         MR. BARKETT:  Well, by denying, here is where it

14    unfolds, Your Honor, is that one -- it's undisputed that one of

15    the major reasons Dr. Cohlmia lost his privileges at Hillcrest

16    was the allegation that he was unable to provide cardiology

17    support for the patients he was admitting for surgery which

18    placed the patients at risk.  That was a key component for the

19    reason Hillcrest Medical Center took Dr. Cohlmia's privileges,

20    he could not provide cardiology support which therefore placed

21    patients at risk.  It's admitted that the reason Dr. Cohlmia

22    could not provide cardiology support was because OHI was

23    telling patients that if you use Dr. Cohlmia, we will not be

24    your cardiologist.

25         THE COURT:  Well, but they --

1          MR. BARKETT:  They were refusing to come to the

2    hospital and treat his patients.

3          THE COURT:  The difficulty I'm having there is legal

4    duty, what legal duty did they have to take those consultants?

5          MR. BARKETT:  Well, I think there's an ethical duty.

6    And certainly, I mean, I haven't researched the issue of an

7    actual legal duty, but certainly patient abandonment would seem

8    to be on its face something that would maybe borderline

9    criminal, not simply some contractual duty.  But certainly the

10   foreseeability of their conduct was an effort to create

11   complications for Dr. Cohlmia.  They were using these patients

12   as pawns and that's what's despicable about OHI and their

13   scheme and plot on their own where they made this decision of

14   themselves and in conjunction with Hillcrest Medical Center to

15   deny Dr. Cohlmia the ability to provide quality care at

16   Hillcrest Medical Center because of their refusal to treat

17   patients.  Not just referrals, we're talking about telling

18   patients, existing patients that if they choose Dr. Cohlmia,

19   they will not have cardiology support during their surgery.

20   These aren't patients that have the opportunity to go out and

21   find another cardiologist and reschedule.  These are patients

22   waiting in the hospital for surgery.

23          And so to say, to argue that that is not a foreseeable

24   act with the intent to cause harm and interfere with patient

25   relationships and prospective business advantage ultimately

leading to the crux of Hillcrest's denial of his privileges,

which again kicked him out of the market and made it impossible

for him to treat patients in the market, is simply turning a

blind eye to reality in this case.  And the evidence is there,

it's admitted.  In fact, OHI, nobody from OHI denies that it

happened.  Nobody from OHI suggests that it was based on any

concern for Dr. Cohlmia's patient care.  It's simply because

they didn't like him and they wanted to not use him.  I mean,

to me, I just, I can't see how they can escape the reality of

the situation that this was an illegal boycott.

In fact, part of the process that shows that this was

all being worked in conjunction is Dr. Yousuf himself.

Dr. Yousuf was brought in as a stopgap because what was

happening between OHI refusing to treat the patients of

Dr. Cohlmia was preventing him from providing quality services

or services period to the patients at Hillcrest.  They knew

that this was going occur.  That's when OHI, not Hillcrest,

went out and found Dr. Yousuf.  Rebecca Smith, an OHI

physician, went out and recruited Dr. Yousuf to come to

Hillcrest in 2002, at the same time they began refusing to

treat Dr. Cohlmia's patients, to come in as a stopgap.  And

they hired him as an employee physician which was unheard of at

the time, so that they had absolute control over this.  I mean,

there is an enormous amount of evidence that what OHI was doing

was with the intent of interfering with Dr. Cohlmia's ability

1    to practice his contractual relations with Hillcrest Medical

2    Center and his contractual relations with patients, all which

3    led to further problems with his contractual relations with

4    insurers, ultimate, ultimate eviction from the marketplace and

5    tremendous monetary loss.

6            THE COURT:  In terms of defamation, if you could

7    identify particularly for me statements that are made after

8    July 7th, 2004, that are not hearsay and are not subject to

9    intracorporate immunity.

10           MR. BARKETT:  Well --

11           THE COURT:  I know you generally -- but if you will

12   specify for me those statements that you contend fall outside

13   of those three categories.

