## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

GEORGE S. COHLMIA, JR. M.D. and )
CARDIOVASULAR SURGICAL )
SPECIALISTS CORP., )
                         )
         Plaintiffs, )
                         )
vs. )       Case No. 05-CV-384-GKF-TLW
                         )
ST. JOHN MEDICAL CENTER, WILLIAM )
HOWARD ALLRED, M.D. and )
WILLIAM BURNETT, M.D. )
                         )
         Defendants. )

## REPORT AND RECOMMENDATION

This matter has been referred to the undersigned for a report and recommendation on the motion for attorney fees filed by defendants St. John Medical Center, William Howard Allred, M.D., and William Burnett, M.D.[1] (these defendants are hereinafter referred to in the singular as "St. John"). [Dkt. ## 458, 460, 486]. The following represents the undersigned's Report and Recommendation.[2]

---

[1] Dr. Allred is the Vice President of Medical Affairs for St. John and is a surgeon specializing in colon and rectal surgery. Dr. Burnett is a former President of St. John's Medical Staff and is board certified in internal medicine. Dr. Allred and Dr. Burnett participated in St. John's decision to terminate Dr. Cohlmia's medical staff privileges, the incident giving rise to this lawsuit. [Dkt. # 376 at 4]. St. John Medical Center paid Dr. Allred's and Dr. Burnett's attorney fees and expenses arising out of this lawsuit.

[2] On October 31, 2010, during a telephone conference the undersigned advised counsel that his report was prepared and that he intended to recommend an award of attorney fees incurred as a result of plaintiff's claims under Section I and probably under Section II of the Sherman Act, and deny attorney fees incurred on St. John's affirmative defense of immunity under the Health Care Quality Improvement Act, on plaintiff's state law claims for Tortious Interference with Contract, and the Oklahoma Antitrust Act. [Dkt. # 529, Ex. A.]. Counsel was instructed to file supplemental briefs to address apportionment between these claims and defenses. Subsequently, the undersigned re-examined the pleadings, exhibits, arguments of counsel, and relevant federal law, and based on that review, has reconsidered some aspects of the recommendation.

**Background**

Plaintiff, George S. Cohlmia, Jr. is a licensed physician in the State of Oklahoma. He has specialized in cardiovascular, thoracic, vascular and endovascular surgery in Tulsa since 1984. Dr. Cohlmia is the sole owner and shareholder of Cardiovascular Surgical Specialists, Inc. (hereinafter referred to in the singular as "Dr. Cohlmia"). [Dkt. # 90 at 2, 7]. Dr. Cohlmia received his board certification in surgery in 1986, and his board certification in thoracic surgery in 1987. Dr. Cohlmia has performed thousands of surgeries in Tulsa. A significant percentage of Dr. Cohlmia's patients are uninsured or under-insured Native Americans. [Dkt. # 90 at 7, 8 and Dkt. # 376 at 5]. Native Americans have traditionally accounted for greater than fifty percent (50%) of Dr. Cohlmia's patient base. [Dkt. # 376 at 21].

On August 3, 2009, the District Court entered judgment in this case in favor of St. John and against Dr. Cohlmia. [Dkt. # 448]. On August 31, 2009, St. John timely filed its application for attorney fees as prevailing party. [Dkt. # 458]. In support of its application, St. John relies on the Statement of Undisputed Facts and attached supporting materials from its Brief in Support of Motion for Summary Judgment filed on April 7, 2009.[3] [Dkt. ## 364, 458]. The following is a brief summary of relevant facts from St. John's brief.

Until July 2003, Dr. Cohlmia had active medical staff privileges at all five major hospitals in Tulsa.[4] Prior to 2003, Dr. Cohlmia performed most of his surgeries at Hillcrest Medical Center

---

[3] On August 27, 2009, Judge Frizzell announced from the bench his decision on St. John's Motion for Summary Judgment and specifically found that there were no genuine issues of material fact which would preclude summary adjudication given the standard in 42 U.S.C. § 11112(a). [Dkt. # 451 at 120].

[4] Hillcrest Medical Center, Saint Francis Hospital, SouthCrest Hospital, Tulsa Regional Hospital and St. John Medical Center.

("Hillcrest"). [Dkt. # 376 at 5]. In the spring of 2001, Dr. Cohlmia began to explore the possibility of developing a physician-owned speciality heart hospital. Dr. Cohlmia hired a consulting firm and obtained an option on real estate. Dr. Cohlmia and his consultant first considered an affiliation with Hillcrest, but determined it was infeasible. [Dkt. # 376 at 9]. Dr. Cohlmia's business plan was presented to various cardiovascular surgeons in Tulsa, including the cardiology groups who practice at St. John and Hillcrest. [Dkt. # 376 at 9-10]. In February 2002, Saint Francis Hospital announced plans to open a speciality heart hospital, as a joint venture with local cardiologists and surgeons. [Dkt. # 376 at 10]. In December 2002, Dr. Cohlmia terminated his arrangement with his consultant, and by June 2002 his project was essentially dead. In April or May 2003, Dr. Cohlmia presented his business plan to cardiologists in Muskogee, Oklahoma; Fort Smith, Arkansas; and physicians in Wichita, Kansas. He did not secure an investor through these efforts. [Dkt. # 376 at 12]. In June 2003, Dr. Cohlmia's real estate option expired. [Dkt. # 376 at 13]. In December 2003, President Bush signed into law a statute prohibiting physicians from referring Medicare patients to new speciality hospitals in which the physician had an ownership interest. The statute imposed a moratorium on development of speciality hospitals not already under development. [Dkt. # 376 at 13].

In the summer of 2002, Hillcrest hired Dr. Arshad Yousuf as a staff cardiovascular surgeon to expand its cardiovascular department. From the outset, the relationship between Dr. Cohlmia and Dr. Yousuf was acrimonious. [Dkt. # 376 at 14]. In January 2003, Hillcrest retained an expert to conduct a departmental review of its cardiology unit.[5] At the conclusion of the review, a report was issued that was critical of certain aspects of the unit, including patient selection. The report

_____

[5] Prior to 2004, Hillcrest was in financial distress. [Dkt. # 376 at 8].

prompted Hillcrest to institute a moratorium on certain high risk cardiovascular surgical procedures. The moratorium applied to all physicians within the department. Once the moratorium was instituted, Dr. Cohlmia shifted a significant percentage of his practice to St. John. [Dkt. # 376 at 15].

On June 6, 2003, Dr. Cohlmia operated on two lung cancer patients at St. John. [Dkt. # 376 at 17]. Both patients were Native Americans. During the surgery on the first patient, Dr. Cohlmia removed one lung and several ribs, and he collapsed the patient's chest cavity. During the surgery on the second patient, Dr. Cohlmia attempted to remove a tumor in a lung that had invaded the chest wall. The following day, the patients' charts were brought to the attention of Dr. Allred by a nurse at St. John. Dr. Allred reviewed the two patients' charts and monitored their condition for several days. Dr. Allred consulted a number of physician specialists and concluded that Dr. Cohlmia had not followed adequate presurgical protocols for these lung cancer patients.[6] One of the patients died seven days following an attempted corrective surgery, and the other patient was disfigured as a result of the surgery.[7] [Dkt. # 376 at 17]. A meeting to review Dr. Cohlmia's procedures in these two cases was held by St. John's Executive Officers on July 7, 2003. The following day, the officers reached a consensus and summarily suspended Dr. Cohlmia's privileges. [Dkt. # 376 at 17]. Dr.

