## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

GEORGE S. COHLMIA, JR. M.D. and )
CARDIOVASCULAR SURGICAL )
SPECIALISTS CORP., )
                           )
         Plaintiffs, )
                           )
v. )     Case No.  05-CV-384-GKF-TLW
                           )
ST. JOHN MEDICAL CENTER, )
WILLIAM HOWARD ALLRED, M.D. )
and WILLIAM BURNETT, M.D., )
                           )
         Defendants. )

## OPINION AND ORDER

Before the court is Magistrate Judge T. Lane Wilson's Report and Recommendation

[Dkt. #536] on the Motion for Attorney Fees [Dkt. #458] filed by defendants St. John Medical

Center, William Howard Allred, M.D. and William Burnett, M.D. (collectively, "St. John").

Magistrate Judge Wilson concluded the claims of plaintiffs George S. Cohlmia, Jr., M.D. and

Cardiovascular Surgical Specialists Corp. (collectively, "Cohlmia") were "unreasonable and

without foundation at the onset of the case, as discovery developed, and ultimately through the

granting of judgment on the merits."  [Dkt. #458 at 25].  He recommended St. John be awarded

$732,668.00 in attorney fees as the prevailing party in this action pursuant to the Health Care

Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11113.  Cohlmia objected to the Report and

Recommendation. [Dkt. #539].

### I. Standard of Review

The district court must conduct a *de novo* review of the Magistrate Judge's Report and

Recommendation.  28 U.S.C. § 636(b)(1); *Northington v. Marin*, 102 F.3d 1564, 1570 (10th

Cir.1996) ("De novo review is required after a party makes timely written objections to a

magistrate's report. The district court must consider the actual testimony or other evidence in the record and not merely review the magistrate's report and recommendations."). The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

## II. Procedural Background of Motion

Following St. John's suspension of his medical privileges, Cohlmia sued St. John and some 18 other defendants, alleging a number of federal and state antitrust and business tort claims. Ultimately, Cohlmia settled with all defendants except St. John. St. John asserted , *inter alia,* an affirmative defense that it was immune under federal law from damages pursuant to the HCQIA, 42 U.S.C. § 11101, *et seq.* St. John also moved for summary judgment on the antitrust and tort claims, arguing they failed for lack of evidentiary support. On February 17, 2009, the court granted St. John's motion for summary judgment on Cohlmia's tortious interference with contract claim, finding plaintiff had presented no evidence of damages. [Dkt. ##340, 341 at 44-45]. On July 31, 2009, the court granted St. John's motions for summary judgment on Cohlmia's remaining claims; and on August 3, 2009, it entered judgment in favor of St. John and against Cohlmia. [Dkt. ##446, 448].

On August 31, 2009, St. John filed its Motion for Attorney Fees totaling $973,601.25.[1] The motion was extensively briefed and the Magistrate Judge conducted several hearings. In a 31-page Report and Recommendation, he reviewed at length the factual background and procedural history of the case, discussed applicable law and scrutinized the fee request and underlying documentation. He determined that St. John was entitled to recover attorney fees under 42 U.S.C. § 11113, but recommended the following reductions:

---

[1] This amount was comprised of $765,824.00 in fees and expenses of the Doerner, Saunders, Daniel & Anderson law firm and $207,777.50 in fees and expenses of the Richards & Connor law firm.

- $13,000.00 for travel time charged at full hourly rates;

- $20,750.00 for fees for St. John's unsuccessful challenge to a motion to compel filed by plaintiff;

- $8,563.00 for paralegal time spent on coding;

- $2,700.00 (from a total of $4,700.00) for preparation of a joint defense agreement;

- a total of 10 percent ($97,360.13) for inadequately documented billings for in-house and co-counsel communications and for activities not traditionally associated with legal work;

- $2,400.00 for work by summer clerks; and

- another 10 percent ($97,360.13) to eliminate fees not attributed to principal timekeepers and block billing;

[Dkt. #536 at 27-30]. After these reductions, the Magistrate Judge recommended a total fee award of $732.558.00. [*Id.* at 30]. He recommended St. John's request for leave to file supplemental attorney fees in its pursuit of an attorney fee award be denied.

In his objection, Cohlmia argues attorney fees are not recoverable under HCQIA because his claims were not frivolous, unreasonable, witout foundation or brought in bad faith. He also objected to the attorney fee amount recommended by the Magistrate Judge. [Dkt. #539].

### III. Material Facts

Cohlmia is a surgeon specializing in cardiovascular, thoracic, vascular, and endovascular surgery. His closely held corporation, Cardiovascular Surgical Specialists Corp. ("CVSS") provides cardiovascular, thoracic, vascular and endovascular surgical care. [#376, Defendants' Statement of Material Facts, ¶1; #422, Plaintiff's Response to Defendants' Statement, ¶1].

St. John is a general acute care hospital in Tulsa. [#376, Defendants' Statement of Material Facts, ¶5; #422, Plaintiff's Response, ¶5].

William Burnett, M.D., who is board certified in internal medicine and cardiovascular diseases, is a former President of SJMC's Medical Staff. Howard Allred, M.D., who specializes in colon and rectal surgery, is the VP of Medical Affairs at SJMC. [Dkt. #376, Defendants' Statement of Material Facts, ¶13; Dkt. #422, Plaintiff's Response, ¶13].

Cohlmia founded CVSS in 1994. Throughout the period relevant to this litigation Cohlmia, through CVSS, provided a variety of surgical services, including cardiovascular surgery, thoracic surgery, vascular surgery and endovascular surgery. [Dkt. #376, Defendants' Statement of Material Facts, ¶¶14, 17; Dkt. #422, Plaintiff's Response, ¶¶ 14, 17.]

In excess of 50% of Cohlmia's patient population is Native American. [Dkt. #376, Defendant's Statement of Material Facts, ¶18; Dkt. #422, Plaintiff's Response, ¶18].

Before 2003, Cohlmia performed most of his surgeries (in some years 70-80%) at Hillcrest Hospital. The remainder were performed at St. John, Southcrest and Saint Francis hospitals. [Dkt. #376, Defendants' Statement of Material Facts, ¶19; Dkt. #422, Plaintiff's Response, ¶19].

Until July of 2003, Cohlmia had active medical staff privileges at Hillcrest, St. John, Saint Francis, Southcrest and Tulsa Regional Medical Center. [Dkt. #376, Defendants' Statement of Material Facts, ¶20; #422, Plaintiffs' Response, ¶20].

**Cohlmia's Suspension by St. John**

On June 6, 2003, Cohlmia performed thoracotomy surgeries at St. John on two patients diagnosed with lung cancer. During surgery on the first patient, Cohlmia removed one lung and several ribs and collapsed the patient's chest cavity. During surgery on the second patient, Cohlmia attempted to remove a tumor in the lung that had invaded the chest wall. [#364-1, Exs. 1, 3]. The second patient died seven days later, after a second surgery to repair an air leak in the

lung that formed as a complication of the initial surgery. [Dkt. #364-1, Exs. 1, 4]. The patients are referred to as Patient "H" and Patient "P" respectively.