14           MR. BARKETT:  Certainly Dr. Leimbach's testimony

15   within the fair hearing process where he asserted that Dr.

16   Cohlmia had -- his surgery stunk --

17           THE COURT:  Right, and then the issue is does

18   Kirschstein apply here, is it absolute or conditional

19   privilege?

20           MR. BARKETT:  Correct, right.

21           THE COURT:  Okay, what next?

22           MR. BARKETT:  Well, obviously there are many

23   undisputed statements made and verified Dr. Decker, Dr. Giddens

24   and Dr. Adams that were made in medical executive committee

25   meetings.  That's probably the majority of it, that we have the

```
 1      absolute proof on that we've presented and they don't dispute.

 2              THE COURT:  Within the executive committee meetings?

 3              MR. BARKETT:  Correct.  And again, our --

 4              THE COURT:  Okay.  But they contend that's subject to

 5      intracorporate communications, right?

 6              MR. BARKETT:  They do contend that.  And I have

 7      contended that that privilege is no more applicable than peer

 8      review --

 9              THE COURT:  But they're not saying it's a privilege,

10      they're not even getting -- they're saying it's not a

11      publication.  That intracorporate immunity, as I understand it,

12      if I'm wrong, correct me here, but they are saying it's not

13      even a publication because these doctors are agents in that

14      context.

15              MR. BARKETT:  Well, it is a publication because

16      they're not all agents and agency always is a question of fact

17      for the jury to decide.  And in this context, if they are

18      acting in bad faith with ulterior motives, economic motives

19      which we have, again, enormous evidence that there is.  It's

20      undisputed.  That these people were acting independently for

21      their own economic benefits and they weren't acting as an

22      intracorporate body.  And I don't think that those facts can be

23      thrown out simply on some boilerplate claim that this was an

24      intracorporate act.  Otherwise none of these other --

25              THE COURT:  Well, I agree it has to be analyzed
```

1    differently under defamation versus tortious interference.  I

2    mean, they are focusing, I think, on the publication aspect as

3    to whether or not it was published outside, as I understand it.

4              MR. BARKETT:  Well, I think that ultimately the same

5    result really is what we're talking about here.  And the fact

6    that it would lead -- these defamatory statements made within

7    this context were made by people that were economic competitors

8    acting as independent agents, publication to nonplayers,

9    nonparticipants in this scheme, leading to his National

10   Practitioner Data Bank loss of privileges certainly is a

11   defamatory publication --

12             THE COURT:  Well, but in terms of those alleged

13   defamatory statements made in these committees, to the extent

14   that these folks are agents of the hospital, how do you get

15   past the publication requirement?

16             MR. BARKETT:  Well, it is -- there's third parties in

17   there that were not coconspirators.  And like I said, agency

18   and conspiracy --

19             THE COURT:  Are they not all hospital people?

20             MR. BARKETT:  No, because some of them are simply

21   sitting there listening to the evidence and making a vote.  The

22   people that were making the defamatory statements, we've

23   alleged and we have proof, were acting in individual capacities

24   outside this corporate environment as coconspirators with the

25   intent of defaming him to these other people leading to his

1    exclusion.

2          THE COURT:  Now, who are these other people

3    specifically and where is that in the record?

4          MR. BARKETT:  Well, there's certainly there's other --

5          THE COURT:  Where is that in the record?

6          MR. BARKETT:  Well, there's other people on the

7    medical executive committee that are not named in this lawsuit

8    that were not making defamatory comments.

9          THE COURT:  Somehow we're not communicating.  I mean,

10   I'm trying to find out factually who is in these particular

11   meetings that would not be an agent or employee of Hillcrest?

12         MR. BARKETT:  Dr. Giddens, for one, who has testified

13   that these statements were published to him indeed.  Dr. Decker

14   at one point I don't believe was on the medical executive

15   committee.  Dr. Adams certainly was another.