---

[6] Dr. Allred talked with several St. John physicians regarding the two subject surgeries performed by Dr. Cohlmia. He spoke to a thoracic surgeon who disagreed with Dr. Cohlmia's decision to operate. The thoracic surgeon said he would not have operated on a patient with cancer in the lung that had spread to the mediastinum and had positive lymph notes. Dr. Allred spoke to Dr. Jay Lohrey, an oncologist, who treated one of the patients post-surgically. Dr. Lohrey felt that Dr. Cohlmia committed error and that his patient had been unnecessarily harmed. A pulmonologist who had reviewed the charts opined that Dr. Cohlmia's pre-surgical work-up was insufficient. [Dkt. # 364 at 3].

[7] At the hearing on St. John's motion for summary judgement, a "pre-surgical workup" was explained as diagnostic testing and consulting with other specialists to identify the type of cancerous tumor, the stage of the tumor, and the best method of treatment. [Dkt. # 451 at 12-14]

Allred notified Dr. Cohlmia in writing of the summary suspension.[8]  Dr. Cohlmia's suspension was reported to the National Practitioner Data Bank as an adverse action.  Dr. Cohlmia appealed the summary suspension.  In August, a three day hearing was conducted on the suspension in accordance with St. John's bylaws.  Retired Federal District Judge Thomas R. Brett served as the hearing officer.  Dr. Cohlmia was represented by counsel.  [Dkt. # 376 at 17].[9]  On September 4, 2003, Judge Brett upheld the suspension.  St. John's Executive Committee and Board of Directors reviewed and approved Judge Brett's decision.  [Dkt. # 376 at 17].

Upon learning of Dr. Cohlmia's suspension at St. John, Hillcrest required Dr. Cohlmia to conduct and document a comprehensive preoperative patient evaluation and review at its facility.  Hillcrest continued to review Dr. Cohlmia's presurgical procedures.  Based on the findings in these reviews, in October 2004, Hillcrest sought summary suspension of Dr. Cohlmia's privileges.  Dr. Cohlmia objected to Hillcrest's actions and voluntarily suspended his practice until the issue could be resolved.  Hillcrest ultimately voted not to renew Dr. Cohlmia's staff privileges.  Following Hillcrest's review process, Dr. Cohlmia's medical staff privileges were terminated.  [Dkt. # 376 at 19-20].

---

[8]  According to St. John's bylaws, Dr. Allred had the authority to summarily suspend any member of the medical staff whenever necessary to "protect the life of any patient(s) or reduce the substantial likelihood of immediate injury or damage to the health or safety of any patient."  [Dkt. # 364 at 2].  The letter included the following information:  (1) a detailed description of the two cases and the reasons they felt the surgeries were inappropriate; (2) a statement that, based on the advice of members of the medical staff, Dr. Cohlmia's conduct posed an imminent threat of harm to patients; (3) a statement that Dr. Cohlmia had the right to request a hearing to address the summary suspension within 30 days and an identification of the person to whom he should direct the request; and (4) a statement that a hearing would be conducted by a hearing officer appointed by one of the Medical Staff Entities.  [Dkt. # 364 at 4].

[9]  Dr. Cohlmia and St. John were represented by their respective attorneys.  Fourteen physicians testified and were cross examined (including Dr. Cohlmia), exhibits were admitted, arguments were made by counsel for both parties and the proceeding was recorded.  [Dkt. # 451 at 56].

In early 2004, Dr. Cohlmia did not apply for recredentialing at Saint Francis Hospital, and in early 2005, Dr. Cohlmia withdrew his application for recredentialing at SouthCrest Hospital. [Dkt. # 376 at 19]. In February 2005, Dr. Cohlmia entered into a joint venture to develop a cardiovascular center in Tahlequah, Oklahoma at the Tahlequah City Hospital. Dr. Cohlmia conducts surgeries in Tahlequah and performs certain non-surgical procedures at an office he maintains in Tulsa. [Dkt. # 376 at 20-21].

## Procedural History

On July 7, 2005, Dr. Cohlmia filed a 61-page Complaint, containing nine counts, naming more than twenty defendants, asserting claims for violation of Section I and II of the Sherman Antitrust Act, and Section IV of the Clayton Antitrust Act, 42 U.S.C. § 1981, Oklahoma Antitrust Reform Act, Tortious Interference with Contract and Prospective Advantage, Defamation, and Intentional Infliction of Emotional Distress. The Complaint sought injunctive relief, monetary damages and attorney fees. At the hearing, the undersigned was advised that Dr. Cohlmia sought $29 million in actual damages, and $90 million in treble and punitive damages. Throughout the course of these proceedings several of the claims and all of the defendants, except St. John, were dismissed for various reasons.[10]

St. John was charged in Count I with Combination and Conspiracy in Restraint of Trade in

_____

[10] At the initial attorney fees hearings, Dr. Cohlmia's counsel claimed settlement with co-defendants in this case was evidence that the claims against St. John were reasonable. The undersigned disagrees. Settlement of a case with a co-defendant has no bearing on the merits of St. John's claim for fees. The facts relevant to St. John are not necessarily the same facts relevant to other defendants. Unlike the defendants who settled, judgment on the merits was entered in favor of St. John and against plaintiffs. Moreover, cases, even those with no merit, settle for many reasons, including a desire to minimize legal fees and expenses. The motivations of St. John's co-defendants and the reasons any of the them entered into a settlement with plaintiff have no bearing on this proceeding.

violation of Section I of the Sherman Act and Section IV of the Clayton Act, in Count III with Conspiracy to Eliminate Market Share in violation of the Oklahoma Antitrust Act, in Count IV with Tortious Interference with Contract and Prospective Advantage, in Count V with Defamation, in Count VI with Denial of Equal Rights in violation of 42 U.S.C. § 1981, and in Count VII with Intentional Infliction of Emotional Distress.[11] [Dkt. # 2]. On September 2, 2005, Dr. Cohlmia filed a First Amended Complaint adding a claim against St. John for Conspiracy to Monopolize the Market in the violation of Section II of the Sherman Act. [Dkt. # 43].[12] On September 29, 2005, St. John filed its first Motion to Dismiss. [Dkt. # 63].

On August 2, 2006, District Judge James Payne entered a 30-page written order addressing St. John's motion to dismiss. As to the Section I violation, plaintiff alleged that St. John abused the peer review process in order to prevent Dr. Cohlmia's development of a speciality heart hospital and to impede his existing medical practice. St. John requested dismissal arguing that the ouster of one physician and the resulting injury to Dr. Cohlmia's practice does not equate to harm to competition, but merely harm to that competitor. Judge Payne agreed with St. John but denied dismissal at "this early stage of litigation because Dr. Cohlmia had alleged facts sufficient to survive dismissal."[13] [Dkt. # 83 at 12].

As to the Section II violation and the corresponding Oklahoma Antitrust Act claim, Dr.