On June 7, 2003, a St. John nurse advised Dr. Allred, Vice-President of Medical Affairs that there might be a serious problem regarding surgery Dr. Cohlmia had performed the previous day. [Dkt. #364-2, Ex. 5, Allred Dep. at 6.]. On the same day, Allred reviewed two patients' charts and "became concerned" because he noticed that in his opinion there was inadequate workup of the patients before the operations. [*Id.* at 8-9]. Allred continued to review the patients' records and monitor their conditions for several days. [*Id.* at 9].

During this time, Allred talked with several St. John physicians expressing concern regarding the care rendered by Cohlmia to these two patients. [*Id.*] According to the St. John Medical Center Medical Staff Bylaws, Allred, as VP of Medical Affairs, had the authority to, on his own initiative, summarily suspend any member of the medical staff whenever necessary to "protect the life of any patient(s) or reduce the substantial likelihood of immediate injury or damage to the health and safety of any patient. [Dkt. #364-2, Ex. 6] Allred testified he wanted to ensure that the review was "fair to Dr. Cohlmia,[that] as much information as possible was collected, assimilated, discussed, and a reasonable fair conclusion was reached." [Dkt. #364-2, Ex. 5 at 14]. He spoke to a pathologist, a thoracic surgeon, a medical oncologist and a pulmonologist about the incidents. [*Id.* at 12, 14-15].

Allred then spoke to Dr. John Forrest, President of the St. John Medical Staff, and David Pynn, President of St. John, advising them of a potential problem. [*Id.* at 14-15]. At a meeting of the Medical Staff Executive Officers on July 7, 2003, attended by Pynn, Allred, Forrest, Burnett and William Morgan, St. John General Counsel, a consensus was reached that Cohlmia's privileges to practice at SJMC should be suspended because Cohlmia's treatment of Patient P

and Patient H demonstrated "significant error in clinical judgment" and Cohlmia's continued practice at SJMC posed the potential for harm to patients. [Dkt. #364-2, Ex. 10, Burnett Dep.at 74-77].

On July 8, 2003, Pynn sent a letter to Cohlmia advising that his privileges had been summarily suspended. [Dkt. #364-3, Ex. 11]. On the same date, the hospital cut off Cohlmia's access to the hospital, and Cohlmia requested, in writing, that a hearing be scheduled as quickly as possible. [Dkt. #364-2, Ex. 5; Allred Dep. at 22; Dkt. #364-3, Ex. 12].

On July 23, 2003, Karen Callahan, attorney for SJMC, sent a letter via certified mail to Cohlmia and his attorney advising that the requested hearing had been set to commence on August 21, 2003 at 9 a.m., and that former U.S. District Court Judge Thomas R. Brett would be the hearing officer. [Dkt. #364-3, Ex. 12].

On August 21, 22 and 26, 2003, a confidential hearing took place with each party presenting testimony under oath, exhibits, and making arguments before concluding. The hearing was recorded by a licensed court reporter. During the hearing, seven physicians testified on behalf of Cohlmia and seven physicians testified on behalf of St. John. [Dkt. #364-1, Ex. 1, Hearing Officer Report; Ex. 4, Transcript of Hearing]. One of Cohlmia's witnesses and three of the medical staff witnesses were expert witnesses. [*Id.*]. Cohlmia testified at length during the hearing. [Dkt. #364-1, Ex. 4]. Both Cohlmia and St. John submitted pre-hearing and post-hearing memoranda. [Dkt. #364-3, Ex. 15; Dkt. #364-4, Exs. 16-19].

On September 4, 2003, Judge Brett issued his Report, Recommendation and Judgment of Hearing Officer finding that the summary suspension of Cohlmia on July 8, 2003, was "the result of a thorough review, by appropriate St. John multidisciplinary medical staff physician specialists, of the medical records regarding major thoracic surgery procedures performed on

June 6, 2003 by Cohlmia." [Dkt. #364-1, Ex. 1].

Judge Brett found that Cohlmia did not obtain the proper workup, which the standard multidisciplinary approach required, prior to performing the surgery on Patient H. Judge Brett found that had Cohlmia obtained this workup, it would have confirmed that he should not proceed with the surgery. He found that the "evidence established that Dr. Cohlmia's basic premise, "Patients without mediastinal lymphadenopathy...may proceed to thoracotomy" was flawed because a prior CT scan showed it was probable the patient had mediastinal lymphadenopathy and the patient had shoulder pain which is a symptom of mediastinal lymphadenopathy. Judge Brett further found that Dr. Cohlmia should not have "cavalierly" relied solely on his own interpretation of the CT scan and, at a minimum, should have had a radiologist interpret the CT scan. [*Id.,* Ex. 1, SJHRG 4050,4051, 4053].

Based on these facts, Judge Brett concluded that Cohlmia "demonstrated a lack of sound medical judgment as a thoracic surgeon when he proceeded with a thoracotomy and resection [on Patient H] without appropriate workup and staging." [*Id.,* SJHRG4053]. The surgery that occurred as a result of this lack of judgment resulted in the patient developing a large air leak, requiring emergency surgery which the patient did not survive. [*Id.,* SJHRG4053-54].

With respect to Patient P, Judge Brett found that, based on the evidence presented at the hearing, Cohlmia also demonstrated "gross deviation in medical judgment" when he removed Patient P's lung and 10 ribs without obtaining the standard workup which would have shown the surgery to be futile and dangerous. [*Id.,* SJHRG4058]. He found that the evidence showed it was medically probable that the small cell carcinoma of the patient's lung could have been pathologically determined preoperatively through standard diagnostic procedures. He found that with such a diagnosis, most doctors would not have proceeded with a thoracotomy. [*Id.,*

SJHRG4056-57].

Judge Brett further found that Cohlmia's attempt to justify proceeding to surgery without the standard workup due to the patient's lack of financial resources did not "support the removal of a lung and a 10 rib thoracoplasty, which would have been contraindicated had there been appropriate workup and staging." [*Id.,* SJHRG4057]. Further Judge Brett found that the patient's symptoms of hoarseness and an obvious mass indicated tumor presence on the laryngeal nerve which should be treated by oncology therapy rather than surgery. [*Id.*]

Judge Brett concluded that the more convincing thoracic surgical specialty evidence at the hearing was that neither the pneumonectomy nor the full ten rib thoracoplasty was necessary as appropriate treatment for Patient P's small cell carcinoma with obvious postoperative residual tumor and that oncology therapies, chemotherapy and radiation were appropriate instead of surgery. [*Id.,* SJHRG4058]. This gross lack of judgment led Cohlmia to remove a patient's lung although the removal would not benefit the patient. Once Cohlmia removed the lung, the presence of the tumor that he failed to detect created a new danger for the patient. Cohlmia attempted to cure this error by removing ten ribs and collapsing the patient's chest wall, leaving him deformed. [*Id.,* SJHRG4055, 4058].

Based on the findings regarding Cohlmia's gross lack of medical judgment and the gravity of the resulting surgeries and outcomes, Judge Brett concluded that St. John was "justified for medical reasons in summarily suspending Dr. Cohlmia's medical and surgical privileges pursuant to Article 7.3 and 7.3-1 of the SJMC bylaws 'to protect the life of any patient(s) or to reduce the substantial likelihood of immediate injury or damage to the health or safety of any patient.'" [*Id.,* SJHRG40598-40599].