16         THE COURT:  Well, okay, now the Adams statement was

17   that Leimbach said -- told him that Dr. Cohlmia was litigious,

18   is that not an opinion?

19         MR. BARKETT:  No, I believe in his deposition he

20   testified about some other comments made within the context of

21   medical executive committee.  I think he was isolating that

22   comment as being one he testified to outside of what they claim

23   to be intracorporate communication.

24         THE COURT:  There appears to even be a difference on

25   how the name is pronounced.  Is it COHL-me-a or cohl-ME-a?

1           MR. BARKETT:  It's COHL-me-a.

2           THE COURT:  COHL-me-a with the accent on the first

3    syllable.

4           MR. BARKETT:  Correct.

5           THE COURT:  All right.

6           MR. BARKETT:  And in our second amended complaint, we

7    set forth the people, including some people that were sitting

8    in the medical executive committees, that were not participants

9    in the conspiracy and I would have to go through these, but

10   they're there.

11          THE COURT:  Well, but the key is not whether you were

12   a participant in the conspiracy allegedly, but whether you're

13   an agent or employee of Hillcrest, right, for terms of

14   determining publication in analyzing whether you have a

15   defamation cause of action?

16          MR. BARKETT:  Well, again, I think you have to look at

17   the context of why the statements were made, what the

18   motivation for the statements were made.  And when you're

19   talking about intracorporate, if they were engaged in some

20   actual intracorporate enterprise, then that might be correct.

21   Here we're talking about an illegal activity simply taking

22   place behind closed doors under the veil of an intracorporate

23   action.  So I don't think that you can ignore the facts of bad

24   faith, malice by the participants in the conspiracy and whether

25   or not in that context they are acting as agents of the

1   corporation.  And that is what the Federal Circuits, I believe,

2   have recognized, that you can't ignore that fact.  You can't

3   ignore the motivation and the intent.  And therefore, you have

4   to, when you talk about agency or when you talk about

5   conspiracy, that's a question that the jury has to decide.

6           THE COURT:  All right, anything else?

7           MR. BARKETT:  That's all.

8           THE COURT:  And we may -- I believe I have a

9   sentencing at 1:30; correct?  And I intend to take some lunch

10  here, so we may have to come back after the sentencing.  Go

11  ahead.

12          MR. CARWILE:  I don't think I'll take too long, Your

13  Honor.  What's noticeably apparent, of course, is they just had

14  a second chance to give you a statement out of the record, one

15  statement.  Just point to one line in a deposition, we've got a

16  lot of them.  Who said it, what did they say?  They can't do

17  it.  Thornton talks specifically about the concept of those

18  serving on peer review committees as agents for that purpose.

19  It doesn't make them agents for all purposes and it doesn't

20  make the agent liable for the torts of the principal, but in

21  conducting peer review and sitting on those committees.  And I

22  will tell you this, there's nothing in this record that anybody

23  went to those meetings who wasn't a member of those committees.

24  Nothing.

25          THE COURT:  See, that's what I was trying to find out.

1          MR. CARWILE:  There isn't any.

2          THE COURT:  Factually, that's theoretically possibly.

3     It would seem to me to be illogical, but it would seem to me

4     theoretically possible and I'm trying to find out if there are

5     some facts on this record to indicate that.

6          MR. CARWILE:  Nobody has testified to that.  There's

7     not a scintilla of that happening.  The other thing, of course,

8     that's absolutely true is if Giddens and Decker said the only

9     time I ever heard it was in those meetings.  That's undisputed.

10    They didn't even dispute that in their response brief.  The

11    paragraphs where we set out Giddens' testimony and Decker's

12    testimony.  The fact is for the intracorporate publication

13    doctrine under Magnolia as reaffirmed in the Pearle Vision

14    case, here is what the court said.  "We are unwilling to

15    rewrite Oklahoma law.  The threshold conclusion in Magnolia

16    that intracorporate communications do not constitute

17    publications means that liability cannot turn on the content of

18    or the intent behind the intracorporate communication."