---

[11] On August 1, 2005, St. John's lead attorney, Michael Lewis, filed St. John's first pleading in the case, but he neglected to file an entry of appearance. [Dkt. # 10].

[12] On September 28, 2005, William Spitler and Lesley Richer entered appearances on behalf of St. John. [Dkt. # 59].

[13] Judge Payne quoted the following authority: "antitrust laws are intended to protect competition, not competitors, and we will not depart from that purpose in order to improve [a doctor's] income standings in the physician league or help him win the Super Bowl of remuneration." [Dkt. # 83 at 12, citing Summit Health, Ltd. V. Pinhas, 500 U.S. 322 (1991)].

Cohlmia alleged that by terminating his medical staff privileges, St. John "posed a dangerous likelihood of success" of obtaining monopoly power over the cardiovascular market. Judge Payne found that Dr. Cohlmia failed to support this conclusory allegation with any facts, and granted dismissal of this claim without prejudice. [Dkt. # 83 at 14].

Judge Payne dismissed with prejudice Dr. Cohlmia's claim for defamation as to any statement made outside the statute of limitation, and dismissed without prejudice all other purported defamation for failing to give St. John notice of the timing of the communication, the parties involved, and the statements deemed actionable. [Dkt. # 83 at 21].

As his civil rights claim, Dr. Cohlmia alleged that St. John's summary suspension was motivated in part by an unlawful desire to deprive Native American patients of cardiothoracic surgical services at St. John, by eliminating Dr. Cohlmia as their preferred physician. Dr. Cohlmia alleged that St. John's actions were motivated by its concern that Dr. Cohlmia's uninsured Native American patients were costing the facility money. Dr. Cohlmia claimed Native Americans were unlawfully discriminated against, were part of a protected class, and were represented by him, their de facto representative and advocate of their right to quality health care. [Dkt. # 83 at 21-2]. Judge Payne found "these allegations to be largely unsupported, if not nonsensical." [Dkt. # 83 at 22]. Judge Payne dismissed without prejudice plaintiffs' Section 1981 claim for failure to allege facts to support a prima facie case. [Dkt. # 83 at 22]. Judge Payne also granted dismissal of Dr. Cohlmia's claim for intentional infliction of emotional distress, because Dr. Cohlmia failed to allege facts to support the essential elements of the claim. [Dkt. # 83 at 24]. However, Judge Payne granted Dr. Cohlmia leave to amend the Complaint, with a directive to limit the amendment to the deficiencies addressed in the Order. [Dkt. # 83 at 7]. Judge Payne also determined that the peer review process

8

was not privileged under Oklahoma law, as argued by St. John, which opened the door for Dr. Cohlmia to conduct full discovery of St. John's peer review documents, depose personnel at St. John, and determine whether there was any merit to plaintiffs' unsupported allegations.  [Dkt. # 83 at 26-7].

On October 10, 2006, Dr. Cohlmia filed a 76-page Second Amended Complaint, joining thirteen additional defendants and alleging additional factual support for all previously pled claims. [Dkt. # 90].[14]  On November 9, 2006, St. John filed its second Motion to Dismiss.[15]  [Dkt. # 103]. Judge Frizzell conducted a hearing on the second motion to dismiss on May 31, 2007.  Judge Frizzell first admonished Dr. Cohlmia's counsel for dragging out the proceeding by exceeding the scope of Judge Payne's order, which was limited to addressing deficiencies.[16]  Judge Frizzell denied dismissal of the antitrust claims, reserving them for a summary judgment determination, but he added a cautionary note:

> And there's some serious hurdles that the plaintiffs have to cross here on monopoly. I mean we've got a number of hospitals in this city.  So, you know, you've got a big hill to climb, frankly, to survive summary judgment.

[Dkt. # 125 at 11].  Judge Frizzell dismissed plaintiff's claims for illegal boycott and defamation, finding there were no facts pled against St. John in those counts.  [Dkt. # 125 at 15,17].

---

[14]  Although Judge Payne had dismissed with prejudice some of plaintiffs' claims, Dr. Cohlmia reasserted all claims pled in his First Amended Complaint.

[15]  In April 2007, the case was transferred to District Judge Gregory Frizzell.  [Dkt. # 119].

[16]  Judge Frizzell stated, "I guess the thing that bothers me here if we continue this practice we're going to be sitting here a year from now still addressing the substantive allegations.  And I think we need to address that and need to spend some time here this morning as to whether or not you went beyond what Judge Payne allowed you to do. . . .To keep re-pleading it is just begging for this, you know, cadre of lawyers over here to keep you tied up in motions to dismiss at the pleading stage and we're never going to advance the ball." [Dkt. # 125 at 11].

As to plaintiff's re-assertion that St. John's termination of Dr. Cohlmia's medical staff privileges violated Section 1981 by denying Native Americans access to St. John's facility, Judge Frizzell questioned whether the required contract nexus between St. John and Native Americans was pled. Dr. Cohlmia claimed the protected contract right was shown by St. John's refusal to treat Native Americans and requested that Judge Frizzell allow discovery on the issue. [Dkt. # 32]. Judge Frizzell accommodated plaintiff but narrowed discovery to evidence that St. John shut its door on Native Americans. [Dkt. # 125 at 29]. A year and a half later, at the conclusion of discovery, plaintiff dismissed the Section 1981 claim. [Dkt. # 334].

On July 16, 2007, St. John filed an Answer, asserting an affirmative defense of immunity under the Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. § 11111(a)(1).[17] [Dkt. # 130 at 20]. A scheduling order was entered on March 27, 2008, with discovery cutoff set for November 15, 2008.[18] [Dkt. # 154]. On June 23, 2008, defendants requested four days to conduct Dr. Cohlmia's deposition. [Dkt. # 175]. The motion was granted, dividing the deposition time among defendants. [Dkt. # 181]. By March 2008, defendants had produced over 30,000 documents. This production was increased to 150,000 documents by August 2008. However, Dr. Cohlmia complained that he had not yet received "the most critical information in the case" and that he contemplated receiving thousands of additional documents from St. John. [Dkt. # 205 at 4, 7]. All defendants opposed any extension of the discovery deadline, but on August 20, 2008, Dr. Cohlmia requested, and later received, his first extension of the discovery deadline. [Dkt. # 205].

---

[17] On March 3, 2008, James Connor, Jr. and Jason Glass entered appearances on behalf of St. John. [Dkt. # 150, 151].

[18] On April 7, 2008, Lesley Richer withdrew as counsel for St. John. [Dkt. # 157].

On August 22, 2008, the reports offered by three of Dr. Cohlmia's expert witnesses were stricken by Magistrate Judge Paul J. Cleary for failure to comply with Rule 26. Judge Cleary concluded that the reports contained mere conclusions without any reasons or basis for the opinions. [Dkt. # 210 at 5]. Judge Cleary rejected Dr. Cohlmia's request to allow up to 30 days before trial to cure the deficiencies. He explained, "A party cannot offer a mere litany of opinions, devoid of rationale, and contend that the report will be 'supplemented' later with the basis and reasons." [Dkt. # 210 at 11]. Judge Clearly rejected plaintiff's alternative request for twenty days to supplement saying the case had been on file for three years and further extensions would increase the cost of litigation for all parties. [Dkt. # 210 at 12]. The order stated:

> The reports of Riddle, Watts and Winslade do not meet the requirements of Rule 26(a)(2). These experts offer opinions, but their reports wholly fail to state the basis and reasons for their conclusions. They fail to set forth the direct testimony they would offer at trial, and provide Defendants no basis for meaningful cross-examination. Even the opinions set forth are often "preliminary" or "expected opinions."