On September 11, 2003, St. John's Medical Executive Committee ("MEC") reviewed the

Report, Recommendation and Judgment by Judge Brett and voted, 13-2, to uphold the suspension of Cohlmia's privileges. [Dkt. #364-5, Ex. 21, Minutes].

On November 17, 2003, the St. John Board of Directors reviewed the facts relating to Cohlmia's suspension, including a formal memorandum in opposition to suspension that Cohlmia had prepared and submitted to the Board. The Board of Directors voted unanimously to affirm the summary suspension of Cohlmia, ratify the actions taken by officers of the hospital and Medical Staff and accept and approve the Judgment of Judge Brett. [Dkt. #365-5, Ex. 22].

None of the three cardiovascular/cardiothoracic surgeons on the staff at St. John who could be considered direct competitors of Cohlmia participated in the fact gathering, hearing process, MEC decision or Board decision with respect to Cohlmia's privileges. [Dkt. #364-1, Ex. 4; Dkt. #364-2, Ex. 8; Dkt. #364-5, Exs. 21, 22].

## Cohlmia's Relationship with HMC

In January 2003, HMC retained an expert to conduct a departmental review of its cardiology unit. [Dkt. #376, Ex. 12, 12/20/02 Letter from Landgarten to Elkins]. The expert conducted the review and, at its conclusion, issued a report critical of certain aspects of the program, including patient selection. [Dkt. #376, Ex. 13, 1/28/03 Letter from Elkins to Landgarten]. The report prompted HMC to institute a moratorium on certain high-risk cardiovascular surgical procedures—a restriction that applied to all physicians within the department. [Dkt. #376, Ex. 14, Landgarten Dep. at 87-88]. Once the moratorium was instituted at HMC, Cohlmia shifted a significant percentage of his practice to St. John. [Dkt. #376, Ex. 1, Cohlmia Dep. at 205].

On July 18, 2003, upon learning of Cohlmia's summary suspension at St. John, HMC required Cohlmia to conduct and document a comprehensive preoperative patient evaluation and

review at its facility. [Dkt. #376, Ex. 25, 7/18/03 Letter From Marc Milsten to Cohlmia].

Cohlmia continued to operate at Hillcrest from July 2003 until May 2006. [Dkt. #326, Ex. 1,

Cohlmia Dep. at 212].

On March 30, 2004, Cohlmia submitted his application for reappointment to HMC's

medical staff. [Dkt. #376, Ex. 26, Uniform Credentialing Application]. In the course of

reviewing Cohlmia's application, HMC initiated both internal and external reviews of certain

cases performed by Cohlmia. [Dkt. #376, Ex. 27, 10/21/04 Letter from Landgarten to Cohlmia].

Based on these reviews, the HMC's Medical Executive Committee ("MEC") recommended that

Cohlmia's application be denied. [*Id.*]. Cohlmia requested and was granted a hearing. At the

conclusion of the three-day hearing, the Fair Hearing Committee issued a Report and

Recommendation in which it found that some of Cohlmia's cases were substandard, but

recommended that such deficiencies be addressed with additional training and continuing

oversight. [Dkt. #376, Ex. 28]. Both Cohlmia and HMC's MEC appealed this determination.

[Dkt. #376, Ex. 29]. Throughout the review process, Cohlmia continued to practice at HMC. On

March 10, 2006, the Appellate Review Body recommended that Cohlmia's application for

reappointment be denied. [Dkt. #376, Ex. 30]. On April 28, 2006, HMC's Board of Trustees

made a final determination to deny Cohlmia's application for reappointment, and Cohlmia was

notified of the decision by letter dated May 1, 2006. [Dkt. #376, Ex. 32].

In early 2004, Cohlmia did not apply for re-credentialing at Saint Francis Hospital, and in

early 2006, he withdrew his application for re-credentialing at Southcrest Hospital. [Dkt. #376,

Ex. 1, Cohlmia Dep. at 427].

**Cohlmia's Efforts to Start HVHT**

As of 2009, when St. John's summary judgment motions were decided, eight acute care hospitals in Tulsa offered inpatient acute care services ("City of Tulsa hospitals"). Collectively, these hospitals had 2,134 staffed beds and an occupancy rate of 65%. Of these eight, five (Hillcrest, Saint Francis, St. John, Southcrest and OSU Medical Center) offered cardiovascular surgery services. Until 2007, Saint Francis also operated a stand-alone heart hospital which it owned jointly with physician investors. [Dkt. #376, Defendants' Statement of Material Facts, ¶21; Dkt. #422, Plaintiff's Response, ¶21].

Hospitals derive a substantial amount of revenue from cardiovascular service lines, which have higher profit margins than many services. [Dkt. #376, Defendants' Statement of Material Facts,, ¶22; Dkt. #422, Plaintiff's Response, ¶22].

Plaintiffs' and defendants' economic experts agree the relevant geographic market for hospital services includes a substantial portion of northeastern Oklahoma, including Tulsa and Cherokee Counties, where Cohlmia maintains an office and practices surgery. [Dkt. #376, Ex. 49].

According to the geographic market as defined by plaintiffs' economist expert, Hillcrest and St. John have a market share of 13% and 19.3% respectively. [Dkt. #376, Defendants' Statement of Material Facts, ¶24; Dkt. #422, Plaintiffs' Response, ¶24. Cohlmia, as of 2009, practiced surgery at TCH (Tahlequah City Hospital), which is a convenient locale for many of his Native American patients. [Dkt, #376, Defendants' Statement of Material Facts, ¶25; Dkt. #422, Plaintiffs' Response, ¶25].

Cohlmia testified that he considers cardiovascular surgeons, interventionalists, interventional radiologists, cardiologist, and in some instance, general surgeons, to be his

competitors. Cohlmia also stated that he competes with those cardiovascular and thoracic surgeons in Tulsa, Fort Smith, Joplin and to a lesser extent, Oklahoma City, and with vascular surgeons and interventional radiologists in a multistate area, including Tulsa, Fort Smith and Joplin. [Dkt. #376, Ex. 1, Cohlmia Dep. at 34-37].

Patient origin data confirm a regional market for the surgical services that Cohlmia provides, which includes the vast majority of Tulsa County, most of Creek, Mayes, Okmulgee, Rogers and Wagoner Counties, and sizeable portions of 12 other counties (including Cherokee County, where Tahlequah City Hospital is located and where Cohlmia currently practices. [Dkt. #376, Ex. 2, McCarthy Report, ¶42].

Cohlmia testified he competes with Tulsa physicians in all categories of services he provides. [Dkt. #376, Ex. 1, Cohlmia Dep., 33-37].

As of 2009, there were eight cardiovascular surgery physician groups in Tulsa, with a total of 16 surgeons. The groups range in size from one to three surgeons. Surgery groups in Tulsa have a history of joining together, then breaking apart. [Dkt. #376, Ex. 2, McCarthy Report, ¶27]. Approximately 14 new cardiovascular surgeons entered the northeastern Oklahoma market between 1994 and 2008. [*Id.,* McCarthy Report, ¶13].