19         THE COURT:  That's how I understood the law and if I'm

20    wrong, but that's how I understood the law.  Let's focus on

21    this Leimbach statement in the fair hearing proceeding.

22    Conditionally or absolutely privileged, I know you --

23         MR. CARWILE:  Absolutely privileged.  The language is

24    drawn right from Kirschstein, Your Honor, because it is the

25    body of case law that says it's absolutely privileged when a

1   lawyer gets up and makes a statement to the jury or the client

2   or the witness testifies in court.  It's absolutely privileged.

3   We don't get into whether that lawsuit was brought in good

4   faith.  We don't get into whether the Judge was acting in good

5   faith.  We don't get into whether the proceeding itself.

6   That's state law.  HCQIA, whatever standard it imposes, it

7   doesn't preempt state law.  There's no argument that

8   Kirschstein isn't the absolute personification.  They say in

9   Kirschstein this privilege is absolute which is the reason you

10  have the privilege.  You don't get into what the motivations of

11  the witnesses, lawyers, judges, third party witnesses, all that

12  was.  So Kirschstein is an absolute privilege.  It's not

13  conditioned on anything.  And to say that somehow the law

14  overlays a good faith obligation to obtain the benefit of that

15  privilege is without support in the case law.

16          THE COURT:  All right, sub issues.  Does that absolute

17  privilege, assuming the privilege is absolute, apply to a

18  proceeding by a nongovernmental agency like HMC?

19          MR. CARWILE:  Yes.

20          THE COURT:  Apparently Kirschstein talks about a

21  California case Ascherman vs. Natanson.  That's A-S-C-H-E-R-

22  M-A-N vs. N-A-T-A-N-S-O-N, found at 23 Cal.App 3rd 861.  But in

23  that case, and I haven't looked at that case, it appears to

24  have been an actual governmental entity.  So the issue here is

25  does it apply to an administrative proceeding by a

1   nongovernmental entity?

2        MR. CARWILE:  It has to be a legislative or judicial

3   or other proceeding authorized by law.  I don't believe there's

4   any restriction in Kirschstein which says it has to be a

5   governmental agency.

6        THE COURT:  All right.  And this is a proceeding

7   authorized by law?

8        MR. CARWILE:  Yes.

9        THE COURT:  All right.

10       MR. CARWILE:  And there just isn't a -- there isn't a

11  case which says Kirschstein doesn't apply in the context and

12  they note that the privilege had been followed in those other

13  states.  It wasn't before them in that particular case in

14  Kirschstein, but they didn't note it with disapproval or

15  distinguish it or anything so that statement is absolutely

16  privileged and Kirschstein is the last word on it in Oklahoma.

17       THE COURT:  All right.  Let's move from defamation

18  then.

19       MR. CARWILE:  One thing on the tortious interference.

20  What you heard was, in the statement by counsel, motive equals

21  causation.  No, it doesn't.  He basically said that.  If we can

22  show all these bad motives, we can show causation.  They are

23  separate elements.  He says we've admitted threatening

24  patients.  We've never admitted that.  The summary judgment

25  briefs don't say that and the evidence we cite doesn't say

1    that.  That's just made up out of whole cloth.  To say this was

2    patient abandonment, we didn't say we abandoned patients.  And

3    anyway, how is that loss to Dr. Cohlmia for a tort claim

4    damage?  He has to have loss of patients, he has to have his

5    relationship with those patients damaged.  No evidence of that,

6    not a single solitary-named plaintiff.  You continue to hear,

7    there's just lots of it, Judge.  There's so much, in fact, we

8    can't tell you one.

9         And lastly this idea that we told patients they could

10   never get a cardiologist.  No, the undisputed fact in the

11   record is that patients were told we will get you another

12   cardiologist who is not from OHI.  You can't even presume

13   causation from that.  There's no evidence that that wasn't

14   followed up on.  The evidence was that that was, in fact, the

15   procedure that was followed.  They were gotten another

16   cardiologist.  So we don't have a situation where -- no facts

17   in the record that an OHI physician signs off and now the

18   patient has to be discharged, Dr. Cohlmia can't operate on him.