[Dkt. # 210 at 14]. Dr. Cohlmia's appeal of the order was denied by Judge Frizzell.[19] [Dkt. # 262].

On November 7, 2008, St. John filed its first motion for summary judgment. [Dkt. # 279]. On September 21, 2008, Dr. Cohlmia filed a second motion to extend discovery. [Dkt. # 246]. On December 5, 2008, Judge Frizzell reversed a prior decision and once again accommodated plaintiff's request for additional discovery and allowed plaintiff an opportunity to supplement their expert reports. [Dkt. ## 301, 323]. Following the second discovery deadline, on February 12, 2009, Judge Frizzell held a hearing on St. John's motion for summary judgment regarding plaintiff's claim for tortious interference with contract. To support this claim, plaintiff argued that St. John's peer review

---

[19] On September 5, 2008, Hilary Velandia entered an appearance on behalf of St. John. [Dkt. # 225].

process was a sham and that St. John's decision to report the adverse action against him to the National Practitioners Base caused Dr. Cohlmia to lose medical staff privileges in Tulsa hospitals and caused the Cherokee Nation, Blue Cross and Blue Shield, and other insurance carriers to question his surgical abilities. [Dkt. # 341 at 87]. To support his claim for tortious interference, Dr. Cohlmia relied heavily on a memo dated June 6, 2003, prepared by Dr. Allred. Plaintiff argued that the memo supported his position that the summary suspension of his privileges was principally motivated by a discriminatory attitude toward Native Americans. [Dkt. # 341 at 25-26]. Dr. Cohlmia also attached copies of his expert reports, but he did not file verifying affidavits.

At the hearing, Judge Frizzell observed that Dr. Cohlmia's briefs failed to comply with the requirements of Rule 56(f), and he declined Dr. Cohlmia's counsel's request for more time to supplement Dr. Cohlmia's pleadings yet again so that they would comport with the rules. [Dkt. # 341 at 87]. As to the merits, Judge Frizzell found that plaintiff failed to show any damages as a result of St. John's peer review process. He also declined to accept plaintiff's novel argument that damages should be presumed upon a suspension of privileges. Instead, Judge Frizzell granted judgment to St. John on plaintiff's tortious interference claim. Id. Dr. Cohlmia filed a motion to reconsider and that motion was denied. [Dkt. # 401].

On April 3, 2009, St. John filed a motion for summary judgment seeking immunity on plaintiff's federal and state antitrust claims for restraint of trade and market monopoly. St. John argued that it was entitled to immunity from these claims under HCQIA, because its peer review process was in compliance with the four objective standards set forth therein. 42 U.S.C. §

11112(a).[20]  [Dkt. # 363].  On April 7, 2009, St. John participated in a series of joint motions in limine.  The first motion sought to exclude Dr. Cohlmia from testifying as to damages, because he failed to provide the nature and amount of damages, and because Dr. Cohlmia had mitigated any loss by his successful joint venture with Tahlequah City Hospital.  [Dkt. # 371 at 1-2].  The second motion sought to limit plaintiff's expert witnesses to the content of their expert reports and to exclude any opinion on the legal issue of whether defendants qualified for immunity under HCQIA.  [Dkt. # 372].  The third motion sought to exclude Dr. Cohlmia's account of his patients' and colleagues' opinion that defendants conspired to restrain competition and monopolize the market.  [Dkt. # 373].  The fourth motion sought to exclude Dr. Cohlmia's testimony on matters outside his personal knowledge.  [Dkt. # 374].  The fifth motion sought to exclude Dr. Cohlmia's written summaries of conversations he had with patients and colleagues.  [Dkt. # 375].  The sixth motion sought to exclude evidence that St. John's peer review process resulted in the failure of Dr. Cohlmia's specialty heart hospital.[21]  [Dkt. # 385].

On April 7, 2009, St. John joined in the other defendants' motion for summary judgment addressing the merits of plaintiff's federal and state antitrust claims.  The opening paragraph in the brief states:  "Now, after the production of thousands of pages of document, scores of depositions, and the reports and testimony of numerous expert witnesses (including antitrust economists), it is

---

[20]  Under Section 11112(a), the review must have been taken (1) in the reasonable belief that the action was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).  See 42 U.S.C. § 11112(a)(4).

[21]  Judge Frizzell did not address the merits of defendants' motions in limine prior to entering summary judgment in favor of St. John and against Dr. Cohlmia.

clear that plaintiffs have failed to establish material facts that entitle them to relief under the federal or Oklahoma antitrust laws."[22]  [Dkt. # 376 at 1].  On July 31, 2009, Judge Frizzell conducted a hearing on St. John's motions for summary judgment.  Both parties presented many of the same factual arguments they made in their motions to dismiss, filed in 2005.

On the immunity issue under HCQIA, St. John focused on:  (1) the deposition testimony of physicians and surgeons and excerpts from transcripts of the peer review process show that Dr. Cohlmia's pre-surgical protocol departed from the proper standards of care; (2) St. John suspended Dr. Cohlmia to protect the safety of patients; and (3) St. John's peer review process complied with the requirements of HCQIA.  Plaintiffs focused on:  (1) the June 26, 2003 memo from Dr. Allred; (2) a comparison of Dr. Cohlmia's Quality Assurance scores with other surgeons; (3) the case of Brown v. Presbyterian Healthcare Services;[23] (4) the timing of Dr. Cohlmia's interest in a speciality heart hospital and St. John's termination of his privileges; (5) plaintiffs' expert opinion that St. John's peer review process was "unwarranted, unfair, unreasonable, incomplete, misleading, inaccurate" and even involved false testimony;[24] (6) a St. John official notifying a Hillcrest official that Dr. Cohlmia's privileges at St. John were summarily suspended; (7) the availability of less

---

[22]  The four years of pretrial proceedings in this case resulted in forty depositions, 250,000 documents produced and over 250 pleadings filed.  [Dkt. # 451 at 3].  St John produced, inter alia, all of Dr. Cohlmia's peer review and credentialing files; all documents, exhibits and transcripts of Dr. Cohlmia's peer review hearing; ten years of St. John's financial records [Dkt. # 209 at 1]; all peer review and credentialing files for all cardiovascular surgeons, interventional radiologists and cardiologists associated with St. John from January 1, 1998 through December 31, 2007; all credentialing and peer review documents and all patient and/or healthcare provider complaints related to Dr. Yousuf; as well as the identification of those with knowledge of the recruitment, interview, credentialing peer review, investigation and/or termination of Dr. Yousuf in his association with St. John.  [Dkt. # 300 at 13].

[23]  101 F.3d 1324 (10th Cir. 1996)

[24]  [Dkt. # 451 at 59].

severe options to address Dr. Cohlmia's pre-surgical protocol; and (8) Dr. Cohlmia's performance of 34 unchallenged surgeries following the two surgeries at issue. [Dkt. # 451 at 3-75].