In the spring of 2001, Cohlmia began to explore the possibility of developing a specialty heart hospital. To this end, he retained a consulting group, Technology Risk Management Group, Inc. ("TRMG"). Cohlmia, his consultants and his attorneys (the "Development Team"), initially explored an affiliation with HMC, but ultimately concluded an affiliation with HMC would be infeasible and shifted its focus to developing a physician-owned free-standing hospital, to be known as Heart and Vascular Hospital of Tulsa ("HVHT"). The Development Team hoped

to have HVHT in operation by January or February of 2004. [Dkt. #376, Defendants' Statement of Material Facts, ¶¶40-41; Dkt. #422, Plaintiffs' Response, ¶¶40-41].

Once the decision was made to pursue a free-standing heart hospital, CVH Investments, LLC, an entity owned by Dennis Cohlmia and Bryan Rayment, obtained an option on a parcel of real estate for its site. [Dkt. #376, Defendants' Statement of Material Facts, ¶42; Dkt. #422, Plaintiffs' Response, ¶42].

The establishment of HVHT depended on securing adequate financing from private investors or other sources. [Dkt. #376, Defendants' Statement of Material Facts, ¶43, Dkt. #422, Plaintiffs' Response, ¶43].

In August 2001, the Development Team met with cardiovascular surgeons in Tulsa to present their business plan and gauge their interest as potential investors. In September 2001, similar presentations were made to various cardiology groups in Tulsa, including the cardiology groups who practiced at SJMC and Hillcrest, as well as Springer Clinic. [Dkt. #376, Defendants' Statement of Material Facts, ¶44; Plaintiffs' Response, ¶44].

On February 14, 2002, Saint Francis announced its plans to open its own free-standing heart hospital, which would operate as a joint venture between Saint Francis and local cardiologists and cardiac surgeons and investors. Many of these physician investors had previously been solicited by the Development Team. [Dkt. #376, Ex. 1, Cohlmia Dep. at 45].

In April 2002, the Development Team distributed a Private Placement Memorandum ("PPM") setting out the business plan, pro forma financial projections, investment terms, etc. According to the PPM, HVHT needed capital contributions in the amount of $4.5 million to "commence business." The PPM also noted that HVHT would operate in the "Tulsa market," a geographic area encompassing 17 counties in Oklahoma, including Cherokee County. By the

terms of the PPM, investors seeking to purchase units of HVHT had until April 30, 2002, to submit a subscription. The PPG acknowledged that Saint Francis' heart hospital "will have significant competitive advantages over HVHT," including greater capital resources. [Dkt. #376, Defendants' Statement of Material Facts, ¶¶46-50; Dkt. #422, Plaintiffs' Response, ¶¶46-50].

In late April 2002, members of the Development Team met with cardiologists from Oklahoma Heart, Inc., to discuss the PPM and the possibility of investing in HVHT. [Dkt. #376, Ex. 1, Cohlmia Dep. at 320]. The meetings and presentations by the Development Team failed to enlist a single investor for HVHT. [Dkt. #376, Ex. 7, Ruffino Affid., ¶28]. On May 31, 2002, the PPM expired, with no subscriptions, and was never renewed. [Dkt. #376, Ex. 8, Riddle Dep. at 253]. By August 2002, a commercial dispute among members of TRMG had resulted in litigation brought by one member of TRMG against TRMG and other members. [Dkt. #376, Ex. 7, Ruffino Affid., ¶27]. By December 2002, Cohlmia had terminated his relationship with TRMG, thus ending efforts to develop HVHT in accordance with the business plan set forth in PPM. [Dkt. #376, Ex. 7, Ruffino Affid., ¶28]. Accordingly, HVHT never progressed beyond the preliminary planning stage.

Development Team members have given a variety of reasons why HVHT failed, none of which relate to defendants' conduct. First, prospective investors were not comfortable with the structure of HVHT and the degree of control Cohlmia would have; Cohlmia had a long history of ending business relationships in litigation, a fact that was widely known by the local medical community; therefore, potential physician investors were hesitant to invest in a venture that gave Cohlmia significant power. [Dkt. #376, Ex. 7, Ruffino Affid., ¶19]. Second, Saint Francis effectively beat the Development Team to the market, greatly reducing the field of potential physician investors and raising significant doubts that Tulsa could support multiple specialty

heart hospitals. [*Id.,* Ruffino Affid., ¶30(ii)].  Third, in-fighting among principals at TRMG (which resulted in litigation) further impaired the Development Team's efforts to move HVHT beyond an initial planning stage. [*Id.,* Ruffino Affid., ¶30(iii)].

Thus, by June of 2002, the HVHT project was essentially "dead." [Dkt. #376, Ronning Affidavit, Ex. 9, ¶21].

In May of 2003, Cohlmia met with cardiologists in Muskogee, cardiologists from Fort Smith and physicians from Wichita in a renewed attempt to secure investors for a heart hospital. He secured no investors. [*Id.,* Defendants' Statement, ¶60; Plaintiffs' Response, ¶60].

In June 2003, the contract for purchase of the proposed site for HVHT was terminated. [Dkt. #425, Ex. 28, 6/19/03 Letter from Jay Helm to Brian Rayment].

St. John suspended Cohlmia's privileges on July 7, 2003.

On December 8, 2003, then-President George W. Bush signed into law a statute prohibiting physicians from referring Medicare patients to new specialty hospitals, including heart hospitals, in which they had a financial interest.  The statute effectively imposed a moratorium on the development of new specialty heart hospitals that were not already "under development" as of November 18, 2003.  *See Medicare Prescription Drug Improvement and Modernization Act of 2003,* PL No. 108-173, §507, 42 U.S.C. §1395nn. [*Id.,* Defendants' Statement, ¶62].  In order for a specialty heart hospital to have been deemed "under development," and thus not subject to the moratorium, all of the following preconditions must have been met by 11/18/03: (1) architectural plans must have been completed; (2) funding must have been obtained; (3) zoning requirements must have been met and (4) necessary approvals from state agencies must have been received. [*Id.,* 42 U.S.C. §1395nn].  As of November 2003,

15

HVHT had no committed financing in place and the real estate option for the HVHT site had

lapsed. [*Id.,* Defendants' Statement, ¶63].


## IV. Procedural History of Lawsuit

Cohlmia filed suit against St. John and some 18 other defendants on July 7, 2005. [Dkt.