19   We don't have any of that in the record.  And we didn't admit

20   that we made the decision in 2002.  I said he wrote the letter

21   in 2003 and we made the decision, that's undisputed when it was

22   made.  I said that there was a continuing relationship between

23   OHI and Hillcrest that goes back and predates that, which is

24   why we can't point to one event on a causation basis, but we

25   didn't make the decision not to treat those patients in 2002.

1    And that's it, Judge.

2         THE COURT:  Yes, it was following the letter of March

3    3rd, 2003, correct?

4         MR. CARWILE:  Yes.

5         THE COURT:  All right.  And as you say, ongoing?

6         MR. CARWILE:  Well, that practice continued.

7         THE COURT:  Right.

8         MR. CARWILE:  It was on a continuum, yes.

9         THE COURT:  All right, because of the nature here of

10   the back and forth, any further argument?

11        MR. BREWSTER:  One point, Your Honor.  I would ask if

12   the Court is considering granting intracorporate immunity to

13   the statements that we consider to be defamatory and also the

14   tortious interference, the basis for tortious interference, if

15   you are considering that, I would request you certify that

16   question to the state court, because I think it's undecided law

17   and it will be very determinative of how this case is conducted

18   ultimately from a evidentiary standpoint.  So if Your Honor is

19   going to apply the principle that Mr. Carwile is asking, then I

20   would ask that we consider certifying that question.

21        THE COURT:  All right.  We're going to take a --

22        MR. BREWSTER:  That would be the most expeditious way

23   to do it.

24        THE COURT:  Let me take a short recess and we'll be

25   back here in about ten minutes.

1          (Recess.)

2          THE COURT:  Be seated, please.  Based upon the briefs,

3     the evidentiary material submitted therewith, the arguments

4     made today here on the record, the Court respectfully grants

5     the motion number 290 of defendants Oklahoma Heart Institute,

6     Inc., Oklahoma Heart, Inc., Wayne M. Leimbach, Jr., M.D. on

7     Counts Five and Six.

8          The defamation claim presents an interesting legal

9     issue.  And although in this brief ten minutes, the Court

10    searched for a case under 12 O.S. Section 1443.1 wherein the

11    proceeding was not governmental or quasi governmental.  The

12    statute is clear here under subsection (a) first, the statute

13    says "any other proceeding authorized by law".  And although it

14    raises some questions as to whether or not commercial entities

15    can essentially petition the legislature to cloak their

16    proceedings in privilege by going to the legislature and having

17    those proceedings authorized by law, that's what the law says,

18    "any other proceeding authorized by law".  The motion is

19    granted.

20         What is next on our agenda here, do we have any other

21    hearings set?

22         MR. CARWILE:  Your Honor, I think, I think you've

23    already preset the next round of hearings, but I could be

24    corrected on that.  We don't have any conferences in front of

25    you, no other pending motions.

1          THE COURT:  All right.  And there is the oral motion

2    to certify, I'm going to decline to do that.  I think the most

3    efficient way here, obviously however this matter plays out,

4    will go up on appeal, either way it seems to me.  And at that

5    juncture, you could ask the circuit to certify to the Oklahoma

6    Supreme Court.  I don't believe, in thinking about it over the

7    last ten minutes that I've had, I don't think that is the most

8    judicially efficient way to address it in terms of this legal

9    issue on the application of Section 443.1.  As I said, it's

10   just been presented to me as a concept.  But if there's nothing

11   further, we will be adjourned.

12          (Recess.)

13

14          A TRUE AND CORRECT TRANSCRIPT.

15

16   CERTIFIED:   s/ Glen R. Dorrough
                  Glen R. Dorrough
17                United States Court Reporter

18

19

20

21

22

23

24

25