On the merits of the antitrust claims, St. John argued: (1) plaintiff did not have standing, (2) the Section I claims failed for lack of a showing of concerted action and market power, and (3) the Section II claims failed for lack of showing that St. John posed a "dangerous probability" of achieving market power. Dr. Cohlmia argued that St. John's activity had the following anti-competitive effects: (1) the "diminution of quality" on a patient's choice of surgeons and denial of services to Native Americans, (2) the "retardation of innovation" as speciality heart hospitals are more productive and provide better care, and (3) St. John's sham peer review process. Dr. Cohlmia argued that he was excluded from the market because of: (1) an abusive peer review process which was tantamount to excluding Dr. Cohlmia from the profession as a whole, and (2) his ongoing efforts to secure bank financing and architectural plans for his speciality heart hospital. [Dkt. # 451 at 75-119].

At the conclusion of lengthy arguments, Judge Frizzell granted summary judgment to St. John, finding that it was entitled to immunity under HCQIA. He found that the material facts were not in dispute and that Dr. Cohlmia failed to rebut the presumption of immunity by a preponderance of evidence. Judge Frizzell addressed the significant factual differences supporting the holding in Brown and found it distinguishable and not controlling.[25] [Dkt. # 451 at 120-21].

As to the second motion for summary judgment on the merits of Dr. Cohlima's state and

_____

[25] Specifically, Judge Frizzell said, "The evidence of ulterior motive in Brown was direct." In Brown, it was clear that an economic competitor had instigated the review and made false misstatements to the National Practitioner Databank, that the doctor was negligent, that the competitor was the principal witness against the plaintiff, and that there was "overwhelming proof of conjuring up evidence against the doctor." In contrast, Judge Frizzell found the evidence of ulterior motive to be merely "inferential." [Dkt. # 451 at 121].

federal antitrust claims, Judge Frizzell found that plaintiff presented "no evidence of antitrust injury." [Dkt. # 451 at 122]. Dr. Cohlmia's loss of privileges at St. John had no impact on market wide prices, or on the quality or quantity of surgical or cardiology services. [Dkt. # 451 at 122]. Judge Frizzell found plaintiff presented "no evidence" of an antitrust injury in fact, because the evidence established that Dr. Cohlmia remained in the marketplace. The time line of events failed to establish that Dr. Cohlmia's interest in developing a specialty heart hospital was causally connected to the termination of privileges at St. John. Dr. Cohlmia is not and was not an appropriate enforcer of the Antitrust Acts, because plaintiffs presented "no connection between the alleged bad act and the alleged antitrust violation in the market." [Dkt. # 451 at 122].

As to alleged concerted action, Judge Frizzell found no violation of Section I of the Sherman Act because plaintiff failed to show a contract or conspiracy between separate entities, and the Act does not reach conduct which is wholly unilateral. [Dkt. # 451 at 123]. Judge Frizzell found that "no reasonable jury could find concerted action with a separate entity or entities here and that plaintiff had not produced the required standard of evidence to show concerted action or conspiracy." [Dkt. # 451 at 123]. Judge Frizzell also found, as to Section I of the Sherman Act, that plaintiff adduced "no evidence of actual anti-competitive effects" attributed to St. John's conduct, "whether in the form of a market wide increase in price, reduction in output or diminution in the quality of any services." [Dkt. # 451 at 124]. Judge Frizzell found that St. John had only 19.3 percent of the relevant market share in 2006, and that a relatively small market share is indicative of a lack of market power.[26] As to Section 2 of the Sherman Act, Judge Frizzell found there was "no evidence

---

[26] For authority that St. John's market share was not sufficient to confer market power, Judge Frizzell cited and relied on Jefferson Parish Hospital District No. 2 v. Hyde, 464 U.S. 808 (1983).

other than speculative evidence" that St. John had monopoly power to control prices and to exclude competition. [Dkt. # 451 at 125]. As to the Oklahoma Antitrust Act, Judge Frizzell applied the mandatory provision to construe it consistent with the federal antitrust act. As to the Essential Facilities Doctrine, which is different than the federal antitrust act, Judge Frizzell determined that the doctrine did not apply because of an insufficient number of facilities in the Tulsa market area at the relevant time. Judge Frizzell granted judgment to St. John on the merits of plaintiff's state and federal antitrust claims. [Dkt. # 451 at 125].

## Discussion

HCQIA was enacted to encourage peer review in the medical profession. 42 U.S.C. § 11101(3). The statute protects participants in peer review activities from liability for damages stemming from a review, so long as the review satisfies the standards set forth in Section 11112(a). Persons covered under HCQIA include professional review bodies, members and staff of such a body, any person under a contract or other formal agreement with such a body, and any person who participates with or assists such a body with the peer review process. 42 U.S.C. § 11111(a)(1). A "professional review body" is a health care entity, including its governing body or a committee of the medical staff of the entity which assists the governing body in conducting a professional review activity. 42 U.S.C. § 11151(11). Anyone providing information to the peer review body is also protected. 42 U.S.C. § 11111(a)(2). In the event of litigation, if immunity is established, HCQIA provides for an award of attorney fees to covered persons for their participation in the peer review process. The attorney fee provision specifically provides:

> In any suit brought against a defendant, to the extent that a defendant has met the standards set forth under section 11112(a) of this title and the defendant substantially prevails, the court shall, at the conclusion of the action, award to a substantially

17

prevailing party defending against any such claim the cost of the suit attributed to such claim, including a reasonable attorney's fee, if the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith.

42 U.S.C. § 11113. To recover attorney fees under Section 11113, St. John must meet four requirements. First, St. John must show it is a "covered person" as defined in Section 11111. Second, St. John must show it complied with the standards in Section 11112(a) during the review process. Third, St. John must show that it substantially prevailed on plaintiffs' claims. Fourth, St. John must show that Dr. Cohlmia's claims, or conduct during the litigation, were frivolous, unreasonable, without foundation or in bad faith.

The undersigned first addresses an issue briefed by the parties: whether St. John's entitlement to attorney fees is predicated on the reasonableness of plaintiff's challenge to St. John's affirmative defense of immunity. Put simply, that is not a requirement under Section 11113. The plain language of the statute specifically addresses the reasonableness of plaintiff's <u>claims</u>, not the reasonableness of plaintiff's challenge to a defendant's affirmative defense of immunity.[27] Even were a court to look beyond the statute's plain language (which is not necessary), the result would be no different. As noted in <u>Addis v. Holy Cross Health System Corp.</u>, 88 F.3d 482 (7th Cir. 1996), Congress passed HCQIA:

> to provide incentive and protection for physicians engaging in effective professional peer review. 42 U.S.C. § 11101(5). These incentives were designed to encourage doctors to engage in meaningful peer review in light of the Health Care Act's imposition of intensified reporting requirements. It was Congress' hope that doctors would comply with the reporting requirements installed by the Health Care Act and

---

[27] HCQIA, which is designed to protect entities such as St. John from millions of dollars in damages arising out of a properly conducted peer review process, is also designed to protect such entities from needlessly paying smaller amounts to defend itself against unreasonable, unfounded, or frivolous claims.

thereby decrease the number of occurrences of medical malpractice.