#2]. He filed a First Amended Complaint on September 2, 2005 [Dkt. #43]. In his 66-page First

Amended Complaint, Cohlmia asserted nine causes of action against St. John and other

defendants:

> Count I—Combination and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;
>
> Count II—Violation of Section 2 of the Sherman Act and Section 4 of the Clayton Act;
>
> Count III—Illegal boycott/concerted refusal to deal;
>
> Count IV—Violation of 79 Okla.Stat. § 202 *et seq.* (Oklahoma Antitrust Reform Act);
>
> Count V—Tortious interference with contract and prospective advantage;
>
> Count VI—Defamation—libel, libel per se, slander, slander per se;
>
> Count VII—Violation of 42 U.S.C. § 1981;
>
> Count VIII—Intentional infliction of emotional distress;
>
> Count IX—Injunctive relief (reinstating plaintiff to full privileged status of the medical staffs of St. John and Hillcrest Medical Center);

[Dkt. #43]. Defendants, including St. John, filed motions to dismiss Counts I-VIII. [Dkt. ##61-

64]. On August 2, 2006, United States District Judge James H. Payne entered a 30-page order

ruling on defendants' motions to dismiss. [Dkt. #83]. In Count I, Cohlmia asserted St. John

abused the peer review process in order to prevent Cohlmia's development of a specialty heart

hospital and to impede his existing practice. St. John, in its motion to dismiss, argued the ouster of one physician and the resulting harm to his practice did not equate to harm to competition, but merely harm to that competitor. The court acknowledged this, but concluded that "at this early stage of litigation … the Court finds that Plaintiffs have alleged sufficient facts to survive dismissal of the Section 1 (and corresponding state law) claim." [Dkt. # 83 at 12.]

With respect to Count II and the corresponding state law claim, the complaint alleged that by terminating his medical staff privileges, St. John "posed a dangerous likelihood of success" of obtaining monopoly power over the cardiovascular market. Judge Payne found that Cohlmia failed to support this conclusory allegation with any facts, and dismissed the claim without prejudice. [*Id.* at 14].

With respect to Count III, the boycott claim, the court found the alleged conduct of defendants did not constitute a per se violation of antitrust law. Applying the rule of reason test, the court ruled that Cohlmia had failed to allege facts showing some anticompetitive effect. [*Id.* at 17-18]. Therefore, Count III was dismissed with prejudice.

The court dismissed with prejudice Cohlmia's claim for defamation as to any statement made outside the statute of limitations, and dismissed without prejudice all other purported defamation as being insufficiently clear with respect to the relationships between the parties involved in the communications, the timing of the communications, and/or the statements deemed actionable. [*Id.* at 21].

Count VII alleged St. John's suspension of Cohlmia's privileges was motivated in part by an unlawful desire to deprive Native American patients of cardiothoracic surgical services at St. John by eliminating Cohlmia as their preferred physician. Cohlmia asserted that St. John's actions were motivated by a concern that his uninsured native American patients were costing

the hospital money. He alleged Native Americans were unlawfully discriminated against and were part of a protected class and he asserted he was their *de facto* representative and advocate of their right to quality health care. [*Id.* at 21-22]. Judge Payne found these allegations to be "largely unsupported, if not nonsensical," and dismissed the claim without prejudice. [*Id.* at 22, 24].

Judge Payne dismissed with prejudice Cohlmia's IIED claim (Count VIII) for failure to allege facts sufficient to support the elements of such a claim. [*Id.* at 24-25].

Judge Payne also determined the peer review privilege was not applicable in the action, and that discovery could proceed unfettered. [*Id.* at 29]. He gave Cohlmia leave to file an amended complaint addressing deficiencies the court had identified in its order. [*Id.* at 29-30].

On October 10, 2006, Cohlmia filed a 76-page Second Amended Complaint, alleging additional facts supporting his previously pled complaints. [Dkt. #90]. Although Judge Payne had dismissed several of the claims with prejudice, Cohlmia continued to plead those claims.

On November 9, 2006, St. John filed its second Motion to Dismiss. [Dkt. #103]. On March 20, 2007, the case was reassigned to the undersigned judge. [Dkt. #119]. On May 31, 2007, this court conducted a hearing on the motion. [Dkt. #121]. During the hearing, the court questioned counsel for Cohlmia about why Cohlmia had reasserted claims Judge Payne had dismissed with prejudice. Counsel contended the claims had been reasserted in order to preserve them for appeal, but agreed to withdraw Count III with respect to St. John. [Dkt. #125 at 10-15]. The court found the antitrust claims should be addressed on summary adjudication, but expressed concern about the viability of the claims, stating that, based on the number of hospitals in Tulsa, plaintiffs faced "serious hurdles" to survive summary judgment. [*Id.* at 11].

The court granted St. John's motion with respect to Count III (illegal boycott) and Count VI (defamation), found the motion to dismiss Count VIII (IIED) was moot because Judge Payne had already dismissed it with prejudice, and denied the motion with respect to Count VII (§ 1981 claim). [*Id.* at 15, 18, 21]. The court directed, however, that discovery on the Section 1981 claim be limited to the issue of whether St. John shut its door on Native Americans. [*Id.* at 29]. After more than a year-and-a-half in which to conduct such discovery, plaintiffs dismissed their Section 1981 claim on January 22, 2009. [Dkt. #334].

On May 31, 2007, the court also entered a scheduling order, setting discovery cutoff for July 15, 2008, and a trial date of March 16, 2009. [Dkt. #122]. On July 16, 2007, St. John filed an answer asserting the affirmative defense of immunity under the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. § 11111(a)(1). [Dkt. #130 at 20]. On March 27, 2008, the court granted plaintiffs' motion for an extension of scheduling order deadlines, setting discovery cutoff for September 15, 2008, and trial for May 18, 2009. [Dkt. #154-1]. By March 2008, defendants had produced over 30,000 documents, and by August 2008, over 150,000, but Cohlmia—complaining that defendants had "stonewall[ed]" him "on the most critical information in this case"—filed opposed motions to extend the discovery deadline yet again. [Dkt. #205 at 6; Dkt. #246]. The court entered a second amended scheduling order extending discovery to February 19, 2009, and setting a new trial date of October 19, 2009. [Dkt. #301].

On August 22, 2008, the reports offered by three of Cohlmia's expert witnesses were stricken by Magistrate Judge Paul J. Cleary for failure to comply with Rule 26(a)(2). Magistrate Judge Cleary concluded that the reports contained the experts' opinions but failed to state the basis or reasons for the opinions. [Dkt. #210 at 5, 14]. The Magistrate Judge denied Cohlmia's

request to allow up to 30 days before trial to cure the deficiencies, stating, "A party cannot offer a mere litany of opinions, devoid of rationale, and contend that the report will be 'supplemented' later with the basis and reasons." [*Id.* at 11]. He also denied Cohlmia's alternative request for 20 days to supplement the reports, pointing out the case had been on file for three years and further extensions would increase the cost of litigation for all parties. [*Id.* at 12]. This court denied Cohlmia's appeal of the Magistrate Judge's order. [Dkt. #262].

St. John filed its first motion for summary judgment on November 7, 2008. [Dkt. #279]. At the conclusion of a hearing on February 12, 2009, the court granted St. John's motion for summary judgment as to Count VII (tortious interference with contract). [Dkt. #340]. In so ruling, the court noted Cohlmia had failed to properly support his assertion of disputed material facts as required by Fed.R.Civ.P. 54(f), and declined to grant the oral request of plaintiff's attorney for additional time to present such facts. [Dkt. #341 at 44]. Rejecting Cohlmia's argument that damages should be presumed, it found Cohlmia had failed to present evidence of damage proximately caused by St. John's suspension of his privileges. [*Id.* at 44-45]. Cohlmia filed a motion to reconsider, and the motion was denied. [Dkt. ##347, 401].