Important elements of this package of incentives were the creation of statutory immunity for those persons and entities engaged in qualified professional peer review, 42 U.S.C. § 11111(a), 11112(a), and a fee-shifting provision designed <u>to deter plaintiffs from filing meritless lawsuits</u> against those persons and entities, 42 U.S.C. § 11113.  Thus, 'doctors and hospitals who have acted in accordance with the reasonable belief, due process, and other requirements of the bill are protected from damages sought by a disciplined doctor.'

<u>Id.</u> at 485 (emphasis added).  In <u>Addis</u>, the Court held the text of Section 11113 explicitly provides that an award of fees may be appropriate to the extent a defendant prevailed on the plaintiff's claims, and its professional review process met the standards in Section 11112(a).  <u>Id.</u> at 486.  The Ninth Circuit explained, "[t]he policy behind this provision is clear:  Congress wanted to encourage professional peer review by limiting the threat of unreasonable litigation expenses." <u>Smith v. Ricks</u>, 31 F.3d 1478, 1487 (9th Cir. 1994).  Thus, St. John's entitlement to attorney fees is not predicated on whether plaintiffs' challenge to its immunity defense was without foundation.  Rather, with respect to step 4, the question is whether Dr. Cohlmia's claims, or his litigation conduct in pursuing those claims, were frivolous, unreasonable, without foundation, or in bad faith.

In reviewing the four requirements, a court may analyze the pleadings, exhibits, procedural history, and orders entered in the case.  Clearly, St. John is a "professional review body" as defined in Section 11151(11).  Dr. Allred and Dr. Burnett, as staff physicians who participated in the review process, are "covered persons" as defined in Section 11111(a)(2).  Judge Frizzell found that Dr. Cohlmia did not rebut the presumption of immunity, thereby concluding that St. John met the standards set forth in Section 11112(a).  As shown above, St. John substantially prevailed on all counts pled against it in the Second Amended Complaint.  Judge Frizzell's order on summary judgment assists in determining the remaining element, whether Dr. Cohlmia's claims or conduct

during the litigation were frivolous, unreasonable, without foundation, or in bad faith. The undersigned does not find that Dr. Cohlmia's "conduct" was frivolous, unreasonable, without foundation or in bad faith. The issue remains whether the "claims" asserted by Dr. Cohlmia were frivolous, unreasonable, without foundation, or brought in bad faith.

Judge Frizzell found that St. John was entitled to immunity, and he rejected Dr. Cohlmia's underlying premise that St. John's peer review process was a sham and served as a subterfuge for St. John to deprive him of state protected property rights, thus allowing St. John to commit torts, antitrust, and civil right violations. Moreover, Judge Frizzell found "no evidence" to support any of Dr. Cohlmia's claims. The undersigned finds that the claims pled against St. John in the Second Amended Complaint were unreasonable when pled, and were clearly shown to be frivolous in the early stages of the litigation.

St. John conducted a thorough, open, and professional peer review in compliance with its by-laws. Over fourteen physicians testified, documents were exchanged, exhibits offered, the entire proceeding was recorded and transcribed, Dr. Cohlmia was represented by counsel, and the proceeding was held before a retired federal district judge, Thomas Brett. Judge Brett issued a detailed written opinion which was reviewed and approved by St John's Executive Committee and St. John's Board of Trustees. On the other hand, in commencing this action, Dr. Cohlmia made unreasonable accusations that St. John's peer review process was a sham and conducted in bad faith.[28] Thereafter, Dr. Cohlmia tried to show that St. John used its peer review process to run him "out of town" and, purportedly, to "deprive Native Americans of quality health care." Dr. Cohlmia

---

[28] St. John's professional peer review process preceded the professional peer review process conducted by Hillcrest Medical Center.

engaged in costly and fruitless discovery, sought unreasonable continuations of discovery deadlines, unreasonably requested leave to conform pleadings to the rules, and even sought an unreasonable last minute supplement hoping to add substance to otherwise conclusory reports from expert witnesses. Judge Frizzell found that plaintiff produced "no evidence" suggesting that St. John was involved in a conspiracy or concerted effort to restrain trade and "no evidence" that St. John had sufficient market share to have even a potential for market power. Judge Frizzell warned Dr. Cohlmia early on that St. John was one of many hospitals in Tulsa and that he had some serious hurdles to cross in establishing antitrust liability. Ignoring indicators that his case against St. John lacked substance, Dr. Cohlmia plowed ahead seeking additional discovery and disregarding the mounting costs of litigation.

Dr. Cohlmia's claim against St. John for defamation fell outside the statute of limitations. Early in the proceeding, Judge Payne characterized the allegations supporting Dr. Cohlmia's Section 1981 claim as "largely unsupported, if not nonsensical." At the pleading stage, Judge Payne dismissed with prejudice plaintiff's claim for intentional infliction of emotional distress. Judge Frizzell granted St. John summary judgment on plaintiff's claim for tortious interference with contract. Finally, Judge Frizzell not only found that St. John was entitled to immunity, which of itself would have ended this litigation, but he went on to find there was no evidence to support Dr. Cohlmia's antitrust allegations.

At the hearing before the undersigned, Dr. Cohlmia argued that his claims were not unreasonable or frivolous, because the peer review process was tainted with irregularities. Plaintiff argued that no cardiovasular surgeon was asked to review the two surgeries in question. However, in Brown, the case plaintiff relies on, the Tenth Circuit was critical of the fact that a competitor of

Dr. Brown's testified against her. The use of a cardiovascular surgeon in this case likely would have been a direct competitor of Dr. Cohlmia. In any event, Judge Frizzell found no such taint. Dr. Cohlmia relied on the June 26, 2003 memo prepared by Dr. Allred as proof that Dr. Cohlmia's summary suspension had "nothing to do with patient care" but was motivated by a desire to eliminate the treatment of Native Americans at St. John's surgical facilities. Judge Frizzell rejected this argument. The undersigned also finds no merit to plaintiff's contention that the June 26 memo establishes that plaintiff's case was reasonably filed. The memorandum, which was obtained in discovery, by its very language, supports St. John's claim that it summarily suspended Dr. Cohlmia out of concern for patient care, because: (1) Dr. Cohlmia failed to follow proper pre-surgical protocol, and (2) Dr. Cohlmia had three times the mortality rate compared to other cardiovascular surgeons. In the memo, Dr. Allred expresses concern that Dr. Cohlmia was operating on patients:

> without any other consultation. He only gets consultations afterwards when it is appropriate or necessary for the patient. I reassured Dr. De Leon that I am aware of this being a significant problem and that we will monitor closely. It is very difficult to remove someone from the staff once they have full privileges. He has been on the staff since 1985, being brought in by Dr. Loughridge, hailed as a 'superb addition to the CV staff.' Unfortunately this has not proved to be correct. I've talked to Dr. Raines about this and they are aware that his mortality rate is three times the mortality rate of the rest of the group. They average 2-3% with his being 9.8 range. This is indeed intolerable.

[Dkt. # 414, Ex.7].