On April 3, 2009, St. John filed a motion for summary judgment on plaintiff's federal and state antitrust claims for restraint of trade and market monopoly. [Dkt. #363]. St. John argued it was entitled to immunity from these claims under HCQIA because its peer review process complied with the four objective standards in 42 U.S.C. § 11112(a). [*Id.*].

On April 7, 2009, all defendants, including St. John, filed a joint motion for summary judgment addressing the merits of plaintiff's federal and state antitrust claims as set forth in Counts I, II, III and IV of the Second Amended Complaint. [Dkt. #376].

With respect to its HCQIA immunity motion, St. John focused on: (1) the deposition testimony of physicians and surgeons and excerpts from transcripts of the peer review process showing that Cohlmia's pre-surgical protocol departed from the proper standards of care; (2) St. John suspended Cohlmia to protect the safety of patients; and (3) St. John's peer review process complied with the requirements of HCQIA. [Dkt. #451 at 15-41, 70-74]. Cohlmia focused on: (1) a June 26, 2003 memo from Dr. Allred; (2) a comparison of Cohlmia's Quality Assurance scores with other surgeons; (3) The Tenth Circuit's holding in *Brown v. Presbyterian Healthcare Services,* 101 F.3d 1324 (10th Cir. 1996); (4) the timing of Cohlmia's interest in a specialty heart hospital and St. John's termination of his privileges; (5) plaintiffs' expert opinion that St. John's peer review process was "unwarranted, unfair, unreasonable, incomplete, misleading, inaccurate" and involved false testimony; (6) a St. John official notifying a Hillcrest official that Cohlmia's privileges at St. John were summarily suspended; (7) the availability of less severe options to address Cohlmia's pre-surgical protocol; and (8) Cohlmia's performance of 34 unchallenged surgeries following the two surgeries at issue. [Dkt. #451 at 42-69].

With respect to the antitrust claims, St. John argued (1) plaintiffs did not have standing; (2) the Section 1 claims failed for lack of a showing of concerted action and market power; and (3) the Section 2 claims failed for lack of showing that St. John posed a "dangerous probability" of achieving market power. [*Id.* at 70-95; 110-119]. Cohlmia argued St. John's actions had the following anticompetitive effects: (1) the "diminution of quality" of a patient's choice of surgeons and denial of services to Native Americans; (2) the "retardation of innovation" as specialty heart hospitals are more productive and provide better care; and (3) St. John's sham peer review process. [*Id.* at 95-110].

At the conclusion of the hearing, the court granted both motions for summary judgment. The court found that with respect to the HCQIA immunity defense plaintiffs had failed to rebut the presumption of immunity by a preponderance of the evidence. [*Id.* at 125]. The court distinguished the facts of this case from *Brown,* noting that in *Brown,* the evidence of ulterior motive was direct: an economic competitor had instigated the review, made false statements about the plaintiff to the National Practitioner Database, and testified against her in peer review proceedings. [*Id.*]. In this case, in contrast, the evidence of ulterior motive was inferential. [*Id.*]. With respect to the antitrust claims, the court concluded plaintiffs had presented no evidence of antitrust injury, no evidence of injury in fact to Cohlmia, and no causal connection between the failure of Cohlmia's heart hospital project and St. John's termination of his privileges. [*Id.* at 122]. As to the alleged concerted action, the court found Cohlmia had failed to show a contract or conspiracy between separate entities, and concluded that Section 1 of the Sherman Act does not reach conduct which is wholly unilateral. [*Id.* at 123]. Further, the court found Cohlmia had presented "no evidence of actual anti-competitive effects" attributable to St. John's conduct. [*Id.* at 124].

With respect to possession of market power, the court held that St. John's 19.3 percent market share was not sufficient to confer market power. [*Id.*]. As to Section 2 of the Sherman Act, the court found Cohlmia had presented no evidence that St. John had the power to control prices of any market in which it competed. [*Id.* at 125].

Regarding the Oklahoma Antitrust Act, the court applied the mandatory provision of the state act that it shall be construed consistent with the federal act. [*Id.*]. The court held that the essential facilities doctrine of state law was inapplicable because of the number of facilities in

the Tulsa market area at the relevant time. [*Id.*]. The court granted St. John's motion for summary judgment on the antitrust claims. [*Id.*].

On September 7, 2012, the Tenth Circuit affirmed the district court's grant of summary judgment on all claims of Cohlmia. [Dkt. #543]. In so ruling, the appellate court concluded that with respect to the HCQIA issue, Cohlmia had not rebutted the presumption that a professional review action is presumed to have met standards for HCQIA immunity. [*Id.* at 15]. Concerning the federal antitrust claims, the circuit court agreed that Cohlmia had presented no evidence his loss of privileges resulted in antitrust injury; that Cohlmia had not demonstrated St. John had sufficient market power to control prices or exclude competition; and that Cohlmia had failed to produce evidence of conspiracy. [*Id.* at 22, 26]. With respect to the state antitrust claims, the Tenth Circuit concurred with the district court's finding that Cohlmia had provided no evidence that St. John violated state antitrust law or specifically, the "essential facility doctrine." [*Id.* at 28]. It affirmed the court's grant of summary judgment on Cohlmia's claims for tortious interference with contracts and intentional interference with prospective economic advantage. [*Id.* at 32, 34]. The appellate court rejected Cohlmia's argument that the district court erred in denying his request to submit an expert report detailing his damage, concluding "[i]t was not an abuse of discretion for the district court to reject Dr. Cohlmia's filing based on his failure to comply with Rule 56(f). [*Id.* at 31]. Similarly, it rejected Cohlmia's argument that the district court erred in overruling his motions to supplement the record because he had failed to comply with required procedures for submission. [*Id.* at 34-35]. Finally, it affirmed the district court's award of costs to St. John. [*Id.* at 35-37].

**V. Law Applicable to Attorney Fee Claim**

Congress enacted HCQIA to improve the quality of medical care by promoting effective professional peer review. 42 U.S.C. § 11101(1), (3). The law protects participants in peer review activities from liability for damages stemming from a review, so long as the review satisfies standards set out in 42 U.S.C. § 11112. HCQIA provides that a prevailing defendant is entitled to recover attorney fees as follows:

> In any suit brought against a defendant, to the extent that a defendant has met the standards set forth under section 11112(a) of this title and the defendant substantially prevails, the court shall, at the conclusion of the action, award to a substantially prevailing party defending against such claim the cost of the suit attributable to such claim, including a reasonable attorney's fee, if the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith. For the purposes of this section, a defendant shall not be considered to have substantially prevailed when the plaintiff obtains an award for damages or permanent injunctive or declaratory relief.