Dr. Cohlmia claims his reliance on the facts of Brown shows his case was reasonable. However, as Judge Frizzell pointed out, the facts in Brown are distinguishable. Dr. Brown's case involved a direct financial competitor assisting in submitting a false report to the National Practitioner Data Bank stating that Dr. Brown had been found by the hospital to be negligent, incompetent, and guilty of malpractice. After Dr. Brown notified the Data Bank that the report was

false, the hospital was notified and given an opportunity to amend the data bank report, which it declined to do. At no time had the review panel or the hospital Board of Trustees found that Dr. Brown was negligent, incompetent, or guilty of malpractice. Also, Dr. Brown sufficiently established damages caused by the interference with her attempt to hire an associate to join her practice. Id. at 1327-8, 1330-1334. In this instance, St. John accurately reported the findings made by Judge Brett, as confirmed by the hospital administration, and Dr. Cohlmia transitioned to a successful relationship with a hospital in Tahlequah. Dr. Cohlmia failed to show any intentionally false statements and resulting damage.

Dr. Cohlmia also argued his claims were reasonable because St. John failed to consult with him prior to his summary suspension. However, St. John had no legal duty to consult with Dr. Cohlmia. His counsel reluctantly admitted this fact, but argued it would be a fairer practice for St. John to do so. Plaintiff further argued that its case was reasonable because Quality Assurance ("QA") reviewed the two cases which gave rise to Dr. Cohlmia's suspension. One case was assigned a four which means "practice unacceptable and potential harm to patient" and the other was given a three which is "variance from the usual standard of care and represents opportunity to improve care." Dr. Cohlmia argued that there were several other physicians with poorer ratings whose medical privileges were not terminated. This argument has no merit. See, e.g., Smith v. Ricks, 31 F.3d 1478 (9th Cir. 1994). In Smith, Dr. Smith, a cardiologist, filed suit after the defendant hospital terminated his medical staff privileges because of poor judgment and inadequate treatment. Dr. Smith sought damages under the Sherman Antitrust Act, contending the hospital and physicians used the peer review process to monopolize the market and to conspire against him to restrain trade. Dr. Smith's only challenge to the hospital's investigation was that he was not permitted to discover or

introduce evidence regarding the conduct of other doctors. The court stated: "Dr. Smith essentially claims he was not the worst doctor at Good Samaritan. However, nothing in the statute, legislative history, or case law suggests the competency of other doctors is relevant in evaluating whether Good Samaritan conducted a reasonable investigation into Dr. Smith's conduct." Id. at 1486. The undersigned finds this reasoning to be sound and applicable here.

As to his claim that St. John and Hillcrest conspired to terminate his privileges, Dr. Cohlmia argued that the claim was reasonable because of his outspoken criticism of Dr. Yousuf.[29] This argument fails as well. Dr. Cohlmia was provided a full due process hearing at St. John thus providing him a fair forum to assert this claim. No subterfuge is shown by the proceeding or by the hearing examiner, Judge Brett. Other arguments made by plaintiff at the hearing were equally without merit.

Plaintiff claimed that the shear volume of discovery and pleadings filed in the case are evidence his claims were reasonable. This argument is meaningless in light of the generous scope of discovery permitted in this case, with an end result that plaintiff presented "no evidence" to support his claims. Plaintiff argued that Judge Frizzell's statement complimenting counsel on their performance during the litigation is indicative that plaintiff's case was reasonable.[30] This argument also lacks merit. Zealous representation of a client can occur even if a claim is frivolous, unreasonable, or lacks foundation.

---

[29] This argument fails at the attorney fee stage of the proceeding, because plaintiff is essentially attempting to relitigate the issue of immunity which was resolved by Judge Frizzell.

[30] Judge Frizzell made the following statement immediately prior to announcing his decision granting judgment to St. John: "First, I'd like to say that the advocacy on both sides here has been just extraordinarily good and I appreciate it very much from all of you." [Dkt. # 529, Ex. C].

For the foregoing reasons, the undersigned finds that Dr. Cohlmia's claims were unreasonable and without foundation at the onset of the case, as discovery developed, and ultimately through the granting of judgment on the merits four years later.

## Reasonable Attorney Fees

In its motion for attorney fees filed on August 31, 2009, St. John requested fees and expenses in the amount of $973,601.25 under HCQIA on the basis that Dr. Cohlmia's challenge to St. John's HCQIA defense was without foundation and unreasonable. In the alternative, St. John sought attorney fees under HCQIA on the basis that Dr. Cohlmia's tortious interference and state and federal antitrust claims were without foundation and unreasonable. [Dkt. # 458 at 2, 9]. In its supplemental brief filed on December 17, 2010, St. John reserved the right to argue for an award of attorney fees on all claims brought by Dr. Cohlmia and in asserting its affirmative defense of HCQIA immunity. [Dkt. # 518 at 2].

By affidavit, Michael Lewis attests that he and his law firm Doerner, Saunders, Daniel & Anderson served as lead counsel for St. John. [Dkt. # 458, Ex. 1, Att. 1]. Mr. Lewis states his law firm maintained daily chronological time sheets with summaries of the legal services it rendered. Doerner, Saunders, Daniel & Anderson seeks $765,824.00 in fees and expenses which it billed to St. John. Id. By affidavit, James Connor, Jr. attests that he and his law firm Richards & Connor were hired by St. John in this case. [Dkt. # 458, Ex. 2, Att. 1]. Mr. Connor states that his law firm maintained daily chronological time sheets with summaries of legal services rendered. Richards & Connor seeks $207,777.50 in fees and expenses which it billed to St. John. The two law firms seek attorney fees for the combined work of 22 lawyers, 6 paralegals, and 4 summer clerks. Of the 22 lawyers representing St John, two served as trial lawyers and lead counsel, four served as healthcare

lawyers, one served as an employment lawyer, eight served as general litigation lawyers, three served as complex litigation lawyers, one as a trial lawyer, one as an appellate lawyer, one as a land use lawyer, and one as a lawyer specializing in Native American law.  [Dkt. # 518, Ex. A].  Doerner, Saunders, Daniel & Anderson filed a 177-page billing statement and Richard & Connor filed an 87-page billing statement.  The undersigned has reviewed, in detail, each of these statements.

Dr. Cohlmia opposes St. John's motion for attorney fees arguing that his claims were not frivolous or unreasonable.  Alternatively, Dr. Cohlmia challenges the attorney fees and expenses  on general grounds of excessive billing and duplication of effort.

Both parties assert that factors set forth in Burk v. City of Oklahoma City, 598 P.2d 659, 661 (Okla. 1970) should be considered in determining the reasonableness of the amount of fees requested.  Under Burk, a court is to consider the hourly rate times the number of hours reasonably spent to determine a lodestar of the fee determination, and a court may increase or decrease fees by considering certain enumerated factors.  See also Morgan v. Galilean Health Enterprises, Inc., 977 P.2d 357, 364 (Okla. 1998).  Those factors include time and labor required; novelty and difficulty of the questions presented; skill requisite to perform the legal service properly; the preclusion of other employment caused by accepting the case; the customary fee; whether the fee is fixed or contingent; time limitations; the amount involved and the results obtained; the undesirability  of the case; the nature and length of the professional relationship; and awards in similar cases.  Id. at 661-62.