42 U.S.C. § 11113. Prevailing defendants are entitled to an award of attorney fees in defending against an unsuccessful challenge to their HCQIA immunity if: (1) they are among the persons covered by § 11111; (2) the standards set forth in § 11112(a) were followed; (3) they substantially prevailed; and (4) the plaintiff's conduct during the litigation was frivolous, unreasonable, without foundation or in bad faith. *Meyers v. Columbia/HCA Healthcare Corp.,* 341 F.3d 461, 472-73 (6th Cir. 2003). *See also, Addis v. Holy Cross Health System Corp.,* 88 F.3d 482, 486 (7th Cir. 1996) (finding the text of § 11113 contemplates an award of fees if, in addition to other factors, a plaintiff's claims are frivolous or otherwise without merit); *Benjamin v. Aroostook Medical Center,* 937 F.Supp. 957 (D. Maine 1996) (HCQUI allows for attorney fees "if either the plaintiff's claim or actions were 'frivolous, unreasonable, without foundation, or in bad faith'"). The award of attorney fees under § 11113 is a discretionary matter for the district court to determine. *Addis,* 88 F.3d at 486-87. Likewise, whether a party's conduct is

frivolous or without foundation is a question committed to the sound discretion of the district court. *Johnson v. Nyack Hospital,* 964 F.2d 116, 123 (2d Cir. 1992).

Clearly, the first three requirements for an award of attorney fees have been satisfied. The St. John defendants are among the persons covered by § 11111. The court, in granting St. John's motion for summary judgment as to HCQIA immunity, determined St. John had complied with the requirements of § 11112(a) and had "substantially prevailed" on Cohlmia's claims. The remaining issue for determination is whether Cohlmia's litigation conduct in pursuing those claims was frivolous, unreasonable, without foundation or in bad faith.[2]

## VI. Analysis

### A. Whether St. John is Entitled to Attorney Fees

As a threshold matter, Cohlmia argues St. John's entitlement to attorney fees must be evaluated based on the reasonableness of his challenge to St. John's affirmative defense of immunity rather than on the reasonableness of his assertion of the claims themselves.[3] The plain language of the statute contradicts this position. Section 11113 refers to "a substantially prevailing party defending against such *claim*" and provides that party will be entitled to recover for "the cost of the suit attributable to such *claim*." 42 U.S.C. § 11113 (emphasis added). Further, as the court in *Addis* stated:

> Congress passed the Health Care Act . . . to "provide incentive and protection for physicians engaging in effective professional peer review. 42 U.S.C. § 11101(5). These incentives were designed to encourage doctors to engage in meaningful

---

[2] Citing antitrust decisions, Cohlmia argues attorney fees cannot be awarded to defendants in private antitrust litigation. [Dkt. #539 at 19]. St. John correctly notes that while this proposition may be generally true, it is inapplicable in cases involving a fee statute such as 42 U.S.C. § 11113.

[3] The Magistrate Judge held that St. John's entitlement to attorney fees was not predicated on whether Cohlmia's challenge to its immunity defense was without foundation, but instead on whether Cohlmia's claims or his litigation conduct in pursuing those claims were frivolous, unreasonable, without foundation or in bad faith. [Dkt. #536 at19]. St. John asserts § 11113 permits recovery of attorney fees on either basis. [Dkt. #542 at 7, n. 2]. In *Smith v. Ricks,* the court, in granting the defendant hospital's motion for attorney fees, found that both the immunity challenge and the underlying antitrust claims were without foundation and/or frivolous. 31 F.3d 1478, 1487-88 (9th Cir. 1994).

> peer review in light of the Health Care Act's imposition of intensified reporting requirements. It was Congress's hope that doctors would comply with the reporting requirements installed by the Health Care Act and thereby decrease the number of occurrences of medical malpractice.
>
> Important elements of this package of incentives were the creation of statutory immunity for those persons and entities engaged in qualified professional peer review, 42 U.S.C. §§ 1111(a), 11112(a), and a fee-shifting provision designed to deter plaintiffs from filing meritless lawsuits against those persons and entities. 42 U.S.C. § 11113. Thus, "[d]octors and hospitals who have acted in accordance with the reasonable belief, due process, and other requirements of the bill are protected from damages sought by a disciplined doctor." H.R.Rep. No. 99-903, 99th Cong., 2d Sess., at 3 (1986), *reprinted in* 1986 U.S.C.C. A.N. 6384, 6385.

88 F.3d at 485. Similarly, in *Smith v. Ricks,* the Ninth Circuit stated, "The policy behind [42 U.S.C. § 11113] is clear: Congress wanted to encourage professional peer review by limiting the threat of unreasonable litigation expenses." 31 F.3d at 1487.

In this case, both Cohlmia's challenge to HCQIA immunity and his underlying substantive claims warrant an award of attorney fees to St. John. The court concludes that Cohlmia's claims were—at best—unreasonable and without foundation and—at worst—frivolous and asserted in bad faith. The court finds the defamation and IIED claims, which were disposed of at the motion to dismiss stage, were frivolous when pled. The Section 1981 claim, pursuant to which Cohlmia accused St. John of attempting to "deprive Native Americans of quality health care," survived St. John's motion to dismiss, but after more than a year and one half of discovery, was voluntarily dismissed by plaintiffs. Although the antitrust claims also survived the motion to dismiss, the court early on expressed skepticism of their viability based on the number of hospitals in the Tulsa area. On February 17, 2009, the court granted St. John's motion for summary judgment on the tortious interference with contract claim. Finally, on July 31, 2009, after four years of discovery and motion practice, the court granted St. John summary judgment on the remaining claims, concluding not only that Cohlmia had failed to rebut the

presumption of HCQIA immunity, but that he had failed to present evidence supporting the elements of his substantive claims for antitrust violations.

As support for his argument that his claims were reasonable, Cohlmia points to the fact that only St. John prevailed on the merits of his claims; the remaining defendants settled with him. The court rejects this argument. Cohlmia's claims against the St. John defendants were based primarily on the hospital's suspension of his privileges. His claims against the remaining defendants were based on his altercations with Hillcrest Medical Center and Oklahoma Heart Institute. Additionally, as Magistrate Judge Wilson noted in his Report and Recommendation, "[c]ases, even those with no merit, settle for many reasons, including a desire to minimize legal fees and expenses." [Dkt. #536 at 6, n. 10].

Recounting the volume of evidence he submitted in opposition to St. John's motions for summary judgment, Cohmlia argues his claims were reasonable.[4] Again, the court disagrees. While plaintiffs indeed introduced a massive quantity of evidentiary materials, the court determined they had failed to controvert a single material issue of fact and St. John was entitled to summary judgment, based on both its immunity defense and on the merits of the antitrust claims. Plaintiffs also suggests the length of the summary judgment hearing supports a conclusion that their claims were reasonable. [*Id.*]. Similarly, they note that at the conclusion of the hearing, the court remarked that the "advocacy on both sides here has been extraordinarily good." [*Id.* at 14, referencing Dkt. #539, Ex. F, 7/31/09 Tr. at 119-20]. The court rejects these arguments, as neither the length of the hearing, nor the advocacy skills of counsel supports a conclusion the claims were reasonable. Plaintiffs asserted and aggressively pursued nine claims

---

[4]During argument before the Magistrate Judge, counsel for plaintiffs stated that, in response to St. John's summary judgment motion, they had submitted a "plethora of evidence," including 85 alleged "material disputed facts" and 71 exhibits. [Dkt. #539, Ex. D, 6/3/11 Hearing Tr. at 3, 7].

against St. John. St. John was forced to engage in four years of intensive, time-consuming and costly discovery and motion practice before prevailing on the merits on all claims. As detailed in Section IV above, the court repeatedly dismissed the IIED, boycott and defamation claims; granted summary judgment on the tortious breach of contract claim; and ultimately granted summary judgment on the antitrust claims, finding both that St. John had immunity under § 11113 *and* that Cohlmia failed to present evidence supporting the elements of such claims. The court's rulings were affirmed on appeal.