Dr. Cohlmia's counsel advised that except for the hourly rate attributed to certain paralegal

work, Dr. Cohlmia does not contest the hourly rate charged by the attorneys for St. John.[31]  Rather, Dr. Cohlmia enumerated specific objections to the amount of time sought in St. John's fee request. The undersigned will first address those objections.

Dr. Cohlmia challenges the reasonableness of billing full hourly rates for travel time, a sum of $13,000.00.  The undesigned agrees, but only because St. John failed to show that these fees were reasonably incurred or necessary.  Dr. Cohlmia challenges the reasonableness of assessing fees for St. John's challenge to plaintiff's motion to compel.  Plaintiff assigns $20,750.00 for this activity. The undersigned agrees, because St. John continued to pursue a peer review privilege after the issue was determined by Judge Payne.

Dr. Cohlmia challenges approximately $17,126.00 in billings for paralegal time in coding at an hourly rate of $95.00, claiming $50.00 per hour is reasonable.  The undersigned agrees that coding is not necessarily a legal skill and the amount requested will be reduced by $8,563.00.[32]  Dr. Cohlmia challenges the reasonableness of $4,700.00 in billings for preparation of a joint defense agreement.  The undersigned finds the amount unreasonable, however the defense agreement resulted in some cost savings in attorney fees for duplicated work.  The undersigned will reduce that amount by $2,700.00.  Dr. Cohlmia challenges the duplication in work performed by attorneys with Doerner, Saunders, Daniel & Anderson and those with Richards & Connor.  Mr. Lewis' firm was hired to defend the antitrust claims, and Mr. Connor's firm was hired for its expertise in cardio-

---

[31]  Except as set forth below, the undersigned finds that the hourly rates charged by St. John's counsel, including paralegals, was reasonable.

[32]  There is, however, no requirement for the court to identify each hour reasonably expended by each timekeeper, nor is there any requirement that the court announce what hours are permitted for each legal task. See Case v. Unified School District No. 233, 157 F.3d 1243 (10th Cir. 1998).

thoracic medicine. Dr. Cohlmia does not assign a dollar value to this objection, accordingly its denied. In addition, the undersigned finds the allocation of work between the two firms to be reasonable.

Dr. Cohlmia objects to duplicate billings for communications between attorneys in the same law firm, in house emails, in-house conferences and conferences with co-counsel and for activities not traditionally associated with legal work. Dr. Cohlmia asserts that 20 percent of the billings are for these activities. The undersigned disagrees that billing for inter-office communications and communications with co-counsel is necessarily unreasonable. Such communications are often necessary and can lead to efficiencies in the distribution and provision of legal services. Nonetheless, such fees are subject to abuse and should be supported by specific explanations or more detailed time sheets allowing a ready determination of the benefit of such communications in each instance. Such support was not always present here. In addition, the undersigned finds merit in Dr. Cohlmia's argument that some of the billed time was for activities not traditionally associated with legal work. Thus, the amount claimed has been reduced by an additional 10 percent. A sum of $97,360.13.

Dr. Cohlmia objects to the $2,400.00 claimed for the work of summer clerks. The undersigned disagrees that billing for the work of summer clerks is necessarily unreasonable. Summer clerks can, sometimes, provide quality legal work at an hourly rate that is far less than a client would pay if the work were performed by an attorney. Such work, however, is generally not performed as efficiently as it would be by an attorney and must be more strictly scrutinized by a supervising attorney. It is difficult, with the information supplied, to determine whether such scrutiny actually occurred here. The undersigned finds that 50% of the time claimed for work of

summer clerks is reasonable and, thus, will reduce this amount by one-half, or $1,200.00.

Dr. Cohlmia objects that three of St. John's attorneys separately billed their full hourly rate for attending a full day of depositions of Dr. Allred, Dr. Cohlmia, and Dr. Landgartner. In a case of this size that involves at least three highly specialized areas (thoracic surgery, HCQIA, and antitrust), it is not presumptively unreasonable to have three attorneys present at critical depositions. Moreover, plaintiff did not furnish the undersigned with a dollar value for this objection, accordingly, and in light of the affidavits supplied by St. John's counsel, it is denied. Dr. Cohlmia further claims that attorney fees should be excluded for any deposition not used or cited in preparation of St. John's motions for summary judgement. The undersigned rejects the notion that only the cost of discovery which was used to support a successful dispositive motion is recoverable, particularly since plaintiff fails to show that the subject depositions were unnecessary and places no dollar value on this objection.

Dr. Cohlmia objects to attorney fees claimed for defending against plaintiff's antitrust claims, arguing that St. John adopted the briefs filed by Womble, Carlyle, Sandridge & Rice, a law firm in North Carolina, specifically attorney Mark Horoscak, whose expertise is antitrust law. However, adopting the briefs of Mr. Horoscak likely saved St. John, and now plaintiff, substantial attorney fees. In addition, the fact that Mr. Horoscak prepared the briefing did not reduce the obligation of St. John's counsel to be informed of, and to participate in, its potential defenses to the antitrust claims, particularly since St. John was the sole remaining defendant at the time of the summary judgment hearing before Judge Frizzell. Knowledge of the content of these briefs was essential in preparing for the hearing. The undersigned denies this objection.

Dr. Cohlmia also challenges the "exorbitant number of timekeepers, use of block and/or

indecipherable billing entries," and the excessive and unrealistic number of hours claimed. [Dkt. # 529 at 27-28]. Dr. Cohlmia does not assign a dollar value to these objections. In response, St. John asserts that 90.3 percent of the legal work performed by Doerner, Saunders, Daniel & Anderson was performed by Mr. Lewis as lead counsel; Hilary Velandia as a healthcare lawyer; Marilyn Schooling as lead paralegal and William Spitler for general litigation. The undersigned finds some validity to Dr. Cohlmia's objection. Accordingly, to accommodate this objection, the undersigned will reduce the fees requested by 10 percent to eliminate fees not attributed to principal timekeepers and block billing, a reduction of $97,360.13. Those objections which fail to specify a dollar value are denied for lack of sufficient evidence (again, in light of St. John's counsel's affidavits).

Finally, the undersigned RECOMMENDS that St. John's request for leave to file supplemental attorney fees in its pursuit of an attorney fee award be denied. Based on the undersigned's detailed review of the time records presented, consideration of the Burk factors, and review of the entire docket, the recommended fee award reflects a reasonable fee for the services provided by St. John's counsel in this litigation, taking into account its efforts on the pending motion.

### Recommendation

In consideration of the objection filed and supported by Dr. Cohlmia, the undersigned **RECOMMENDS** that St. John be awarded $732,668.00 in attorney fees as prevailing party in this action pursuit to 42 U.S.C. § 11113.

### Objection

In accordance with 28 U.S.C. § 636(b) a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the

District Court for the Northern District of Oklahoma by February 3, 2012.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b) directs the district judge to:

> determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72(b); see also 28 U.S.C. § 636(b)(1).

The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for de novo review by the district court or for appellate review.

SUBMITTED THIS 20th day of January, 2012.


_____
T. Lane Wilson
United States Magistrate Judge