Plaintiffs cite a number of cases in which defendants successfully asserted HCQIA immunity defenses, but were denied attorney fees: *Muzquiz v. W.A. Foote Memorial Hospital, Inc.,* 70 F.3d 422 (6th Cir. 1995); *Benjamin,* 937 F.Supp. at 963; *Meyers v. Columbia/HCA Healthcare Corp.,* 341 F.3d 461 (6th Cir. 2003), *Stratienko v. Chattanooga-Hamilton County Hosp. Authority,* 2009 WL 1471453, *2, *4 (E.D. Tenn. 2009); and *Johnson v. Nyack Hosp.,* 964 F.2d 116 (2d Cir. 1992).[5]

---

[5] In *Muzquiz,* the appellate court upheld the district court's determination that the prevailing defendant hospital was not entitled to recover attorney fees because plaintiff's claims were not without foundation. The court found, based on statements made to the doctor, protracted processing of his application for privileges in contrast to the processing of the applications of other doctors who applied at the same time, and the fact that he was the oldest applicant and the only applicant of Mexican heritage, plaintiff had "a legitimate factual basis" for asserting his claims. *Id.* at 432-33. In *Muzquiz,* plaintiff's claims of Title VII discrimination and state civil rights violations actually proceeded to trial. In contrast, Cohlmia's claims were disposed of, at the latest, on summary judgment.

In *Benjamin,* a physician, acting pro se, asserted antitrust, Title VII and abuse of process claims against a hospital and staff members who served on its peer review committee. 937 F.Supp. at 963. The court granted defendants' motion for summary judgment on the basis of HCQIA immunity and state law immunity, and additionally found plaintiff had failed to establish the substantive elements of his claims. *Id.* at 968-975. However, the court declined to award attorney fees to defendants, The court did not elaborate on its rationale, other than to note plaintiff's claims were "not wholly without merit." *Id.* at 975.

In *Meyers*, a physician sued a hospital that denied him staff privileges, alleging, *inter alia,* breach of contract, antitrust violations, and state tort claims. The federal district judge granted defendants' motion for summary judgment based on HCQIA immunity but denied their motion for attorney fees, concluding that plaintiff "had valid questions concerning the manner in which the [] Defendants conducted the professional review." *Id.* at 473. In *Meyers*, the initial review committee was composed of the plaintiff physician's competitors, the review process took more than two years and there was evidence the hospital did not comply with its bylaws. *Id.* at 463-65. The court also observed that the district court never reached the question of whether plaintiffs had sufficient evidence to reach a jury on their claims. *Id.* at 473.

As the court in *Meyers* noted, "[w]hether a party's claim or conduct is frivolous, unreasonable, without foundation, or in bad faith is a question committed to the sound discretion of the district court." 341 F.3d at 473. This court, having shepherded this case through most of its long life, concludes the facts here are distinguishable from the cases relied upon by Cohlmia, and warrant an award of attorney fees.

In this case, St. John engaged in a thorough, open and professional peer review in compliance with its bylaws. Cohlmia was represented by counsel and the proceeding was held before a retired federal district judge, who issued a detailed written opinion which was reviewed and approved by St. John's Executive Committee and Board of Trustees. From the outset, Cohlmia's conduct was unreasonable. In commencing this action, he alleged that peer review process was a sham and conducted in bad faith, was an attempt to "run him out of town" and to "deprive Native Americans of quality health care." He ignored indicators that the case against St. John lacked substance and engaged in extensive, costly discovery. He unreasonably failed to file expert reports that conformed to the Federal Rules of Civil Procedure, and then sought leave to fix those reports.

At the hearing before the Magistrate Judge, Cohlmia argued his claims were not unreasonable or frivolous because the peer review process was tainted with irregularities. Specifically, he complained that no cardiovascular surgeon was asked to review the two

---

In *Stratienko,* a physician challenged a 30-day summary suspension that occurred an hour and a half after a competitor physician reported an altercation in the doctor's lounge. The court dismissed plaintiff's non-antitrust claims and granted summary judgment in favor of defendants on his federal antitrust claims and federal and state constitutional claims based on HCIQ immunity. Relying in part on *Meyers,* however, it denied defendants' motion for attorney fees.

In *Johnson,* the district court granted summary judgment against the plaintiff physician on his antitrust and interference with economic advantage claims against a hospital that revoked his privileges because plaintiff failed to comply with a state law requiring him to file a complaint with the state public health council prior to seeking redress in court. However, the court denied defendants' request for attorney fees, finding plaintiff's mistake did not warrant an award of attorney fees. The appellate court affirmed the decision. 964 F.2d at 123-124.

surgeries at issue.  As the Magistrate Judge pointed out in his Report and Recommendation, in *Brown*—the case principally relied on by plaintiff in arguing the merits of his claim—the Tenth Circuit criticized the fact that a competitor of Dr. Brown testified against her.  Here, the use of a cardiovascular surgeon likely would have involved a direct competitor of Cohlmia.

The court concurs with the Magistrate Judge's finding that Cohlmia's claims were "unreasonable and without foundation at the onset of the case, as discovery developed, and ultimately through granting of judgment on the merits four years later."  [Dkt. #458 at 25].  As a result, St. John is entitled to recover attorney fees under the HCQIA, 42 U.S.C. § 11113.

### B. Reasonableness of Fees Sought

Cohlmia also challenges the reasonableness of the amount of the recommended fee award.  First, he asserts the Magistrate Judge should have apportioned the fee award among specific claims made by Cohlmia, and no attorney fee should have been awarded for claims dismissed early and/or by stipulation of the parties.  Cohlmia cites no authority for this proposition.

Additionally, he complains that the Report and Recommendation did not comport with earlier views the Magistrate Judge expressed in an October 13, 2010, telephonic hearing.  This objection is meritless.  In the October 2010 hearing, the judge simply conveyed a preliminary opinion regarding the attorney fee issue, and heard argument from the parties.  Subsequently, the Magistrate Judge gave St. John an opportunity to supplement its attorney fee motion, allowed Cohlmia to respond to the supplemental motion, and conducted additional hearings on the motion on April 28, 2011, and May 24, 2011.  [Dkt. ##518, 529, 531, 533].  Cohlmia's claim that the Magistrate Judge's considerations were "unfair" and "unjust" is groundless.

The court, having reviewed the amount of the fee award, concurs with the Magistrate Judge's recommendations as to reductions and the total fee.

### VII. Conclusion

For the foregoing reasons, the Report and Recommendation of the Magistrate Judge [Dkt. #536] is accepted and St. John's Motion for Attorney Fees [Dkt. #458] is granted in the amount of $732,558.00.

ENTERED this 26th day of October, 2012.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA